MAY 2 4 2016
U.S.C.A. 3rd. CIR

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

**Case Number:**     **15-4045**

**Case Name:**     **Steven Durst, et al. v. Matthew Durst, et al.**

## INFORMAL BRIEF

1.     **Jurisdiction:**  What order(s) of the district court or agency are you appealing?

What is the date of the order(s)?

We are appealing the following Orders:

| | | |
|---|---|---|
| a. | August 5, 2013 | Judge Simandle |
| b. | October 15, 2015 | Judge Simandle |
| c. | November 30, 2015 | Judge Simandle |
| d. | January 13, 2015 | Judge Simandle |
| e. | January 14, 2014 | Judge Donio |

When did you file your notice of appeal or petition for review?

My Notice of Appeal is dated December 15, 2015.

2.     **Statement of the case:**     Explain the proceedings in the district court or before the agency (i.e. what the district court or the agency did in deciding your case).

Plaintiffs, Steven Durst ("Steve") and Reuben Durst ("Mike") sought relief against Defendants for, among other things:

(a)     Against Defendant Matthew Durst for: (i) Breach of fiduciary duty in settling the State Action without the approval of Co-Trustee, Plaintiff Mike; (ii) Misappropriating $22,000.00 for his own benefit; (iii) Breaching fiduciary duty in favoring his own child (a secondary beneficiary) over the primary beneficiaries (Steve's children) and (iv) exceeding the scope of his authority as Trustee.

(b)     Against Defendant John Yacovelle, Esquire for willful misconduct, breach of fiduciary duty and malpractice for failing to abide by the terms of the Trust and failing to consult the Co-Trustee in the settlement of the State Action.

(c)     Against Defendant Kelley Peck, Esquire for willful misconduct, breach of fiduciary duty and malpractice for among other things: (i) Failing to protect her client

regarding Section 7.04; (ii) Misappropriating $30,000.00; and (iii) Misrepresenting her role in the appraisal process.

   (d)     Against Defendant The law firm of Halloran & Sage for breach of fiduciary duty and malpractice as the employer of Defendant Kelley Peck, Esquire.

   (e)     Against Defendant law firm of Defendant Robinson & Cole for willful misconduct, breach of fiduciary duty and malpractice as the employer of Defendant Kelley Peck, Esquire.

   (f)     Against Appraiser Defendant Parker Benjamin for willful misconduct, malpractice for failing to account for the adverse effects of Section 7.04 in preparing an appraisal of the Millville Asset.

   The Court below entered summary judgment in favor of all Defendants and dismissed all of Plaintiff's claims.

**3.    Statement of facts:**  Explain the facts and events that led to the complaint in the district court or the action before the agency.

Prior to November 29, 2004, Plaintiff Steven Durst ("Steve") was employed by Goodman Properties ("Goodman"), a commercial real estate development firm.  As part of his compensation at Goodman, Steve received an interest in real estate developments such as shopping centers.  Steve received his interest in said income producing properties by way of a percentage interest in a limited liability company.

During his employment with Goodman, Steve accumulated in excess of Two Million Dollars in cash and assets.

By trust instrument dated November 29, 2004, Plaintiff Steve as Grantor/Settlor, formed the (revocable) Jake Ball Trust (the "Trust").  He named his brothers Plaintiff Reuben Durst ("Mike") and Defendant Matthew Durst ("Matt") as Co-Trustees.  Pursuant to the specific terms of the Trust documents all decisions regarding the Trust required the consent and approval of both Trustees.  Neither was permitted to act unilaterally.  (Exhibit "1", Paragraph 3, Lines 4-5).

Sometime thereafter, Defendant Matt consulted with a trust attorney, Defendant Kelley Peck ("Peck") who was then employed by the law firm of Defendant Halloran & Sage.  Peck recommended certain amendments which resulted in the First Amendment and Restatement dated May 10, 2007 (the "First Amendment").  The Trust remained revocable.

At the same time as the First Amendment, Peck prepared a letter for Mike to send to Matt; giving Matt specific and limited authority to act alone on day to day, ministerial functions of the Trust.  Said letter specifically provides:

> Dear Matt:
>
> This letter will serve as authorization for you to perform all _**ministerial tasks**_ associated with the investment and management of the Jake Ball Trust, as well as all distribution decisions, **that are within my power to delegate**.  If at **any time you require my input or assistance**, please let me know.  Also, if there are _**matters outside the scope of this delegations**_ that require my attention or approval, please advise me accordingly.   By this letter I am expressly approving all acts and omission by you _**within the scope of this delegation of authority**_.  (Exhibit "2")
>
> Sincerely,
>
> Mike Durst, co-Trustee

(Emphasis added in order to highlight the limited nature of
the delegation of authority to Defendant/Trustee Matt).

It is significant to note that this limited delegation of authority was given to
Defendant Matt while the Trust was revocable. The limited delegation of authority and
the Grantor/Plaintiff Steve's ability to revoke the Trust served as a check and balance
on Matt's activities with regard to the Trust. This is especially important in light of the
fact that at his deposition Matt admitted his total lack of qualifications to handle
sophisticated real estate transactions and acknowledging that the real expert in such
matters was Plaintiff/Grantor Steve. (See Depositions of Matthew Durst, Exhibit "3",
Page 146, Line 22 through Page 148, Line 9).

Subsequently, Defendant Peck (who was hired by Defendant Matt)
recommended that the Trust be converted to an Irrevocable Trust. This resulted in the
Trust Amendment of December 24, 2007. In addition, Steve would contribute his ten
percent (10%) interest in a shopping center in Millville, New Jersey (the "Millville
Asset")[1] and Steve would take back a Note for $500,000.00 (secured by the Millville
Asset).

Steve's 10% interest in the Millville Asset was an example of how he would be
compensated by Goodman for his services. Steve had previously signed numerous
limited liability company operating agreements all of which were identical, except the
Millville Asset Agreement had an additional section that had a significant negative
impact on the Millville Asset's value.

The Millville Asset Operating Agreement contained a provision (Section 7.04)
that was not present in any of the prior limited liability companies.

Section 7.04 specifically provides, in pertinent part, the following:

7.04    Buy Out in the Event of a Termination of Employment.

(a)    In the event that either Steven Durst or
Christopher Anderson ceases to be employed by Goodman
Management LLC for any reason whatsoever (hereinafter
referred to as "Former Employee"), the Bruce a. Goodman
shall have the option to purchase the entire Membership
Interest of the Former employee (the interest of Matthew
durst, Trustee under the Jake Ball Trust Agreement in the
event that Steven Durst ceases to be employed by
Goodman Management, LLC) at a price equal to the "Net
Operating Income" of the Property (fir the preceding
calendar year) divided by .09, less all debts, obligations and
mortgages of the Company (including but not limited to the

---

[1] The Millville Asset was the single largest asset of the Trust and had a value of $841,000.00.

outstanding balance due under the Goodman Loans) times the Percentage Interest of the Membership Interest held by the former Employee. "Net Operating Income" shall mean annual rents received during the preceding calendar year less annual unreimbursed operating and capital expenses and repairs, professional fees and management fees incurred during the preceding calendar year. The Net Operating Income shall be determined by the accountants regularly engaged by the Company. The annual Net Income distributions to Former Employee, shall be prorated as of the date of closing on the sale of the Former Employee's Membership Interest.

In other words, Section 7.04 above made the value of the Trust's interest in the Millville Asset contingent upon Steve's continued employment with Goodman. The effective result of this is that Steve's interest in the Millville Asset (valued at $841,000.00) could be rendered worthless if his employment with Goodman was terminated. The value of $841,000.00 was determined by an appraiser hired for the Trust by Kelley Peck. (See Exhibit "4", November 28, 2011 Letter from Kelley Peck to Judge Becker, Page 2, first full paragraph "There is a clause in the LLC Operating Agreement that may render the interest worthless under certain circumstances.")

Using the formula of Section 7.04, the value of the Millville Asset (after Steve's termination of employment with Goodman) would be arrived at by using a cap rate that devalued the asset by over 100%. It would use a cap rate of 9.5% v. 5.5% commonly used. The result would be a complete forfeiture of an asset valued at $841,000.00. (See Exhibit "5", Cover sheet to Parker Benjamin Appraisal).

Subsequent thereto, Steve's employment with Goodman was, in fact, terminated.

When Goodman tried to use the adverse effects of Section 7.04, Defendants Matt and Yacovelle took legal action in the New Jersey State Courts ("State Action") to declare Section 7.04 invalid. (See Exhibit "6", Complaint for Declaratory Judgment and Equitable Relief).

At the time she made the Trust irrevocable, Defendant Peck failed to understand, account for, disclose and/or advise Plaintiffs Steve and Mike and Defendant Matt of the significant negative impact of Section 7.04. She also hired an appraiser (Defendant Parker Benjamin) who also failed to take appropriate account of Section 7.04. (See Exhibit "7", Deposition of Kelley Peck, Page 50, Lines 3-10).

During the pendency of the State Action, Plaintiff Steve asked attorneys Yacovelle and Peck about the propriety of instituting suit against the appraiser (Parker Benjamin) who valued the Millville Asset at $841,000.00. At the time that Steve made this inquiry Defendant Yacovelle acknowledged that it would be malpractice for the appraiser to have missed the significance of Section 7.04. (See Exhibit "8", January 2,

2012 letter from John Yacovelle to Judge McDonnell, Page 4 "he had obviously been negligent, since the appraisal indicated that he had seen the Operating Agreement, but nowhere did he flag Section 7.04 and either attempt to explain it away, or discount his appraisal because of it. He simply missed it or ignored it.)

In response to Steve's request to sue Parker Benjamin, Defendant Yacovelle, Defendant Peck and Defendant Robinson & Cole claimed that there could be no malpractice claim against Parker Benjamin because Benjamin's appraisal was delivered approximately six months after the Trust became irrevocable. (See Exhibit "9"). If the Parker Benjamin appraisal value was not known at the time the Trust was converted to irrevocable, it was argued that there could be no malpractice on the part of Parker Benjamin. As a result of this fabrication, the lawsuit against Parker Benjamin was never instituted.

During her deposition in the case at bar, however, Defendant Kelly Peck admitted that she did know about the valuation of $841,000.00 (Exhibit "10", Deposition of Kelley Peck, Page 42, Lines 17-20) from Parker Benjamin at the time she converted the Trust to irrevocable. In other words Defendants Kelly Peck and Robinson & Cole lied about their reliance upon the Parker Benjamin appraisal. The reason for the lie is obvious. If Parker Benjamin was liable for malpractice then Kelly Peck and Robinson & Cole were likewise culpable for their failure to deal with the adverse inferences of Section 7.04. (See Deposition of Kelley Peck, Exhibit "10").

Also during the pendency of the State Action, Goodman made a settlement offer that essentially would allow the Trust to keep its 10% interest in the Millville Asset while using the proceeds of Millville Asset profits to reduce and/or eliminate a liability that the Trust had to Goodman.[2] (See Exhibit "11", May 19, 2011 Letter from Bruce Goodman to Steve Durst)

Defendant Yacovelle unilaterally rejected the offer of settlement that would allow the Trust to maintain its 10% interest and instead settled the State Action on terms and conditions extremely unfavorable to the Trust. (See Exhibit "9") Again this was done without consultation with Matt's self-proclaimed expert (Plaintiff Steve) nor was it done in consultation with Plaintiff Mike (as required by the Trust documents).

Specifically, they essentially sold an $841,000.00 shopping center interest (the "Millville Asset") for $85,000.00. Both Matt and Yacovelle failed to consult with Co-Trustee Mike in making this poorly conceived settlement. They basically concluded that selling the most valuable asset of the Trust at ten cents on the dollar was a "ministerial" act that did not require the review or consent of the co-Trustee.

---

[2] Goodman held a mortgage on a trust property referred to as the 1600 Building. That liability was never determined by any Court nor was it ever agreed upon. Goodman, however, put an enormously inflated value on the mortgage liability in order to induce the State Action settlement referred to herein.

The Millville Asset had a real market value in excess of the $841,000.00. This was in income producing shopping center that had rental income, equity accumulation from debt reduction and tax benefits.

A simple review of the facts clearly illuminate the indefensible action of Defendants Matt and Yacovelle. The Millville Asset was a shopping center valued at over $94,000,000.00. The mortgages on the Millville Asset amortized debt reduction of approximately $3,000,000.00 per year. With a 10% interest in the Millville Asset, the Trust would accumulate an additional $300,000.00 in equity every year.

In addition, in settling the State Action Defendants Matt and Yacovelle relied upon the value of the 1600 Building based upon advice they got from Goodman. They described Goodman as having a "fiduciary" obligation to provide an actual valuation. In other words they relied (as a fiduciary) on the word of the very Defendant that they were suing.

After leaving Halloran & Sage, Peck joined Defendant Robinson & Cole. When it was brought to her attention that Parker Benjamin's appraisal failed to account for Section 7.04, Peck lied in order to protect herself and Parker Benjamin. Specifically, Peck and Robinson & Cole contended that they did not know the appraisal of the Millville Asset at the time that the Trust became irrevocable. In her deposition, (Exhibit "10") however, she acknowledged being aware of the appraisal by Parker Benjamin at the time she made the Trust irrevocable and made the Trust liable for a $500,000.00 Note payable.

As a result of the above facts Plaintiffs suffered losses of approximately $4,493,500.00 calculated as follows:

| I | Equity (as of 2007) in the Union Lake Crossing, LLC as per appraisal | $ 841,000 |
|---|---|---|
| Ii | Equity acquired since the 2007 appraisal through 2015; 10% of annual amortization of 3 million dollars per year for nine years | 2,700,000 |
| iii | Litigation costs resulting from Defendants' malpractice | |
| | John Yacovelle – Trust Attorney | 90,000 |
| | Morris & Klemm – PA Trust Attorneys | 66,000 |
| | Kelley Peck (See probate Accounting)  estimate | 40,000 |
| | Fred Santarelli | 180,000 |
| | Vincent D'Elia | 140,000 |
| | Estimate to complete | 50,000 |
| TOTAL LITIGATION COSTS | | 566,000 |
| iv | Balance on Notes | 250,000 |
| v | Interest on Trust Note 2007-2011 | 74,000 |
| vi | Interest on Trust Note 2011-2015 | 62,500 |
| TOTAL | | $4,493,500 |

4.    **Statement of related cases:**  Have you filed an appeal or petition for review in this case before?  If so, give title of case and docket number.

