IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

**C.A. NO. 15-4045**

---

REUBEN DURST, Trustee, STEVEN DURST, Individually and as Trustee,

Plaintiffs-Appellants

v.

MATTHEW DURST, Individually and as Trustee, HALLORAN & SAGE, LLP, ROBINSON & COLE, LLP, and KELLEY GALICA-PECK,

Defendants-Appellees

---

# JOINT BRIEF OF DEFENDANTS/APPELLEES HALLORAN & SAGE LLP AND KELLY GALICA-PECK

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 1:12-cv-05255
HONORABLE JEROME B. SIMANDLE, U.S.D.J.

**LAW OFFICE JOHN A. YACOVELLE**
8438 Mackall Road
St. Leonard, MD 20685-2478
Attorneys for Defendant/Appellee
Matthew Durst, Individually
and as Trustee

**MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP**
Liberty View, Suite 600
457 Haddonfield Road
Cherry Hill, NJ 08002-2220
Attorneys for Defendant/Appellee
Robinson & Cole, LLP

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962
Attorneys for Defendant/Appellee
Halloran & Sage, LLP

**WHITE AND WILLIAMS, LLP**
Liberty View, Suite 400
457 Haddonfield Road
Cherry Hill, NJ 08002-2220
Attorneys for Defendant/Appellee
Kelley Galica Peck, Esq.

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

In accordance with Rule 26.1, defendant/appellee Halloran & Sage, LLP, states that no parent or public corporation owns 10% or more of its stock. Defendant/appellee Kelley Galica-Peck is an individual, so the disclosure requirement does not apply.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......... v

JURISDICTION AND VENUE .......... 1

STATEMENT OF THE ISSUES PRESENTED .......... 1

STATEMENT OF THE CASE .......... 1

I. THE CREATION OF THE JAKE BALL TRUST .......... 2

II. THE TRUST'S INTEREST IN GOODMILL, LLC .......... 2

III. H&S AND PECK ARE RETAINED TO REPRESENT MATTHEW DURST AND THE TRUST IS SUBSEQUENTLY CONVERTED TO AN IRREVOCABLE TRUST .......... 4

IV. STEVEN DURST IS TERMINATED BY GOODMAN, THE BUY-OUT PROVISION OF SECTION 7.04 IS TRIGGERED, AND LITIGATION ENSUES .......... 7

V. THE DEPOSITION TESTIMONY OF STEVEN DURST IN THIS CASE .......... 8

VI. PLAINTIFFS' DAMAGES CLAIMS ON BEHALF OF THE TRUST .......... 11

VII. THE PERTINENT RULINGS BY THE DISTRICT COURT IN THIS CASE .......... 12

SUMMARY OF THE ARGUMENTS .......... 15

LEGAL ARGUMENT .......... 16

POINT ONE

THE DISTRICT COURT'S ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF H&S SHOULD BE AFFIRMED .......... 16

A. STANDARD OF REVIEW .......... 17

B. THE ELEMENTS OF A CLAIM FOR LEGAL MALPRACTICE .......... 18

C. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' LEGAL MALPRACTICE CLAIMS AGAINST H&S PERTAINING TO SECTION 7.04 OF THE GOODMILL, LLC OPERATING AGREEMENT AND THE VALUE OF THE

MILLVILLE ASSET ARE BARRED AS A MATTER OF LAW BECAUSE OF A LACK OF PROXIMATE CAUSATION ............ 18

1. PLAINTIFFS CANNOT SHOW THAT THE OPERATING AGREEMENT COULD HAVE BEEN MODIFIED EVEN IF STEVEN DURST WAS ADVISED ABOUT THE POTENTIAL IMPACT OF SECTION 7.04 OF THE OPERATING AGREEMENT .................................... 20

2. PLAINTIFFS DID NOT REASONABLY RELY ON PECK OR H&S IN ISSUING THE PROMISSORY NOTE TO STEVEN DURST .................................. 24

3. PLAINTIFF'S CLAIMS RELATING TO SECTION 7.04 OF THE GOODMILL, LLC OPERATING AGREEMENT ARE BARRED BY THE DISTRICT COURT'S PRIOR RULINGS REGARDING THE 2011 SETTLEMENT OF THE STATE COURT LITIGATION ............................... 30

4. PLAINTIFFS CANNOT PROVE DAMAGES ................ 32

POINT TWO

THE DISTRICT COURT'S ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF PECK SHOULD BE AFFIRMED ...................... 35

A. IF THIS COURT AFFIRMS ENTRY OF SUMMARY JUDGMENT ON BEHALF OF H&S, THIS COURT MUST ALSO AFFIRM ENTRY OF SUMMARY JUDGMENT ON BEHALF OF PECK BECAUSE PECK'S ALLEGED ACTS WERE COMMITTED IN HER CAPACITY AS A PARTNER OF H&S .................... 35

B. IF THIS COURT AFFIRMS ENTRY OF SUMMARY JUDGMENT ON BEHALF OF R&C, THIS COURT MUST ALSO AFFIRM ENTRY OF SUMMARY JUDGMENT ON BEHALF OF PECK BECAUSE PECK'S ALLEGED ACTS WERE COMMITTED IN THE SCOPE OF HER EMPLOYMENT WITH R&C ................ 37

POINT THREE

THE COURT SHOULD AFFIRM THE DISTRICT COURT'S ORDER DATED OCTOBER 15, 2015, DENYING PLAINTIFFS' UNTIMELY AND INAPPROPRIATE MOTION FOR RECONSIDERATION ............. 40

A. STANDARD OF REVIEW .................................. 40

B. THE DISTRICT COURT PROPERLY FOUND THAT PLAINTIFFS' MOTION FOR RECONSIDERATION WAS UNTIMELY .......... 41

C. PLAINTIFFS FAILED TO SHOW THAT RECONSIDERATION WAS NECESSARY TO PREVENT MANIFEST INJUSTICE OR THAT NEW EVIDENCE EXISTED THAT WAS PREVIOUSLY UNAVAILABLE .......... 42

1. PLAINTIFFS DID NOT DEMONSTRATE MANIFEST INJUSTICE .......... 42

2. THE DISTRICT COURT CORRECTLY REJECTED PLAINTIFFS' CLAIMS THAT RECONSIDERATION WAS PROPER BASED ON PREVIOUSLY UNAVAILABLE EVIDENCE .......... 44

CONCLUSION .......... 47

COMBINED CERTIFICATIONS .......... 48

## TABLE OF AUTHORITIES

Page(s)

**CASES**

2175 Lemoine Avenue Corp. v. Finco, Inc., 640 A.2d 346 (N.J. Super. Ct. App. Div. 1994) ....... 18, 20, 21

Abbamont v. Piscataway Twp. Bd. of Educ., 650 A.2d 958 (N.J. 1994) .................................... 38

Albright v. Burns, 503 A.2d 386 (N.J. Super. Ct. App. Div. 1986) ............... 18

American Sanitary Sales Co. v. State, 429 A.2d 403 (N.J. Super. App. Div. 1981), certif. denied, 434 A.2d 1094 (N.J. 1981) ............................ 32

Anderson v. Liberty Lobby, 477 U.S. 242 (1986) ........................................... 17

Builders Square Inc. v. Nat'l Union Fire Ins. Co. of Pitsburgh, Pa., No. CIV.A. 95-164, 1995 WL 476246 (E.D.Pa. Aug. 9, 1995) .... 38

Caldwell v. Haynes, 643 A.2d 564 (N.J. 1994) .................................... 32

Carteret Sav. Bank, F.A. v. Shushan, 721 F. Supp. 705 (D.N.J. 1989) .............................. 41

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................... 17

Conklin v. Hannoch Weisman, 678 A.2d 1060 (1996) .................................... 18, 19

Di Cosala v. Kay, 450 A.2d 508 (N.J. 1978) .................................... 38

Elizabethtown Water Co. v. Hartford Casualty Ins. Co., 18 F. Supp. 2d 464 (D.N.J. 1998) ............................ 41

Falzarano v. Leo, 635 A.2d 547 (N.J. Super. Ct. App. Div. 1993) ............... 36

Froom v. Perel,
872 A.2d 1067 (N.J. Super. Ct. App. Div. 2005), certif. denied, 883 A.2d 1063 (N.J. 2005) ........................ 19, 20

Harsco Corp. v. Zlotnicki,
779 F.2d 906 (3d Cir. 1985) .................................. 40

Horn v. Thoratec Corp.,
376 F.3d 163 (3d Cir. 2004) .................................. 17

In re Burlington Coat Factory Sec. Litig.,
114 F.3d 1410 (3d Cir. 1997) .................................. 45

Interfaith Community Org., Inc. v. PPG Indus.,
702 F. Supp. 2d 295 (D.N.J. 2010) ........................ 44, 45

Kelly v. Berlin,
692 A.2d 552 (N.J. Super. App. Div. 1997) .................. 32

Lamb v. Barbour,
455 A.2d 1122 (N.J. Super. Ct. App. Div. 1982), certif. denied, 460 A.2d 693 (N.J. 1983) .................... 19, 20, 22

Lane v. Oil Delivery, Inc.,
524 A.2d 405 (N.J. Super. App. Div. 1987) .................. 32