No.

Do you have any cases related to this case pending in the district court, in the court of appeals or before the agency?  If so give title of case and docket number?

No.

5.    **Did the district court or the agency incorrectly decide the facts of your case?**  Yes.

**If so, what facts?**

See factual summary in response to Question 3 above.

6.    **Did the district court or the agency apply the wrong law (either cases or statutes)?**  Yes.

**If so, what law do you want applied?**

I.    **THE TRIAL COURT ERRED IN GRANTING PARTIAL SUMMARY JUDGMENT TO DEFENDANT MATT AND IN FAILING TO ALLOW THE AMENDED COMPLAINT JOINING JOHN YACOVELLE ESQUIRE AS A DEFENDANT.**

The following facts are undisputed:

A.    All of the Trust documents require the approval of both Trustees (Mike and Matt) for Trust transactions.

B.    Mike gave his brother/Co-Trustee a limited delegation of authority to conduct "ministerial" acts, during the period in which the Trust was revocable. Defendants cannot produce any proof that said delegation was continued after the Trust became irrevocable.

8

C.   Defendant Matt acted unilaterally in settling the State Court Action despite the Trust documents that require the approval of both Trustees for non-ministerial decisions; and

D.   The settlement was upheld by the State Court as to its enforceability by Goodman.

Based on the above, Goodman was allowed to enforce the State Court settlement despite the strenuous objection of Co-Trustee Mike and the primary beneficiaries (none of whom were ever parties to the State Court Action).  A review of the law of *res judicata* and collateral estoppel will demonstrate the Trial Court's misapplication of the doctrine to the case at bar.

> For the doctrine [of collateral estoppel] to apply it must be shown that:
>
> (1) the issue decided in the prior adjudication was identical with the one presented in the subsequent action, (2) the prior action was a judgment on the merits, and (3) the party against whom it was asserted had been a party or in privity with a party to the earlier adjudication. [State v. Gonzalez, supra, 75 N.J. at 189, 380 A.2d 1128.]
>
> Furthermore, there are two facets to the requirement that the judgment in the prior action be on the merits. First, collateral estoppel applies only to matters or facts that are directly in issue and are necessary to support the judgment rendered in the prior action. The doctrine does not extend to "any matter which came collaterally in question, ... nor ... any matter to be inferred by argument from the judgment." Mazzilli v. Accident & Cas. Ins. Co., etc., supra, 26 N.J. at 315-316, 139 A.2d 741, quoting from Mullaney v. Mullaney, 65 N.J.Eq. 384, 388, 54 A. 1086 (E. & A. 1903).
>
> The second aspect of the requirement that the judgment be on the merits is that the factual issue must actually have been litigated and determined. Robinson-Shore Develop. Co. v. Gallagher, 26 N.J. 59, 68, 138 A.2d 726 (1958).

Allesandra v. Gross, 187 N.J. Super. 96, 105 (App. Div. 1982).

Applying the above standard we can see that the Trial Court erred in its interpretation of collateral estoppel.

## 1.    WAS THE ISSUE IN THE PRIOR ACTION IDENTICAL WITH THE ONE PRESENTED IN THE CASE AT BAR?

Clearly it was not.

The prior proceeding was an action by Defendant Goodman to enforce a settlement.  In her Bench Memorandum, Judge McDonnell cited Article IX, Section P of the Trust which states:

> "[a]ny person dealing with the Trustee may rely, without further inquiry, upon the statement of any Trustee as to any such Trustee's authority to act on behalf of any Trustee."

Hence, the Court concluded that Goodman could rely on the settlement based upon Article IX, Section P above.

The Trial Judge did not, however, conclude or even address the issue of whether or not the Trust documents authorized Matt to unilaterally dispose of the largest asset of the Trust for less than Ten Cents on the Dollar.  Clearly, transferring an asset that represented almost half of the Trust value was not a "ministerial act" of Trustee Matt.

## 2.    WAS THE PRIOR ACTION A JUDGMENT ON THE MERITS?

For the reasons expressed above, it is clear that it was not a judgment on the merits of the capacity of Trustee Mike *vis a vi* the Trust.  Again, Matt's conduct clearly exceeded his authority as a Co-Trustee with "ministerial" authority.  While the settlement may have been enforceable as to Goodman, the issue of Matt's authority has never been adjudicated.

### 3. **WAS THE DECISION IN THE PRIOR ACTION ASSERTED AGAINST A PARTY TO THE EARLIER ADJUDICATION?**

Again the answer is no.

The State Court Judge ruled that the settlement was enforceable by Goodman for the reasons expressed above. By virtue of that decision, she declared that the effort of Steven Durst and Mike Durst to intervene was moot.

As such, the State Court Judge never ruled on the issue of Matt's authority pursuant to the Trust documents.

Plaintiffs Steven Durst and Mike Durst have been deprived of their day in Court against Trustee Matt Durst who clearly violated his fiduciary obligation as a Trustee.

> A judgment is not conclusive in a subsequent action as to issues which might have been but were not litigated and determined in the prior action.
>
> Allesandra v. Gross, 187 N.J. Super. 96, 106 (App. Div. 1982).

In fact, the State Court Judge, in upholding the settlement, passed no judgment with regard to whether or not Matt exceeded his authority. If he exceeded his authority and violated his fiduciary duty to the other Trustee and the beneficiaries, he must be held accountable.

The error of granting partial summary judgment to Defendant, Co-Trustee Matt serves as a cancer that infects the remainder of the Court's decisions.

It spreads to the decision to allow John Yacovelle to escape his culpability in committing several improper and illegal acts of malpractice including:

(a)    Failure to recognize, advise or consult with Co-Trustee Mike concerning the decision to dispose of the major asset of the Trust.

(b)     Allowing Trustee Matt to exceed his "ministerial" authority.

(c)     Allow for the sale of the Millville Asset despite knowing it was encumbered by the security interest of Plaintiff Steve Durst.

(d)     Participating in the conspiracy to protect Robinson & Cole and Kelley Peck from a malpractice claim with respect to Section 7.04 (more fully discussed below).

## II.     THE TRIAL COURT ERRED IN FAILING TO ALLOW PLAINITFFS STEVE AND MIKE THE RIGHT TO AMEND THEIR COMPLAINT AND JOIN DEFENANT JOHN YACOVELLE, ESQUIRE AS A DEFENDANT IN THIS ACTION.

Rule 15(a)(2) of the Federal Rules of Civil Procedure deals with amendments to pleadings and provides that in all cases, other than amendments as a matter of right, "The Court should freely give leave when justice so requires."

As set forth above, the Court erred in interpreting the legal effect of *res judicata*.

John Yacovelle was the attorney for the Trust in the State Action.  In this matter he attempts to hide behind a false interpretation of *res judicata* in order to conceal and protect his negligence and/or deliberate disregard of his fiduciary and legal obligations.

The Trust Documents require that Trust decisions be made by **BOTH THE TRUSTEES.** But trust attorney Yacovelle ignores the Trust Documents to allow one trustee to take action that disposes of a major asset of the Trust for approximately ten cents on the dollar.  Because the State Court Judge ruled that Goodman could rely on the Trust Documents to enforce the settlement **DOES NOT** address the issue of Yacovelle/Matt's authority to enter into that settlement.

12

Under the interpretation given by Yacovelle and Matt, a Trustee (with apparent authority) could do absolutely anything they wanted as long as it could be said that the party relying on their action thought the Trustee had the apparent authority.

This not only ignores the authority of Mike as Co-Trustee but it also ignores the fact that the asset conveyed to Goodman was, in fact, encumbered by a security interest held by Steve.

None of these issues were addressed in the State Court Action.

In addition to adhering to the terms of the trust documents, Yacovelle unilaterally rejects a settlement offer without consultation with Matt, Mike or Steve.

Why are Plaintiffs precluded from pursing this claim? Why are Plaintiffs being deprived of their day in court?

The Trial Court contends that this claim was not specifically pleaded and shuts Plaintiffs out on this legal nicety.

The <u>Federal Rules of Civil Procedure Rule 15(b)</u> provides for amendments of pleadings even during or after the trial:

> (b)    Amendments During and After Trial.
>
> (1)    Based on an Objection at Trial. If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

If a litigant is allowed to amend his pleadings **DURING** the trial, why can't the Court accept same before the trial?

13

How is the "interest of justice" served when a lawyer is allowed to escape liability for his malpractice due to a misinterpretation of *res judicata* and where the complex pattern of facts were exposed during discovery?

### III.    THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS KELLY PECK, ROBINSON & COLE AND HALLORAN & SAGE

A brief review of the facts will aid in understanding the nature of the conspiracy of lies perpetrated by Yacovelle, Peck, Halloran & Sage and Robinson & Cole.

Before Plaintiff Steve contributed his 10% interest in the Millville Asset, Kelly Peck required an appraisal in order to justify a note payable to Steve for $500,000.00.

In her email of October 25, 2007 (Exhibit "12") , Kelly Peck makes it clear that she needed the appraisal <u>before</u> converting the trust to revocable to irrevocable:

> I want to explore the possibility of delaying the signing [of the irrevocable Trust documents] until we receive the appraisal. I spoke to Paul Ruby and he is willing to do the appraisal and will have it for us in about 2 weeks. To do so, he needs the Operating Agreement and the Appraisal, both of which I have and can give him.

The need for the appraisal was understandable as the Trust was giving a Note to Steve for $500,000.00 in exchange for the Millville Asset.  Clearly Peck needed proof that the Millville Asset was valued at over $500,000.00.

As part of the process of converting the Trust to irrevocable, Peck on December 21, 2007 prepared an "Agreement".  (Exhibit "15").[3]

---

[3] Please note that there were two versions of this document.  One of them contained a Millville Asset value of $600,000.00 and the other contained a value of $841,000.00.  The $841,000.00 represents the exact number concluded by Parker Benjamin in their appraisal.  Defendants have thrown up a smoke screen claiming that either Steve or his then attorney Vincent D'Elia forged the $841,000.00 version of this document.  The truth is that it is no coincidence that the document contained the exact same number as the appraisal.  In her deposition Kelly Peck acknowledged providing the different values and admitted that she knew about the appraisal when she allowed the Trust to be converted from irrevocable to revocable.

So in 2011, when Steve urged Kelley Peck and John Yacovelle to sue the appraiser Parker Benjamin for his failure to account for the devastating impact of Section 7.04, (See Exhibit "10", Page 43, Lines 18-23).    Defendants Yacovelle, Robinson & Cole and Kelly Peck clearly knew that if Parker Benjamin was liable for missing the significance of §7.04, then Kelly Peck and Halloran & Sage were equally liable.

Hence came the big lie.

Robinson & Cole took the position that Parker Benjamin (and hence Robinson & Cole) could not have been negligent because they did not rely upon the appraisal.  The formal written appraisal came out six months after the conversion of the Trust. According to the big lie, Kelly Peck and Robinson & Cole could not  have relied on the appraisal (at the time of the conversion) since they did not have it and did not know the amount of the appraisal.

So when did Kelly Peck/Robinson & Cole know about the appraised value? Since they knew the appraisal was $841,000.00 at the time of conversion, then they did rely on it to make the Trust irrevocable.

In her deposition, Kelly Peck fully acknowledged that she knew the amount of the Parker Benjamin appraisal at the time she converted the Trust.  Hence, Robinson & Cole and Kelley Peck participated in a bold faced lie designed for the self-protection of Kelly Peck, Halloran & Sage and Robinson & Cole.

There is no issue of fact here.  Kelly Peck and Robinson & Cole lied to Plaintiff Steve in order to protect themselves.  In the process they created a loss to Steve (on his note) and the Trust.

But the Trial Court concludes that somehow, there is nothing wrong with this behavior. There is nothing wrong with lawyers lying to their clients. There is no loss that comes from the lie.

In fact, as set forth above, because of the loss of a valuable asset that was dramatically appreciating in value, Steve and the Trust lost in approximately $4,500,000.00.

## IV. THE TRIAL COURT ERRED IN REFUSING TO ALLOW PLAINTIFFS TO AMEND THEIR COMPLAINT TO ASSERT A CLAIM AGAINST THE APPRAISER PARKER BENJAMIN.

The facts surrounding the decision to not sue Parker Benjamin was built on a foundation of lies from Defendants Yacovelle, Peck and Robinson & Cole.

But the Trial Court decided that the amendment to sue Parker Benjamin was too late to be considered. In other words "time" trumps "truth" when deciding what is "in the interest of justice."

To allow Parker Benjamin to go scot-free due to the lies perpetrated by officers of the Court (Yacovelle, Peck and Robinson & Cole) is unconscionable.

## V. THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION.

It is significant to note that there is nothing in the <u>Federal Rules of Civil Procedure</u> addressing a time constraint for the filing of a motion for reconsideration.

Defendants, however, cite a local New Jersey Federal District Court Rule for the proposition that a motion for reconsideration must be filed within fourteen days of the date of the order.

But this begs an obvious question: What is a litigant to do when facts are uncovered in discovery that were not available within the fourteen day period?

In the case at bar, Peck and Robinson & Cole had insisted that they did not know about and did not rely upon the defective Parker Benjamin appraisal when they converted the Trust to irrevocable.

But at her sworn deposition, Peck acknowledged and admitted that she was fully aware, knew and relied upon the appraisal that both she and Parker Benjamin knew or should have known had a diminished value by virtue of Section 7.04. (See Exhibit "10").

The position taken by the Trial Court was that facts available through discovery that changed the nature of the case are not a basis for reconsideration. This conclusion is arbitrary, capricious and unreasonable.

The granting of a motion for reconsideration is a matter within the sound discretion of the Court. <u>Cummings v. Bahr</u>, 295 N.J. Super. 374 (App. Div. 1996).