Leja v. Schmidt Mfg.,
743 F. Supp. 2d 444 (D.N.J. 2010) ............................ 43

Lentz v. Mason,
32 F. Supp. 2d 733 (D.N.J. 1999) ............................ 44

Lightning Lube, Inc. v. Witco Corp.,
4 F.3d 1153 (3d Cir. 1993) .................................. 32

Lovett v. Estate of Lovett,
593 A.2d 382 (N.J. Super. Ct. 1991) ........................ 18

Malanga v. Manuf. Cas. Ins. Co.,
146 A.2d 105 (N.J. 1958) .................................. 36

Massarksy v. General Motors Corp.,
706 F.2d 111 (3d Cir. 1983) .................................. 46

Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros,
176 F.3d 669 (3d Cir. 1999) .................................. 40

Mitchell v. Twp. of Willingboro,
913 F. Supp. 2d 62 (D.N.J. 2013) ............................ 42

North River Ins. Co. v. CIGNA Reinsurance Co.,
52 F.3d 1194 (3d Cir. 1995) ........ 41

Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co.,
744 F. Supp. 1311 (D.N.J. 1990) ........ 41

Panna v. Firstrust Sav. Bank,
760 F. Supp. 432 (D.N.J. 1991) ........ 40

Park Inn Intern., L.L.C. v. Mody Enterprises, Inc.,
105 F.Supp.2d 370 (D.N.J. 2000) ........ 25

Reedy v. Evanson,
615 F.3d 197 (3d Cir. 2010) ........ 17

Research Group v. Magnesium Elektron, Inc.,
123 F.3d 111 (3rd Cir. 1997) ........ 31

Rodriguez v. Raymour's Furniture Co., Inc.,
93 A.3d 760, 769 (N.J. Super. Ct. App. Div. 2014), rev'd on other grounds, __ A.3d ........ 25

Rudbart v. N. Jersey Dist. Water Supply Comm'n.,
605 A.2d 681 (N.J. 1991) cert. den., 506 U.S. 871, 113 S. Ct. 203, 121 L.Ed.2d 145 (1992) ........ 24

Sommers v. McKinney,
670 A.2d 99 (N.J. Super. Ct. App. Div. 1996) ........ 18, 20

Staron v. Weinstein,
701 A.2d 1325 (N.J. Super. Ct. App. Div. 1997) ........ 36

State v. Jersey Central Power & Light Co.,
351 A.2d 337 (N.J. 1976) ........ 20

Tessmar v. Grosner,
128 A.2d 467 (N.J. 1957) ........ 32

Vort v. Hollander,
607 A.2d 1339 (N.J. Super. Ct. App. Div. 1992) ........ 19

Zendell v. Newport Oil Corp.,
544 A.2d 878 (N.J. Super. Ct. App. Div. 1998) ........ 18

**STATUTES**

28 U.S.C. § 1332 ........ 1

28 U.S.C. § 1391 ........ 1

**RULES**

Civ. R. 7.1(i) .................................... 41, 44

Fed. R. Civ. P. 12(b)(6) .................................... 45

Fed.R.Civ.P. 56(c) .................................... 17

Fed.R.Civ.P. 56(e)(2) .................................... 17

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Venue lies in the District of New Jersey pursuant to 28 U.S.C. § 1391 because the causes of action arose therein.

Plaintiffs/appellants Reuben Durst, Trustee, and Steven Durst, individually and as Trustee (collectively, "Plaintiffs"), filed their Notice of Appeal on December 23, 2015.

## STATEMENT OF THE ISSUES PRESENTED

The issues presented as relating to defendant/appellee Halloran & Sage, LLP ("H&S"), are as follows:

1. Did the District Court err in granting summary judgment in favor of H&S by order dated November 30, 2015?

2. Did the District Court err in denying Plaintiffs' motion for reconsideration of various orders on October 15, 2015?

The issue presented as relating to defendant/appellee Kelley Galica-Peck ("Peck") is as follows:

1. Did the District Court err in granting summary judgment in favor of Peck by order dated November 30, 2015?

## STATEMENT OF THE CASE

This action arises from defendant Matthew Durst's actions as Trustee on behalf of the Jake Ball Trust. Plaintiffs in this action, Steven and Reuben Durst, have asserted claims for breach

of fiduciary duty against Matthew Durst as well as claims for legal malpractice on the part of H&S, Peck (a former partner of H&S), and Robinson & Cole, LLP, stemming from Peck's representation of Matthew and Reuben Durst as Co-Trustees of the Jake Ball Trust.

## I. THE CREATION OF THE JAKE BALL TRUST.

Plaintiff Steven Durst ("Steven") established a revocable *inter vivos* trust ("Trust") on November 29, 2004, for his benefit as well as the benefit of his children and nieces and nephews. (Sa936a, ¶2; Sa938, ¶18.)[1] The Trust was created by the "The Jake Ball Trust Agreement," which named Steven's brothers, Reuben and Matthew Durst, as Co-Trustees. (Sa936, ¶2.) Steven retained the ability to direct investments and distributions from the Trust. (Sa947.)

## II. THE TRUST'S INTEREST IN GOODMILL, LLC.

On or about November 15, 2005, Steven signed an Operating Agreement for a limited liability company named "Goodmill, LLC." (Sa492.) Goodmill, LLC was formed to develop and operate a large shopping center in Millville, New Jersey. (Sa473-474.) Steven was not a member of Goodmill, LLC. Instead, Steven elected to have his brother, Matthew, as Trustee of the Jake Ball Trust Agreement, serve as the member for an interest in the

[1] H&S and Peck will refer to the Joint Supplemental Appendix filed herewith as "Sa."

venture. (Id.) By its terms, the Operating Agreement grants "The Jake Ball Trust Agreement" a 10% member interest in Goodmill, LLC (the "Millville Asset"). (Sa493.) The other members of Goodmill, LLC are identified as Bruce Goodman, Christopher Anderson, Goodman Properties Incentive Plan Limited Partnership, Peter Friedman and Mitchell Benson. (Sa469.)

Steven signed his brother Matthew's name on the Operating Agreement, which identifies Matthew as "Trustee under the Jake Ball Trust Agreement." (Sa961, at T48:23 through 49:2; Sa492.) Steven Durst testified at his deposition that he did not read the Operating Agreement before he signed it:

> Q: Did you read this agreement before you signed it with Matt's name?
> A: Not really. I might have given it a once-over. Doubtful, though. I mean, did I digest it? Obviously, as you know, that's been a bone of contention.
>
> Q: Well, I'm asking you. You're the one that's under oath. I'm asking you if you read it.
> A: My answer is no.
>
> Q: No? You did not read it?
> A: No.

[Sa961, at T49:10 through -19.]

Section 7.01 of the Operating Agreement sets forth restrictions on the transfer of any member's interest in Goodmill, LLC. (Sa483.) Section 7.01(a) precludes the sale, assignment and/or transfer of any member's interest to anyone other than a permitted transferee without the prior written

consent of the Manager, Bruce Goodman ("Goodman"), who was Steven's boss at the time. (Id.) Section 7.04, entitled "Buy Out in the Event of a Termination of Employment," states that in the event Steven ceases to be employed by Goodman, Goodman may buy out the Trust's 10% interest in Goodmill, LLC pursuant to a formula. (Sa487.) Plaintiffs have alleged that this provision "could effectively destroy the value of the Millville Asset." (Sa965, at ¶42.) Once Steven signed the Operating Agreement, the Trust was "stuck" with Section 7.04. (Sa965, at T70:14 through -17.)

Section 10.01 of the Operating Agreement governs amendments. It states, "No modification or amendment of this Agreement shall be binding unless such amendment is approved in writing by all of the Members." (Sa489 (emphasis added).)

## III. H&S AND PECK ARE RETAINED TO REPRESENT MATTHEW DURST AND THE TRUST IS SUBSEQUENTLY CONVERTED TO AN IRREVOCABLE TRUST.

More than a year later, in late 2006, Peck and her law firm, H&S, were retained to represent Matthew as Trustee of the Trust. (Sa463, at ¶5.) On December 29, 2006, Reuben Durst executed a written document authorizing Matthew Durst, his Co-Trustee, "to perform all ministerial tasks associated with the investment and management of the Jake Ball Trust[.]" (Plaintiffs' Appendix, Exh. 2.)

The Jake Ball Trust Agreement was amended and restated on May 10, 2007 ("First Amendment and Restatement"). (Sa936, at ¶2.) After the First Amendment and Restatement was executed, Steven decided that he wanted to convert the Trust to an irrevocable Trust. (Sa970, at T159:15 through 160:2.)

As part of the plan to convert the Trust to an irrevocable Trust, Peck recommended that the Trust retain an appraiser to value the Millville Asset. (Sa983, at T36:20 through 37:15.) The Trust, through Peck, retained Paul Ruby from the firm of Parker Benjamin to conduct a valuation of the Millville Asset on behalf of the Trust (the "Ruby Appraisal"). (Id.) Steven Durst was aware by November of 2007 that Parker Benjamin was performing an appraisal of the Millville Asset. (Sa1054.)