The reconsideration rule applies when "the court failed to consider evidence or there is good reason for it to reconsider new information." (*see* Id. at 384-85).

> Reconsideration should be utilized only for those cases which fall into that narrow corridor in which either 1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence. Said another way, a litigant must initially demonstrate that the [c]ourt acted in an arbitrary, capricious, or unreasonable manner, before the [c]ourt should engage in the actual reconsideration process.
>
> [<u>D'Atria v. D'Atria</u>, 242 N.J. Super. 392, 401 (Ch. Div. 1990)

As to previously unavailable evidence, the <u>D'Atria</u> Court concluded that

> If a litigant wishes to bring new or additional information to the Court's attention which it could not have provided on the first application, the Court should, in the interest of justice (and in the exercise of sound discretion), consider the evidence. <u>Id.</u>

17

## VI.    CONCLUSION

This matter was originally brought in the New Jersey State Courts.   The New Jersey Rules of Court Section 1:1-2(a) states, in pertinent part:

> Unless otherwise stated, any rule may be relaxed or dispensed with by the court in which the action is pending if adherence to it would result in an injustice.

Once removed to the Federal Court, however, the case was subject to the Federal Rules of Civil Procedure.   While those rules do not contain a rule relaxing provision, they do indicate that the purpose of the rules are to facilitate fair and just results.

The Former Chief Justice of the United States Supreme Court Earl Warren was famous for asking a simple question "is it fair"?

Lawyers arguing cases before the Warren Supreme Court would confidently cite a string of cases that supporting their client's position.   Chief Justice Warren, however, would then ask his question.   Is it fair?

Chief Justice Warren would always carefully study the law of each case and apply it to the relevant facts in order to reach his legal decision.

But after that process was done, he would ask himself the same question.   Is if fair?   If he could not answer that question positively, he would revisit his decision and make sure it was, in fact, fair.

Before deciding this matter, I respectfully request that this Court ask itself the same question.

Is it fair that:

1.      Defendant Matt get away without liability for wasting the Trust's most valuable asset;

2.      Defendant Matt not be held accountable for exceeding his authority as a Trustee;

3.      Defendant Matt bilked the Trust for the benefit of his family at the expense of the primary beneficiaries;

4.      Defendant Yacovelle not be held accountable for ignoring the right of Co-Trustee Mike in completing the settlement of the State Court Action;

5.      Defendant Kelly Peck and Halloran & Sage escape liability for failing to take appropriate action regarding the devastating effect of Section 7.04;

6.      Defendants Yacovelle, Kelly Peck and Robinson & Cole go scot-free for lying about their knowledge of the appraisal at the time of conversion of the Trust to irrevocable;

7.      Defendant Parker Benjamin avoid liability for the negligence in failing to account for the provisions of Section 7.04.

**7.      Are there any other reasons why the district court's judgment or the agency's decision was wrong?** Yes.

**If so, briefly state these reasons.**

For the reasons set forth in the answer to Paragraph 6.

**8.      What action do you want the Court of Appeals to take in this case?**

1.    I respectfully request that the Court allow oral argument so that this complex matter can be fully reviewed.

2.    That the decision of the District Court be reversed and remanded on the following conditions:

a.    The denial of the Motion to Amend Plaintiffs' Complaint to assert a claim against John Yacovelle, Esquire should be reversed and the Court shall allow Plaintiffs to file the Amended Complaint.

b.    The granting of the Motions for Summary Judgment in favor of Halloran & Sage, Robinson & Cole, Kelley Peck and Matt Durst should be reversed and the matter remanded to proceed with a revised discovery schedule and trial.

c.    The Trial Court determination that the State Court Action is *res judicata*/collateral estoppel is reversed and the matter remanded for a trial on the merits.

d.    That the Trial Court determination denying an amended complaint to assert a claim against Parker Benjamin should be reversed and remanded allowing Plaintiffs to proceed with discovery and trial.

Steven Durst

Reuben (Mike)  Durst

# PROOF OF SERVICE

I certify that on May 24, 2016 I hand-delivered a copy of this brief and all attachments to the following parties **at the addresses listed below**:

Christopher P. Leise, Esquire
Marc L. Penchansky, Esquire
White and Williams, LLP
LibertyView
457 Haddonfield Road, Suite 400
Cherry Hill, NJ 08002

William F. O'Connor, Jr., Esquire
Louis A. Modugno, Esquire
McElroy, Deutsch, Mulvaney & Carpenter LLP
1300 Mount Kemble Road
Morristown, NJ 07962

Paul H. Zoubek, Esquire
Kristen E. Polovoy, Esquire
Montgomery McCracken Walker & Rhoads, LLP
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002

John A. Yacovelle, Esquire
Law Office, John A. Yacovelle
8438 Mackall Road
St. Leonard, MD 20685

(Via email and Federal Express)

Steven Durst

Reuben (Mike) Durst

Dated: May 24, 2016

Mr. Matthew Durst, Trustee
December 29, 2006
Page 4

You also indicated that the trust is likely to receive approximately $300,000 per year of income from the shopping center rents. This income is likely to accumulate and grow. The growth and income also will be subject to estate tax at a rate of approximately 55-65%. As indicated above, Steve has the ability to gift $12,000 per year to all of his descendants and nieces and nephews. He can increase this amount to $24,000 if his wife agrees. He does not need to give this amount directly to them, but can hold it in a trust for their benefit. The gifts cannot be made to the Jake Ball Trust because, as noted, anything in that trust when Steve dies will be subject to estate taxes. However, the gifts could be made to the irrevocable insurance trust discussed above. Steve has six children, two grandchildren and eight nieces and nephews, for a total of 17 potential beneficiaries. This means that Steve could transfer $408,000 per year to an irrevocable trust without incurring any gift tax and without using any of his lifetime gift exemption. The beauty of this option is that Steve is able to take advantage of the annual gifting exemptions for all 17 beneficiaries, but it is not necessary to make equal distributions to all of these beneficiaries. The Trustees would maintain discretion to make distributions as noted in Part I above, and the primary beneficiaries would be Steve's children.

Although you are the Trustee of the Jake Ball Trust, you do not have the ability to effectuate these tax-saving strategies for the Trust on your own. Only Steve can implement these suggestions. Obviously, there are a variety of other techniques that could work to further reduce his tax liabilities, but I cannot know if they are applicable without knowing more about Steve's personal situation. I realize that it may be difficult from Steve's perspective to hear recommendations from someone he does not know. I am happy to meet with you and Steve in person at any time to discuss the proposed amendments to the Jake Ball Trust and my suggestions for reducing the estate tax liability associated with insurance and the shopping center interest that are owned by the trust. In fact, I have family in New Jersey and would be happy to go down for the day to meet Steve at his office if that would be preferable for him.

### III. Immediate Steps

First, I understand that Mike would prefer that you handle the day-to-day administrative decisions regarding the trust. I enclose a letter for Mike to sign delegating investment, management and distribution decisions to you. This is necessary because, under the law, if two trustees are named, they both must act together on even the most basic of decisions. However, either Trustee can delegate ministerial duties to the other. This letter accomplishes that. If it is easier for the two of you at this stage, Mike could resign for now and be reappointed after Steve's death. The amended trust agreement should allow each of you and Mike to appoint your own successor as Trustee. If you fail to do so, a majority of Steve's children would have the right to do so. Of course, as long as Steve is living, he would have the right to name additional and successor Trustees.

We will prepare a letter to the IRS to advise them that all future correspondence on the trust should be sent to you at your home address. You will need to sign a power of attorney allowing us to communicate with the IRS on your behalf. I enclose a copy of the

December 29, 2006

Mr. Matthew Durst,
Co-Trustee
Jake Ball Trust
20 Woodcliff Drive
Simsbury, CT 06070

Re:    Jake Ball Trust Administration

Dear Matt:

This letter will serve as authorization for you to perform all ministerial tasks associated with the investment and management of the Jake Ball Trust, as well as all distribution decisions, that are within my power to delegate. If at any time you require my input or assistance, please let me know. Also, if there are matters outside the scope of this delegations that require my attention or approval, please advise me accordingly. By this letter I am expressly approving all acts and omission by you within the scope of this delegation of authority.

Sincerely,

Mike Durst, co-Trustee

cc:    Steve Durst

930509v.1

2

1 which I guess is your words the thread sent from Steve
2 to John Yacovelle, Saturday, May 14th, 2011 at 9:24
3 p.m. Subject, I got Bruce Leff SREA SRA, same as the
4 immortal Wes, working on a proper cap rate for
5 2005-2006. I anticipate a 6.5 percent to 7 percent
6 rate worst case. The center is 90 percent national
7 credit tenants on long term leases and therefore is
8 according to Leff investment grade. Will you e-mail
9 the cover letter from Hoffman to Matt advising him to
10 sign five blank pages on Monday from Fred's office.
11 SD.
12        MR. YACOVELLE: You added a you which
13 there wasn't.
14        THE WITNESS: Will e-mail, I'm sorry.
15 Let me clarify. Will e-mail you the cover letter from
16 Hoffman to Matt advising him to sign five blank
17 signature pages on Monday from Fred's office. SD.
18    Q.    Now, you understand that Mr. Yacovelle's
19 e-mail to you and Steve is talking about the effect of
20 the 7.04 provision of the operating agreement, correct?
21    A.    I just understood that he sent me an e-mail.
22 In terms of -- I'm looking. I don't understand cap
23 rate. Can you clarify the question for me?
24    Q.    My question is did you understand that he
25 was referring to the effect of 7.04 in the operating

---

1  matters?
2    A.   He's the expert. I'm not the expert. The
3 answer is no.
4    Q.   I asked you did you have any training?
5    A.   The answer is no.
6    Q.   Okay.
7    A.   The second time.
8    Q.   Do you have any training or any training
9 with regard to doing appraisals of property?
10    A.   No.
11    Q.   Okay. Do you have any experience with
12 appraisals?
13    A.   No.
14    Q.   I saw the list of stock you invested in.
15 Are there other real estate that you have invested in?
16    A.   That I've invested in personally? Clarify
17 the question.
18    Q.   That you personally.
19    A.   No.
20    Q.   And other than the real estate we talked
21 about as part of the Jake Ball Trust did you invest in
22 any other real estate items for the Jake Ball Trust?
23    A.   There was a house that Steve wanted
24 purchased for his daughter Erica down in Florida. And
25 I think we initially had put out $100,000. The market

---

Page 146

1 agreement?
2    A.   He was talking about a cap rate in here. If
3 it had to do with the 7.04 then that's what it had to
4 do with.
5    Q.   But you don't have any recollection?
6    A.   In terms of recollection of what, the
7 e-mail?
8    Q.   That it had something to do with 7.04.
9    A.   It's an e-mail that says cap rates. It's
10 got a few curse words in it. Valuation formula someone
11 by the name of Bruce Leff is working on the property
12 cap rate for 2005 and 6. And this is an e-mail from
13 2011. It mentions the center 90 percent national
14 credit tenants on long term leases and something of an
15 e-mail from Hoffman to me advising him to sign five
16 blank pages on Monday.
17    Q.   Okay. You had testified when you were
18 examined by one of the other attorneys about the amount
19 of research and the time you spent researching the
20 stock. Do you recall that testimony?
21    A.   I do.
22    Q.   And do you have any training, formal
23 training in financial matters?
24    A.   No.
25    Q.   Do you have any training in real estate

---

Page 14

1 I believe tanked. The group of homes devalued
2 significantly and we ended up losing $50,000.
3    Q.   You indicated you had no training in real
4 estate appraisals. Do you know the criteria that's
5 used by an appraiser to value real estate?
6    A.   No.
7    Q.   Do you know how to evaluate the value of a
8 commercial property?
9    A.   No.
10        MR. D'ELIA: I'm done.
11        (The witness is excused and the deposition is
12 concluded at 3:55 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

F

# ROBINSON & COLE LLP



KELLEY GALICA PECK

280 Trumbull Street
Hartford, CT 06103-3597
Main (860) 275-8200
Fax (860) 275-8299
kpeck@rc.com
Direct (860) 275-8332

November 28, 2011

Judge Cynthia Becker
Simsbury Regional Probate Court
933 Hopmeadow Street
P.O. Box 495
Simsbury, CT 06070-0495

Re:  **Jake Ball Trust Final Accounting**

Dear Judge Becker:

On behalf of Matthew Durst, as a trustee of the above-referenced trust, I enclose an accounting along with a list of interested parties and a copy of the governing trust instrument. I request that the court schedule a hearing with respect to this accounting as soon as possible. Jurisdiction over this *inter vivos* trust pertains in this court under Connecticut General Statutes § 45a-175 because Matthew Durst, the trustee submitting the accounting, is a resident of Simsbury, Connecticut. The trust is governed by Connecticut law as per Section D of Article X.

The filing fee pursuant to Connecticut General Statutes § 45a-108 will be paid upon receipt of the court's invoice setting forth the fee.

The following additional facts will be relevant to your review of this accounting:



*Law Offices*

BOSTON

PROVIDENCE

HARTFORD

NEW LONDON

STAMFORD

WHITE PLAINS

NEW YORK CITY

ALBANY

SARASOTA

www.rc.com

Steven Durst ("Steve") established the above-reference trust as a revocable trust on November 29, 2004 (copy enclosed). He named his two brothers, Matthew Durst ("Matt") and Rueben H. Durst ("Mike") as co-trustees. While the trust was revocable, Steve was the primary beneficiary and retained the ability to direct investments and distributions from the trust. On December 24, 2007, Steve amended and restated the revocable trust in its entirety and made the trust irrevocable (copy enclosed). On December 29, 2006, Mike executed a letter to Matt delegating trustee powers for ministerial tasks for investment and management decisions and distribution decisions to Matt (copy of letter enclosed). On or about October 5, 2011, Mike advised Matt that he wanted to be involved in trust decisions related to litigation then pending, as discussed below. Mike has not revoked the delegation of power in writing. Though Mike was a co-trustee of the Trust at all time, from inception until October 5, 2011, he did not participate in Trust investment, management or

11386111-v1

4

# ROBINSON & COLE LLP

distribution decisions. The accounting is prepared and filed only on behalf of Matt Durst.