The Trust was amended and converted to an irrevocable Trust by execution of a "Second Amendment and Restatement dated December 24, 2007, of the Jake Ball Trust Agreement dated November 29, 2004." ("Second Amendment and Restatement"). (Sa233.) The Second Amendment and Restatement names Reuben and Matthew Durst as the Trustees of the Trust and names Steven Durst as "Grantor" of the Trust. (Id.) Reuben Durst testified at his deposition that Steven was the "money person" who provided funds to the Trust and that he (Reuben) had no knowledge of Steven ever being a Trustee of the Trust. (Sa990-992, at T47:25 through 48:23; T49:7 through -14.) Steven signed

the Second Amendment and Restatement but did not read it before doing so, a voluntary decision he made with the understanding that it would become a binding legal document. (Sa968, at T124:2 through -19.)

Article I of the Second Amendment and Restatement, which is entitled, "Declaration of Irrevocability," states in part:

> I understand the difference between a revocable trust and an irrevocable trust, and I hereby declare that, as of the date of execution of this instrument, this trust and the estates hereby created to be irrevocable. I irrevocably relinquish any and all rights to alter, amend or revoke this Agreement.

[Sa236.]

Article VIII governs the appointment of Trustees and states, in pertinent part, that "[a]ny Trustee is authorized to appoint an additional Trustee or Trustee or a successor Trustee or a succession of successor Trustees to act in the event of any vacancy in his or her office." (Sa243.) Furthermore, Article IX of the Second Amendment and Restatement, which is entitled, "Trustee Powers," permits the trustees to enter into an agreement to sell any properties held by the Trust and to compromise and settle all claims by or against the Trust. (Sa246-247.)

Article X(J) of the Second Amendment and Restatement, which is entitled, "Trust Accountings," states in part:

> The Trustees **may** provide to me, or my guardian or conservator if I am incapacitated, or, after my death,

> to each eligible income beneficiary and presumptive remainderman (or the parent or legal representative of any such individual who is a minor or is incapacitated), statements of trust transactions at such time and in such form as the Trustees consider advisable.

[Sa247 (emphasis added).]

The terms of the conversion of the Trust to an irrevocable Trust were set forth in a written agreement dated December 21, 2007, between Steven, Matthew and Reuben Durst (the "Conversion Agreement"). (Plaintiffs' Appendix, Exh. 15.) Steven Durst signed the Conversion Agreement but did not read it before doing so. (Sa974, at T220:9 through -12.)

Under the Conversion Agreement, the Trust agreed to convey a promissory note (the "Note") to Steven in the amount of $500,000. (Plaintiffs' Appendix, Exh. 15, at 1.2.) The Note in favor of Steven was secured by a collateral assignment of the Trust's 10% membership interest in Goodmill, LLC. (Id. at Section 1.3.)

## IV. STEVEN DURST IS TERMINATED BY GOODMAN, THE BUY-OUT PROVISION OF SECTION 7.04 IS TRIGGERED, AND LITIGATION ENSUES.

On or about May 31, 2010, Steven Durst was terminated by his boss, Bruce Goodman. (Sa999, at ¶16.) Following the termination, Goodman advised that he was exercising his option to "buy out" the Trust's 10% interest in Goodmill, LLC. (Sa1000, at ¶18.) Matthew Durst, as Trustee for the Trust,

commenced litigation through separate counsel in the Superior Court of New Jersey in an attempt to have Section 7.04 of the Goodmill, LLC Operating Agreement declared void and unenforceable (the "State Court Litigation"). (Sa1001.) Peck left H&S on or about October 4, 2010, and joined Robinson & Cole, LLP ("R&C"). Shortly after Peck joined R&C, Matthew Durst transferred his matter at H&S to R&C. (Sa465, at ¶14.)

The State Court Litigation was settled on October 4, 2011. (Sa6.) As part of the settlement, the Trust conveyed its 10% interest in Goodmill, LLC, to Bruce Goodman. (Sa939.) Goodman took the Trust's 10% interest in Goodmill, LLC with full knowledge of the collateral assignment in favor of Steven Durst and with knowledge that Steven would have the right to try and take it back. (Sa204-09, at T16:24 through 17:6; 26:23 through 27:4.) Steven Durst never made any claim against the collateral interest conveyed to Goodman as part of the settlement of the State Court Litigation. (Sa972, at T210:16-24.)

## V. <u>**THE DEPOSITION TESTIMONY OF STEVEN DURST IN THIS CASE.**</u>

In their Amended Complaint, Plaintiffs allege that H&S and Peck failed to account for the impact of Section 7.04 of the Operating Agreement and that if Steven had been made aware of Section 7.04, he "could have done something about it," meaning he would have gone to Goodman and had that provision

renegotiated. (Sa942, at ¶42(c); Sa969, at T155:1-156:8.) However, Steven testified at his deposition as follows:

> Q: So is it your testimony, then, if you had read in '04 or '05 the Goodmill, LLC, Operating Agreement which you signed on behalf of the Trust but did not read, correct?
> A: Yes, that's correct.
>
> Q: If you had seen Section 7.04, correct?
> A: Yep.
>
> Q: You would have understood that it gave Goodman this right to buy back your interest at a--under a formula, correct?
> A: Yeah, at a dramatic discount, yes, that's--
>
> Q. And what was the predicate for him being able to buy back your interest based on that formula?
> A: Termination.
>
> Q: You no longer being an employee of Goodman Enterprises?
> A: That's right.
>
> Q: Okay. So had you seen that in the beginning, is it your testimony that you would have gone to Goodman and had that renegotiated?
> A: Yes.

[Sa969, at T155:14 through 156:8.]

Steven then conceded that he had never presented an alternative version of Section 7.04 to Goodman for consideration:

> Q: Mr. Durst, with all due respect--
> A: Yeah.
>
> Q: --My question was did you or anyone on your behalf ever draft an alternative version of Exhibit 2 Section 7.04--
> A: No, we didn't modify 7.04.

Q: Listen to me I didn't finish, did you ever draft an alternative version of Section 7.04 and present it to Mr. Goodman for consideration?
A: No.

[Sa969, at T157:11 through -20.]

Steven also admitted that it would be "pure speculation" to predict what Goodman would have done if Steven had gone back to Goodman prior to converting the Trust and asked him to change Section 7.04:

Q: Do you know why he fired you?
A: He handed me a relatively benign half-a-paragraph notice that said--you know, said you're fired.

Q: But why do you think he fired you?
A: Oh, I think he fired me--well, couple reasons. The excuse was I guess is unhappiness over my sticking up for Deborah Gardener. The real reason, in my judgment, going back to imposition of 7.04 in this LLC agreement and to never appearing or anything like it in any of the other dozen or so agreements, was, that it was time given the fact that I made a lot of money, the shopping center had been completed and was open, he was done with me, whatever use I had to him he had gotten that use and it was time to cut the ties and he wanted to make a move to retrieve our ten percent, he wanted it back.

Q: And was this something he had been planning, as you look at it in retrospect, that he had been planning for some time, for example, with 7.04 in the LLC Operating--
A: Absolutely.

Q: So that was his plan all along, correct?
A: Unfortunately, yeah, that's what I think.

Q: Which indicates that if you had gotten down on your knees and begged him to renege, he wouldn't have done it, right?
A: Well, who knows?

Q: Yes or no?
A: Who knows?

Q: Pure speculation?
A: Pure speculation.

[Sa970, at T158:21 through 159:24 (emphasis added).]

Steven also testified that he never attempted to renegotiate the terms of Section 7.04 of the Operating Agreement with any of the other four members of the LLC and that he never requested an accounting from the Trustees until after the State Court Litigation had settled and there was "bad blood over the settlement." (Sa967-68, at T115:12 through -20.) He further admitted that even though he is a "knowledgeable, sophisticated experienced 40 years real estate guy," he has a "long history of not reading lengthy documents." (Sa978-80, at T94:25 through -96:1.)

## VI. PLAINTIFFS' DAMAGES CLAIMS ON BEHALF OF THE TRUST.

Steven Durst admitted in his deposition that the only damages sought by Plaintiffs are damages allegedly sustained by the Trust. (Sa972-73, at T211:25 through -9; 214:19 through -24.) However, Plaintiffs failed to provide an expert report in discovery containing a valuation of the Trust's 10% interest in Goodmill, LLC. (Sa1049-51.) Discovery revealed that after the shopping center at Millville opened in 2006, many of its spaces were leased:

Q: When did it actually open?
A: It opened mostly in '06. And with finality, I think everything, almost everything was open in 2007, although there were still some ground lease parcels that were not leased. Still is one to this day. But there was one that was later leased, probably in '09 or '10, to Sonic. And there were some small stores that remained, you know, rented actually for quite some period of time. I would say into '09 and '10. But the majority, simple majority was completed in '06. The vast majority, 80 to ninety percent, was probably done by the end of '07. And they remained 526,000 square feet as I say a couple of ground parcels, and probably 10-15,000 square feet of small stores to rent after that.

[Sa960, at T46:16 through 47:5.]

## VII. THE PERTINENT RULINGS BY THE DISTRICT COURT IN THIS CASE.

On August 5, 2013, the District Court granted partial summary judgment in favor of Matthew Durst and held that "collateral estoppel applies to bar relitigation of the fairness of the settlement" of the State Court Litigation in 2011. (Sa21.) Subsequent to that ruling, Plaintiffs moved for leave to assert a legal malpractice claim against John Yacovelle, Esq., counsel for Matthew Durst. In considering the viability of that claim, Magistrate Judge Donio concluded that Plaintiffs were unable to prove damages stemming from the 2011 settlement because "[t]he District Court's August 5, 2013 Order bars relitigation into the 'fairness' of the state court settlement." (Sa36.)