One of the assets to the Trust is a 10% membership interest in Goodmill, LLC. The LLC owns a shopping center in Millville, New Jersey. At the time the trust became irrevocable in December, 2007, the interest was valued at $841,000. However, there is a clause in the LLC operating agreement that may render the interest worthless under certain circumstances. In consideration for Steve making the Trust irrevocable, the trustee executed a promissory note payable to Steve for $500,000 (the balance of the value of the Trust on conversion being treated as a gift). The note bears interest at a rate of 4.72% and a term of 15 years. A copy of the note will be provided upon request.

Bruce Goodman, either directly or indirectly, owns a controlling interest in Goodmill, LLC. In addition to being co-members in the LLC, Mr. Goodman was Steve's employer. As a result of a breakdown in the business relationship between Steve and Mr. Goodman and Steve's termination of employment, litigation arose in New Jersey involving the Trust. In that litigation, Mr. Goodman asserted that, based upon the operating agreement of the LLC, he is entitled to purchase the Trust's 10% interest in Goodmill, LLC and the interest has no value based on the terms of the LLC operating agreement. Steve has disputed this assertion and believes the 10% interest has substantial value.

In addition to the Goodmill, LLC interest, the trust also holds interests in the Reserve at Union Lake, LLC and Zack & Jack Realty Associates, LP. Bruce Goodman, directly or indirectly, has controlling interests in both of these entities. The Reserve at Union Lake, LLC own property located in Millville, New Jersey adjacent to the shopping center owned by Goodmill, LLC. The Trust owns a 20% interest. There is no established value for the Trust's 20% interest, though the LLC operating agreement appears to contain provisions similar to that of Goodmill, LLC and may, therefore, be worthless under the same theory. Steve asserts that the interest may be worth as much as $250,000 if the restrictions of the operating agreement are inoperative.

The trust owns a 99% limited partnership interest Zack & Jack Realty Associates, LP. The 1% general partner is an entity controlled exclusively by Bruce Goodman. The only asset of the LP is real property located at 1600 Hunting Park in Philadelphia, Pennsylvania. In 2007, the property was appraised at $1,300,000, and is encumbered by a mortgage. With interest, the liability on the mortgage presently exceeds $1,300,000. The mortgage is held by Bruce Goodman. There is no current appraisal of the property, but no improvements were made to the property since 2007 and, in fact, the property has suffered damage and a decline in value as a result of the real estate market decline. The trustee has estimated the value to be no more than $700,000, at best. The mortgage is presently in default and Mr. Goodman has obtained a Confession of Judgment in the Pennsylvania courts. Mr. Goodman may



# ROBINSON & COLE LLP

foreclose at any time and take the property as well as any deficiency on the mortgage note. The deficiency (which is a liability of the Trust) is estimated to be in the range of $500,000 to $600,000. At best, the LP interest is worthless and may carry substantial liability.

As noted in the Accounting, the three business entities are the subject of major litigation in New Jersey and Pennsylvania and are the subject of a settlement agreement as discussed below. To date, the trust has incurred over $150,000 in legal fees defending the claims in New Jersey and Pennsylvania. On October 3 and 4, 2011, Matt, as trustee, participated in a two-day mediation with Bruce Goodman in the Cumberland County, New Jersey Superior Court. If the trust litigation continues, the Trust would continue to pay substantial litigation expenses in both the New Jersey and Pennsylvania cases. If the Trust loses the New Jersey case, it would be forced to surrender the 10% interest in Goodmill, LLC and the 20% interest in the Reserve at Union Lake LLC with no compensation for the interest. The Trust already lost the Pennsylvania case and, depending on the amount of the deficiency actually determined, stands to lose up to $600,000 as a deficiency judgment. If the trust is successful in the New Jersey litigation, it would retain an asset, as a minority interest, in a valuable shopping center. At present, the LLC is highly leveraged. The timeframe until the LLC has a positive cash flow is unknown.

In addition to the foregoing assets and liabilities, the trust has a potential legal malpractice claim in Pennsylvania relating to the preparation of the various operating agreements. The value of this claim is speculative and undetermined.

On the basis of the foregoing, and at the recommendation of the New Jersey attorney retained by the Trust, Matt agreed to settle all of the litigation on behalf of the Trust. At the mediation on October 4, 2011, Matt, as trustee, reached a settlement agreement with Bruce Goodman with the following general terms: i) the Trust would receive $80,000 in exchange for the 10% interest in Goodmill, LLC, the 20% interest in the Reserve at Union Lake, LLC and the 99% Zack & Jack Realty Associates, LP interest; ii) Bruce Goodman would forgive the $1,300,000 debt secured by the mortgage on 1600 Hunting Park in Philadelphia for which he holds a confessed judgment; iii) no further Trust distributions will be made to Steve; and iv) the Trust would retain the right to pursue the legal malpractice claim. This agreement was placed on the record in the Cumberland County Superior Court and the New Jersey case was ordered settled by the Court. A copy of the court's order will be provided upon request. Though the order related only to the New Jersey case, the agreement also would settle the Pennsylvania case relating to the mortgage at 1600 Hunting Park.

Steve made his objections to the proposed settlement known at the time of the mediation. Immediately following the mediation on October 5, 2011, Mike Durst made known to Matt his objection to the terms of the settlement. He demanded that Matt turn over all Trust assets to him and take no further action with respect to any Trust assets, including the settlement of the various Bruce Goodman litigation



**ROBINSON & COLE** LLP

matters. In addition, Steve's four adult children who are beneficiaries of the Trust informed Matt of their objection to the settlement. They demanded that he resign and turn over all Trust assets to Mike. The beneficiaries threatened to take legal action if he failed to comply immediately with their demands.

While Matt continues to believe that the settlement is in the best interest of the Trust and the beneficiaries, he intends to resign as trustee. In preparation for his resignation, he submits the enclosed final accounting for judicial approval by this court. As requested by Mike Durst and the adult beneficiaries, Matt transferred all of the Trust's cash and marketable securities into the Trust's checking account at Northwest Community Bank in October, 2011. Then, as further requested, on October 17, 2011, Matt forwarded the checkbook for that account to Mike. As of October 17, 2011, Matt has taken no action with respect to any of the Trust assets and he has not participated in or agreed to any investment, management or distribution decision regarding the Trust. Matt makes no representation in the accounting with respect to any transaction in the Trust on or after October 17, 2011.

In light of the foregoing, on behalf of Matthew Durst, in his capacity as trustee of the Jake Ball Trust, we request that you schedule a hearing as soon as possible for the purpose of reviewing and approving this petition and his final accounting and approving his transfer of the trust property to Mike Durst as co-trustee. The settlement is pending in the New Jersey court and the opposing side will require the action by the trustee in the near future. It is essential that this matter be resolved as soon as possible so that Matt can resign and allow Mike to proceed with the litigation. We request that the hearing on this matter be set within two weeks. I further request that you ask the clerk to contact me at the 860-275-8332 to schedule the hearing to order a conflict that would result in a further delay and expense.

If you require any additional information with respect to this matter prior to the hearing, please contact me.

Best regards.

Very sincerely,

Kelley Galica Peck

cc:    Matthew Durst (w/o encl.)
       Vincent D'Elia, Esq. (w/ encl.)



# PB

May 19, 2008

Kelley Galica Peck, Esq.
Halloran & Sage, LLP
225 Asylum Street
Hartford, CT 06103

Dear Kelley:

At your request, I have calculated a valuation of a 10.0% fractional interest (owned by the Jake Ball Trust) in Goodmill, LLC ("Goodmill"). The primary asset of this entity is the Union Lake Crossing Shopping Center ("ULCSC") located at SWC North Second Street and Union Lake Boulevard in Millville City, New Jersey. It is my understanding that this valuation will be used for potential distributing/gifting of minority interests.

## CONCLUSION

As of December 31, 2007, a 10% fractional interest in Goodmill had a fair market value of $841,000.

## DEFINITION OF VALUE

Fair market value is defined as follows:

"...the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the facts. Court decisions frequently state in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property."

## OVERVIEW

The ULCSC consists of some 43.7 acres, a community shopping center, in ongoing construction, which is to contain 526,946 sq. ft. of

**Parker Benjamin inc**

406 Farmington Avenue
Farmington, CT 06032
(860) 521-4198

1526 University Blvd. W.
Suite 115
Jacksonville, FL 32217
(904) 535-3370



K

Law Office, John A. Yacovelle
8438 Mackall Rd.
St. Leonard, MD 20685
888-819-3736
410-586-3344

CUMBERLAND FINANCE
SUPERIOR COURT Batch #  900
CUMBERLAND COUNTY
LAW DIVISION                    AUG 1 2 2010
AUG 1 2 2010        CASE-MO # 1108
REC'D & FILE-AMT $ 200.00
CIVIL CASE  Initials
MANAGEMENT OFFICE              ll

---

**MATTHEW DURST, Trustee of the
JAKE BALL TRUST,**

Plaintiff,

vs.

**GOODMILL, LLC, and
BRUCE A. GOODMAN,**

**Defendants**

Superior Court of New Jersey
Chancery Division, General
Equity,
Cumberland County

Civil Action  C 27-10

Docket No.:

**COMPLAINT FOR
DECLARATORY JUDGMENT
and EQUITABLE RELIEF**

---

Plaintiff, MATTHEW DURST, Trustee of the JAKE BALL Trust, residing at 20 Woodcliff Drive, Simsbury, Connecticut, by way of Complaint against the defendants, says:

1. Plaintiff is, and has been since November 29, 2004, Trustee of a certain Trust, the Jake Ball Trust, originally funded by Steven Durst, which became an irrevocable trust on or about December 24, 2007.

2. On or about November 15, 2005, plaintiff and others, including defendant Bruce A. Goodman, formed the defendant Goodmill, LLC, for the ultimate purpose of constructing, leasing and operating a shopping center in the City of Millville, County of Cumberland and State of New Jersey.

3. Upon execution of the Operating Agreement for Goodmill, LLC, the Jake Ball Trust became a Member of the LLC, and the owner of a 10% interest therein.

4. Defendant Goodmill, LLC proceeded to construct, lease and operate a shopping center known as Union Lake Crossing on lands located at N. 2nd St. in Millville, N.J.

5. On or about June 27, 2007, defendant Bruce Goodman, through his attorney, Peter Friedman, Esq., caused formation of an entity called 1600 GP LLC, which subsequently became the General Partner in a limited partnership entity called Zack &



1

6

Jack Realty; defendant Goodman owned a 99% interest in 1600 GP LLC and the plaintiff Jake Ball Trust owned a 1% interest.

6.   The limited partnership, Zack & Jack Realty, in turn, was owned 1% by the general partner, 1600 GP LLC, and 99% by the limited partner, the Jake Ball Trust.

7.   Within days of the formation of these entities, defendant Bruce Goodman loaned the sum of $1.2 million dollars to enable Zack & Jack Realty to purchase a certain property in North Philadelphia and the plaintiff Jake Ball Trust, the limited partner in Zack & Jack Realty, proceeded to guaranty repayment of the loan which, according to the documents, was finally due and payable on July 1, 2010, and is now allegedly in default.

8.   As part of the loan guaranty documentation, plaintiff executed, on behalf of the Jake Ball Trust, a series of documents drafted for his signature by Peter Friedman, Esq., attorney for the General Partner, including a "Surety Agreement" and a "Pledge of Membership Interest and Security Agreement", each of which is attached hereto and marked as "Exhibit A" and "Exhibit B", respectively.

9.   The "Surety Agreement", which included a Pennsylvania Confession of Judgment provision, purported to guaranty payment of the loan in the original amount of $1.2 million dollars, while the "Pledge of Membership Interests and Security Agreement" purported to secure the obligations undertaken in the Surety Agreement, and, as security therefore, pledged the entire 10% interest of the Jake Ball Trust in Goodmill, LLC.

10.   On or about August 14, 2007, Jeffrey Hoffmann, Esq., an associate of Peter Friedman, Esq., sent to the plaintiff email, via Kelley Peck, Esq., the Jake Ball Trust's Connecticut attorney, a document called "Assignment of Rights to Receive Distributions from Goodmill, LLC", along with a letter purporting to be from his client, defendant Bruce A Goodman, in which Goodman terminated the "Pledge Agreement dated June 29th, 2007" in consideration of the execution by plaintiff of the accompanying "Assignment of Rights to Receive Distributions", which the plaintiff did, in fact, execute. (Copies of the emails with the Goodman letter attachment and the Assignment attachment are attached to this Complaint as "Exhibit C").

11.   The effect of the aforesaid August 14 transaction was to replace plaintiff's pledge of the 10% Trust interest in Goodmill LLC with an assignment, not of plaintiff's interest, but of plaintiff's right to <u>distributions</u> from Goodmill in the event of a default on the loan to Zack & Jack Realty.

12.   On or about July 7, 2010, defendant Goodman, acting through yet another attorney, one Gregory Fox, Esq., issued two Notices to plaintiff; the first was a "Default Notice", ("Exhibit D" attached) alleging that the original note had an unpaid balance and that plaintiff was in default of its obligations under the Surety Agreement; and the second was a **"<u>NOTICE OF ASSUMPTION OF MEMBERSHIP INTERESTS</u>"** ("Exhibit E" attached). In which it is announced that defendant Goodman has "assumed all rights to the [10% Goodmill] membership interests" and that he "may elect to sell the interests".

2

13. Although dated July 7, plaintiff received these notices on or about July 18, 2010, and sent them to counsel who promptly, on July 20, (letter attached as "Exhibit F") called to Mr. Fox's attention the fact that he was proceeding on the basis of a Pledge Agreement that had been terminated by his client back on August 14, 2007 and requested that Mr. Fox, without delay, rescind the Notice of Assumption of Membership Interests.

14. The Notice of Assumption of Membership Interests has not been rescinded, and plaintiff is concerned Goodman will take additional steps based upon his mistaken notion that he now owns the 10% Goodmill interest actually owned by the Jake Ball Trust.