The District Court subsequently granted summary judgment in favor of co-defendant R&C. (Sa39.) The Court held:

> Because Plaintiffs were precluded from challenging the fairness of the state court settlement, Plaintiffs cannot prove in their legal malpractice claim against R&C that they were damaged by R&C's representation during the conveyance of the Millville Asset <u>or the settlement more broadly</u>. <u>Collateral estoppel in this instance prevents the court from considering Plaintiffs' position but for R&C's alleged negligence.</u> <u>Even if Plaintiffs could establish the breach of a duty owed by R&C in the context of the state court settlement and the disposition of the Millville Asset, Plaintiffs cannot show that they were damaged because the court must assume that this settlement was fair and equitable.</u>

[Sa56-57 (emphasis added).]

On April 10, 2015, the Magistrate Judge denied Plaintiffs' motion to add Parker Benjamin as a defendant. (Sa61-62.) Plaintiffs did not appeal from the denial of that motion. Instead, they waited nearly four months and then moved to reconsider the denial of that motion. (Sa633.) In their untimely motion, Plaintiffs also moved to reconsider the Magistrate Judge's order dated July 25, 2014, denying their previous motion for leave to amend their complaint to assert claims against Matthew Durst's counsel as well as the District Court's orders dated August 5, 2013, and January 13, 2015, granting summary judgment in favor of Matthew Durst and Robinson

& Cole, respectively. (Id.) The District Court denied Plaintiffs' motion by order dated October 15, 2015. (Sa56-57).

H&S and Peck separately moved for summary judgment on August 14, 2015. (Sa927, 1063.) The District Court granted summary judgment in favor of both by order dated November 30, 2015. (Sa69). The District Court found that Plaintiffs' malpractice allegations regarding the failure to warn Steven Durst about Section 7.04 of the Operating Agreement and any effect it might have on the valuation of the Millville Asset failed for lack of proximate causation. (Sa97-102.) The District Court likewise found that certain ancillary claims against H&S relating to the alleged failure to provide annual accountings, failure to perfect the collateral security interest in the Millville Asset and failure to ensure that Steven Durst retained the ability to change Trustees also failed as a matter of law. (Sa102-04.) As to Peck, the District Court found that the record undisputedly showed that all allegations against her were for actions taken in the scope of her employment. Consequently, entry of summary judgment was appropriate since all claims against her were based on the same foundation as the claims dismissed against the law firm defendants. (Sa104-06.)

Plaintiffs have not appealed the District Court's dismissal of those ancillary claims. Instead, their appeal as it relates to H&S focuses solely on the alleged failure to warn Steven

Durst about the potential negative impact of Section 7.04 of the Operating Agreement. (Plaintiffs' Br. at 14-16.) Their appeal as to Peck concerns Section 7.04, her alleged misappropriation of money, and her alleged misrepresentation about her role in the appraisal process. (Id. at 1-2).

## SUMMARY OF THE ARGUMENTS

The District Court correctly held that Plaintiffs' claims against H&S and Peck relating to Section 7.04 of the Operating Agreement failed for lack of proximate causation. As to Peck only, the District Court properly found (1) that the allegations against Peck concerned work she did in the scope of her partnership and employment and (2) Plaintiffs pleaded no distinct and viable claim against her. Since Plaintiffs cannot succeed with a legal malpractice claim against the law firm defendants, entry of summary judgment in favor of Peck was also appropriate.

The District Court also properly denied Plaintiffs' motion to reconsider: 1) the Magistrate Judge's order denying leave to amend the Complaint to assert claims against Parker Benjamin (the appraiser retained by Plaintiffs to value the Millville Asset); 2) the August 2013 ruling granting Matthew Durst partial summary judgment; 3) the July 2014 order denying Plaintiffs' motion to name Matthew Durst's counsel as a defendant; and 4)

the January 2015 order granting summary judgment in favor of Robinson & Cole, LLP.

## LEGAL ARGUMENT

## POINT ONE

## THE DISTRICT COURT'S ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF H&S SHOULD BE AFFIRMED.

Plaintiffs argue that the District Court erred in granting summary judgment in favor of H&S on their claim that Peck and H&S committed legal malpractice by misrepresenting the value of the Trust's 10% interest in the Millville Asset when they "missed" the language of Section 7.04 of the Operating Agreement and failed to warn Steven Durst of its potential impact. (See Plaintiffs' Br. at 15.) Specifically, Plaintiffs assert that if Peck had advised Steven Durst of the possibility that Section 7.04 could "wipe out" the value of the Millville Asset, the Trust would not have issued him the $500,000 Note and security agreement and he would have been able to negotiate with Goodman to amend the Operating Agreement. (Id. at 14-16.) The District Court correctly rejected these arguments, concluding that Plaintiffs cannot establish a proximate causal connection between any act or omission by Peck while at H&S and the damages sought in the Amended Complaint. This Court should affirm that ruling in all respects.

**A. STANDARD OF REVIEW.**

This Court's review of a grant of summary judgment is plenary. Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010) (citing Horn v. Thoratec Corp., 376 F.3d 163, 165 (3d Cir. 2004)). Under Fed.R.Civ.P. 56(c), summary judgment is proper when "the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." In resolving a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 251-52 (1986). More specifically, the Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case as to which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

On a motion for summary judgment, the party opposing the motion "may not rely merely on allegations or denials in its own pleading; rather, its response must … set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). More than a mere "scintilla of evidence" supporting the non-moving party is required. Anderson, 477 U.S. at 252. Further,

disputes over irrelevant and unnecessary facts will not preclude a grant of summary judgment. Id. at 248.

## B. THE ELEMENTS OF A CLAIM FOR LEGAL MALPRACTICE.

An action for legal malpractice is based upon the principles of professional negligence. The burden is on the plaintiff to demonstrate that: (1) an attorney-client relationship existed between the plaintiff and the defendant, thus giving rise to a duty of care upon the attorney; (2) the attorney breached his or her fiduciary duty to the client; and (3) the attorney's breach was the proximate cause of the client's damages. Conklin v. Hannoch Weisman, 678 A.2d 1060, 1070 (1996); Sommers v. McKinney, 670 A.2d 99, 103 (N.J. Super. Ct. App. Div. 1996); Zendell v. Newport Oil Corp., 544 A.2d 878, 881 (N.J. Super. Ct. App. Div. 1998); Albright v. Burns, 503 A.2d 386, 389 (N.J. Super. Ct. App. Div. 1986). If any of the basic elements of the cause of action are lacking, the claim is not actionable. Lovett v. Estate of Lovett, 593 A.2d 382, 388 (N.J. Super. Ct. 1991).

## C. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS' LEGAL MALPRACTICE CLAIMS AGAINST H&S PERTAINING TO SECTION 7.04 OF THE GOODMILL, LLC OPERATING AGREEMENT AND THE VALUE OF THE MILLVILLE ASSET ARE BARRED AS A MATTER OF LAW BECAUSE OF A LACK OF PROXIMATE CAUSATION.

It is well-settled that a successful legal malpractice claim requires a plaintiff to prove that an attorney's negligence proximately caused a loss. 2175 Lemoine Avenue Corp.

v. Finco, Inc., 640 A.2d 346, 352 (N.J. Super. Ct. App. Div. 1994). Even where an attorney's breach of duty is obvious, there can be no recovery absent a categorical showing that damages resulted from the professional's negligence. Vort v. Hollander, 607 A.2d 1339, 1341 (N.J. Super. Ct. App. Div. 1992) ("Respondents overlook the fact that they could not prevail on their counterclaim without proof that they were damaged by their former attorney's alleged malpractice"); Lamb v. Barbour, 455 A.2d 1122, 1125 (N.J. Super. Ct. App. Div. 1982), certif. denied, 460 A.2d 693 (N.J. 1983) (holding that attorney's conduct was not the proximate cause of plaintiff's business failure where plaintiff intended to acquire the business anyway). To establish proximate cause, a "plaintiff must present evidence to support a finding that defendant's negligent conduct was a 'substantial factor' in bringing about plaintiff's injury, even though there may be other concurrent causes of harm." Froom v. Perel, 872 A.2d 1067, 1076 (N.J. Super. Ct. App. Div. 2005), certif. denied, 883 A.2d 1063 (N.J. 2005) (quoting Conklin, supra, 678 A.2d at 1071-1072). The District Court's holding here should be affirmed for several reasons.