**WHEREFORE**, plaintiff demands judgment:

(a) Declaring and adjudging that the Jake Ball Trust is still a Member of Goodmill, LLC, and the owner of a 10% interest therein, entitled to all of the rights relating to that ownership; and

(b) Declaring and adjudging that the purported "Notice of Assumption of Membership Interests" dated July 7, 2010, is of no force and effect; and

(c) Permanently enjoining defendants from taking any steps based upon the aforesaid purported "Assumption"; and

(d) For such further relief as may be appropriate in the circumstances; and

(e) For costs of suit.


Dated: August 9 , 2010

Law Office, John A. Yacovelle

By: _____
    John A. Yacovelle
    Attorney for Plaintiff


## CERTIFICATIONS

As required by Rule 4:5-(b)(3) and Rule 1:38-7(c), I Certify that the documents attached contain no confidential personal identifiers and that should any subsequently submitted documents contain such confidential personal identifiers, they will be redacted.

NOTICE OF OTHER ACTIONS: As required by Rule 4:5-1(b)(2), I Certify that there is a related action pending in the Commonwealth of Pennsylvania, captioned Bruce A. Goodman vs. Matthew Durst, Trustee of the Jake Ball Trust, in the Court of Common Pleas of Montgomery County, docket No. 2010-21864, in which the plaintiff Goodman, defendant herein, is attempting to obtain a judgment by confession on the loan referred to in paragraph 7 of this Complaint, based in part upon documents referred to in paragraphs 8 and 9 of the Complaint. If and when that judgment is entered, it will be the subject of a motion to strike or vacate, according to Pennsylvania procedure, upon, *inter alia,* jurisdictional grounds, irregularities in the documents and certain signatures, and an

3

alleged breach of fiduciary responsibilities by the General Partner (controlled by defendant Goodman herein) of the borrower, Zack & Jack Realty, and the attorney for the General Partner and for the limited partnership. This Pennsylvania action does <u>not</u> involve any issue concerning whether or not the Jake Ball Trust is a Member with a 10% interest in Goodmill, LLC.

John A. Yacovelle

Law Office, John A. Yacovelle
8438 Mackall Rd.
St. Leonard, MD 20685
888-819-3736
410-586-3344

SUPERIOR COURT OF N.J.
CUMBERLAND COUNTY
LAW DIVISION
AUG 19 2010
REC'D & FILED
CIVIL CASE
MANAGEMENT OFFICE

| | |
|---|---|
| **MATTHEW DURST, Trustee of the JAKE BALL TRUST,** | **Superior Court of New Jersey Chancery Division, General Equity, Cumberland County** |
| **Plaintiff,** | **Civil Action** |
| vs. | **Docket No.: C27-10** |
| **GOODMILL, LLC, and BRUCE A. GOODMAN,** | |
| **Defendants** | **<u>AMENDED</u> COMPLAINT FOR DECLARATORY JUDGMENT and EQUITABLE RELIEF** |

Plaintiff, MATTHEW DURST, Trustee of the JAKE BALL Trust, residing at 20 Woodcliff Drive, Simsbury, Connecticut, by way of Complaint against the defendants, says:

## FIRST COUNT

1. Plaintiff is, and has been since November 29, 2004, Trustee of a certain Trust, the Jake Ball Trust, originally funded by Steven Durst, which became an irrevocable trust on or about December 24, 2007.

2. On or about November 15, 2005, plaintiff and others, including defendant Bruce A. Goodman, formed the defendant Goodmill, LLC, for the ultimate purpose of constructing, leasing and operating a shopping center in the City of Millville, County of Cumberland and State of New Jersey.

3. Upon execution of the Operating Agreement for Goodmill, LLC, (attached as "Exhibit I") the Jake Ball Trust became a Member of the LLC, and the owner of a 10% interest therein.

4. Defendant Goodmill, LLC proceeded to construct, lease and operate a shopping center known as Union Lake Crossing on lands located at N. 2nd St. in Millville, N.J.



1

5. On or about June 27, 2007, defendant Bruce Goodman, through Pennsylvania attorney, Peter Friedman, Esq., who was serving as counsel for both Goodman and the Jake Ball Trust, caused formation of an entity called 1600 GP LLC, which subsequently became the General Partner in a limited partnership entity called Zack & Jack Realty; defendant Goodman owned a 99% interest in 1600 GP LLC and the plaintiff Jake Ball Trust owned a 1% interest.

6. The limited partnership, Zack & Jack Realty, in turn, was owned 1% by the general partner, 1600 GP LLC, and 99% by the limited partner, the Jake Ball Trust.

7. Within days of the formation of these entities, defendant Bruce Goodman loaned the sum of $1.2 million dollars to enable Zack & Jack Realty to purchase a certain property in North Philadelphia and the plaintiff Jake Ball Trust, the limited partner in Zack & Jack Realty, signed the signature page that was then affixed to a document purporting to also guaranty repayment of the loan which, according to the documents, was finally due and payable on July 1, 2010, and is now allegedly in default.

8. As part of the loan guaranty documentation, plaintiff signed, on behalf of the Jake Ball Trust, signature pages later affixed to a series of documents drafted for his signature by Peter Friedman, Esq., attorney for parties on both sides of the loan transaction, including a purported "Surety Agreement" and a "Pledge of Membership Interest and Security Agreement", each of which is attached hereto and marked as "Exhibit A" and "Exhibit B", respectively.

9. The "Surety Agreement", which included a Pennsylvania Confession of Judgment provision, purported to guarantee payment of the loan in the original amount of $1.2 million dollars, while the "Pledge of Membership Interests and Security Agreement" purported to secure the obligations undertaken in the Surety Agreement, and, as security therefore, pledged the entire 10% interest of the Jake Ball Trust in Goodmill, LLC.

10. On or about August 14, 2007, Jeffrey Hoffmann, Esq., an associate of Peter Friedman, Esq., sent to the plaintiff email, via Kelley Peck, Esq., the Jake Ball Trust's Connecticut tax attorney, a document called "Assignment of Rights to Receive Distributions from Goodmill, LLC", along with a letter from his other client, defendant Bruce A Goodman, in which Goodman a) acknowledged the Jake Ball Trust's request to terminate the surety agreement and the agreement pledging the Trust's Goodmill LLC membership interests, and b) confirmed that said agreements were terminated, in consideration of the execution by plaintiff of the accompanying "Assignment of Rights to Receive Distributions", which the plaintiff did, in fact, execute. (Copies of the emails with the Goodman letter attachment and the Assignment attachment are attached to this Complaint as "Exhibit C").

11. The effect of the aforesaid August 14 transaction was to replace plaintiff's pledge, as surety, and his 10% trust interest in Goodmill LLC with an assignment, of plaintiff's right to receive distributions from Goodmill (but not any membership interests) in the event of a default on the loan to Zack & Jack Realty.

12. On or about July 7, 2010, defendant Goodman, acting through yet another attorney, one Gregory Fox, Esq., issued two Notices to plaintiff; the first was a "Default Notice", ("Exhibit D" attached) alleging that the original note had an unpaid balance and that plaintiff was in default of its obligations under the Surety Agreement; and the second was a **"NOTICE OF ASSUMPTION OF MEMBERSHIP INTERESTS"** ("Exhibit E" attached). In which it is announced that defendant Goodman has "assumed all rights to the [10% Goodmill] membership interests" and that he "may elect to sell the interests".

13. Although dated July 7, plaintiff received these notices on or about July 18, 2010, and sent them to counsel who promptly, on July 20, (letter attached as "Exhibit F") called to Mr. Fox's attention the fact that he was proceeding on the basis of a Pledge Agreement that had been terminated by his client back on August 14, 2007 and requested that Mr. Fox, without delay, rescind the Notice of Assumption of Membership Interests.

14.    The Notice of Assumption of Membership Interests has not been rescinded, and plaintiff is concerned Goodman will take additional steps based upon his mistaken notion that he now owns the 10% Goodmill interest actually owned by the Jake Ball Trust.

**WHEREFORE**, plaintiff demands judgment on the First Count:
   (a) Declaring and adjudging that the Jake Ball Trust is still a Member of Goodmill, LLC, and the owner of a 10% interest therein, entitled to all of the rights relating to that ownership; and
   (b) Declaring and adjudging that the purported "Notice of Assumption of Membership Interests" dated July 7, 2010, is of no force and effect; and
   (c) Permanently enjoining defendants from taking any steps based upon the aforesaid purported "Assumption"; and
   (d) For such further relief as may be appropriate in the circumstances; and
   (e) For costs of suit.

**SECOND COUNT**

15. Plaintiff repeats the allegations of the First Count and incorporates them herein, in lieu of repetition thereof.

16. On or about May 31, 2010, the Grantor of the Jake Ball Trust, Steve Durst, was terminated from his employment with Goodman Properties, LLC, by the defendant Bruce Goodman by letter attached hereto as "Exhibit G", in which no reason was given for the termination, but a reference was made to a contact between Durst and the Human Resources Director on May 28, wherein Durst is said by Goodman to have been contemplating the filing of an employment harassment/discrimination complaint against Goodman.

17.  Such a complaint has, in fact, been filed with the EEOC and the Pennsylvania Human Relations Commission with an EEOC docket no. 530-32-02904 in which Durst alleges that his termination was illegal and in violation of federal and state laws. A copy of said complaint has been served upon Goodman's counsel and will be provided to the Court when required.

18.  In addition to his effort to "confess judgment" in Pennsylvania (referenced in the Certification hereto), and to "assume ownership" of the 10% interest held by plaintiff in Goodmill, LLC, addressed in the First Count hereof, Goodman has now, through Attorney Stephen Hladic, notified the plaintiff that he proposes to exercise his option to "buy out" the 10% interest of the Trust in Goodmill, LLC, under Section 7.04 of the Operating Agreement ("Exhibit I") by reason of the termination of employment of Steve Durst, Grantor of the Trust. (See "Exhibit H" attached).

19. Although Defendant Goodman had caused circulation to the Members, including plaintiff, as well as lending sources, of an appraisal valuing the Goodmill LLC Shopping Center at $94,300,000, as of September 1, 2007, application of the termination "buy-out" formula in Section 7.04, valued the company at $53,864,109.22; further application of the formula resulted in a valuation of plaintiff's interest effectively at –0- (or a negative $2,241,165), whereas the value of that interest based upon the appraisal, minus debt, would be $1,802,422.

20.  If Goodman's erroneous and illegal interpretation and application of the alleged "formula" is accepted, it would cause a complete forfeiture of the Jake Ball Trust's interest in Goodmill, LLC, a result abhorred by equity, particularly given Goodman's illegal conduct in purporting to trigger the forfeiture by illegally "terminating" the employment of Steve Durst in retaliation for Durst complaining about Bruce Goodman's sexual harassment of female employees and other workplace discrimination as alleged in the EEOC complaint.

21.  If plaintiff resigned its Membership (the Operating Agreement is silent regarding resignation), its rights would be controlled by N.J.S.A. Sec. 42:2B-39, under which plaintiff would be entitled to receive "the fair value of his limited liability company interest as of the date of resignation, less all applicable valuation discounts".

22.  Plaintiff asserts that this Court should declare the valuation formula of Section 7.04 to be void and of no effect in valuing plaintiff's interest on the grounds, *inter alia,* that a) the buyout is triggered by an event unrelated to the value of plaintiff's interest, i.e., the termination of a third party; b) the termination may be for "any reason whatsoever", which would include an illegal reason, as alleged by Steve Durst in his pending Pennsylvania proceeding, and approving the triggering of such a provision if the termination should prove to be illegal is against public policy and would result in an inequitable forfeiture and windfall based on Goodman's illegal conduct; c) the entire provision is punitive, was not created by the fiduciaries, Goodman and attorney Friedman, in an exercise of good faith and fair dealing, but rather for the purpose of rendering Steve Durst some kind of indentured servant whose termination would be very

4

costly for the grantor trust he had created; d) the formula produces an unconscionable result in that it capitalizes the rental income of a single calendar year and offsets the entire debt of the Company against the result, so that the formula would produce a negative buyout result for many years into the future; e) the formula includes expenses, such as Professional and Management fees that are completely under the control of defendant Goodman, the Manager of the LLC, and which are alleged, along with certain other expenses, to be excessive and which will be the subject of discovery; and f) the "annual rents" are diminished by the fact that defendant Goodman is part owner of a certain tenant "We Buy Gold", which pays no rent at all; together with such additional grounds as may be developed.

23.   Plaintiff cannot resign its Membership in the LLC, which would affect its ability to litigate these issues, without a determination as to the correct meaning and validity of the Section 7.04 buyout formula and its enforceability in view of Goodman's illegal conduct in attempting to trigger a forfeiture and windfall for himself based thereon..

**WHEREFORE,** plaintiff demands judgment on the Second Count:
a)  Declaring and adjudging that the termination "buyout" provision of Section 7.04 of the Goodmill LLC operating is void as against public policy and unenforceable;
b)  Declaring and adjudging that plaintiff, upon resignation of its Membership interest, would be entitled to receive the "fair value" of the interest as defined in Sec. 42:2B-39, N.J.S.A.;
c)  Fixing the "fair value" of plaintiff's interest and directing payment thereof to the plaintiff by a date certain;
d)  For such further relief as the Court may deem appropriate; and
e)  For costs of suit.


Dated: August  18, 2010

Law Office, John A. Yacovelle

By: _____
John A. Yacovelle
Attorney for Plaintiff


## CERTIFICATIONS

As required by Rule 4:5-(b)(3) and Rule 1:38-7(c), I Certify that the documents attached contain no confidential personal identifiers and that should any subsequently submitted documents contain such confidential personal identifiers, they will be redacted.

NOTICE OF OTHER ACTIONS:  As required by Rule 4:5-1(b)(2), I Certify that there is a related action pending in the Commonwealth of Pennsylvania, captioned Bruce

A. Goodman vs. Matthew Durst, Trustee of the Jake Ball Trust, in the Court of Common Pleas of Montgomery County, docket No. 2010-21864, in which the plaintiff Goodman, defendant herein, is attempting to obtain a judgment by confession on the loan referred to in paragraph 7 of this Complaint, based in part upon documents referred to in paragraphs 8 and 9 of the Complaint. If and when that judgment is entered it will be the subject of a motion to strike or vacate, according to Pennsylvania procedure, upon, *inter alia,* jurisdictional grounds, irregularities in the documents and certain signatures, and an alleged breach of fiduciary responsibilities by the General Partner (controlled by defendant Goodman herein) of the borrower, Zack & Jack Realty, and the attorney for the General Partner and for the limited partnership. This Pennsylvania action does <u>not</u> involve any issue concerning whether or not the Jake Ball Trust is a Member with a 10% interest in Goodmill, LLC.