1. **PLAINTIFFS CANNOT SHOW THAT THE OPERATING AGREEMENT COULD HAVE BEEN MODIFIED EVEN IF STEVEN DURST WAS ADVISED ABOUT THE POTENTIAL IMPACT OF SECTION 7.04 OF THE OPERATING AGREEMENT.**

Plaintiffs cannot prove that if Steven Durst was informed about the impact of Section 7.04 before the Trust was converted, Goodman and the other members of Goodmill, LLC would have agreed to modify the Operating Agreement. In matters such as this involving transactional legal malpractice, the plaintiff must offer evidence that, even in the absence of the attorney's negligence, the other party to the transaction would have accepted the plaintiff's offer and agreed to the transaction, leading to the client receiving the benefit. See Froom, supra, 872 A.2d at 1077; see also State v. Jersey Central Power & Light Co., 351 A.2d 337, 341-42 (N.J. 1976) (finding that because the damages at issue would have occurred even in the absence of the defendant's act or omission, the defendant's conduct was not a substantial factor in causing the loss). This substantial burden "cannot be satisfied by mere conjecture, surmise or suspicion." Lamb, supra, 455 A.2d at 1125; accord Sommers, supra, 670 A.2d at 105; 2175 Lemoine Ave. Corp., supra, 640 A.2d at 351.

Several decisions from the New Jersey Appellate Division illustrate this State's strict view on establishing proximate causation in transactional legal malpractice cases. In Froom,

supra, the plaintiff, a real estate company, brought a legal malpractice action against a law firm that was involved in a project to develop a parcel of abandoned property located in Edison. 872 A.2d 1069-74. Plaintiff asserted that the firm failed to protect its purported ownership interest in the project. Id. at 1073. At trial, the jury returned a verdict against the law firm for $2.7 million. Id. The Appellate Division reversed, finding that the evidence presented by plaintiff was insufficient to support a finding by the jury that professional negligence by the law firm was a proximate cause of the development company's loss of its purported interest in the project. Id. at 1077. The court found that even if the law firm had acted to protect the plaintiff's interests, there was insufficient evidence to show that the other parties to the transaction would have agreed to give the development company a fifty-percent ownership interest in the project when plaintiff made no financial contribution to the property's acquisition or development. Id. at 1077-78.

Likewise, in 2175 Lemoine Avenue, supra, the corporate owner of a parcel of real property sought a declaration that Finco's option to purchase a 50% interest in the property and the grant to Finco of an interest in a related partnership were void and unenforceable. 640 A.2d at 348. Finco filed a third-party complaint against its attorney for legal malpractice,

alleging that she negligently negotiated and structured the transaction. Id. at 349. The trial court found for Finco and awarded damages in the amount of $111,283. Id. In reversing the trial court's damage award, the Appellate Division held that Finco failed to present testimony showing either that the subject transaction could have legally been structured differently or that the parties would have been willing to structure the transaction in the manner claimed by the client. Id. at 353. Thus, Finco "failed to prove the essential element of proximate cause" -- that the complained of conduct was a substantial contributing factor in causing the loss. Id.

Similarly, in Lamb, supra, the trial court found that an attorney, who had represented the plaintiff purchasers of a business that failed within two months of its acquisition, was professionally negligent. 455 A.2d at 1123. The Appellate Division reversed, holding that even if the attorney had been negligent, there was insufficient proof that the attorney's conduct was a proximate cause of plaintiff's loss. Id. at 1125. The Court stated:

> [M]ost conspicuous is the absence of testimony by either of plaintiffs as to any circumstances reasonably to be hypothesized under which they could have been dissuaded from completing the transaction. It should not be lightly assumed that these young people would have been easily discouraged from acquiring for a net cash investment of only $4,000 a business which as we said

> earlier, grossed annual revenues of more than $1,000,000 and which had been successfully operated for approximately 16 years.

[Id. at 1125.]

It is undisputed that Steven Durst and Goodman never modified Section 7.04 of the Goodmill Operating Agreement. While there were negotiations in the State Court Litigation that focused on an unrelated property located at 1600 Huntington Park Avenue in Philadelphia, Steven never prepared or presented an alternate version of Section 7.04 to Goodman for consideration. (Sa969, at T157:5-158:16.) In fact, during his deposition in this case Steven conceded that even if he had gotten down on his knees and begged Goodman to modify Section 7.04, it would be "pure speculation" to predict what Goodman's reaction would have been. (Sa970, at T159:24.) According to Steven, Goodman inserted this provision because he was planning all along to "cut the ties" with Durst and retrieve the Trust's 10% interest once the shopping center was completed and open. (Id. at T159:1 through -10.) Therefore, Plaintiffs cannot demonstrate that Goodman, the Managing Member of Goodmill, LLC, would have been willing to structure the Operating Agreement differently under any circumstances. Without this proof, there is no proximate causal connection between the alleged negligence by Peck while at H&S and the purported loss of the Millville Asset.

Furthermore, insofar as the Goodmill Operating Agreement required the consent of all members in writing before it could be modified, Steven conceded that he never sought consent to modify Section 7.04 with the other members of the company. (Sa967-68, at T171.) This evidence demonstrates that even though Steven allegedly became aware of the negative impact of Section 7.04 in July of 2010, he had no luck whatsoever in correcting it. In other words, there is also no evidence that the other members of Goodmill, LLC were amenable to structuring the transaction any differently.

### 2. PLAINTIFFS DID NOT REASONABLY RELY ON PECK OR H&S IN ISSUING THE PROMISSORY NOTE TO STEVEN DURST.

Neither the Trust nor Steven Durst could have reasonably relied on Peck and/or H&S when the Trust decided to issue the Note to Steven in exchange for converting to an irrevocable trust. According to the Amended Complaint, Steven Durst is the Grantor of the Trust.[2] (Sa936, at ¶1.) In 2005, Steven Durst executed the Goodmill Operating Agreement conveying the 10% interest in that asset to the Trust. As a signatory to the Operating Agreement on behalf of the Trust, Steven is presumed to have read and understood its legal effect. Rudbart v. N. Jersey Dist. Water Supply Comm'n., 605 A.2d 681, 686 (N.J. 1991) cert. den., 506 U.S. 871, 113 S. Ct. 203, 121 L.Ed.2d 145

[2] Steven Durst has asserted in this case that he is a Trustee of the Trust. However, the District Court held that he is not. (Sa71 n.2.) Plaintiffs have not appealed that ruling.

(1992); Rodriguez v. Raymour's Furniture Co., Inc., 93 A.3d 760, 769 (N.J. Super. Ct. App. Div. 2014), rev'd on other grounds, __ A.3d. __ (2016). The fact that Durst did not read the Operating Agreement is irrelevant. "The failure to read a contract will not excuse a party who signs it, nor will the party's ignorance of its obligation." Park Inn Intern., L.L.C. v. Mody Enterprises, Inc., 105 F.Supp.2d 370, 374 (D.N.J. 2000)(holding that franchisee's failure to read forum selection clause did not render clause invalid despite franchisee's claim that he believed agreement would mirror term sheet received earlier in negotiations).

In light of these facts, Steven and the Trust are presumed to have known of the potential problem with Section 7.04 and the possible consequences of its terms when Steven executed the Goodmill, LLC Operating Agreement on November 15, 2005. Again, Steven executed the Operating Agreement on behalf of the Trust, which was then a revocable Trust, over a year before Peck and H&S were retained by the Trustee, Matthew Durst, as his counsel. In addition, the Trust owned the 10% interest in Goodmill, LLC, and was bound by the terms of the Operating Agreement long before it ever executed the Note. (Sa965, at T70:14 through -17.) As such, Steven and the Trust were aware of the effect of Section 7.04 when Steven entered into the agreement with the Trust on December 21, 2007, issuing Steven the $500,000 Note in

exchange for Steven's release of the right to revoke or amend the Trust. (Id.)

While Plaintiffs allege that the Trust and Steven Durst reasonably relied upon the incorrect valuation advice given by the Trustee's attorneys based upon the Parker Benjamin appraisal when the Trust executed a Note in favor of Steven Durst and when Steven conveyed the Millville Asset to the Trust, this cannot be so.

First, Steven did not convey the Millville Asset to the Trust based any valuation provided by H&S, Peck, or Parker Benjamin because the asset was held by the Trust prior to the conversion agreement on December 21, 2007. Since Steven does not have standing to assert a claim on behalf of the Trust, he is apparently claiming he relied on the valuation of the asset provided by the Trustee's attorneys to the Trustee when Steven agreed to convert the Trust to an irrevocable Trust in consideration for the Note.

However, Steven was aware that the Trust had authorized Peck to retain Parker Benjamin to perform an appraisal of the value of the Millville Asset prior to the date Steven executed the irrevocable trust agreement and received the Note. (Sa1054.) Plaintiffs failed to provide any evidence to establish Peck or anyone else performed a separate valuation of the asset prior to the execution of the conversion agreement and

the Trust's issuance of the Note. Plaintiffs have also failed to provide any evidence, other than their own self-serving statements, to establish H&S or Peck actually provided Steven with valuation advice. Assuming *arguendo* H&S and Peck provided Steven with valuation advice concerning the asset, the only possible conclusion that can be drawn is Steven knew or should have known such valuation advice provided by H&S and Peck to the Trustee was based solely upon the valuation of the asset performed by Parker Benjamin.

Regardless, Steven holds himself out to be a knowledgeable and sophisticated real estate businessman. (Sa978-80, at T94:25 through -96:1.) Therefore, Steven cannot seriously contend he reasonably relied on the valuation advice provided to the Trustee by the Trustee's attorneys, namely Peck, who was not (and is still not) an appraiser, accountant, or real estate expert.