John A. Yacovelle

6

50

1  valuation of the Goodmill, LLC interest, did you
2  advise Matt Durst at all about 7.04?
3       A.    I did not have a discussion with him
4  about Section 7.04 of the —
5       Q.    Operating agreement.
6       A.    Operating agreement.
7       Q.    How about Steve Durst?
8       A.    I did not have a discussion with Steve
9  either.
10      Q.    Okay.
11            MR. STEVEN DURST:  Give us 30 seconds,
12  guys.
13            (Whereupon, there is a break taken from
14  12:15 p.m. to 12:16 p.m.)
15      Q.    When did you first become aware of the
16  potential impact of Section 7.04 of the operating
17  agreement?
18      A.    Sometime in the fall of 2007 I was
19  talking with Paul Ruby about the valuation of the
20  company.
21      Q.    In the fall of 2007?
22      A.    Yes.
23            (Exhibit Peck-3, Letter dated
24  November 28, 2011, to Judge Cynthia Becker from
25  Kelley Peck consisting of four pages, is marked for

CRUZ & COMPANY, LLC

51

1  Identification by the court reporter.)
2       Q.    I am going to show you what has been
3  marked Peck-3 for identification, and before I do
4  that, let me point out to you that at prior
5  depositions we have acknowledged that some of these
6  documents have underlines and highlights.  We have
7  stipulated that all of those underlines and
8  highlights were done by Steve Durst and they are not
9  relevant to the conversation.
10            Now showing you Peck-3, and can you
11  tell me what that is?
12      A.    It appears to be a document dated
13  November 28, 2011, to Judge Cynthia Becker of the
14  Simsbury Regional Probate Court, regarding Jake Ball
15  Trust Final Accounting.
16      Q.    When you say "document," it appears to
17  be a letter, correct?
18      A.    Yes.
19      Q.    And it is a letter written by you?
20      A.    Yes.
21      Q.    And is that your signature on the last
22  page?
23      A.    Yes.
24      Q.    And if you turn to page -- I guess it
25  is the second page.  Let me see it real quick.

52

1            The first full paragraph on the second
2  page, can you read that into the record?
3       A.    Okay, I am going to skip the
4  punctuation.  "One of the assets of the trust is a
5  10 percent membership interest in Goodmill, LLC.
6  The LLC owns a shopping center in Millville, New
7  Jersey.  At the time the trust became irrevocable in
8  December 2007 the interest was valued at 841,000.
9  However, there is a clause in the LLC operating
10  agreement that may render the interest worthless
11  under certain circumstances.  In consideration of
12  Steve making the trust irrevocable, the trustee
13  executed a promissory note payable to Steve for
14  $500,000.  The balance of the value of the trust on
15  conversion being treated as a gift.  The note bears
16  interest at a rate of 4.72 percent and a term of
17  15 years.  A copy of the note will be provided upon
18  request."
19      Q.    Okay, and that was written by you.  Is
20  that correct?
21      A.    Yes.
22      Q.    You agree with it?
23      A.    I agree with on November 28, 2011,
24  that that was my opinion.
25      Q.    That was accu -- okay, thank you.

CRUZ & COMPANY, LLC

53

1       A.    It was my understanding of what had
2  been communicated to me.
3       Q.    It was indicated -- you said that was
4  indicated to me, indicated to you by whom?
5       A.    Well, in the intervening years I had
6  been made aware that there had been a lawsuit, that
7  there was an argument over whether or not the asset
8  was of any value, so -- so at that point there had
9  already been a lawsuit and it was deemed to be -- I
10  think they ended up with an $80,000 value.
11      Q.    Okay.
12      A.    In settlement.
13      Q.    You indicated that you were aware of a
14  lawsuit.  Tell me what you know about that lawsuit
15  involving Section 7.04, if you will.
16            MR. LEISE:  Objection to form.
17      Q.    Strike the question.
18            When you said you were aware of a
19  lawsuit, can you tell me what you meant?
20      A.    It is my understanding there was a
21  good deal of litigation that was taking place in
22  2010 and 2011 in New Jersey relating to the trust
23  and Steven Durst's relationship with Goodmill
24  Properties and Bruce Goodman, and there was a
25  variety of different cases going on.

LAW OFFICE

## JOHN A. YACOVELLE

8438 MACKALL ROAD
ST. LEONARD, MD 20685
PHONE OR FAX 1-888-819-3736
EMAIL: yacovelle@hughes.net

MEMBER MARYLAND, NEW JERSEY
& DISTRICT OF COLUMBIA BARS

January 2, 2012

The Honorable Anne McDonnell, J.S.C.
1 North Broad Street
Woodbury, NJ 08096

### Re: Durst v. Goodman, Docket No. C-27-10

### LETTER BRIEF

Dear Judge McDonnell:

Please accept this Letter Brief in response to the various Motions set down before Your Honor on January 6, 2012.

I represent the plaintiff, Matthew Durst, Trustee of the Jake Ball Trust. The defendants are represented by Stephen Hladik, Esq. and David Onorato, Esq. (*pro hac vice*). Vincent D'Elia, Esq., represents Steven Durst, grantor of the irrevocable Trust and Reuben "Mike" Durst a Trustee of the Trust who after several years of doing nothing for the Trust has risen to object to the settlement of the above-captioned matter. The motions before the court are these: a motion to enforce the settlement entered on the record on October 4, 2011 and a motion to disqualify Mr. D'Elia as counsel (both by Mr. Hladik); and motions by Mr. D'Elia to set aside the settlement; reopen the case and allow it to proceed to trial; and to allow the intervention of both Steve and "Mike" Durst in the matter.

It would seem that the threshold issue is the disqualification motion, since if it is granted, the proposed interveners would need to obtain other counsel to represent their interests. On the **disqualification** motion, I have no position, either factual

provision, he claimed he had never read the Agreement and, basically, that the buy-out had been slipped past him. On the other hand, 3 ostensibly reputable witnesses were prepared to testify that Steve knew of the provision and had actually negotiated changes in the formula. That is the case which we came to Woodbury on October 3 prepared to try. We were also prepared to settle that case. Many discussions with defense counsel over the previous months involved a modification to Sec. 7.04 which would, for instance, make the option non-exercisable for an extended period such as 10 years, during which time the formula would presumably lead to a positive buyout number were the option to be exercised. We were well-motivated to settle, because the clause was written in plain English, Steve was known to be a sophisticated real estate person, and the 3 adverse witnesses were not easily dismissed. All in all, we were confronted with an uphill battle.

What was the **value** of the Trust interest in Goodmill as of October, 2011? On December 21, 2007, in an Agreement leading to the Trust becoming irrevocable, Steve Durst declared that the 10% interest was worth $600,000 "as per the attached appraisal", though there was none attached. (JAYCert par.9)

Later on, as we are told over and over in the moving papers, Paul Ruby of Parker Benjamin, Inc. of Farmington, CT, issued an appraisal dated May 19, 2008, valuing the 10% Goodmill interest at $841,000. Here is what we have not been told in the moving papers about that appraisal. At the repeated insistence and demand of Steve Durst, Matt (and I) explored the feasibility of a malpractice suit against the appraiser. He had obviously been negligent, since the appraisal indicated that he had seen the Operating Agreement, but nowhere did he flag Section 7.04 and either attempt to explain it away, or discount his appraisal because of it. He simply missed it or ignored it. Connecticut trial counsel, however, pointed out that no damages had been proximately caused by the negligence, because the appraisal was issued after the Operating Agreement had been signed (Nov. 2005) and after the Trust had issued a $500,000 note to Steve on December 24, 2007, (based on Steve's $600,000 valuation) and the appraisal influenced neither action because it did not yet exist. (JAYCert par .10) The suit, therefore, was not filed, but those most closely involved with the case knew better than to put stock in the $841,000 number, and that definitely includes Steve Durst, notwithstanding paragraph 7 of his Certification. And while we are looking at that paragraph, my reading of the report and the website of Paul Ruby have turned up no indication that he is an "MAI" or that his work product is an "MAI Appraisal" as claimed by Steve. Typically, Members of the American Institute of Real Estate Appraisers to not hide that fact; rather, they trumpet it. In

h2

**veriʒon**                                                                    Print

**Subject** **Fwd: CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**
**From:**  **Matthew Durst <gmmbt@comcast.net>**
**Sent:**  **Jun 18, 2011 09:52:23 AM**
**To:**    stevedurst@verizon.net

Begin forwarded message:

**From: John Yacovelle <yacovelle@yahoo.com>**
**Date: June 18, 2011 10:18:05 AM EDT**
**To: gmmbt@comcast.net**
**Subject: CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**

Matt:
In view of the several calls that have taken place this week (from Peck/Heath, Steve and you), I find it necessary to write this so as to clarify the situation regarding Parker Benjamin, Inc. and Paul Ruby. Ruby delivered a DRAFT appraisal of the Trust interest in Goodmill dated May 19, 2008, at which time he faxed the DRAFT to Kelley Peck. That is what I have--you faxed it to me on July 10 2010. I do not know if or when the draft became a final product, but that could be an important date in terms of the running of the 3-year Connecticut statute of limitations on negligence claims.
In any event, the appraisal speaks of value as of 12/31/2007 and assigns the sum of $841,000. As we already know, Ruby had before him the Operating Agreement, from which he quoted on page 4 of the appraisal. He did not, however, note the existence of paragraph 7.04 which could have rendered the interest worthless for some years into the future. Let us assume for purposes of discussion that this omission amounted to negligence. Now, in order to be actionable, the negligence has to result in damages to the plaintiff--presumably the Trust.

There are two potential areas of damages: the first is that the Trust, when it issued a $500K Note to Steve, could have been wasting money on a property of little value (the portion of the valuation attributable to Goodmill). Kelley Peck and Ed Heath called me on Thursday the 16th and he pretty much demolished that potential claim. He said that the agreement with Steve used the figure $900K as the estimated value of the Goodmill interest, a figure he said came from Steve. Regardless of where it came from, the agreement was finalized in December 2007, several months before the draft appraisal let alone the final appraisal. Therefore, you could not have relied on the appraisal valuation of $841K in the agreement with Steve. In other words, the damages on this theory were clearly not proximately caused by the appraiser's assumed negligence. I agree with that conclusion completely.

The second potential area of damages only comes clearly into focus if we try our case and lose it. In that case, Goodman will pick up the 10% interest free of charge rather than at the value the appraiser assigned. There are still some problems to be confronted: one, when was the report finalized? Was it more than three years ago, and if so, is the claim then barred by the statute of limitations? Or, would it be true under Connecticut law that the claim would not accrue (that the statute would not begin to

http://netmail.verizon.net/webmail/driver?nimlet=deggetemail&fn=1

run) until damages were actually suffered--that is if and when we lose the case? I do not know the answers to these questions because a) I don't know when the appraisal was finalized and b) I don't know Connecticut law. These are questions you have to ask the proposed attorney very early on. It may be that the only way you can protect against a statute of limitations problem if we lose the case is to file suit immediately; but if the claim does not accrue until we lose it, then the statute of limitations is not a problem. There is, however, another potential problem: the Goodmill agreement was signed by Steve (in your name) on November 15, 2005 (or 2006, depending upon which version of the agreement you believe). It is pretty clear that a) he didn't read it; and b) that a lot of time passed before you even saw it. Now, along comes Ruby in 2008 and says the interest is worth $841K; suppose, instead, he said it was worthless or, speculating on the likelihood of termination, discounted it by 80% and said it was worth $168K. What would the Trust have done differently as of May or June of 2008 than what it actually did? The Operating Agreement was signed, a done deal. The Trust could have started suit to have the provision declared invalid (before any termination) or Steve could have negotiated some kind of a buyout of the interest with Goodman, etc., etc. But these are pretty speculative moves and the question for the attorney is whether, assuming we lose our case, the issuance of the appraisal in 2008 without calling attention to the precarious position the Trust was in proximately caused the Trust to wind up with a goose egg.

I do not want to express an opinion on a Connecticut case, but the more I think about this the more problems I see. There is no harm in you running it by a lawyer at a very early date, but my instinct is that it will probably not turn out well. By the way, I do not plan on losing our case at the present time. I have rejected the Hladik proposal that we simply modify the termination buyout (maybe a little tweaking of the cap rate, etc., and kick it down the road for up to ten years. I am insisting on the provision being inapplicable to the Trust. Whether it remains applicable to Andersen is of no interest to us. I will keep the heat on and let you know when I hear anything.
J.A.Y.
P.S. Feel free to share this with Steve if you wish.



**42**

1    MR. LEISE:  Objection to form.

2    ANSWER:  -- the information.")

3    MR. LEISE:  I just didn't know what

4    information you meant.  That was my objection.

5    BY MR. D'ELIA:

6    Q.    Okay, to make it clear, you had the

7    information from Parker Benjamin at or about the

8    time that 8(A) was executed that the valuation was

9    $841,000.  Is that fair to say?

10    MR. O'CONNOR:  Objection to form.  I

11    think we are getting completely bolloxed up here.

12    MR. LEISE:  Objection.

13    MR. O'CONNOR:  She is talking about 8

14    in one minute and the next minute you are asking

15    about 8(A) in reference to what she said about 8, so

16    I think we are completely confused here.

17    A.    I believe -- your question is whether

18    I had the information that the value was 841 at

19    around the time when it was executed, and the answer

20    to that question is yes.

21    Q.    When Exhibit 8(A) was executed?

22    A.    I -- the only difference I can see

23    between these two documents is page 1.

24    Q.    Correct.

25    A.    So I don't know when — I don't think

CRUZ & COMPANY, LLC

**43**

1    there were two different instruments signed.  To the

2    best of my knowledge, they look like the signatures

3    are the same on the two documents.  It doesn't look

4    to me like they are two different documents.