Second, the Trust, by and through its two Trustees, has admitted it did not rely on the valuation advice provided by the Trustee's attorneys to its detriment. Matthew Durst testified during his deposition that he believed the asset was valued at $600,000.00, not $841,000.00, at the time he executed the conversion agreement and Matthew did not know who provided him with the $600,000.00 valuation. (Sa1059, at T61:20 through 62:1.) Matthew Durst also testified he still would have

executed the conversion agreement on December 21, 2007, if he believed the value was $841,000.00 rather than $600,000.00. (Sa1060, at 128:9 through 129:11.) The other Trustee, Reuben Durst, admitted during his deposition that he did not rely on any advice provided by Peck to the Trust or Matthew Durst at any time. (Sa993, at T65:12 through -16.) Therefore, Plaintiffs failed to offer any evidence to establish the Trustee's attorneys provided either of the Trustees with any valuation advice whatsoever, which means the Trust could not have reasonably relied on the Trustee's attorneys to the Trust's detriment.

Moreover, Plaintiffs failed to provide any evidence that it was improper for Peck to recommend that Matthew Durst retain an appraiser such as Parker Benjamin for the purpose of valuing the 10% interest in Goodmill, LLC held by the Trust in order to effectuate the agreement to make the Trust irrevocable and the issuance of the Note to Steven.

Nevertheless, Plaintiffs did not provide any evidence that the valuation advice provided by H&S and Peck based upon Parker Benjamin's valuation of the asset was actually incorrect. Plaintiffs failed to provide their own valuation of the asset or one from an expert. Plaintiffs also failed to obtain documents or testimony from any representative or employee of Parker Benjamin concerning Parker Benjamin's valuation of the asset

during the course of discovery in an attempt to establish their claim that the valuation was deficient.

Instead, Plaintiffs contend that if Steven and the Trust had been made aware of the effect of the termination buy-out provision in 7.04, then one or both of them could have employed measures to protect against the potential consequences of the provision. However, as set forth supra, Steven and the Trust knew or are presumed to have known of the buy-out provision in Section 7.04 and the possible consequences of its terms when Steven executed the Operation Agreement on November 21, 2005 - prior to H&S and Peck's representation of Matthew as Trustee. Therefore, when the Trust was made irrevocable and the Note was issued in December of 2007, Steven and the Trust were already aware of the provision, as a matter of law. It follows that Plaintiffs cannot rely on such a contention to establish the Trust reasonably relied on H&S and Peck's advice.

Furthermore, since the Plaintiffs have not provided any evidence to establish the valuation was incorrect or otherwise deficient, there is no dispute as to any material fact regarding the accuracy of the valuation. Therefore, the Court should presume the valuation was correct. Since the record evidence demonstrates that if H&S and Peck provided advice regarding the value of the asset, that advice was based solely upon Parker

Benjamin's valuation and the Court may presume its advice regarding the value of the asset was correct.

In sum, Plaintiffs' claim also fails because Plaintiffs did not reasonably rely on any alleged valuation advice provided by H&S and Peck and Plaintiffs cannot establish H&S and Peck's alleged advice was improper. Therefore, the Trust could not have relied on the advice to its detriment when it issued the Note to Steven and when Steven agreed to convert the Trust into an irrevocable Trust.

### 3. **PLAINTIFFS' CLAIMS RELATING TO SECTION 7.04 OF THE GOODMILL, LLC OPERATING AGREEMENT ARE BARRED BY THE DISTRICT COURT'S PRIOR RULINGS REGARDING THE 2011 SETTLEMENT OF THE STATE COURT LITIGATION.**

Beyond opining that because of Peck's alleged negligence Steven Durst "failed to protect himself" from the consequences of Section 7.04, Plaintiff's expert concluded that Peck's negligence "was a significant and foreseeable reason" why the Goodmill Asset garnered only $80,000 as part of the settlement of the State Court Litigation. (Sa1008.) However, the District Court previously held that "collateral estoppel applies to bar relitigation of the fairness of the settlement" of the State Court litigation in 2011. (Sa21.) The District Court later reaffirmed this ruling in granting co-defendant R&C's motion for summary judgment:

> Because Plaintiffs were precluded from challenging the fairness of the state court settlement, Plaintiffs cannot prove in their legal malpractice claim against R&C that they were damaged by R&C's representation during the conveyance of the Millville Asset or the settlement more broadly. Collateral estoppel in this instance prevents the court from considering Plaintiffs' position but for R&C's alleged negligence. Even if Plaintiffs could establish the breach of a duty owed by R&C in the context of the state court settlement and the disposition of the Millville Asset, Plaintiffs cannot show that they were damaged because the court must assume that this settlement was fair and equitable.

[Sa56-57 (emphasis added).]

The District Court's ruling on the settlement of the State Court Litigation constituted the law of the case and, as such, the Court properly declined to revisit it. Research Group v. Magnesium Elektron, Inc., 123 F.3d 111, 116 (3rd Cir. 1997)(noting that law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation). Consequently, as a matter of law the District Court found that nothing Peck or her former firm did regarding Section 7.04 could have proximately caused damages to the Trust because the 2011 settlement was fair and equitable as a matter of law.

Therefore, there is no proximate causal connection between the alleged failure to realize and convey the impact of Section 7.04 and any harm purportedly sustained by the Trust.

4. **PLAINTIFFS CANNOT PROVE DAMAGES.**

It is widely recognized that the plaintiff bears the burden of proving that it has in fact been damaged. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1176 (3d Cir. 1993); Caldwell v. Haynes, 643 A.2d 564, 571 (N.J. 1994); Lane v. Oil Delivery, Inc., 524 A.2d 405, 409 (N.J. Super. Ct. App. Div. 1987). After the plaintiff has demonstrated harm, "it need prove the amount of damages only to a reasonable degree of certainty." Id. (citing Tessmar v. Grosner, 128 A.2d 467 (N.J. 1957)). The amount of damages awarded may not be based on mere speculation. Kelly v. Berlin, 692 A.2d 552, 558 (N.J. Super. Ct. App. Div. 1997)(emphasis added); see also American Sanitary Sales Co. v. State, 429 A.2d 403, 406-07 (App. Div. 1981), certif. denied, 434 A.2d 1094 (N.J. 1981)(emphasizing that trial judges should not engage in speculation when assessing damages). Expert testimony is necessary to assist the jury where the subject matter is such that laypersons lack sufficient knowledge or experience to evaluate and determine damages. Id. at 558-59.

Plaintiffs cannot establish that the Trust has in fact been damaged or the amount of its damages within a reasonable degree of certainty. In order to sustain its claim, the Trust must establish the value of its 10% interest in Goodmill, LLC starting, at the latest, in 2007 when Parker Benjamin performed its valuation of the asset. Without that figure, it cannot show

the impact of Section 7.04 on the value prior to Goodman exercising the buy-out provision in 2011.

In order to establish this value, Plaintiffs will need testimony from a real estate or business valuation expert. However, Plaintiffs did not retain an expert in either of these fields. The subject matter in question is so esoteric and outside the ken of the average lay person that an expert is critical to assist the jury in understanding topics such as amortization, rent streams, replacement costs, depreciation and business valuation. Despite the nature of the subject matter, no expert report was served in discovery or provided to the District Court for review.

Plaintiffs' damages claims with regard to the Millville Asset are based entirely on Steven Durst's purely subjective calculations as to the value of the shopping center, which were literally carried out in his head. Indeed, Durst himself admitted that other than his own personal calculations, he has no documentation to support his estimated value of the asset. (Sa972, at T212:24.) Expert testimony is also necessary to explain how the asset was "virtually worthless" even though it consistently generated significant rents from 2006 until the time it was conveyed to Goodman as part of the 2011 settlement of the State Court Litigation. As Steven Durst testified in his deposition:

Q: When did it actually open?
A: It opened mostly in '06. And with finality, I think everything, almost everything was open in 2007, although there were still some ground lease parcels that were not leased. Still is one to this day. But there was one that was later leased, probably in '09 or '10, to Sonic. And there were some small stores that remained, you know, rented actually for quite some period of time. I would say into '09 and '10. But the majority, simple majority was completed in '06. The vast majority, 80 to ninety percent, was probably done by the end of '07. And they remained 526,000 square feet as I say a couple of ground parcels, and probably 10-15,000 square feet of small stores to rent after that.

[Sa960, at T46:16 through 47:5.]

Obviously, the asset had significant value if the shopping center was generating rent for the nearly five years before the State Court Litigation was resolved. An expert would have to examine the overall rents enjoyed by the shopping center as well as the revenues and/or profits allocated to the Trust's 10% interest and then factor these figures into her overall valuation. The expert would also have to explain how the asset's value was affected during this period despite the overall success of the shopping center. In light of Plaintiffs' failure to serve an expert report on the value of the Millville Asset, Plaintiffs cannot establish whether the Trust was harmed and, if so, the extent of that harm.

For all of these reasons, the District Court properly held that Plaintiffs' claims against H&S were barred as a matter of law.

## POINT TWO

### THE DISTRICT COURT'S ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF PECK SHOULD BE AFFIRMED.

Plaintiffs argue that the District Court erred in granting summary judgment in favor of Kelley Galica-Peck. Plaintiffs' claims against Peck are based upon alleged malpractice during her partnership with H&S and as counsel at R&C. The District Court entered summary judgment on Peck's behalf. It reasoned that since the defendant law firms were not liable for legal malpractice, Peck also could not be liable.