5    Q.    Okay.

6    A.    So I am having a little trouble

7    understanding.  You are saying you signed

8    documents.  I don't think this was

9    signed on one day and this was signed on a different

10    day.

11    Q.    Okay.

12    A.    So I am not really understanding your

13    question.

14    MR. D'ELIA:  I would like to take a

15    ten-minute break.

16    (Whereupon, there is a break taken from

17    11:50 a.m. to 12:01 p.m.)

18    Q.    Did there come a time when you had a

19    conversation with Matt, Steve or Mr. Yacovelle

20    concerning a potential claim against Parker

21    Benjamin?

22    A.    Yes, there was Matt -- Matt did tell

23    me that Steve wanted to sue Parker Benjamin.

24    Q.    And did you give any advice with regard

25    to the merits of the claim against Parker Benjamin?

**44**

1    A.    I am not a litigator, so I really

2    didn't.  I referred him to another attorney in my

3    office who does litigation.

4    MR. LEISE:  Can I make a statement for

5    the record, Vince?  I believe this line of

6    questioning would concern the witness' time at

7    Robinson & Cole.  We are not waiving -- I am going

8    to allow the witness to answer the questions in the

9    spirit of cooperation, but I am not waiving any and

10    all arguments arising from the previous decisions in

11    this case.

12    MR. D'ELIA:  I understand that.

13    MR. LEISE:  Okay.

14    Q.    The attorney at your office that

15    reviewed the potential claim against Parker

16    Benjamin, was that Ed Heath?

17    A.    Yes.

18    Q.    Do you recall having a conversation

19    with Mr. Heath and Mr. Yacovelle concerning the

20    potential claim against Parker Benjamin?

21    A.    I don't specifically recall a

22    conversation with Ed and John Yacovelle.  I only

23    recall a conversation with Matt.  But that doesn't

24    mean it didn't happen.  I just don't recall it.

25    (Exhibit Peck-2, Forward of an e-mail

CRUZ & COMPANY, LLC

**45**

1    from Matthew Durst to Steven Durst of an e-mail from

2    John Yacovelle to Matt Durst dated June 18, 2011, is

3    marked for identification by the court reporter.)

4    Q.    I have marked as Peck-2 a document that

5    appears to be a forward of an e-mail from Matthew

6    Durst to Steven Durst of an e-mail from John

7    Yacovelle to Matt Durst dated June 18, 2011.

8    I don't know if you have ever seen this

9    before.  Do you recognize that e-mail?

10    (Witness reviews document.)

11    A.    I don't.

12    Q.    You don't?

13    A.    But it doesn't mean I haven't seen it.

14    I don't recognize it.

15    Q.    You don't recognize it as you are

16    sitting here now?

17    A.    Correct.

18    Q.    Why don't you read into the record this

19    paragraph where I have my finger, which appears to

20    be the second paragraph of that e-mail?  If you

21    could read that into the record, I have some

22    questions about it.

23    A.    Can I just take a minute?

24    Q.    Sure, read it first.

25    (Witness reviews document.)

CRUZ & COMPANY, LLC

**Goodman** Properties
636 OLD YORK ROAD, JENKINTOWN, PA 19046

VIA: E-MAIL: stevedurst@verizon.net

May 19, 2011

Re:    **Response to May 18, 2011 offer**

Steve:

The following terms are elements of settlement negotiations – are confidential and as such are inadmissible as evidence in a court of law or legal proceedings.

In response to your latest offer May 18, 2011, I offer the following:



1) Hunting Park: Agreed. However, it must be clear that any and all deficiencies from a sale must be made up by the Trust. Millville can be the source of the repayment of the deficiency out of either cash flow, a sale or a refinance. The deficiency shall bear interest at a rate of 5%.

2) Union Lake Crossing: It is anticipated that over the next five years we will be refinancing the property and hopefully be out of harm's way with our lenders for another ten years. The phantom income will not kick in for many years. The buy-out that you are referring too cannot be an obligation on my part; rather, I will agree to amend our Operating Agreement to delay the buy-out for ten years. This should allow the property to further mature and to pay down additional debt, and over the next ten years the net value as defined in the Operating Agreement should be much greater than it is today. However, I am not obligated to buy it at that time. It is my option.

3) The Reserve: Notwithstanding the fact that your facts are off, we can figure out collectively the best course of action in order to modify the Master Plan improvements.

4) Agreed as too Bottino. However, as I have expressed to you earlier, we do not want to get involved with solar for Common Area Electric. However, we will consider granting you an easement for the Common Area Electric provided that none of our rooftops are used and we are not obligated to contribute any of our tenants' Common Area Electric reimbursements (i.e. your deal must work based purely on SRECS and tax benefits alone).

5) Agreed.

6) Agreed.

7) N/A: If we are finalizing this agreement it gets finalized by Friday, May 27, 2011. We both have legal teams who can do that.

Sincerely,

GOODMAN PROPERTIES

Bruce A. Goodman

BAG/bt



EXHIBIT

, Signing on Saturday

## Carol Kulik

**From:** Durst, Matt [MDurst@stfranciscare.org]
**Sent:** Thursday, October 25, 2007 12:37 PM
**To:** Carol Kulik
**Subject:** FW: Signing on Saturday

Can you print this out for Steve per our conversation.

Thanks

Matt

**From:** Peck, Kelley [mailto:peck@halloran-sage.com]
**Sent:** Thursday, October 25, 2007 10:47 AM
**To:** Durst, Matt
**Subject:** Signing on Saturday

Matt

I have witnesses if we need them for Saturday morning. However, I want to explore the possibility of delaying the signing until we receive the appraisal. I spoke to Paul Ruby and he is willing to do the appraisal and will have it for us in about 2 weeks. To do so, he needs the Operating Agreement and the appraisal both of which I have and can give him. He also will need a copy of the 2 mortgage notes and a statement of the relatively exact amount still due (as of the September payment is fine). The whole purpose of this appraisal is to have a professional statement regarding the available discount. If Paul does not have the exact mortgage information as well as a copy of the mortgage paperwork, it calls into question the validity of his entire appraisal, so it is worthwhile to give him the exact info.

I under-estimated the cost a little bit. His fees went up, so it will be $2500. However, with Steve having just come off an audit, I do not want to put him in the position of having another problem with his gift tax returns, so I think it is worth doing. So much so that I am willing to discount my fee by $1000, to make up for the additional cost of the appraisal.

Now to the reason for delay. As you can see from the documents that I sent to you, we will be selling less than the whole 10% interest in the LLC. After our meeting on Tuesday, I agree that using more of the lifetime exemption is a good idea. To accomplish this, however, we need to know the exact appraisal amount before we can decide on the exact % that we are selling and the exact amount of the promissory note - for example it may turn out to be a 5.5% interest and the note may be for $532K. I do not want to sign these documents now and then have the numbers inserted later. Since this transaction might be subject to IRS scrutiny, I prefer that it be done "by the book." I also think that using exact numbers in the transaction rather than rounding off numbers is better because it give the transaction greater legitimacy. The whole purpose is to ensure that the transaction looks commercially reasonable. No bank would round off to $500K, so we should not do that either.

I know you are anxious to get this done, but we have until the end of the year to do it and it is better to be cautious in these types of transactions. If we get the mortgage information to Paul next week, by fax, e-mail or regular mail, he will have the appraisal done in 2 weeks. I know it is convenient that Steve will be here this weekend, but that should not be the driving factor. We can still meet to discuss the


EXHIBIT

terms of the transaction and address any questions Steve or you still have.  We can then target Nov 15 as the settlement date (or any other date before 12/31 that is convenient!!)  This also will give me the time to make any changes to the transaction based on our conversation on Saturday.

Let me know your thoughts and call me to discuss if you prefer.  If I am not in the office, I will call you back from my cell phone

Kelley

Kelley Galica Peck, JD, LLM
Halloran & Sage  LLP
One Goodwin Square
Hartford, CT 06103-4303
Telephone: 860-297-4632
Fax.  860-548-0006
mailto:peck@halloran-sage.com
www.halloran-sage.com

IRS Circular 230 Disclosure:  In compliance with Treasury Department Regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used by any taxpayer, and cannot be used, for the purpose of: (i) avoiding penalties under the Internal Revenue Code that may be imposed on the taxpayer; or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Confidentiality:  The information contained in this e-mail message is intended only for the use of the individual or entity named above and is privileged and confidential.  Any dissemination, distribution, or copy of this communication other than to the individual or entity named above is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone.

<<Galica-Peck, Kelley.vcf>>

NOTICE: This email and/or attachments may contain confidential or proprietary information which may be legally privileged. It is intended only for the named recipient(s). If an addressing or transmission error has misdirected this email, please notify the author by replying to this message. If you are not the named recipient, you are not authorized to use, disclose, distribute, make copies or print this email, and should immediately delete it from your computer system.
Saint Francis Care has scanned this email and its attachments for malicious content. However, the recipient should check this email and any attachments for the presence of viruses. Saint Francis Care accepts no liability for any damage caused by any virus transmitted by this email.

10/25/2007

From: Peck, Kelley [mailto:peck@halloran-sage.com]
To: Durst, Matt
Subject: RE: Signing Meeting

OK
see you then

Kelley


Kelley Galica Peck, JD, LLM
Halloran & Sage LLP
Telephone: 860-297-4632
mailto:peck@halloran-sage.com


IRS Circular 230 Disclosure: In compliance with Treasury Department Regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used by any taxpayer, and cannot be used, for the purpose of: (i) avoiding penalties under the Internal Revenue Code that may be imposed on the taxpayer; or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.


From: Durst, Matt [mailto:MDurst@stfranciscare.org]
Sent: Monday, December 17, 2007 10:20 AM
To: Peck, Kelley


12/19/2007



Signing Meeting

## Carol Kulik

**From:**  Durst, Matt [MDurst@stfranciscare.org]
**Sent:**  Wednesday, December 19, 2007 1:10 PM
**To:**  Peck, Kelley
**Cc:**  Steve Durst
**Subject:** RE: Signing Meeting

Hi Kelley,

I want to review the purpose of the meeting on Friday, 12.21/2007.
1. To review the re-assessment that Paul Ruby has completed for the Goodmill Shopping Center and sign the documents converting the JB Revocable Trust to an Irrevocable status as we had discussed.
2. Fund the existing Steve Durst Irrevocable Life Insurance Trust with the current $1, 500,000.00 10 year term policy as we had discussed..
3. Discuss the involvement of Halloran & Sage in preparing the 2007 tax returns for all facets of the JB Trust as well as Steve's personal income tax retern for 2007.

Is there anything else that we will need to review, discuss or ammend?

Matt



PLAINTIFF'S
EXHIBIT.
D-MD-8
2-2-15 B

# AGREEMENT

THIS AGREEMENT is dated as of December 21, 2007, by and among **STEVEN DURST** ("Steven"), as Grantor, and **MATTHEW DURST** and **REUBEN H. DURST** (the "Trustees"), as Trustees of the Jake Ball Trust dated November 29, 2004 (hereafter the "Jake Ball Trust" or the "Trust").

WHEREAS, the Jake Ball Trust holds the following assets (collectively referred to as the "Trust Property"):

(1) a ten percent (10%) interest in **GOODMILL, LLC**, a limited liability company operating and existing under the laws of the State of New Jersey, having a principal place of business at 636 Old New York Road, 2nd Floor, Jenkinstown, Pennsylvania, 19046, having a net value of Six Hundred Thousand Dollars ($600,000), as per the attached appraisal;

(2) a money market account at Pershing, LLC, account number 2110-5728, with a balance as of December 1, 2007 of $50,000.00; and

(3) a savings account at Northwest Community Bank, account number 55000371422, with a balance as of December 1, 2007 of $575.14; and

(4) a checking account at Northwest Community Bank, account number 55000459393, with a balance as of December 1, 2007 of $1,000.00; and

(5) a stock and cash account at Schwab and Company, holding 1,000 shares of Apple and 10,000 shares of Geron, as well as cash, valued as of December 3, 2007, at $254,520; and

(6) 75,000 shares of common stock in Useful Technology, a non-publicly-traded stock of a corporation having a principal place of business at 600 North Pine Island Road, Suite 450, in Plantation, Florida, having a present value of $75,000, as per a letter of appraisal.

WHEREAS, Steven, the Grantor and current beneficiary of the Trust has certain rights under the Jake Ball Trust, including, but not necessarily limited to, the right to alter, amend or revoke the Trust, make withdrawals of all or any part of the income and principal of the Trust, and to change the Trustees of the Trust, including specifically the right to vest title to the Trust Property in his own name (the "Rights"); and

WHEREAS, Steven is willing to relinquish substantially all of his Rights in the Trust by executing the Irrevocable Amendment and Restatement of the Trust Agreement attached hereto as Exhibit A; and

WHEREAS, Steven and the Trustees agree that all of the Trust Property will continue to be held by the Trust following conversion to an irrevocable Trust and, the act of converting the trust to an irrevocable trust constitutes a gift of the Trust Property to the beneficiaries of the Trust; and



WHEREAS, Steven is willing to transfer the entire value of the Trust Property, being approximately $980,000, in exchange for a promissory note in the amount of $500,000; and

WHEREAS, the Trustees have concluded that it is in the best interest of the current and contingent remainder beneficiaries of the Trust for the Trustees to pay Steven the sum of Five Hundred Thousand Dollars ($500,000) by a fifteen year, fully amortized promissory note bearing a rate of 4.72%, together with an assignment of a ten percent (10%) interest in Goodmill, LLC as collateral for the full performance of their obligations under this Agreement and the Promissory Note, in exchange for Steven's execution of the Irrevocable Amendment and Restatement of the Trust Agreement attached hereto as Exhibit A, thereby substantially relinquishing all of his Rights in and to the Trust Property.