### A. IF THIS COURT AFFIRMS ENTRY OF SUMMARY JUDGMENT ON BEHALF OF H&S, THIS COURT MUST ALSO AFFIRM ENTRY OF SUMMARY JUDGMENT ON BEHALF OF PECK BECAUSE PECK'S ALLEGED ACTS WERE COMMITTED IN HER CAPACITY AS A PARTNER OF H&S.

For her time as partner at H&S, Plaintiffs' allegations against Peck concern the drafting and amendment of the Trust agreement and involve the transfer or disposition of assets held by the Trust. (Sa943, ¶51.) It is well-entrenched New Jersey law "that every member of a partnership is jointly and severally liable for torts committed by other members of the partnership acting within the scope of the firm business, even though they do not participate in, or ratify, or have knowledge of such

negligence or legal malpractice." Falzarano v. Leo, 635 A.2d 547, 550 (N.J. Super. Ct. App. Div. 1993) (citing Malanga v. Manuf. Cas. Ins. Co., 146 A.2d 105 (N.J. 1958)); see also Staron v. Weinstein, 701 A.2d 1325, 1327-28 (N.J. Super. Ct. App. Div. 1997) ("As to a law firm's vicarious liability, it is established that every partnership member is jointly and severally liable for torts committed by other members of the partnership acting within the scope of the firm business."). The factual averments in Plaintiffs' Amended Complaint against Peck during her partnership at H&S reflect that Peck acted within the scope of H&S's business when she provided legal services to Matthew Durst related to his obligation to manage the Trust's affairs. (Sa943, ¶51.)

Matthew Durst retained H&S and Peck to represent him as Trustee of the Trust. Matthew Durst had certain responsibilities and duties as a Trustee of the Trust, including managing the Trust's assets and protecting the Trust's interests. Therefore, Peck was acting in the scope of H&S's business when drafting the amended Trust agreement and making recommendations about the transfer or disposition of certain Trust assets because she was attempting to effectuate Matthew Durst's interests as a Trustee of the Trust. Conversely, Plaintiffs did not allege that Peck provided legal services to them outside of the scope of H&S's business. (Sa936-44.) Moreover, Plaintiffs have neither

alleged any facts nor provided any evidence to establish a discrete basis for liability against Peck apart from H&S.

Therefore, if the Court affirms the entry of judgment in favor of H&S on Plaintiffs' claims, it must find that the partnership, which includes all partners, cannot be held liable for Plaintiffs claims based upon the acts or conduct of any other partner acting within the scope of the firm business. Peck was a partner of H&S at the relevant times and was acting within the scope of H&S's business when she provided legal services to Matthew Durst as Trustee of the Trust.[3] Therefore, if the Court enters judgment in favor of H&S on all of Plaintiffs' claims, then it must also enter judgment in favor of Peck on all of Plaintiffs' claims.

### B. IF THIS COURT AFFIRMS ENTRY OF SUMMARY JUDGMENT ON BEHALF OF R&C, THIS COURT MUST ALSO AFFIRM ENTRY OF SUMMARY JUDGMENT ON BEHALF OF PECK BECAUSE PECK'S ALLEGED ACTS WERE COMMITTED IN THE SCOPE OF HER EMPLOYMENT WITH R&C.

For her time as counsel at R&C, Plaintiffs allege that her actions allowed the Trust to convey the Millville Asset as part of the state court settlement contrary to the terms of the loan agreements and Peck, along with R&C and Matthew Durst, improperly withheld $35,000 in escrow during the Connecticut

[3] Even if Peck was an employee of H&S at all or part of the relevant time period, this analysis would remain the same. Peck's actions, as alleged by Plaintiffs, were in furtherance of the services provided by H&S to its clients and were the type of services an attorney with a focus on estate and trust planning and probate planning, such as Peck, would provide to a client of H&S seeking those services such as Matthew Durst, as Trustee of the Trust.

Probate proceedings. Peck adopts and incorporates R&C's appellee brief to refute the underlying merits of these claims. See Fed. R. App. P. 28(i). If this Court should affirm the entry of summary judgment in favor of R&C on the underlying malpractice claims, it must also do so for Peck.

"An employee is acting within the scope of employment if the action is "'of the kind [that the servant] is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, by a purpose to serve the master.'" Abbamont v. Piscataway Twp. Bd. of Educ., 650 A.2d 958, 963 (N.J. 1994)) (quoting Di Cosala v. Kay, 450 A.2d 508 (N.J. 1978)). However, if an attorney is acting outside of the scope of her employment, she may be individually liable for her conduct rather than her law firm. See generally Builders Square Inc. v. Nat'l Union Fire Ins. Co. of Pitsburgh, Pa., No. CIV.A. 95-164, 1995 WL 476246, at *3 (E.D.Pa. Aug. 9, 1995) (discussing the principles of vicarious liability under New Jersey law where an attorney was not acting within the scope of his employment with the firm).

During the relevant time period, Peck was employed as counsel at R&C with a focus on estate and trust planning and probate law. Peck's conduct, as alleged by Plaintiffs, was in furtherance of her representation of Matthew Durst as Trustee of the Trust, which was obviously an estate and trust planning

matter. Peck's alleged acts, which occurred during her employment with R&C, were in furtherance of her representation of Matthew Durst and were performed, in part, to actuate the business interests of R&C – to make a profit.

Plaintiffs' allegations, regardless of their veracity, arise out of Peck's representation of Matthew Durst as Trustee of the Trust in her capacity as an attorney. Such a contention is supported by Plaintiffs' own allegations in their Amended Complaint in which they aver Peck improperly withheld or conveyed Trust assets in two different lawsuits involving the Trust. There is no dispute the Trust held the Millville Asset at the time it was conveyed by the Trust in order to effectuate a settlement of the New Jersey State Court Litigation to which the Trust was a party. (Sa943-44, ¶¶49-51.) Additionally, based upon the plain language in Plaintiffs' Amended Complaint, the $35,000.00 in "Trust Funds" transferred to an escrow account obviously were held by the Trust and were initially transferred pursuant to an order by the Connecticut Probate Court involving the Trust. (Id.)

Plaintiffs have not alleged any facts or provided any evidence to establish an independent claim against Peck – separate and apart from their claims against R&C – for any of Peck's actions occurring on or after the date she commenced her employment with R&C. Therefore, Plaintiffs' claims against Peck

arising out of her allegedly improper actions committed within the scope of her employment with R&C fail, as a matter of law, because the Court has already determined those same claims fail against R&C, as a matter of law.

Accordingly, the Court should affirm the entry of judgment in favor of Peck on all of Plaintiffs' claims against Peck.

**POINT THREE**

**THE COURT SHOULD AFFIRM THE DISTRICT COURT'S ORDER DATED OCTOBER 15, 2015, DENYING PLAINTIFFS' UNTIMELY AND INAPPROPRIATE MOTION FOR RECONSIDERATION.**

Plaintiffs also appeal from the District Court's order denying their motion for reconsideration of four prior orders. For the reasons that follow, the District Court's October 15, 2015, order denying Plaintiffs' motion for reconsideration should be affirmed.

**A. STANDARD OF REVIEW.**

This Court should review the denial of Plaintiffs' motion for reconsideration for an abuse of discretion. Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 673 (3d Cir. 1999). "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985). A "party seeking reconsideration must show more than a disagreement with the court's decision," Panna v.

Firstrust Sav. Bank, 760 F. Supp. 432, 435 (D.N.J. 1991), and will fail to meet its burden if it merely presents "a recapitulation of the cases and arguments considered by the Court before rendering its original decision." Elizabethtown Water Co. v. Hartford Casualty Ins. Co., 18 F. Supp. 2d 464, 466 (D.N.J. 1998) (quoting Carteret Sav. Bank, F.A. v. Shushan, 721 F. Supp. 705, 706 (D.N.J. 1989)). It is improper on a motion for reconsideration to "ask the Court to rethink what it has already thought through—rightly or wrongly." Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co., 744 F. Supp. 1311, 1314 (D.N.J. 1990) (citations omitted).

Accordingly, a motion for reconsideration shall only be granted if the moving party shows: "(1) an intervening change in the controlling law; (2) the existence of new evidence that was previously unavailable; or (3) the need to correct a clear error of law or to prevent manifest injustice." North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

## B. THE DISTRICT COURT PROPERLY FOUND THAT PLAINTIFFS' MOTION FOR RECONSIDERATION WAS UNTIMELY.

The Local Rules of Civil Procedure for the District of New Jersey require that a motion for reconsideration shall be served within 14 days after entry of the order in question. L. Civ. R. 7.1(i). The failure to move for reconsideration in a timely

manner is grounds for denial of such a motion for that reason alone. See, e.g., Mitchell v. Twp. of Willingboro, 913 F. Supp. 2d 62, 78 (D.N.J. 2013) (denying motion for reconsideration filed 28 days after the court entered interlocutory order denying summary judgment). In this case, the orders which Plaintiffs asked the District Court to reconsider were entered on August 5, 2013, July 25, 2014, January 13, 2015, and April 10, 2015, respectively. Plaintiffs' application was filed on August 10, 2015, more than two years after the Court's August 5, 2013, order was entered granting partial summary judgment in favor of Matthew Durst. For this reason alone, the District Court correctly denied reconsideration.