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

## ARTICLE 1.
## CONVERSION TO IRREVOCABLE TRUST

Section 1.1.    Obligation to Make Trust Irrevocable.  On or about the 24th day of December, 2007, at the law offices of Halloran & Sage, LLP, at 8:00AM (hereafter referred to as the "Closing"), or at such other location as may be mutually agreed upon by the parties, Steven will execute the Amendment and Restatement of the Trust Agreement, which is attached hereto as Exhibit A, making the Trust irrevocable and relinquishing substantially all of his rights in and to the Trust Property.

Section 1.2.    Consideration Payable by the Trustees.  At the Closing, the Trustees will deliver to Steven a Promissory Note in the principal amount of Five Hundred Thousand Dollars ($500,000) bearing interest at a rate of 4.72% payable in fifteen (15) equal annual payments, with no penalty for prepayment, to Steven in exchange for his making the Trust irrevocable.  The Promissory Note shall be in the form set forth in the Promissory Note attached hereto as Exhibit B.

Section 1.3.    LLC Interest as Collateral.  The Trustees agree to execute an assignment of a ten percent (10%) interest in Goodmill, LLC as collateral for the full satisfaction of the obligations of the Trustees pursuant to this Agreement and the Promissory Note.  The form of the assignment of the 10% interest in the LLC shall be as set forth in the Collateral Assignment Agreement attached hereto as Exhibit C.

1060334-1

## ARTICLE 2.
## INDEMNIFICATION

Section 2.1.    <u>Indemnification by Steven</u>.  Steven represents that he is not constrained in any respect from making the Trust irrevocable and relinquishing his Rights in the Trust Property.  Steven shall indemnify the Trustees and hold them harmless from all liability, damages, losses and expenses (including reasonable attorneys' fees and expenses) ("<u>Losses</u>") suffered or incurred or arising from or in connection with the transaction contemplated herein.

Section 2.2.    <u>Indemnification by the Trustees</u>.  The Trustees represent that they are not constrained in any respect from engaging in the transaction contemplated herein.  The Trustees shall indemnify and hold harmless Steven from any Losses suffered or incurred by Steven arising from in connection with the transaction contemplated herein.

## ARTICLE 3.
## MISCELLANEOUS

Section 3.1.    <u>Amendments</u>.  No amendment to this Agreement shall be effective unless it shall be in writing and signed by each party hereto.

Section 3.2.    <u>Assignment</u>.  This Agreement and the rights and obligations hereunder shall not be assignable or transferable by the Trustees or Steven without the prior written consent of the other party hereto; <u>provided</u>, <u>however</u>, that no assignment shall limit or affect the assignor's obligations hereunder.

Section 3.3.    <u>No Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person or entity, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

Section 3.4.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party.

Section 3.5.    <u>Entire Agreement</u>.  This Agreement contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.

Section 3.6.    <u>Governing Law</u>.  This Agreement and the provisions hereof shall be governed by and construed in accordance with the internal laws of the state of Connecticut without regard to its principles of conflicts of laws.

1060334-1

Section 3.7.    <u>Severability</u>.  If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

Section 3.8.    <u>No Consequential or Punitive Damages</u>.  Notwithstanding anything to the contrary elsewhere in this Agreement, no party (or its affiliates) shall, in any event, be liable to any other party (or its affiliates) for any consequential damages, including, but not limited to, loss of revenue or income, or loss of business reputation or opportunity, or any punitive damages relating to the breach or alleged breach of this Agreement.

Section 3.9.    <u>Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of the respective parties.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

Signed and Acknowledged
in the Presence of:

                                         JAKE BALL TRUST

Name: _____

                                         By: _____
                                              **MATTHEW DURST**
                                              Its Trustee

Name: _____

                                         And

                                         By: _____
                                              **REUBEN H. DURST**
                                              Its Trustee

Name: _____

Name: _____

                                         _____
Name: _____               Steven Durst

Name: _____

1060334-1

Section 3.7.   <u>Severability.</u>  If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

Section 3.8.   <u>No Consequential or Punitive Damages.</u>  Notwithstanding anything to the contrary elsewhere in this Agreement, no party (or its affiliates) shall, in any event, be liable to any other party (or its affiliates) for any consequential damages, including, but not limited to, loss of revenue or income, or loss of business reputation or opportunity, or any punitive damages relating to the breach or alleged breach of this Agreement.

Section 3.9.   <u>Effect.</u>  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of the respective parties.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

Signed and Acknowledged
in the Presence of:

JAKE BALL TRUST

By: _____

Name: _____
                    MATTHEW DURST
                    Its Trustee

Name: _____

And

By: _____

Name: _____
                    REUBEN H. DURST
                    Its Trustee

Name: _____

Name: _____
                    Steven Durst

Name: _____

1060334-1

**STATE OF CONNECTICUT**              )
                                      ) ss. Hartford
**COUNTY OF HARTFORD**                )

    Personally appeared Matthew Durst, as Trustee, signer of the foregoing instrument, who is personally known to me, who acknowledged the same to be his free act and deed as such Trustee, on behalf of the Trust, before me.

 

Notary Public
~~My Commission Expires:~~

Kelley M. Galica Peck
*NOTARY PUBLIC*
My Commission Expires: 09/30/2008

**STATE OF**                          )
                                      ) ss.
**COUNTY OF**                         )

    Personally appeared Reuben H. Durst, as Trustee, signer of the foregoing instrument, who is personally known to me, who acknowledged the same to be his free act and deed as such Trustee, on behalf of the Trust, before me.

 

Notary Public
My Commission Expires:

**STATE OF** Pennsylvania             )
                                      ) ss.
**COUNTY OF** Montgomery              )

    Personally appeared Steven Durst, signer of the foregoing instrument, who is personally known to me, who acknowledged the same to be his free act and deed, before me.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SANTINA J. BOCKMAN, Notary Public
Abington Twp., Montgomery County
My Commission Expires December 4, 2010

Notary Public
My Commission Expires: 12/4/2010

1060334-1

**STATE OF CONNECTICUT**                    )
                                           ) ss.
**COUNTY OF HARTFORD**                      )

    Personally appeared Matthew Durst, as Trustee, signer of the foregoing instrument, who is personally known to me, who acknowledged the same to be his free act and deed as such Trustee, on behalf of the Trust, before me.

                                                    Notary Public
                                                  My Commission Expires:

**STATE OF** Georgia                        )
                                           ) ss.
**COUNTY OF** Fulton                        )

    Personally appeared Reuben H. Durst, as Trustee, signer of the foregoing instrument, who is personally known to me, who acknowledged the same to be his free act and deed as such Trustee, on behalf of the Trust, before me.

                                                  Notary Public
                                                  My Commission Expires: 4/17/2011

**STATE OF** ~~Georgia~~                    )
                                           ) ss.
**COUNTY OF** ~~Fulton~~                    )

    Personally appeared Steven Durst, signer of the foregoing instrument, who is personally known to me, who acknowledged the same to be his free act and deed, before me.

                                                  Notary Public
                                                  My Commission Expires:

1060334-1



PLAINTIFF'S
EXHIBIT
D-M-D-8A
2-2-15 TS

*H*

## AGREEMENT

THIS AGREEMENT is dated as of December 21, 2007, by and among STEVEN DURST ("Steven"), as Grantor, and MATTHEW DURST and REUBEN H. DURST (the "Trustees"), as Trustees of the Jake Ball Trust dated November 29, 2004 (hereafter the "Jake Ball Trust" or the "Trust").

WHEREAS, the Jake Ball Trust holds the following assets (collectively referred to as the "Trust Property"):

(1) a ten percent (10%) interest in GOODMILL, LLC, a limited liability company operating and existing under the laws of the State of New Jersey, having a principal place of business at 636 Old New York Road, 2nd Floor, Jenkinstown, Pennsylvania, 19046, having a net value of Eight Hundred Forty One Thousand Dollars ($841,000), as per the attached appraisal;

(2) a money market account at Pershing, LLC, account number 2110-5728, with a balance as of December 1, 2007 of $50,000.00; and

(3) a savings account at Northwest Community Bank, account number 55000371422, with a balance as of December 1, 2007 of $575.14; and

(4) a checking account at Northwest Community Bank, account number 55000459393, with a balance as of December 1, 2007 of $1,000.00; and

(5) a stock and cash account at Schwab and Company, holding 1,000 shares of Apple and 10,000 shares of Geron, as well as cash, valued as of December 3, 2007, at $254,520; and

(6) 75,000 shares of common stock in Useful Technology, a non-publicly-traded stock of a corporation having a principal place of business at 600 North Pine Island Road, Suite 450, in Plantation, Florida, having a present value of $75,000, as per a letter of appraisal.

WHEREAS, Steven, the Grantor and current beneficiary of the Trust has certain rights under the Jake Ball Trust, including, but not necessarily limited to, the right to alter, amend or revoke the Trust, make withdrawals of all or any part of the income and principal of the Trust, and to change the Trustees of the Trust, including specifically the right to vest title to the Trust Property in his own name (the "Rights"); and

WHEREAS, Steven is willing to relinquish substantially all of his Rights in the Trust by executing the Irrevocable Amendment and Restatement of the Trust Agreement attached hereto as Exhibit A; and

WHEREAS, Steven and the Trustees agree that all of the Trust Property will continue to be held by the Trust following conversion to an irrevocable Trust and, the act of converting the trust to an irrevocable trust constitutes a gift of the Trust Property to the beneficiaries of the Trust; and

WHEREAS, Steven is willing to transfer the entire value of the Trust Property, being approximately $980,000, in exchange for a promissory note in the amount of $500,000; and

WHEREAS, the Trustees have concluded that it is in the best interest of the current and contingent remainder beneficiaries of the Trust for the Trustees to pay Steven the sum of Five Hundred Thousand Dollars ($500,000) by a fifteen year, fully amortized promissory note bearing a rate of 4.72%, together with an assignment of a ten percent (10%) interest in Goodmill, LLC as collateral for the full performance of their obligations under this Agreement and the Promissory Note, in exchange for Steven's execution of the Irrevocable Amendment and Restatement of the Trust Agreement attached hereto as Exhibit A, thereby substantially relinquishing all of his Rights in and to the Trust Property.

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

# ARTICLE 1.
## CONVERSION TO IRREVOCABLE TRUST

Section 1.1.  Obligation to Make Trust Irrevocable.  On or about the 24th day of December, 2007, at the law offices of Halloran & Sage, LLP, at 8:00AM (hereafter referred to as the "Closing"), or at such other location as may be mutually agreed upon by the parties, Steven will execute the Amendment and Restatement of the Trust Agreement, which is attached hereto as Exhibit A, making the Trust irrevocable and relinquishing substantially all of his rights in and to the Trust Property.

Section 1.2.  Consideration Payable by the Trustees.  At the Closing, the Trustees will deliver to Steven a Promissory Note in the principal amount of Five Hundred Thousand Dollars ($500,000) bearing interest at a rate of 4.72% payable in fifteen (15) equal annual payments, with no penalty for prepayment, to Steven in exchange for his making the Trust irrevocable.  The Promissory Note shall be in the form set forth in the Promissory Note attached hereto as Exhibit B.

Section 1.3.  LLC Interest as Collateral.  The Trustees agree to execute an assignment of a ten percent (10%) interest in Goodmill, LLC as collateral for the full satisfaction of the obligations of the Trustees pursuant to this Agreement and the Promissory Note.  The form of the assignment of the 10% interest in the LLC shall be as set forth in the Collateral Assignment Agreement attached hereto as Exhibit C.

1060334-1



**Section 3.7.** <u>Severability</u>. If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

**Section 3.8.** <u>No Consequential or Punitive Damages</u>. Notwithstanding anything to the contrary elsewhere in this Agreement, no party (or its affiliates) shall, in any event, be liable to any other party (or its affiliates) for any consequential damages, including, but not limited to, loss of revenue or income, or loss of business reputation or opportunity, or any punitive damages relating to the breach or alleged breach of this Agreement.

**Section 3.9.** <u>Effect</u>. This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of the respective parties.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

Signed and Acknowledged
in the Presence of:

JAKE BALL TRUST

Name:

By:

MATTHEW DURST
Its Trustee

Name:

And

Name:

By:

REUBEN H. DURST
Its Trustee

Name:

Name:

Steven Durst

Name:



1060334-1

Section 3.7.    Severability.  If any provision of this Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

Section 3.8.    No Consequential or Punitive Damages.  Notwithstanding anything to the contrary elsewhere in this Agreement, no party (or its affiliates) shall, in any event, be liable to any other party (or its affiliates) for any consequential damages, including, but not limited to, loss of revenue or income, or loss of business reputation or opportunity, or any punitive damages relating to the breach or alleged breach of this Agreement.

Section 3.9.    Effect.  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of the respective parties.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the date first written above.

Signed and Acknowledged
in the Presence of:

JAKE BALL TRUST

Name: _____

By: _____
MATTHEW DURST
Its Trustee

Name: _____

And

Name: _____

By: _____
REUBEN H. DURST
Its Trustee

Name: _____

Name: _____

Steven Durst

Name: _____

1060334-1

**STATE OF CONNECTICUT**       )

**COUNTY OF HARTFORD**       ) ss. Hartford

                             )

Personally appeared Matthew Durst, as Trustee, signer of the foregoing instrument, who is personally known to me, who acknowledged the same to be his free act and deed as such Trustee, on behalf of the Trust, before me.

                                  Notary Public

                                 My Commission Expires:

                                 **Kelley M. Galica Peck**
                                 *NOTARY PUBLIC*
                          My Commission Expires: 09/30/2008

**STATE OF**       )

**COUNTY OF**       ) ss.

                             )

Personally appeared Reuben H. Durst, as Trustee, signer of the foregoing instrument, who is personally known to me, who acknowledged the same to be his free act and deed as such Trustee, on behalf of the Trust, before me.

                                  Notary Public
                                  My Commission Expires:

**STATE OF** Pennsylvania       )

**COUNTY OF** Montgomery       ) ss.

                             )

Personally appeared Steven Durst, signer of the foregoing instrument, who is personally known to me, who acknowledged the same to be his free act and deed, before me.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SANTINA J. BOCKMAN, Notary Public
Abington Twp., Montgomery County
My Commission Expires December 4, 2010

                                  Notary Public
                                  My Commission Expires: 12/4/2010

1060334-1