### C. PLAINTIFFS FAILED TO SHOW THAT RECONSIDERATION WAS NECESSARY TO PREVENT MANIFEST INJUSTICE OR THAT NEW EVIDENCE EXISTED THAT WAS PREVIOUSLY UNAVAILABLE.

Plaintiffs offered two grounds in support of their motion for reconsideration: (1) that denial of this motion would result in manifest injustice and (2) that additional information secured during recent discovery disclosed specific new facts that justify the relief sought. (Sa64, ¶10.) The District Court correctly rejected these arguments.

#### 1. PLAINTIFFS DID NOT DEMONSTRATE MANIFEST INJUSTICE.

Reconsideration may be granted where it is needed to correct a clear error of law or fact or to prevent a "manifest

injustice." As noted by the late Hon. Dickinson Debevoise, U.S.D.J.:

> A decision suffers from "clear error" only if the record cannot support the findings that lead to that ruling. . . . Thus, a party must do more than allege that portions of a ruling were erroneous in order to obtain reconsideration of that ruling; it must demonstrate that (1) the holdings on which it bases its request were without support in the record, or (2) would result in "manifest injustice" if not addressed. . . . Mere "disagreement with the court's decision" does not suffice.

[Leja v. Schmidt Mfg., 743 F. Supp. 2d 444, 456 (D.N.J. 2010).]

Plaintiffs utterly failed to demonstrate that any of the holdings in question lacked support in the record. Plaintiffs offered no legal arguments, cited no cases and offered no analysis whatsoever to show that these rulings were incorrect. They also failed to demonstrate how injustice would result if these matters were not reconsidered. Plaintiffs had over three years to conduct discovery in support of their claims and develop the factual and legal bases for their arguments that H&S and Peck were guilty of malpractice. Despite having ample opportunity to make their case, they repeatedly failed to pursue their claims in a timely manner and failed to demonstrate that they were entitled to the relief that was previously denied. Simply, there was no deprivation of Plaintiffs' rights whatsoever. Therefore, the District Court was correct in

holding that Plaintiffs merely sought to relitigate issues already decided because they simply did not like the outcome. (Sa65-67.)

**2. THE DISTRICT COURT CORRECTLY REJECTED PLAINTIFFS' CLAIMS THAT RECONSIDERATION WAS PROPER BASED ON PREVIOUSLY UNAVAILABLE EVIDENCE.**

In order to permit reconsideration under New Jersey Local Civil Rule 7.1(i) when new evidence becomes available, "the moving party must present new evidence that would alter the disposition of the case." Interfaith Community Org., Inc. v. PPG Indus., 702 F. Supp. 2d 295, 317 (D.N.J. 2010). A motion should be denied where the movant provides no explanation for the failure to obtain ascertainable information earlier. Lentz v. Mason, 32 F. Supp. 2d 733, 751 (D.N.J. 1999) (denying motion for reconsideration where plaintiffs offered no explanation for their failure to exercise due diligence and obtain information that could have been discovered earlier). Here, the District Court concluded that the "new" evidence relied on by Plaintiffs was neither "unknown nor unavailable" at the time of the motions in question. (Sa66-67). There are several reasons why the District Court's conclusions should not be disturbed.

First, Plaintiffs did not demonstrate any "new" evidence that could not have been offered to the District Court previously. In fact, Plaintiffs relied largely on emails from 2007-2011 that were in their possession before this litigation

even started. (Sa66.) While they also cited portions of the transcripts from the depositions of Matthew Durst and Kelley Peck, those depositions were taken on April 28 and 29, 2015, respectively, nearly three years after the case commenced. There was no explanation offered by Plaintiffs for why they waited so long to take these depositions. There was also no explanation offered for why Plaintiffs waited nearly four months to file their reconsideration motion following these depositions or why they waited until after discovery ended to do so.

More importantly, the deposition testimony relied on by Plaintiffs before the District Court did nothing whatsoever to alter the disposition of the case or the earlier rulings by the District Judge and/or Magistrate Judge. Interfaith Community Org., 702 F. Supp. 2d at 317. The motions for summary judgment granted by the District Court on August 5, 2013, and January 13, 2015, were purely legal rulings stemming from the settlement of related litigation in the Superior Court of New Jersey in 2011. The deposition testimony of Kelley Peck and Matthew Durst did not impact those findings in the least.

This testimony also did not alter the fact that a claim against the appraisal company, Parker Benjamin, would have been futile. A motion for leave to amend should be denied as futile where the proposed amended complaint would not survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). In re Burlington

Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997); Massarksy v. General Motors Corp., 706 F.2d 111, 125 (3d Cir. 1983) (finding that a "trial court may property deny leave to amend where the amendment would not withstand a motion to dismiss").

Plaintiffs' purported "appraisal malpractice" claim was and remains futile due to the lack of a proximate causal connection between any act or omission by Parker Benjamin and the harm allegedly sustained by the Trust. While Plaintiffs asserted (and continue to assert) that Steven Durst could have successfully obtained a modification of the Goodmill Operating Agreement and avoided the pecuniary harm sustained by the Trust, this argument completely misses the mark for the reasons set forth in Point One, infra. There was simply no basis to assert a claim against Parker Benjamin and Plaintiffs' motion seeking leave to assert such a claim was properly denied, as was the motion for reconsideration appealed from here.

**CONCLUSION**

For all of the foregoing reasons, the District Court's orders granting summary judgment in favor of H&S and Peck and denying Plaintiffs' motion for reconsideration should be affirmed.

Respectfully submitted,

By: /s/ William F. O'Connor, Jr.
William F. O'Connor, Jr.
**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
(973) 993-8100
Attorneys for Defendant/Appellee Halloran & Sage, LLP

By: /s/ Christopher P. Leise
Chistopher P. Leise
Marc L. Penchansky, Esq.
**WHITE AND WILLIAMS LLP**
LibertyView, Suite 400
457 Haddonfield Road
Cherry Hill, New Jersey 08002-2220
(856) 317-3600
Attorneys for Defendant/Appellee Kelley Galica-Peck

Dated: July 27, 2016

**COMBINED CERTIFICATIONS OF COMPLIANCE AND SERVICE**

I, William F. O'Connor, Jr., hereby certify as follows:

1. I am an attorney at law duly admitted to practice in the State of New Jersey and am a member of the law firm of McElroy, Deutsch, Mulvaney & Carpenter, LLP, counsel for appellee Halloran & Sage, LLP. I am also admitted to practice law before this Court.

2. This brief complies with the type-volume limitation of Fed. R. App. P. 33(a)(7)(B) because this brief contains fewer than 14,000 words.

3. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Courier New, 12 point.

4. This brief complies with the requirements of Third Circuit Local Rule 31.1(c) because the text of the brief filed electronically through the Court's CM/ECF system is identical to the text of the paper copies filed with the Court.

5. This brief complies with the requirements of Third Circuit Local Rule 31.1(c) because a virus check of this file was performed using Microsoft Security Essentials 4.2.223, and no virus was detected.

6. On July 27, 2016, I caused the Joint Brief of defendants/appellees Halloran & Sage, LLP, and Kelley Galica-Peck, Joint Supplemental Appendix, and this Combined Certification of Compliance and Service to be electronically filed with the Court and served upon all counsel of record. I also emailed copies of the aforesaid documents to *pro se* plaintiff Steven Durst.

7. On July 27, 2016, I also caused seven (7) identical hard copies of the Joint Brief of defendants/appellees Halloran & Sage, LLP and Kelley Galica-Peck, including this Certification, to be served on the Court by overnight delivery at the following address:

Office of the Clerk
United States Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106-1790

8. On July 27, 2016, I also caused four (4) identical hard copies of the Supplemental Appendix to be served on the Court by overnight delivery at the following address:

Office of the Clerk
United States Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106-1790

9. On July 27, 2016, I also caused one (1) hard copy of the Joint Brief of defendants/appellees Halloran & Sage,

LLP, and Kelly Galica-Peck, Supplemental Appendix, and this Certificate of Service, to be served on the following by overnight delivery:

Mr. Steven Durst
23 Oakwood Drive
Medford, New Jersey 08055
Tel.: (609) 953-6718
Plaintiff *Pro Se*

John A. Yacovelle, Esq.
Law Office John A. Yacovelle
8438 Mackall Road
St. Leonard, Maryland 20685-2478
Attorneys for Defendant/Appellee, Matthew Durst
(Matthew Durst, individually and as Trustee)

Paul H. Zoubek, Esq.
Montgomery, McCracken, Walker & Rhoads, LLP
Liberty View, Suite 600
457 Haddonfield Road
Cherry Hill, New Jersey 08002-2220
Attorneys for Defendant/Appellee, Robinson & Cole, LLP

Christopher P. Leise, Esq.
White and Williams, LLP
Liberty View, Suite 400
457 Haddonfield Road
Cherry Hill, New Jersey 08002-2220
Attorneys for Defendant/Appellee, Kelley Galica Peck, Esq.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

/s/ William O'Connor, Jr.
William O'Connor, Jr.

DATED: July 27, 2016