IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

## C.A. NO. 15-4045

---

REUBEN DURST, Trustee, STEVEN DURST, Individually
and as Trustee,

Plaintiffs-Appellants

v.

MATTHEW DURST, Individually and as Trustee, HALLORAN &
SAGE, LLP, ROBINSON & COLE, LLP, and KELLEY GALICA-PECK,

Defendants-Appellees

---

**SUPPLEMENTAL APPENDIX VOLUME III OF III (SA633 TO SA1246)
ON BEHALF OF DEFENDANTS/APPELLEES**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 1:12-cv-05255
HONORABLE JEROME B. SIMANDLE, U.S.D.J.

**LAW OFFICE JOHN A. YACOVELLE**
8438 Mackall Road
St. Leonard, MD  20685-2478
Attorneys for Defendant/Appellee
Matthew Durst, Individually
and as Trustee

**McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP**
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ  07962
Attorneys for Defendant/Appellee
Halloran & Sage, LLP

**MONTGOMERY, MCCRACKEN, WALKER
& RHOADS, LLP**
Liberty View, Suite 600
457 Haddonfield Road
Cherry Hill, NJ  08002-2220
Attorneys for Defendant/Appellee
Robinson & Cole, LLP

**WHITE AND WILLIAMS, LLP**
Liberty View, Suite 400
457 Haddonfield Road
Cherry Hill, NJ  08002-2220
Attorneys for Defendant/Appellee
Kelley Galica Peck, Esq.

SUPPLEMENTAL APPENDIX
TABLE OF CONTENTS

<u>VOLUME I</u>

1.  Notice of Appeal, dated December 22, 2015
    (filed December 23, 2015) .................................. Sa1

Orders and Opinions

2.  Order and Opinion in the matter of Jake Ball Trust, et
    al., vs. Matthew Durst, et al., Case No. 12-5255,
    entered by Honorable Jerome B Simandle, Chief U.S.
    District Judge, dated August 5, 2013
    (filed August 5, 2013) .................................... Sa2

3.  Order and Opinion in the matter of Steven Durst and
    Reuben Durst vs. Matthew Durst, et al., Case No. 12-5255,
    entered by Honorable Ann Marie Donio U.S. Magistrate Judge,
    dated July 25, 2014 (filed July 25, 2014) ................. Sa22

4.  Order and Opinion in the matter of Jake Ball Trust, et al.,
    vs. Matthew Durst, et al., Case No. 12-5255, entered by
    Honorable Jerome B. Simandle, Chief U.S. District Judge,
    dated January 13, 2015 (filed January 13, 2015) ........... Sa39

5.  Order and Opinion in the matter of Jake Ball Trust, et al.,
    vs. Matthew Durst, et al., Case No. 12-5255, entered by
    Honorable Jerome B. Simandle, Chief U.S. District Judge,
    dated October 15, 2015 (filed October 15, 2015) ........... Sa58

6.  Order and Opinion in the matter of Jake Ball Trust, et al.,
    vs. Matthew Durst, et al., Case No. 12-5255, entered by
    Honorable Jerome B. Simandle, Chief U.S. District Judge,
    dated November 30, 2015 (filed November 30, 2015) ......... Sa68

<u>VOLUME II</u>

**Appendix Related to the August 5, 2013 Order
of the United States District Court for the
<u>District of New Jersey</u>**

7.  Notice of Motion for Partial Summary Judgment by Defendant/
    Counterclaimant Matthew Durst, dated December 12, 2012
    (filed December 13, 2012) ................................. Sa108

8.   Affidavit of John A. Yacovelle, Esq. in Support of Motion
     for Partial Summary Judgment with Accompanying Exhibits,
     dated December 12, 2012 (filed December 13, 2012) .......... Sa110

9.   Exhibit A-Order by the Honorable Anne McDonnell, P. J.Ch.,
     dated October 4, 2011 (filed December 13, 2012) ........... Sa121

10.  Exhibit B-Short Notice of Motion to Enforce Settlement
     Agreement, dated December 13, 2011
     (filed December 13, 2012) ................................. Sa123

11.  Exhibit C-Certification of John A. Yacovelle, Esq. in
     Response to Notice of Motion to Enforce Settlement, dated
     December 14, 2011 (filed December 13, 2012) ............... Sa125

12.  Exhibit D-Notice of Cross Motion to (A)Set Aside the
     Proposed Settlement in this Matter (B) Reopen the Case and
     Allow Same to Proceed to Trial and (C)To Allow the
     Intervention of Reuben (Mike Durst and Steven Durst with
     Accompanying Certification of Steven Durst in (A)Opposition
     to Motion to Enforce Settlement and (B)In Support of Cross
     Motion to Set Aside the Settlement and Reopen the Case and
     Allow Intervention, dated December 28, 2011
     (filed December 13, 2012) ................................. Sa128

13.  Exhibit E- Letter Brief and Certification of John A.
     Yacovelle, Esq., in Response to Pending Motions, dated
     January 2, 2012 (filed December 13, 2012) ................. Sa135

14.  Exhibit F-Case Management Order by the Honorable Anne
     McDonnell, P.J.Ch., dated January 6, 2012
     (filed December 13, 2012) ................................. Sa150

15.  Exhibit G-Answers to Interrogatories by Plaintiff to
     Proposed Intervenor, dated March 8, 2012
     (filed December 13, 2012) ................................. Sa152

16.  Exhibit H-Answers to Interrogatories Served Upon Matthew
     Durst, dated February 29, 2012 (filed December 13, 2012) ... Sa161

17.  Exhibit I-Email from John Yacovelle, Esq. to
     delia@delialawfirm.com, dated February 9, 2012, Letter from
     John Yacovelle, Esq. to Vince D'Elia, Esq., dated February
     23, 2012, Handwritten Letter from S.D. to John undated
     (filed December 13, 2012) ................................. Sa171

18. Exhibit J-Status Report from John A. Yacovelle, Esq. to
    Honorable Anne McDonnell, J.S.C. with Accompanying
    documents, dated March 27, 2012 (filed December 13, 2012) .. Sa177

19. Exhibit K-Plaintiff's Brief on Motions
    (filed December 13, 2012) ................................. Sa188

20. Exhibit L-Transcript of Motion, dated April 26, 2012
    (filed December 13, 2012) ................................. Sa195

21. Exhibit M-Certification of Christopher Pennington received
    and filed May 11, 2012 (filed December 13, 2012) .......... Sa214

22. Exhibit N-Order entered by Honorable Anne McDonnell,
    P.J.Ch., dated June 27, 2011 (filed December 13, 2012) ..... Sa218

23. Exhibit O-Notice of Appeal, dated August 9, 2012 (filed
    December 13, 2012) ....................................... Sa226

24. Exhibit P-Order entered by Joseph H. Orlando, Clerk of
    Appellate Division, dated November 13, 2012 (filed December
    13, 2012) ............................................... Sa229

25. Letter Vincent D'Elia, Esq to Clerk of United States
    District Court for automatic extension, dated December 18,
    2012 (filed December 18, 2012) ........................... Sa232

26. Exhibit A-Jake Ball Trust Agreement, dated November 29,
    2004, Amended December 24, 2007 (filed January 8, 2013) .... Sa233

27. Exhibit B-Confidential Settlement Agreement and Mutual
    General Release of Claims undated(filed January 8, 2013) ... Sa270

28. Exhibit C-Affidavit of Steven Durst in Support of
    Opposition to Defendant's Motion for Partial Summary
    Judgment, dated January 8, 2013 (filed January 8, 2013) .... Sa278

29. Exhibit D-Order and Bench Memorandum from Honorable
    Anne McDonnell J.S.C., dated June 27, 2012
    (filed January 8, 2013) ................................... Sa282

30. Exhibit E- Certification of Steven Durst in (A)Opposition
    to Motion to Enforce Settlement and (B)In Support of Cross
    Motion to Set Aside the Settlement and Reopen the Case and
    Allow Intervention with accompanying exhibits, dated
    December 28, 2011 (filed January 8, 2013) ................. Sa289

31.  Exhibit F-Letter Bruce A. Goodman to Rick Dreher, dated
     October 27, 2010 (filed January 8, 2013) .................. Sa343

32.  Exhibit G-Omitted. Please see Plaintiffs' Appendix Tab 2.

33.  Exhibit H-Letter Brief of John A. Yacovelle, Esq. in
     in Response to Pending Motions, dated January 2, 2012
     (filed December 13, 2012 and January 8, 2013) ............. Sa135

34.  Exhibit I-Affidavit of Reuben Durst in Support of
     Opposition to Defendant's Motion of Partial Summary
     Judgment, dated January 4, 2013 (filed January 8, 2013) .... Sa350

35.  Exhibit J-Letter of Intent on behalf of Ironstone Strategic
     Capital Partners to Chris Pennington, dated January 4, 2012
     (filed January 8, 2013) ................................... Sa353

36.  Exhibit K-Internet Headline Re: Philadelphia Schools, dated
     April 30, 2012 (filed January 8, 2013) .................... Sa357

37.  Exhibit L-Plaintiff's Supplemental Brief on Pending Cross
     Motions Regarding Settlement (filed January 8, 2013) ....... Sa359

38.  Exhibit M-Non-Negotiable Promissory Note
     (filed January 8, 2013) ................................... Sa369

39.  Exhibit N-Omitted. Please see Plaintiffs' Appendix Tab 15.

40.  Exhibit O-Email from John Yacovelle, Esq. to
     mclemm@morrisclemm.com and gmmbt@comcast.net, dated
     June 3, 2012 (filed January 8, 2013) ..................... Sa375

             **Appendix Related to the July 25, 2014 Order
             of the United States District Court for the
             District of New Jersey**

41.  Notice of Motion for Leave to File Second Amended
     Complaint, dated February 3, 2014
     (filed February 3, 2014) ................................. Sa377

42.  Second Amended Complaint, dated February 3, 2014 (filed
     February 3, 2014) ........................................ Sa378

43.  Exhibit A-Email Steve Durst to Delia@delialaw.com
     forwarding letter from Matt to Mike, dated April 3, 2012
     (filed February 3, 2014) ................................. Sa397

44.   Exhibit B-Letter John A. Yacovelle, Esq. to
      Vincent D'Elia, Esq., dated March 19, 2012
      (filed February 3, 2014) ................................... Sa400

45.   Exhibit C-State of Connecticut Court of Probate
      Administration Account Form, dated November 28, 2011 (filed
      February 3, 2014) ......................................... Sa403

46.   Exhibit D-Email communications involving Matthew Durst,
      John Yacovelle, Esq. and Steve Durst, dated
      October 31, 2010 and November 26, 2010
      (filed February 3, 2014) ................................... Sa405

47.   Exhibit E-Omitted. Please see Plaintiffs' Appendix Tab 11.

48.   Exhibit F-Letter from John Yacovelle, Esq. to
      Vincent D'Elia, Esq. and Steven Hladik, Esq., dated
      February 5, 2012 (filed February 3, 2014) ................. Sa408

49.   Exhibit G-Email communications involving John Yacovelle,
      Esq., Steven Hladik, Esq. and donorato@kernslaw.com,
      dated December 28, 2011 (filed February 3, 2014) .......... Sa411

50.   Exhibit H-Email communications involving John Yacovelle,
      Esq., Steve Durst, and gmmbt@comcast.net dated,
      May 14-15, 2011 (filed February 3, 2014) ................. Sa414

51.   Exhibit I-Omitted. Please see Plaintiffs' Appendix Tab 11.

52.   Exhibit J-Assignment of Rights to Receive Distributions
      From Goodmill, LLC, dated June 29, 2007 (filed
      February 3, 2014) ......................................... Sa417

53.   Exhibit K-Letter from John Yacovelle, Esq. to
      Steve Hladik, Esq. and David Onorato, Esq., dated
      October 20, 2011(filed February 3, 2014) ................. Sa420

54.   Exhibit L-Letter from John Yacovelle, Esq. to Matt Durst,
      dated July 15, 2010 (filed February 3,2014) .............. Sa423

55.   Exhibit M-Omitted. Please see Plaintiffs' Appendix Tab 15.

56.   Exhibit N-Omitted. Please see Plaintiffs' Appendix Tab 4.

57.   Exhibit O-Omitted. Please see Plaintiffs' Appendix Tab 9.

58. Exhibit P-Robinson and Cole LLP Invoice for Services, dated August 30, 2011 (filed February 3, 2014) ............ Sa427

59. Exhibit Q-Amended Complaint for Declaratory Judgment and Equitable Relief Unfiled Version(filed February 3, 2014) ... Sa429

60. Exhibit R-Omitted. Please see Plaintiffs' Appendix Tab 12.

61. Exhibit S-Schedule B-1 (filed February 3, 2014) ............ Sa436

62. Exhibit T-Parker Benjamin Valuation, dated May 19, 2008 (filed February 3, 2014) ................................... Sa438

63. Exhibit U-Letter Bruce A. Goodman to Rick Dreher, dated October 27, 2010 (filed January 8, 2013 and February 3, 2014) ................................................... Sa343

64. Exhibit V-Newspaper Article (filed February 3, 2014) ....... Sa445

65. Exhibit W-Certification of David C. Onorato, Esq. (filed February 3, 2014) ................................... Sa447

66. Exhibit X-Newspaper Article (filed February 3, 2014) ....... Sa451

67. Certification of Steven Durst, dated February 24, 2014 (filed February 24, 2014) ................................... Sa454

**Appendix Related to the January 13, 2015
Order of the United States District Court
for the District of New Jersey**

68. Defendant Robinson & Cole LLP's Notice of Motion for Summary Judgment Under Fed. R.Civ. P.56, dated November 3, 2014 (filed November 3, 2014) ................... Sa459

69. Certification of Kelly Galica Peck, Esq., in Support of Robinson & Cole LLP's Motion for Summary Judgment dated, October 30, 2014 (filed November 3, 2014) ................... Sa462

70. Exhibit 1-Goodmill LLC Operating Agreement, dated November 15, 2005 (filed November 3, 2014) ................ Sa469

71. Exhibit 2-Omitted. Please see Plaintiffs' Appendix Tab 15.

72. Exhibit 3-Letter Henry M. Beck, Jr., Esq. to Matthew D. Durst, dated October 13, 2010 (filed November 3, 2014) ..... Sa494

73.  Exhibit 4-Email communications involving Erica Durst,
     Kelley Galica Peck, Esq. and Vincent D'Elia, Esq., dated
     December 12-13, 2011 (filed November 3, 2014) .............. Sa496

74.  Exhibit 5-Letter Louis R. Piscatelli to Kelley Galica Peck,
     Esq., dated February 9, 2012 (filed November 3, 2014) ...... Sa500

75.  Exhibit 6-State of Connecticut Simsbury Regional Probate
     Court, Probate District 09, Memorandum of Decision, dated
     May 24, 2013 (filed November 3, 2014) ..................... Sa503

76.  Exhibit 7-Complaint in the matter of Steven Durst vs
     Matthew Durst, Superior Court Judicial District of
     Hartford, dated June 21, 2013 (filed November 3, 2014) ..... Sa509

77.  Exhibit 8-Complaint in the matter of Matthew Durst vs
     Reuben Durst, Steven Durst, Loren Mague and Erica Durst
     Superior Court Judicial District of Hartford, dated
     June 24, 2013 (filed November 3, 2014) .................... Sa520

78.  Exhibit 9- State of Connecticut Simsbury Regional Probate
     Court, Probate District 09, Memorandum of Decision, dated
     October 29, 2013 (filed November 3, 2014) ................. Sa527

79.  Exhibit 10-Letter Kelley Galica Peck, Esq. to Pamela
     Baldini, Clerk of Simsbury Regional Probate Court, dated
     November 5, 2013 (filed November 3, 2014) ................. Sa530

80.  Certification of Paul H. Zoubek, Esq., in Support of
     Defendant Robinson & Cole LLP's Motion for Summary
     Judgment Under Fed. R. Civ.P. 56, dated November 3, 2014
     (filed November 3, 2014) .................................. Sa534

81.  Exhibit 1-Wilkerson vs Hallett, 2010 WL 3906854
     (D.N.J. September 29, 2010) (filed November 3, 2014) ....... Sa537

82.  Exhibit 2-Order entered by Honorable Ann Marie, United
     States Magistrate Judge, dated July 25, 2014 (filed
     July 25, 2014 and November 3, 2014) ....................... Sa22

83.  Exhibit 3-Order and Bench Memorandum from Honorable
     Anne McDonnell J.S.C., dated June 27, 2012 (filed January 8
     2013 and November 3, 2014) ................................ Sa282

84.  Exhibit 4- Transcript of Motion, dated April 26, 2012
     (filed December 13, 2012 and November 3, 2014) ............ Sa195

85. Certification of Steven Durst in Opposition to Defendant
    Robinson & Cole LLP's Motion for Summary Judgment, dated
    (filed November 24, 2014) ................................. Sa548

86. Exhibit A-Letter from Kelley Galica Peck, Esq. to Matthew
    Durst, dated December 29, 2006
    (filed November 24, 2014) ................................. Sa554

87. Exhibit B-Checks from Jake Ball Trust payable to Matthew
    Durst (filed November 24, 2014) .......................... Sa561

88. Exhibit C-Email Kelley Galica Peck, Esq. to
    Vincent D'Elia, Esq., dated December 12, 2011
    (filed November 24, 2014) ................................. Sa586

89. Exhibit D- State of Connecticut Simsbury Regional Probate
    Court, Probate District 09, Memorandum of Decision, dated
    May 24, 2013 (filed November 3, 2014 and
    November 24, 2014) ........................................ Sa503

90. Exhibit E-Robinson & Cole LLP Invoice for Services
    Rendered, dated August 10, 2012
    (filed November 24, 2014) ................................. Sa588

91. Exhibit F-Letter from Kelley Galica Peck, Esq. to
    Vincent D'Elia, Esq., dated November 7, 2011
    (filed November 24, 2014) ................................. Sa590

92. Certification of Louis R. Moffa, Jr., Esq. in Support of
    Defendant Robinson & Cole LLP's Summary Judgment Reply
    Brief, dated December 3, 2014 (filed December 1, 2014) ..... Sa593

93. Exhibit 1-Amboy Bancorporation vs The Bank Advisory Group,
    Inc., 432 F. App'x 102 (3rd Cir. 2011)
    (filed December 1, 2014) .................................. Sa596

94. Exhibit 2-Bell vs City of Philadelphia
    275 F. App'x 157 (3rd Cir. 2008)(filed December 1, 2014).... Sa606

95. Exhibit 3- Boles vs City of Philadelphia Water Dep't
    No.06-1609, 2010 WL 2044473, at *6 (E.D. Pa. May21, 2010)
    (filed December 1, 2014) .................................. Sa612

96. Exhibit 4-Duran vs Warner, No. 07-5994, 2013 WL 4483518
    At *5 (D.N.J. Aug. 20, 2013) (filed December 1, 2014) ...... Sa619

97.  Exhibit 5-Holland vs Macerich, No. 09-914 RMB/AMD, 2011
     U.S. Dist. Lexis 149657 at *9-10 (D.N.J. Dec. 29,, 2011)
     (filed December 1, 2014) ................................. Sa627

**VOLUME III**

> **Appendix Related to the October 15, 2015 Order
> of the United States District Court for the
> District of New Jersey**

98.  Notice of Motion to Reconsider 1) Denial of Motion to Amend
     Complaint to Join Additional Defendants, 2) Granting of
     Motion for Summary Judgment for Defendants Robinson & Cole,
     3) Granting Motion for Partial Summary Judgment in Favor
     of Matthew Durst, 4)Denying Motion to Amend Complaint to
     Join John Yacovelle, Esq as Defendant, dated
     August 10, 2015 (filed August 10, 2015) .................... Sa633

99.  Certification of Steven Durst in Support of Motion to
     Reconsider 1) Denial of Motion to Amend
     Complaint to Join Additional Defendants, 2) Granting of
     Motion for Summary Judgment for Defendants Robinson & Cole,
     3) Granting Motion for Partial Summary Judgment in Favor
     of Matthew Durst, 4)Denying Motion to Amend Complaint to
     Join John Yacovelle, Esq as Defendant, dated August 7, 2015
     (filed August 10, 2015) ................................. Sa635

100. Exhibit A-Omitted. Please see Plaintiffs' Appendix Tab 12.

101. Exhibit B-Buy Out in the Event of Termination Document
     Language (filed August 10, 2015) .......................... Sa669

102. Exhibit C-Omitted.  Please see Plaintiffs' Appendix Tab 10.

103. Exhibit D-Omitted.  Please see Plaintiff's Appendix Tab 9.

104. Exhibit E-Excerpts from Deposition of Kelly Peck, Esq.
     Dated April 28, 2015, Page 28, Lines 7-14
     (filed August 10, 2015) ................................. Sa671

105. Exhibit F- Excerpts from Deposition of Kelly Peck, Esq.
     dated April 28, 2015, Page 48, Lines 23-24 and page 49,
     lines 5-7 (filed August 10, 2015) ......................... Sa673

106. Exhibit G-Omitted.  Please see Plaintiffs' Appendix Tab 4.

107. Exhibit H- Email communications involving Erica Durst, Kelley Galica Peck, Esq. and Vincent D'Elia, Esq., dated December 9-13, 2011 (filed August 10, 2015) ............... Sa675

108. Exhibit I-Connecticut Court Orders of April 3, 2013 and May 24, 2013 (filed August 10, 2015) ...................... Sa677

109. Exhibit J- Excerpts from Deposition of Kelly Peck, Esq. dated April 28, 2015, Page 76-77 (filed August 10, 2015) ... Sa682

110. Exhibit K-Letter from Kelley Galica Peck, Esq. to Steve Durst, Matthew Durst and Reuben Durst, dated October 13, 2011 (filed August 10, 2015) ................................ Sa684

111. Exhibit L-State of Connecticut Court of Probate Accounting, dated November 28, 2011 (filed August 10, 2015) ........... Sa688

112. Exhibit M- Excerpts from Deposition of Kelly Peck, Esq. dated April 28, 2015, Page 17 (filed August 10, 2015) ...... Sa768

113. Exhibit N-Omitted.  Please see Plaintiffs' Appendix Tab 10.

114. Exhibit O-Omitted.  Please see Plaintiffs' Appendix Tab 7.

115. Exhibit P-Omitted.  Please see Plaintiffs' Appendix Tab 7.

116. Exhibit Q-Excerpts from Deposition of Bruce Goodman Page 128, Lines 1&2 (filed August 10, 2015) ............... Sa770

117. Exhibit R-Assignment of Rights to Receive Distributions From Goodmill, LLC, dated June 29, 2007 (filed February 3, 2014 and August 10, 2015) .............. Sa417

118. Exhibit S-Letter from Bruce Goodman to Matthew Durst, dated August 14, 2007 (filed August 10, 2015) ................... Sa772

119. Exhibit T-Email communications involving Matthew Durst, John Yacovelle, Esq. and Steve Durst, dated October. 31, 2010 and November 26, 2010 (filed February 3, 2014 and August 10, 2015) ........................................ Sa405

120. Exhibit U- Letter Brief and Certification of John A. Yacovelle, Esq., in Response to Pending Motions, dated January 2, 2012 (filed December 13, 2012 and August 10, 2015) ......................................... Sa135

121. Exhibit V-Email communications involving Matt Durst, Kelley
     Peck, Esq. and Steve Durst, dated December 17, 2007
     (filed August 10, 2015) ..................................... Sa774

122. Exhibit W-Matt Durst email to John Yacovelle, Esq.
     (filed August 10, 2015) ..................................... Sa776

123. Exhibit X- Robinson and Cole LLP Invoice for Services,
     dated August 30, 2011 (filed February 3, 2014 and
     August 10, 2015) ........................................... Sa427

124. Exhibit Y-John Yacovelle's accusations against Steven Durst
     and Vincent D'Elia, Esq. (filed August 10, 2015) ........... Sa778

125. Exhibit Z-Email communications involving John Yacovelle,
     Esq., Steven Hladik, Esq. and donorato@kernslaw.com,
     dated December 28, 2011 (filed February 3, 2014 and
     August 10, 2015) ........................................... Sa411

126. Certification of Kristen E. Polovoy, Esq. In Support of
     Motion of Robinson Cole LLP's Response Brief in Opposition
     To Plaintiff's Motion for Reconsideration, dated
     September 8, 2015 (filed September 8, 2015) ................ Sa781

127. Exhibit 1-Transcript of Telephonic Hearing, dated
     April 9, 2015 (filed September 8, 2015) .................... Sa785

128. Exhibit 2-Canete vs Barnabas Health Systems, 2013 U.S.Dist.
     LEXIS 133910 (D.N.J. Sept 18, 2013)
     (filed September 8, 2015) ................................. Sa814

129. Exhibit 3-Irwin Katz & Assoc., Inc. vs. Concepts in Health,
     Inc., 2015 U.S. Dist. LEXIS 90225 (D.N.J. July 13, 2015)
     (filed September 8, 2015) ................................. Sa822

130. Exhibit 4-Kamienski vs Attorney General of N.J., 2012 U.S.
     Dist. LEXIS 74122 (D.N.J. June 9, 2015)
     (filed September 8, 2015) ................................. Sa827

131. Exhibit 5-Ledgestone Associates LLC vs Internet Methods,
     2008 U.S.Dist. LEXIS 49081 (D.N.J. June 27, 2008)
     (filed September 8, 2015) ................................. Sa834

132. Exhibit 6-Levinson vs Regal Ware, Inc., 1989 U.S. Dist.
     LEXIS 18373 (D.N.J. Dec. 1, 1989)
     (filed September 8, 2015) ................................. Sa838

133. Exhibit 7-<u>Lighthouse Point Marina & Yacht Club, LLC. Vs Int'l Marine Underwriters,</u> 2015 U.S. Dist. LEXIS 57556 (D.N.J. May 1, 2015) (filed September 8, 2015) ............ Sa848

134. Exhibit 8-<u>Rios vs City of Bayonne,</u> 2015 U.S. Dist. LEXIS 65137 (D.N.J. May 19, 2015)(filed September 8, 2015) ....... Sa857

135. Exhibit 9-<u>United States vs Pechiney Plastics Packaging, Inc.,</u> 2012 U.S. Dist. LEXIS 114255 (D.N.J. Aug., 14, 2012) (filed September 8, 2015) .................................. Sa862

136. Order in the matter of Steven Durst and Reuben Durst vs. Matthew Durst, et al., Case No. 12-5255,entered by Honorable Ann Marie Donio U.S. Magistrate Judge, dated April 10, 2015(filed April 10, 2015) ................ Sa870

137. Notice of Motion for Leave to File Second Amended Complaint, dated February 14, 2014 (filed February 20, 2015) .................................. Sa872

137. Brief in Support of Motion for Leave to File Second Amended Complaint, dated February 14, 2014 (filed February 20, 2015) .................................. Sa875

139. Certification of Steven Durst in Support of Plaintiffs' Motion for Leave to File Second Amended Complaint, dated February 20, 2015 (filed February 20, 2015) ............... Sa879

140. Robinson & Cole LLP's Opposition to Plaintiffs' Third Motion for Leave to File Second Amended Complaint, dated March 2, 2015 (filed March 3, 2015) ....................... Sa882

141. Minute Entry for Proceeding held before Honorable Ann Marie Donio, Telephone Status Conference held on April 9, 2015 (filed April 9, 2015) ................................... Sa887

142. Transcript Of Proceedings Held Before Honorable Ann Marie Donio dated April 9, 2015 (filed July 30, 2015) ........... Sa888

143. Defendant Robinson & Cole LLP's Answer to Affirmative Defenses to Plaintiffs' Amended Complaint dated April 25, 2013 (filed April 25, 2013) .................... Sa916

**Appendix Related to the November 30, 2015 Order of the United States District Court <u>for the District of New Jersey</u>**

144. Notice of Motion for Summary Judgment on Behalf of
     Defendant Halloran & Sage LLP, dated August 14, 2015
     (filed August 14, 2015) ................................... Sa927

145. Certification of Counsel Support of Defendant Halloran &
     Sage LLP Motion for Summary Judgment, dated August 14, 2015
     (filed August 14, 2015) ................................... Sa930

146. Exhibit A-Amended Complaint in Reuben Durst, Steven Durst
     Vs. Matthew Durst et al, dated February 15, 2013
     (filed August 14, 2015) ................................... Sa935

147. Exhibit B-Jake Ball Trust Agreement, dated
     November 29, 2004 (filed August 14, 2015) ................. Sa946

148. Exhibit C-Excerpts from Deposition of Steven Durst, dated
     February 2, 2015 (filed August 14, 2015) .................. Sa958

149. Exhibit D-Excerpts from Deposition of Steven Durst, dated
     February 3, 2015 (filed August 14, 2015) .................. Sa963

150. Exhibit E-Excerpts from Deposition of Steven Durst, dated
     September 19, 2011 (filed August 14, 2015) ................ Sa976

151. Exhibit F-Certification of Kelly Galica Peck, Esq., in
     Support of Robinson & Cole LLP's Motion for Summary
     Judgment, dated October 30, 2014 (filed November 3, 2014
     and August 8, 2015) ....................................... Sa462

152. Exhibit G-Omitted.  Please see Plaintiffs' Appendix Tab 2.

153. Exhibit H-Excerpts from Deposition of Kelley Galica Peck,
     Esq. dated April 28, 2015 (filed August 14, 2015) ......... Sa981

154. Exhibit I- Jake Ball Trust Agreement, dated November 29,
     2004, Amended December 24, 2007 (filed January 8, 2013 and
     August 14, 2015) .......................................... Sa233

155. Exhibit J-Excerpts from Deposition of Reuben Durst, dated
     May 11, 2015 (filed August 14, 2015) ...................... Sa984


156. Exhibit K-Omitted.  Please see Plaintiffs' Appendix Tab 15.

157. Exhibit L-Amended Complaint For Declaratory Judgment and
     Equitable Relief in <u>Durst v. Goodmill, LLC, et als.,</u>
     Docket No. CUM-C-27-10, dated August 18, 2010
     (filed August 14, 2015) ................................. Sa996

158. Exhibit M- Transcript of Motion dated April 26, 2012
     (filed December 13, 2012 and August 14, 2015) ............. Sa195

159. Exhibit N-Expert Report of Frederic Jacob, Esq., dated
     June 25, 2015 (filed August 14, 2015) .................... Sa1003

160. Exhibit O-Steven Durst's Answers to Interrogatories
     propounded by Halloran & Sage LLP, dated December 23, 2014
     (filed August 14, 2015) ................................. Sa1018

161. Exhibit P-Halloran & Sage LLP's Second Request for the
     Production of Documents, dated February 26, 2015
     (filed August 14, 2015) ................................. Sa1039

162. Exhibit Q-Letter from William F. O'Connor, Jr., Esq., to
     Vincent D'Elia, Esq., dated April 16, 2015
     (filed August 14, 2015) ................................. Sa1050

163. Exhibit R-Goodmill LLC Operating Agreement, dated
     November 15, 2005 (filed November 3, 2014 and
     August 14, 2015) ........................................ Sa469

164. Exhibit S-Email communications involving Steve Durst,
     Matt Durst and Kelly Peck, Esq. dated November 9, 2007
     (filed August 14, 2015) ................................. Sa1054

165. Exhibit T-Excerpts from Deposition of Matthew Durst,
     dated April 28, 2015 (filed August 14, 2015) .............. Sa1057

166. Notice of Motion for Summary Judgment filed by Defendant
     Kelley Galica Peck, Esq., dated August 14, 2015
     (filed August 14, 2015) ................................. Sa1063

167. Notice of Motion for Summary Judgment on Remaining Issues,
     (filed August 15, 2015) ................................. Sa1066

168. Certification of Matthew Durst, dated August 14, 2015
     (filed August 15, 2015) ................................. Sa1068

169. Exhibit 1-Excerpt from Deposition of Steve Durst, dated
     February 2, 2015, Page/Line 110:24-111:5
     (filed August 15, 2015) ................................. Sa1076

170. Exhibit 2-Excerpts of Deposition of Reuben Durst
     Pages 18-25 (filed August 15, 2015) ........................ Sa1077

171. Exhibit 3- Excerpts of Deposition of Reuben Durst
     Pages 58-73(filed August 15, 2015) ......................... Sa1080

172. Exhibit 4- Excerpts of Deposition of Steve Durst
     Pages 133-137(filed August 15, 2015) ...................... Sa1083

173. Exhibit 5- Excerpts of Deposition of Reuben Durst
     Pages 54-57 (filed August 15, 2015) ........................ Sa1085

174. Exhibit 6-Excerpts of Deposition of Steve Durst,
     Pages 110-113 (filed August 15, 2015) ...................... Sa1087

175. Exhibit 7-Email from John Yacovelle, Esq. to
     Vincent D'Elia, Esq, Teresa Lentini, Kim Yous,
     William O'Connor, Esq. and Christopher Leise dated
     February 8 (filed August 15,2015) ......................... Sa1089

176. Exhibit 8-Plaintiff's Supplemental Request for Production
     of Documents Upon Matthew Durst (filed August 15, 2015) .... Sa1091

177. Exhibit 9-Excerpts of Deposition of John Yacovelle, Esq.
     dated April 28, 2015, Pages 85-104
     (filed August 15, 2015) ................................... Sa1094

178. Exhibit 10-Outstanding Discovery Backup items (filed
     August 15, 2015) .......................................... Sa1100

179. Exhibit 11-Non-Privileged Trust Business Documents
     (filed August 15, 2015) ................................... Sa1120

180. Exhibit 12-Excerpts of Deposition of Steve Durst,
     Pages 214-217 (filed August 15, 2015) ..................... Sa1126

181. Exhibit 13-Excerpts of Deposition of Steve Durst,
     Pages 130-133 (filed August 15, 2015) ..................... Sa1128

182. Exhibit 14-Connecticut Court Orders of April 3, 2013 and
     May 24, 2013 (filed August 10, 2015 and August 15, 2015) ... Sa677

183. Exhibit 15- Complaint in the matter of Steven Durst vs
     Matthew Durst, Superior Court Judicial District of
     Hartford, dated June 21, 2013 (filed November 3, 2014 and
     August 15, 2015) .......................................... Sa509

184. Certification of Counsel in Support of Motion for
     Summary Judgment, dated August 14, 2015 (filed
     August 15, 2015) .......................................... Sa1130

185. Exhibit 16-Equal Employment Opportunity Commission Intake
     Questionnaire, date July 7, 2010 (filed August 15, 2015) ... Sa1132

186. Exhibit 17-Excerpts of Accounting filed by Matthew Durst
     (filed August 15, 2015) ................................... Sa1148

187. Notice of Motion to Strike Plaintiff's Late Amendment to
     Discovery Responses, dated August 28, 2015
     (filed August 28, 2015) ................................... Sa1159

188. Certification of Counsel in Support of Defendant Halloran &
     Sage LLP's Motion to Strike, dated August 28, 2015
     (filed August 28, 2015) ................................... Sa1161

189. Exhibit A-Steven Durst's Answers to Interrogatories
     propounded by Halloran & Sage LLP, dated December 23, 2014
     (filed August 14, 2015 and August 28, 2015) ............... Sa1018

190. Exhibit B-Excerpts from Deposition of Steven Durst, dated
     February 3, 2015 (filed August 14, 2015 and August 28,
     2015) ...................................................... Sa963

191. Exhibit C-Halloran & Sage LLP's Second Request for the
     Production of Documents, dated February 26, 2015
     (filed August 14, 2015 and August 28, 2015) ............... Sa1039

192. Exhibit D-Letter from William F. O'Connor, Jr., Esq., to
     Vincent D'Elia, Esq., dated April 16, 2015
     (filed August 14, 2015 and August 28, 2015) ............... Sa1050

193. Exhibit E-Plaintiff's Amendment to Answers to
     Interrogatories and Request for Production of Documents,
     dated July 18 2015 (filed August 28, 2015) ................ Sa1166

194. Certification of Steven Durst in Opposition to a Motion
     From Halloran & Sage to "Strike Plaintiffs' Late Amendments
     To Discover Responses, dated September 21, 2015
     (filed September 21, 2015) ................................ Sa1171

195. Exhibit A- Plaintiff's Amendment to Answers to
     Interrogatories and Request for Production of Documents,
     dated July 18, 2015 (filed August 28, 2015 and
     September 21, 2015) ....................................... Sa1166

196. Exhibit B-Omitted. Please see Plaintiffs' Appendix Tab 11

197. Certification of Steven Durst in Opposition to Motion for
     Summary Judgment Filed on Behalf of Defendant Kelley Peck
     and Motion for Summary Judgment Filed on Behalf of
     Defendant Halloran & Sage, LLP, dated September 24, 2015
     (filed September 24, 2015) ................................. Sa1175

198. Exhibit A-Omitted.  Please see Plaintiffs' Appendix Tab 7.

199. Exhibit B-Omitted.  Please see Plaintiffs' Appendix Tab 4.

200. Exhibit C-Omitted.  Please see Plaintiffs' Appendix Tab 10.

201. Exhibit D- Email Kelley Galica Peck, Esq. to Vincent
     D'Elia, Esq., dated December 12, 2011 (filed
     November 24, 2014 and September 24, 2015) ................. Sa586

202. Exhibit E-Bank Statement Withdrawal of $35,000.00 (filed
     September 24, 2015) ....................................... Sa1191

203. Exhibit F-Robinson & Cole LLP Invoice for Services
     Rendered, dated August 10, 2012
     (filed November 24, 2014 and September 24, 2015) .......... Sa588

204. Exhibit G-Omitted. Please see Plaintiffs' Appendix Tab 2.

205. Exhibit H-Excerpts from Deposition of Matthew Durst Pages
     146-147 (filed September 24, 2015) ....................... Sa1193

206. Exhibit I- Letter from Kelley Galica Peck, Esq. to Matthew
     Durst, dated December 29, 2006 (filed November 24, 2014
     and September 24, 2015) ................................... Sa554

207. Exhibit J-Omitted.  Please see Plaintiffs' Appendix Tab 9.

208. Exhibit K-Omitted.  Please see Plaintiffs' Appendix Tab 11.

209. Exhibit L- Excerpts from Deposition of Matthew Durst Pages
     81-82 (filed September 24, 2015) .......................... Sa1195

210. Exhibit M-Omitted.  Please see Plaintiffs' Appendix Tab 9.

211. Exhibit N- Letter Brief of John A. Yacovelle, Esq. in
     in Response to Pending Motions, dated January 2, 2012
     (filed January 8, 2013 and September 24, 2015) ............ Sa135

212. Exhibit O-Omitted. Please see Plaintiffs' Appendix Tab 11.

213. Certification of Steven Durst in Opposition to Motion
     For Summary Judgment Filed on Behalf of Matthew Durst,
     Dated September 24, 2015 (filed September 24, 2015) ........ Sa1197

214. Exhibit A-Omitted. Please see Plaintiffs' Appendix Tab 2

215. Exhibit B- Exhibit B-Letter John A. Yacovelle, Esq. to
     Vincent D'Elia, Esq., dated March 19, 2012
     (filed February 3, 2014 and September 24, 2015) ........... Sa400

216. Exhibit C- Letter from Kelley Galica Peck, Esq. to Matthew
     Durst, dated December 29, 2006 (filed November 24, 2014 and
     September 24, 2015) ...................................... Sa554

217. Exhibit D- State of Connecticut Court of Probate
     Administration Account Form, dated November 28, 2011 (filed
     February 3, 2014 and September 24, 2015) ................. Sa403

218. Exhibit E-Letter from Matthew Durst to Mike Durst dated
     April 3, 2012 (filed February 3, 2014 and
     September 24, 2015) ...................................... Sa397

219. Exhibit F- Jake Ball Trust Agreement, dated November 29,
     2004, Amended December 24, 2007 (filed January 8, 2013,
     August 14, 2015 and September 24, 2015) .................. Sa233

220. Exhibit G- Jake Ball Trust Agreement, dated November 29,
     2004, Amended December 24, 2007 (filed January 8, 2013,
     August 14, 2015 and September 24, 2015) .................. Sa233

221. Exhibit H- Excerpts from Deposition of Matthew Durst Pages
     146-147 (filed September 24, 2015) ....................... Sa1212

222. Exhibit I-Check Number 1323 for $1,000.00 payable to
     Matthew Durst, dated November 1, 2008 (filed
     September 24, 2015) ...................................... Sa562

223. Exhibit J-Check Number 1471 for $2,000.00 payable to
     Matthew Durst dated August 24, 2010 (filed
     September 24, 2015) ...................................... Sa568

224. Exhibit K-Check Number 1545 for $1,500.00 payable to
     Matthew Durst dated March 5, 2011 (filed
     September 24, 2015) ...................................... Sa573

225. Exhibit L-Lease Agreement dated October 19, 2010
     (filed September 24, 2015) ................................... Sa1214

226. Exhibit M- Checks from Jake Ball Trust payable to Matthew
     Durst (filed November 24, 2014 and September 24, 2015) ..... Sa561

227. Exhibit N- Amended Complaint For Declaratory Judgment and
     Equitable Relief in Durst v. Goodmill, LLC, et als.,
     Docket No. CUM-C-27-10, dated August 18, 2010
     (filed August 14, 2015 and September 24, 2015) ............. Sa966

228. Exhibit O-Omitted. Please see Plaintiffs' Appendix Tab 11.

229. Exhibit P-Omitted. Please see Plaintiffs' Appendix Tab 9.

230. Exhibit Q-Omitted. Please see Plaintiffs' Appendix Tab 10.

231. Exhibit R- Letter Brief and Certification of John A.
     Yacovelle, Esq., in Response to Pending Motions, dated
     January 2, 2012 (filed December 13, 2012, August 10, 2015
     And September 24, 2015) ................................... Sa135

232. Exhibit S-Email communications involving Mike Durst and
     Erica Durst dated January 8, 2012
     (filed September 24, 2015) ................................ Sa1217

233. Exhibit T-Portion of Certification of Matthew Durst, dated
     May 31, 2015 (filed September 24, 2015) ................... Sa1219

234. Exhibit U-Omitted. Please see Plaintiffs' Appendix Tab 15

          **Additional Appendix Related to the October 15, 2015
          Order of the United States District Court for the
          District of New Jersey**

235. Amended Complaint in Reuben Durst, Steven Durst
     vs. Matthew Durst et al, dated February 15, 2013
     (filed February 15, 2013) ................................ Sa1222

236. Proposed Second Amended Complaint in Reuben Durst, Steven
     Durst vs. Matthew Durst et al, dated February 20, 2015
     (filed February 20, 2015) ................................ Sa1232

237. Proposed Consent Order Regarding Amended Complaint in
     Reuben Durst,Steven Durst vs. Matthew Durst et al,
     (filed March 2, 2015) .................................... Sa1244

**The D'Elia Law Firm, LLC**
By: Vincent D'Elia, Esquire
601 Route 73 North, Suite 300
Marlton, New Jersey 08053
Phone (856) 797-9777
Fax    (856) 797-1447
e-mail: delia@delialawfirm.com
Attorneys for Plaintiffs, Jake Ball Trust, Steven Durst and Reuben Durst

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| Reuben Durst, Trustee, Steven Durst, individually and as Trustee<br><br>Plaintiff<br><br>v.<br><br>Matthew Durst, individually and as Trustee, Halloran & Sage, LLP, Robinson & Cole, LLP and Kelley Galica-Peck<br>Defendants | **CIVIL ACTION**<br>No. 1:12-cv-05255-JBS-AMD<br><br><br>**MOTION DATE:  SEPTEMBER 8, 2015** |

### NOTICE OF MOTION TO RECONSIDER:

1.    **DENIAL OF A MOTION TO AMEND COMPLAINT TO JOIN ADDITIONAL DEFENDANTS**

2.    **GRANTING OF MOTION FOR SUMMARY JUDGMENT FOR DEFENDANTS ROBINSON & COLE**

3.    **GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF MATTHEW DURST**

4.    **DENYING MOTION TO AMEND COMPLAINT TO JOIN JOHN YACOVELLE, ESQUIRE AS A DEFENDANT**

PLEASE TAKE NOTICE that on September 8, 2015 at 9:00 a.m. or as soon thereafter as counsel may be heard, the undersigned, attorney for Plaintiffs, shall apply to the above-named Court for an Order:

633a

1.    Reconsidering Plaintiffs' Motion to Amend to Join Additional Defendants and enter an Order granting Plaintiffs' Leave to Join the Appraisers Parker Benjamin and Paul Ruby;

2.    Reconsidering Defendant Robinson and Cole's Motion for Summary Judgment and entering an Order denying same;

3.    Reconsidering Defendant Matthew Durst's Motion for Partial Summary Judgment and entering an Order denying same; and

4.    Reconsidering Plaintiff's Motion to Amend its Complaint to Join John Yacovelle, Esquire as a Defendant in entering an Order granting same.

Plantiffs will rely upon the Certification of Stephen Durst attached hereto.

A proposed form of Order is attached hereto.

Oral Argument is requested.

THE D'ELIA LAW FIRM, LLC
Attorney for Plaintiffs

Dated:  August 10, 2015            By:____/s/Vincent D'Elia_____

F:\FILES\7933 (Steve Durst v. Matthew Durst (District Court Case)\Pleadings\notice of motion to reconsider.doc

2

**The D'Elia Law Firm, LLC**
By: Vincent D'Elia, Esquire
601 Route 73 North, Suite 300
Marlton, New Jersey 08053
Phone (856) 797-9777
Fax    (856) 797-1447
e-mail: delia@delialawfirm.com
Attorneys for Plaintiffs, Jake Ball Trust, Steven Durst and Reuben Durst

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| Reuben Durst, Trustee, Steven Durst, individually and as Trustee<br><br>        Plaintiff<br><br>    v.<br><br>Matthew Durst, individually and as Trustee, Halloran & Sage, LLP, Robinson & Cole, LLP and Kelley Galica-Peck<br><br>        Defendants | **CIVIL ACTION**<br>No. 1:12-cv-05255-JBS-AMD |

## CERTIFICATION OF STEVEN DURST IN SUPPORT OF MOTION TO RECONSIDER:

1.    **DENIAL OF A MOTION TO AMEND COMPLAINT TO JOIN ADDITIONAL DEFENDANTS**

2.    **GRANTING OF MOTION FOR SUMMARY JUDGMENT FOR DEFENDANTS ROBINSON & COLE**

3.    **GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT IN FAVOR OF MATTHEW DURST**

4.    **DENYING MOTION TO AMEND COMPLAINT TO JOIN JOHN YACOVELLE, ESQUIRE AS A DEFENDANT**

I, Steven Durst, being of full age, hereby certify as follows:

1.    I am a Plaintiff in the above-captioned matter and, as such, am fully familiar with the facts herein.

2.    I respectfully submit that denial of this Motion to Reconsider will result in a manifest injustice and the Defendants will be permitted to benefit from their own wrongdoing. In addition, I further respectfully submit that additional information secured during the recent discovery will disclose specific new facts and information that justify reconsideration.

3.    The recently concluded deposition of Defendant Kelley Peck, Esquire makes it abundantly clear that her misrepresentation (during the time she was an employee of Robinson & Cole) to me (her client) intentionally caused the delay in the filing of the claim against the appraisal company Parker Benjamin and the appraiser Paul Ruby (hereinafter collectively referred to as "Parker Benjamin").

**FACTUAL BACKGROUND: RECONSIDERATION OF MOTIONS REGARDING PARKER BENJAMIN AND ROBINSON & COLE**

4.    Prior to December 2007, I was the Grantor under the revocable Jake Ball Trust (hereinafter "Trust"). In or about December 2007, the Trust was in the process of being amended to make it irrevocable.

5.    Defendant Kelley Peck was an attorney with Halloran & Sage, LLP at the time that the Trust was converted from revocable to irrevocable. She prepared the amended Trust documents which included the Trust's acquisition of a 10% interest in Union Lake Crossing, a 526,000 square foot regional shopping center in Millville, New Jersey, that I had earned as project manager.

6.    In exchange for the 10% interest aforesaid, I received a promissory note for $500,000.00 with interest at 4.79% secured by the 10% interest in Union Lake.

2

7.    Before executing the irrevocable Trust amendment, Kelley Peck required an appraisal of the 10% interest.  She hired Parker Benjamin, whom she had done business with in the past.

8.    Critical to understanding the nature of my claim against Kelley Peck, Halloran & Sage and Robinson & Cole is a clear understanding of when Kelley Peck had the appraisal by Parker Benjamin.

9.    Prior to execution of the December 2007 Irrevocable Trust documents, Kelley Peck made it abundantly clear that the documents would not be executed until the Parker Benjamin appraisal was in hand, in order to satisfy IRS Requirements.

10.    This position was corroborated by her own email which confirmed that the December 2007 Irrevocable Trust documents would wait until she got the appraisal from Parker Benjamin.  She confirmed this in an email in which she estimated that the appraisal would be in her hands within two weeks from October 25, 2007.  In fact, The Irrevocable Trust documents were signed on December 21, 2007.

11.    In her October 25, 2007 email (Exhibit "A"), Ms. Peck states:

> ...I want to explore the possibility of delaying signing until we receive the appraisal.  I spoke to Paul Ruby and he is willing to do the appraisal and will have it for us in about two weeks." To do so he will need the Operating Agreement and the Appraisal both of which I have and can give him...

12.    In preparation for the appraisal, both Kelly Peck and Parker Benjamin reviewed the Operating Agreement of the Union Lake Crossing as such a review was critical to determining the value of the 10% interest.

13.    Both Kelly Peck and Parker Benjamin have acknowledged reviewing the Operating Agreement but negligently failed to take into account the provisions of Paragraph 7.04(a) of the Operating Agreement:

> In the event that either Steven Durst or Christopher Anderson ceases to be employed by Goodman Management LLC for any reason whatsoever (hereinafter referred to as "Former Employee"), then Bruce A. Goodman shall have the option to purchase the entire Membership Interest of the Former Employee (the interest of Matthew durst, Trustee under the Jake Ball Trust Agreement in the event that Steven Durst ceases to be employed by Goodman Management, LLC) at a price equal to the "Net Operating Income" of the Property (for the preceding calendar year) divided by .09, less all debts, obligations and mortgages of the Company (including but not limited to the outstanding balance due under the Goodman Loans) times the Percentage Interest of the Membership Interest held by the former Employee.  "Net Operating Income" shall mean annual rents received during the preceding calendar year less annual unreimbursed operating and capital expenses and repairs, professional fees and management fees incurred during the preceding calendar year.  The Net Operating Income shall be determined by the accountants regularly engaged by the Company. The annual Net Income distributions to Former Employee, shall be prorated as of the date of closing on the sale of the Former Employee's Membership Interest. (See Exhibit "B")

14.    The enormous significance of Section 7.04(a) is obvious.  If my employment with Goodman was terminated, the cap rate provided in paragraph 7.04(a) would render the 10% interest as worthless.

15.    When made aware of this issue, I instructed Trust attorneys Yacovelle and Peck to start suit against the Parker Benjamin.  This is confirmed in Kelly Peck's sworn deposition testimony (Exhibit "C", 43 at 18-23).

> Q:    Did there come a time when you had a conversation with Matt, Steve or Mr. Yacovelle concerning a potential claim against Parker Benjamin?

4

A.    Yes, there was Matt - - Matt did tell me that Steve wanted to sue Parker Benjamin.

16.    At the time I requested institution of the lawsuit against the appraiser, Kelley Peck was an employee of Robinson & Cole (previously dismissed as a Defendant by this Court). Kelley Peck and Robinson & Cole took the position that since the appraisal was not issued until approximately six months after the execution of the Trust amendment (making the Trust irrevocable) no claim against the appraiser could be pursued.

17.    This position taken by Kelly Peck/Robinson & Cole, is confirmed in an email from John Yacovelle relating to his discussion with Kelley Peck and Ed Heath (both of Robinson & Cole).  In his June 18, 2011 email (Exhibit "D"), Mr. Yacovelle states:

> There are two potential areas of damages:  the first is that the Trust, when it issued a $500K Note to Steve, could have been wasting money on a property of little value (the portion of the valuation attributable to Goodmill). Kelley Peck and Ed Heath called me on Thursday the 16th and he pretty much demolished that potential claim.  He said that the agreement with Steve used the figure $900K as the estimated value of the Goodmill interest, a figure he said came from Steve. Regardless of where it came from, the agreement was finalized December 2007, several months before the draft appraisal let alone the final appraisal.  Therefore, you could not have relied on the appraisal valuation of $841K in the agreement with Steve.  In other words, the damages on this theory were clearly not proximately caused by the appraiser's assumed negligence.  I agree with that conclusion completely.

18.    No one could dispute the logic of this.  One cannot say in December of one year that they relied upon a document that was not even available until May of the next year.  Kelley Peck and the appraiser, however, had the appraisal in 2007 and did,

in fact, rely upon said appraisal in December 2007. This is confirmed by Peck in her recent deposition.

19.    On pages 38 to 39 of her deposition, Kelley Peck acknowledged that she had, in fact, received the appraisal from Parker Benjamin in December 2007 prior to the execution of the irrevocable Trust documents and the $500,000.00 promissory note to Steve Durst. So she acknowledged that she did rely upon the appraisal. Consider this sworn testimony of Kelley Peck at her deposition (38 at 23; 39 at 1):

> Q:    At the time [December 2007] that you prepared those documents, [amended Trust documents] you had information from Paul Ruby as to the value of the property?
>
> A:    I did.

20.    It is in that context that we must look at the conduct of both Kelley Peck and Robinson & Cole. Peck knew that she had relied upon the appraisal in December of 2007 when she amended the Trust documents and converted them from revocable to irrevocable. Yet when asked to pursue a claim against the appraiser, she (and Robinson & Cole's Ed Heath) took the position that they did not have the appraisal.

21.    And why would Peck and Robinson & Cole misrepresent the timeframe within which they knew the appraised value of the 10%? Why in her sworn testimony does Kelley Peck, as an employee of Robinson & Cole, acknowledge relying upon the appraisal yet in her unsworn opinion to her own clients she says the exact opposite?

22.    The answer is simple. Kelley Peck knew she was guilty of the same negligence as Parker Benjamin in that she failed to advise either Matt, Steve or Mike Durst of the enormous impact of paragraph 7.04(a). Rather than take the ethical mode and advise her clients, she chose a cover-up of her guilt.

23.     If Parker Benjamin was liable (as acknowledged by John Yacovelle), then Kelley Peck was likewise liable for negligence.  Robinson & Cole (Peck's employer at the time that she misrepresented her reliance on the appraisal) must likewise be held responsible for that cover up.

24.     Peck states in her deposition (28 at 7-14) (Exhibit "E"):

Q:     At the time you prepare the collateral assignment of LLC interest you already had a copy of the Goodmill LLC operating agreement, did you not?

A.     Yes

Q:     And you had reviewed it before writing the collateral assignment of limited liability?

A:     Yes

25.     Peck continues in her deposition (48 at 23-24; 49 at 5-7) (Exhibit "F"):

Q:     And what effect did 7.04 have on the valuation of the Goodmill LLC property?

A:     Well, I didn't do the valuation, so I am not sure of the exact scope of the impact that it had.

26.     Yet in her November 28, 2011 (Exhibit "G") letter to Probate Court, Peck states the exact opposite:

At the time the Trust became irrevocable in December 2007 the interest was valued at $841,000.  However, there is a clause in the LLC operating agreement that may render the interest worthless under certain circumstances

27.     If the appraiser missed 7.04 and/or ignored it then, according to John Yacovelle, Esquire, he is negligent.   Likewise, if the appraisal and Section 7.04 of the Operating Agreement was known to Kelley Peck prior to the signing of the December 2007 Irrevocable Trust Amendment, then she too was negligent.  In addition, there is

7

clear liability against Robinson & Cole for their participation in the cover up and in their failure to discharge their obligation to institute suit against Parker Benjamin when asked to do so by me (her client).

28.    Defendants Kelley Peck and Robinson & Cole cannot be allowed to benefit from their wrongdoing.  Their efforts to conceal and protect Parker Benjamin were self-serving and motivated by the avoidance of a lawsuit which was clearly actionable against them as well as Parker Benjamin.

29.    Hence, the reason so much time has lapsed since I implored Matthew Durst, John Yacovelle and Kelley Peck to sue the appraiser, a fact all have now acknowledged in the last 2 months in sworn depositions.  The reason is a clear and undeniable cover-up by Yacovelle, Heath, Peck, Matthew Durst and Robinson & Cole to escape the consequences of their negligence.

30.    Accordingly, it is appropriate to stop Halloran & Sage, Robinson & Cole and their attorneys from complaining about scheduling inconvenience brought about by their herein described breeches of duty and integrity and stop inhibiting the light of day from falling on those responsible.

31.    Ms. Peck's pattern (while employed by Robinson & Cole) of misrepresentation and shifting allegiance cannot be overlooked or underestimated. For example, after the ill-advised State Court Settlement in December 2011, Defendant Matthew Durst transferred $35,000.00 of Trust money to the Trust account of Robinson & Cole.

32.    The stated reason offered by Kelley Peck and Robinson & Cole for this misappropriation of $35,000.00 was to preserve Trust assets and to cover future expenses including legal fees and taxes.

33.    Kelley Peck and Robinson & Cole both clearly knew that the escrow for payment of taxes was bogus. Since this was a Grantor's Trust, there could be no taxes. A grantor Trust is not liable for payment of taxes.    Kelley Peck knew this and participated in the misappropriation anyway.

34.    As to "other expenses" it should be noted that if there are no bills or invoices presented, then the Trust does not have any expenses. So despite the fact that for over a year and a half not one bill came in making a claim against the Trust, yet Kelley Peck and Robinson & Cole still insisted upon diverting the $35,000.00.

35.    The only legitimate basis for holding the $35,000.00 was to guaranty Peck and Robinson & Cole's legal fees and both Peck and Robinson & Cole did this knowing full well that they could easily pad their legal bills to the tune of $35,000.00 or more.

36.    This position is clearly corroborated by Ms. Peck's email (Exhibit "H") wherein she states:

> If they [the beneficiaries] intend to object, I will need to advise the court and I will advise Matt to reconsider his strategy.

37.    If the money were to be used to pay legitimate Trust taxes or expenses, there would not be any strategy to revise, just bills to pay. There would be no taxes to pay as Peck knew since she set up the Trust as a Grantor Trust. On December 12, 2011, the same day, Matt Durst removed $35,000.00 of Trust money and put it in

Robinson & Cole Trust account not pursuant to any court order but to the "revised strategy", as advised by Kelley Peck.

38.    In the two years until the $35,000.00 was returned there were zero bills, zero taxes and zero legal expenses from the other 3 law firms Peck ardently endeavored to have share the misappropriated funds. No other firm took the bait, and in the Connecticut Court May 24, 2013 order, Peck's $28,388.00 bill was reduced by the Court to $1,395.00. It is clear that Ms. Peck wanted to put everyone on notice that if my children challenged the accounting she was going to pursue a "revised strategy." It is clear that that quote "revised strategy" included misdirection and misappropriation of $35,000.00.

39.    The $35,000.00 was not in Robinson & Cole's escrow account pursuant to a court order. It was frozen there by a court order at my request to prevent Robinson & Cole through Peck from paying herself the $28,000.00 bill she conjured up. The Court by its order of May 24, 2013 rebuffed Peck's rationale and her bill as bogus. I would urge the court to revisit Peck's email to Mr. D'Elia on December 12, 2011 to see if a fair reading of that email is whether "to advise Mr. D'Elia that my children thought there were irregularities in Trustee Matt's accounting, or was it to threaten a revised strategy" in the words of Ms. Peck.

40.    This Court, in its opinion of January 13, 2015, says Plaintiff has failed to comply with Rule 56D specifically:

1.    What information is sought;

2.    How if uncovered it would preclude summary judgment; and

3.    Why has it not been previously obtained.

644a

41.    And the Court continues:

if a party opposing summary judgment files an affidavit under Rule 56D, that specifically addresses these requirements, a continuance of a motion for summary judgment for purposes of discovery should be granted as a matter of course.

42.    The Plaintiff (we) have been trying to obtain the:

a.    Checkbook for the Trust for over 3 years;

b.    The hard drive for the Trust computer for over 3 years; and

c.    The legitimate back up for the $22,000 in checks Matt Durst wrote to himself out of the Trust checkbook, endorsed same and deposited in his personal account.

43.    We have not obtained any of the above because Matt Durst has refused to turn them over despite stating they had done so.

44.    October 13, 2011 email from me to Kelly Peck regarding checkbook. November 28, 2011 letter form Ms. Peck to Probate Court. Judge Becker Page 4, Paragraph 2.

On October 17, 2011 Matt forwarded the checkbook for that account to Mike.

June 6, 2012 Civil Action US District Court Pg. 5, Paragraph 29, 30.

45.    I do not think it stretches the imagination to conclude that there is damaging evidence in the contents of the hard drive and the check register, or we would have received them. This evidence is not in our knowledge and control, but that of Defendant's Matt Durst, Kelley Peck and Robinson & Cole. The Court should note Peck's March 22, 2012 letter to Trust attorney Piscatelli, offering to give back the Trust

money. If it will allow finalization of the accounting, her final effort at extortion before the money was ordered returned to the Trust, not to escrow by order.

46.    Finally, the court on Page 18 of its January 13, 2015 opinion states:

> The Court rejects Plaintiff's belated argument to the extent that it relies on allegations outside of the pleadings without any evidentiary support.

47.    The evidence is solely in the hands of Matt Durst who has for 3 years refused to supply the proofs that he used his own funds for various expenses ($22,000+/-) that he repaid to himself out of Trust funds. If Matt Durst cannot display proof of his funds being used for the $22,000.00 in expenses then it is clear, he misappropriated Trust money. He has been asked for that proof repeatedly over the past 3 years.

48.    The information sought (and not provided) for 3 years as demonstrated by at least 6 exhibits would prelcude summary judgment because it will clearly demonstrate the Defendant Matthew Durst is hiding evidence and is doing so upon the advice and with the knowledge of Robinson & Cole attorney Peck.

49.    What we seek is:

1.    The checkbook used for Trust business with all registers;

2.    The hard drive from the Trust computer;

3.    The hard, specific evidence that Matt Durst used his own money to justify him reimbursing himself out of Trust funds.

50.    We have presented herein numerous documents authored by either Matt Durst or Kelley Peck asserting that they have turned over the checkbook (the Trust's). Then on February 12, 2012, Peck issues the ultimate insult to everyone associated with

this case. "Matt did not keep a check register, his month to month records were discarded as soon as the statements were received and verified each month." "He kept electronic access to account information."

51.    But we still do not have the hard drive.

52.    This outright lie by Peck follows statements by Peck (in writing) that they had forwarded the checkbook to Mike Durst. Those written statements (all attached) were made on October 17, 2011, November 7, 2011, November 28, 2011 and January 8, 2012 in letters to Robinson & Cole letterhead.

53.    We ask the Court to note the Probate Court's Order of April 3, 2013 (Exhibit "I") Schedule A-1 Page 3:

> The Court finds that the amounts $35,000 placed in escrow with the firm of Robinson & Cole by the Trustee are owned by the Trust.

These funds were not placed in Robinson & Cole's escrow by the Court Order, they were ordered frozen there at my request after being misappropriated by Matthew Durst upon the advice (of Robinson & Cole attorney Kelley Peck) to "revise his strategy".

54.    The Defendant Robinson & Cole raised defenses to several elements of their involvement in the case which we will deal with in specificity in this motion. Robinson & Cole primarily based its motion on the premise that most of the allegations and supporting evidence involved matters that (in time) preceded Robinson & Cole's involvement with the Trust, the Trustee and related matters in this litigation.

55.    The recent depositions of Peck and Matthew Durst, however, have cast a great deal of light on these and other matters this that will undermine that position.

56.    There was no Probate Court order whereby Robinson & Cole and/or Peck were ordered or granted permission to take the $35,000 of Trust's money. There is, however, an order requested by Plaintiff's freezing the money to preclude Robinson & Cole from paying itself over ($28,000) in hastily concocted bills and depleting the Trust of its funds.

57.    There is an Order from the Connecticut Court dated May 24, 2013 (Exhibit "I") rejecting Robinson & Cole's legal bill to the tune of 97% and ordering the funds returned to the Trust net of $300 paid to an accountant and $1,000 paid to Plaintiff (Trustee) Dr. Mike Durst for travel expenses.

58.    It should be noted that Peck stated in her deposition on April 28, 2015, (76 at 18-23) (Exhibit "J"):

Q.    Do you recall using the expression "revise my strategy" or words to that effect?

A.    No I didn't use that expression,

(76 at 20-22) (Exhibit "J")

59.    Also see Kelley Peck deposition (76 at 28; 77 at 1) (Exhibit "J")

Q.    Did you indicate that you would advise Matt to revise his strategy?

A.    You know, I don't think I ever used the term revised strategy in any context

60.    Additionally, Exhibit "J" completely refutes Peck's statements. No where in that original plan was there an objection built into it.

(77 at 10-11) (Exhibit "J")

61.    One only has to view Peck's own letter of October 13, 2011 (Exhibit "K") to determine this statement is an outright lie. "At any time any of the beneficiaries can appear in Court and post objections."

62.    Clearly Peck attempted to utilize the return of the Trust's $35,000 to extort compliance with the soon to be exposed bogus accounting she did and submitted to the Probate Court. Peck admitted that she, not Matt Durst did the accounting submitted to Probate Court. (See Exhibit "L").

63.    In her deposition of April 28, 2015 (Exhibit "M"), (17 at 17), Peck was asked:

Q.    What were the nature of those conversations? (with Steve Durst)

A.    Discussions regarding his goals and objectives with respect to his family  and his taxes and the Trust and his estate planning in general.

A.    I prepared a will (for Steve Durst)

In short, Peck was my estate planning attorney with fiduciary duties to me.

Q.    Did you prepare Document marked DMD-16 – the final accounting (for Probate Court).

A.    Yes

64.    In that final accounting Peck did the following:

a.    Charged a total of $45,000 of summer seashore vacations over three years solely to me as note reductions . In reality Defendant Matt Durst's wife and 3 sons attended as did Dr. Mike Durst and his daughters and a guest.

b.    Charged $180,000 in legal fees paid by the Trust to attorney Fred Santarelli of Elliott Greenfield as note reductions payments as thought the wrongful termination litigation had nothing to do with the Goodman litigation concerning the

Trust's 10% interest in the shopping center known as Goodmill LLC.

c.    Failed to include the accrued interest due me of over $74,000 (as of October 2011)

65.    The bogus accounting (if properly done) raises the amount still due (from Matt Durst-Trustee) to well over $250,000, a strong motive to induce Matt Durst as Trustee not to pursue litigation against the appraiser Parker Benjamin for their negligence since if Parker Benjamin was guilty of missing 7:04, so was Peck.

66.    In addition to the breaches of fiduciary duty, all of which occurred in 2011 while employed at Robinson & Cole, Peck and Robinson & Cole engaged in a complete cover up in summer of 2011 in their outright lies regarding failure to sue appraiser Parker Benjamin (the firm) and Paul Ruby (the individual appraiser) for negligently missing clause 7:04 in the Goodmill Operating Agreement when he (Ruby) performed the appraisal in 2007. This clause had the possibility of rendering the Trust's 10% interest in the shopping center worthless.  See Peck letter to Probate Court dated November 28, 2011. (Exhibit "G")

67.    The reason given by Robinson & Cole and Ed Heath (litigation attorney utilized in Peck's firm) for not filing suit against the appraiser was that the appraisal was not done until May 2008 and therefore they could not be culpable as the conversion of the Trust to irrevocable and the attendant note, collateral agreement and indemnification all took place December 21, 2007 predating the appraisal, according to (Exhibit "D") Ed Heath, Peck and Yacovelle concurring.  Therefore, the appraisal could not have been instrumental in the process.

16

68.    Problem is, it's all a big lie to protect Peck, Robinson & Cole and Matthew Durst. If the appraiser was negligent for missing 7:04, how could the aforementioned trio not likewise be negligent?  So, when did we, Peck, Robinson & Cole, Matthew Durst, really have the appraised value from Parker Benjamin?

69.    In Kelly Peck's deposition (42 at 17-20 (Exhibit "N"):

A.    I believe your question is whether I had the information that the value was 841 ($841,000) at around the time when it was executed (the documents converting the JBT to irrevocable) and the answer to that question is yes.

70.    Also consider 52 at 7-8 (Exhibit "O"):

At the time the Trust became irrevocable in December 2007 the interest was valued at $841,000.

(See Email from Peck to Matt Durst (Exhibit "A") dated October 25, 2007.

71.    Kelley Peck spoke to Paul Ruby and he is willing to do the appraisal and will have it for us in about 2 weeks from October 25, 2007.

72.    Consider the message forwarded from John Yacovelle to Matt Durst dated June 18, 2011 (Exhibit "D") which provides, in pertinent part:

As we already know, Ruby had before him the Operating Agreement [Union Mill Center], from which he quoted on page 4 of the appraisal.  He did not, however, note the existence of paragraph 7:04 which could have rendered the interest worthless for some years into the future.

73.    In the same email (Exhibit "D") Mr. Yacovelle goes on to say:

...the agreement was finalized in December 2007, several months before the draft appraisal let alone the final appraisal. Therefore, you could not have relied on the appraisal valuation of $841K in the agreement with Steve.

17

Per Yacovelle's efforts to perpetrate the cover-up which Peck and her coworker Heath knew were untrue. For whatever its worth, Peck finally told the truth under oath in her April 28, 2015 deposition.

74.    Peck testified several times during the deposition that she had the appraisal, Goodmill Operating Agreement and all necessary documents and information to settle prior to December 31, 2007.

75.    Peck further admitted she never discussed clause 7:04 with Matt or me in any fashion clearly underscoring her negligence.

(50 at 3-10) (Exhibit "P").

76.    Peck also admitted repeatedly in the April 28 deposition that without the 7:04 triggered termination (of me) as an employee at Goodman Properties – there would be no litigation. Accordingly, her treatment of the $180,000 paid to Attorney Santarelli to fight the termination as note reductions to me are another example of her disregard for reality and truth. Yacovelle's Motion for Declaratory Judgment finds the complaint focused on clause 7:04 and the consequences of the termination to the Trust namely loss of its main asset, made attorney Santorelli's fight against the termination an integral part of the entire case.

77.    Finally, one only has to read the last sentence of Yacovelle's deposition of Bruce Goodman:

What I (Yacovelle) think truthfully is Steven Durst has everything to do with it (the case)

(Deposition of Bruce Goodman, 128 at 1-2) (Exhibit "Q")

18

78.    It is clear through Peck's testimony in her April 28, 2015 deposition that she never once discussed the impact or existence of clause 7:04 in the Goodmill Operating Agreement with either Matt Durst or me.

79.    It is clear Peck lied in her deposition as to whether she threatened to direct Matt to revise her strategy – which led to the illicit taking of the Trust's $35,000.

80.    It is undisputed that Peck, Yacovelle and Robinson & Cole were directed to file suit against the appraiser for missing 7:04 in his valuing the Trust's Goodmill asset, over 4 years ago.

81.    It is clear Peck hid the truth when her coworker Ed Heath (a litigator) concluded the appraiser could not be the proximate cause of damages to the Trust because the appraisal was not done until May 2008. Yet Peck has testified, under oath, in her deposition repeatedly that she had the appraisal in late 2007 and utilized it in her work converting the Trust to irrevocable status. Peck sold out her client to protect her own selfish interest for the same reason the appraiser is negligent, she missed 7:04.

82.    Having admitted in her deposition that she agreed that 7:04 was a primary cause of the ongoing litigation (my termination leading to its implementation) Peck took the position that legal fees ($140,000 - $200,000) spent to fight the illegal termination should be treated as note reductions to me. Peck admitted in her deposition that she authored the accounting – not Matt Durst as previously stated by her.

83.    Peck failed to provide to me the 2011 Grantor's depreciation on Goodmill; an intentional oversight of $160,000 and a serious breech of her fiduciary duty.

84.    For the above reasons and the facts and proofs that accompanied them, I respectfully request the decision to allow Robinson & Cole to be released as a defendant in this litigation – be reconsidered and reversed.

### THE MOTION TO RECONSIDER REGARDING THE JOINING OF JOHN YACOVELLE AS A DEFENDANT AND THE PARTIAL SUMMARY JUDGMENT IN FAVOR OF MATTHEW DURST

85.    With regard to the Motion for for Partial Summary Judgment in favor of Matthew Durst, this Motion to Reconsider is more akin to a motion to clarify for the reasons set forth below.

### FACTUAL BACKGROUND:  PARTIAL SUMMARY JUDGMENT IN FAVOR OF MATTHEW DURST AND ASSERTION OF THE CLAIM AGAINST JOHN YACOVELLE, ESQUIRE

86.    Based on the facts and circumstances uncovered in the discovery and other depositions, I am also seeking the Court's reconsideration of the Partial Summary Judgment in favor of Matthew Durst and the denial of my motion to amend the Complaint to include John Yacovelle.

87.    That discovery has exposed Mr. Yacovelle's malpractice for a multitude of breaches of fiduciary duty and then ultimately repeatedly lying throughout this case and endeavoring to cover up the lies by doubling down with repeated false statements.

88.    The proofs set forth below will not be of the "he said she said" variety but a litany of lies and misstatements that have now been dragged out into the light of day by the recently concluded depositions of Matthew Durst and Kelley Peck.

89.    In December 2007 the Trust was involved in the Superior Court litigation being handled by Mr. Yacovelle.  While the case was brought by Trust Trustee Matt, I was the undisputed centerpiece of the litigation.  I was privy to all of the relevant facts

20

and circumstances needed to prevail in that case. As such, I was regularly and consistently consulted by Matt and Mr. Yacovelle during the pendency of that litigation.

90.    Like anyone else involved in litigation, it was my goal to settle the Trust dispute with Bruce Goodman. Goodman was well represented, is exceptionally bright and extremely wealthy; a formidable array.

91.    Accordingly in 2011, I was able to:

1.    Settle my own litigation with Goodman; and

2.    Elicit from him a significant reversal in his position on clause 7:04 in the Goodmill Operating Agreement that would have allowed the Trust to maintain its 10% ownership in the Union Lake Crossing Shopping Center and pay off any deficiency emanating from the sale of the 1600 building in Philadelphia that Goodman held a mortgage on by applying our share of distributions from the center's cash flow.

92.    Furthermore, the Trust would have been accruing 10% interest of the Three Million Dollars ($3,000,000.00) in principal debt being amortized each year; enough to pay off the deficiency in 1-2 years (even by Goodman's inflated standards).

93.    By now the deficiency on the 1600 Building would have been paid in full and the Trust's equity would have increased by $3,541,000.00 (the $841,000.00 at inception and 9 years added at $300,000.00 per year.) This deal was negotiated by Bruce Goodman and me simultaneously with our settlement and memorialized on May 19, 2011.

94.    Additional documents memorializing this understanding were prepared by Bruce Goodman's attorneys and transmitted to my brother, Trustee Matthew Durst. (See Exhibits "R" and "S")

95.    Mr. Yacovelle, however, unilaterally decided to reject that offer without any consultation or advice with me, Mike or Matt.  As stated by Mr. Yacovelle in his own words:

> ...I have rejected the Hladik proposal that we simply modify the termination buyout (maybe a little tweaking of the cap rate, etc., and kick it down the road for up to ten years.

(See Exhibit "D", page 2, para. 2)

96.    Mr. Yacovelle's unilateral decision resulted in over $500,000.00 in legal fees to correct his malpractice.

97.    In addition, Mr. Yacovelle's unilateral decision cost this Trust approximately Four Million Dollars ($4,000,000.00) in income.

98.    Mr. Yacovelle, in rejecting the proposal without consultation or advice with his client or myself, was done despite his admitted lack of expertise in issues of valuation.  This is more particularly set forth in Exhibit "T".

99.    But the real reason became evident during the recent depositions as follows.  It is freely acknowledged by Yacovelle, Peck and Matt Durst that in the summer of 2011, once I had the first two legs of the case resolved I sought the third and final leg. I directed Matt and Yacovelle to pursue litigation against Parker Benjamin for missing the existence of clause 7:04 in the Goodmill Operating Agreement which gave Goodman the right to buy the Trust's interest in the shopping center at a cap rate – that rendered our interest valueless. In a Letter Brief to Judge McDonnell, Yacovelle states:

At the repeated insistence and demand of Steve Durst, Matt (and I) explored the feasibility of a malpractice suit against the appraiser. He had obviously been negligent, since the appraisal indicated that he had seen the Operating Agreement, but nowhere did he flag Section 7:04 and either attempt to explain it away, or discount his appraisal because of it. He simply missed it or ignored it.

(See Exhibit "U")

100.    Yacovelle goes on to say in Exhibit "U":

Connecticut trial counsel, however, pointed out that no damages had been proximately caused by the negligence, because the appraisal was issued after the Operating Agreement had been signed (Nov. 2005) and _after_ the Trust had issued a $500,000 note to Steve on December 24, 2007, (based on Steve's $600,000 valuation) and the appraisal influenced neither action because it did not yet exist. (JAYCert par. 10) The suit, therefore, was not filed...

101.    Unfortunately for Yacovelle, Peck testified repeatedly in her recent deposition that she had the appraisal (the $841,000.00 value) at the time (or prior to) the conversion of the revocable Trust to irrevocable on December 24, 2007.

Peck to Mr. D'Elia

I believe - your question is whether I had the information that the value was 841 at around the time when it was executed, and the answer to that question is yes.

(See Exhibit "N")

102.    In an email from Kelley Peck to Matt Durst dated October 25, 2007 (Exhibit "A"), Peck stated:

Matt, I have witnesses if we need them for Saturday morning. However, I want to explore the possibility of delaying the signing until we receive the appraisal. I spoke to Paul Ruby and he is willing to do the appraisal and will have it for us in about 2 weeks.

103.    In an email from Matt Durst to Peck sent December 19, 2007 (Exhibit "V"):

I want to review the purpose of the meeting on Friday, 12.21.2007. 1. I want to review the re-assessment that Paul Ruby has completed for the Goodmill Shopping Center and sign the documents converting the JB Revocable Trust to an Irrevocable status as we had discussed...

104.    In an email from Peck to Matt Durst dated October 25, 2007 (Exhibit "A"), Peck said:

This is the last document that will need to be reviewed. It makes the LLC interest the collateral for the promissory note in case the trust defaults on a loan payment.

105.    Exhibit "L" is page 13 of the Trust accounting filed with Connecticut Probate Court in November 28, 2011 showing the appraiser paid in full on October 31, 2011.

106.    So, we have all sorts of exhibits and statements proving the appraisal was done and in Peck's hands in October or November 2007 in time for the December 24, 2007 closing converting the Trust from revocable to irrevocable. And we have no less a figure than Yacovelle himself declaring that Parker Benjamin had missed 7:04 and it's possible deleterious effect on the Trust and the value of its asset (the 10% interest in the Center). And we have admissions from Peck and Yacovelle that I wanted the appraiser sued for his well-recognized negligence.

107.    So why was there no suit instituted against the Parker Benjamin? The answer is obvious and has now been exposed in the depositions and other discovery. A lawsuit against Parker Benjamin would clearly have resulted in a cross claim against Peck and Robinson & Cole. If Parker Benjamin was negligent for missing section 7.04, then clearly Peck was also negligent.

108.    Peck Deposition (50 at 1-2) (Exhibit "P"):

...did you advise Matt Durst at all about 7:04?

A.    I did not have a discussion with him about section 7:04 of the Operating Agreement."

Q.    How about Steve Durst

A.    I did not have a discussion with Steve either.

109.    So, Peck knew she missed 7:04 as did all of us, Matt, me and Yacovelle. Why didn't Peck and/or Yacovelle sue Parker Benjamin? Because everyone realized he would cross claim Peck and her law firm.

110.    Hence, the big lie. Peck asks Heath, a litigator at Robinson & Cole, for a report on the viability of a suit against the appraiser. Despite all of them knowing the appraisal was done and in Peck's hands in late 2007, a cover-up was concocted relying on the May 2008 final draft as a means of side stepping a suit against Parker Benjamin. As we now know, however, it was a cover-up per the evidence herein and Peck's own testimony under oath.

111.    So, the last piece of what would have been a vastly superior situation for the Trust was killed by Yacovelle ignoring and unilaterally rejecting Goodman's May 19, 2011 offer and the ability to wipe out any deficiency on the 1600 building mortgage and amass $300,000.00 a year ($2,700,000.00 by now) in equity by painless amortization and end the litigation.

112.    Matt Durst sent Yacovelle the email marked as Exhibit "W" clearly prioritizing his own issues.

...the Trusts ability to satisfies Steve's request in a legal/practical manner without placing me @ risk personally in any manner whatsoever.

25

113.     Of particular note is the bill to the Trust (Exhibit "X") for Robinson & Cole's services in May, June and July 2011 and the number of line items dealing with the idea of suing the appraiser. We know Robinson & Cole and its attorneys Peck and Heath concluded one could not sue Parker Benjamin because the appraisal was done after the December 24, 2007 settlement and issuance of the note relying on the appraisal. We know Yacovelle ardently agreed there was no proximate cause against the appraiser for that reason.

114.     As a further example of how far Yacovelle was willing to go to push this bogus position on the Court, we submit the relevant pages of Yacovelle's Supplemental Brief to the Court accusing either Vincent D'Elia, Esquire or me of altering the value of the note used in the closing from $600,000.00 to $841,000.00.  Yacovelle does not explain how no one else but he noticed this over a four year period in which it existed. He does not explain how we guessed the value of $841,000.00 and were simply fortunate the actual appraisal (alleged to have been done six months later) was exactly the same amount.

115.     Rather than (Exhibit "Y") further speculate on Yacovelle's arrogant and untruthful efforts to sustain the Robinson & Cole position to lie, to cover-up that lie, and not to sue Parker Benjamin fearing the inevitable cross claim, we will simply rely on Peck's truthful testimony during her deposition and (Exhibit "W") showing who made the changes, namely Peck herself.

116.     Is there a reason for experienced attorneys to lie then compound the lie by covering it up?  With my personal litigation with Goodman settled; with the May 19, 2011 offer by Goodman presenting a viable and very beneficial opportunity for the Trust

26

(and ending expensive and contentious litigation), Matt Durst and Kelley Peck had an unholy alliance by virtue of language in the irrevocable version of the Trust which gave Matt a stranglehold on the Trust's finances and prevented me or my beneficiaries from replacing him or doing anything about it except for the scenario we have before us; willful misconduct, because Matt Durst above all did not want to sue Peck, or by suing the Parker Benjamin, cause her to be sued.

117.    So Matt Durst despite knowing the truth went along with the cover-up to safeguard Peck, Robinson & Cole and his own control of the Trust. I'm almost twenty years older than Matt. One day, after my passing, the shopping center would be fully paid off and Matt Durst in control of $750,000.00 to $1,000,000.00 of income per year. In return for crafting this B movie perhaps Peck would be granted a fee of $100,000.00 per year to look after things. A nice annuity.

118.    In addition to all of the above, Yacovelle compounded his litany of misdeeds by virtue of the following actions or omissions. We were castigated for failing to provide a new MAI appraisal on the 1600 building (where BG held a 900,000 mortgage) to assist the Court in determining value. Keeping in mind Yacovelle is a fiduciary to the Trust (as is Matt Durst) did he not have a responsibility to order an appraisal? The better the appraisal the lower the alleged deficiency so there can be no doubt it was an item the trust should have prioritized. How did Yacovelle fulfill his fiduciary duties? Please read Yacovelle's email to his (supposed) adversaries (Goodman's attorneys) (Exhibit "Z")

> I have an MAI sniffing around 1600 and am pleased to learn preliminarily that it ain't worth crap.

119.    Considering that the lower the value of 1600, the worse it is for the Trust *vis a vis* any deficiency, is there any question as to how honestly Yacovelle was representing the client who paid him $90,000.00 in the period of one year?

120.    Finally, the Court has in its opinion and order precluded us from arguing whether the value placed on the 1600 building as an element of the settlement (was fair) that Matt Durst and Yacovelle reached with Goodman.

121.    Yacovelle has admitted he killed a deal worth at least 3.5 Million Dollars to the Trust (Goodman's May 19, 2011 offer) that was by any logic vastly superior to that which he crafted in October 2011. The concept of fair and unfair is highly subjective. If I inherited a piece of ground from my parents – my cost being zero and I received a Two Million Dollar offer for it in a week, many might say that was fair.  If however, I had received an offer of Five Million Dollars for the asset, under equal or better or better conditions, then if I were a fiduciary, or logical, or honest, or all three, there is no question what I would do.

122.    But we now know Matt Durst and Yacovelle had other motives than the best interest of the trust and its beneficiaries, namely cover Matt Durst and Peck's exposed derrieres for failing to pursue the appraiser, and ultimately Peck and her law firms.

123.    Both Matt Durst and Yacovelle lacked sufficient expertise in the various aspects of commercial real estate. Both repeatedly acknowledged this in various writings throughout the case. Matt Durst acknowledged in his testimony under oath during his deposition that he had no background or education in real estate matters. Yet both he and Yacovelle want this Court to believe that he had the authority to do

anything he wanted – and in particular liquidate the trust's keystone asset – the 10% interest in Union Lake Crossing, as well as the trust's 20% interest in the Reserve (29 acres of commercial land). That 20% interest alone was jointly valued by BG's right hand man Chris Anderson and me at $245,000.

124.    Matt Durst asserts his authority to liquidate the trust and/or its key assets emanates from the December 29, 2006 letter attached as Exhibit "AA". This letter was crafted at the time the trust was revocable and I had 100% control and authority. To assume that when this letter was crafted that it meant Matt (or Mike) could do anything they chose is ludicrous. If Peck had meant it to be unlimited authority, it would not have contained the following language:

> Also, if there are matters outside the scope of this delegations that require my attention or approval, please advise me accordingly.

125.    When Matt Durst received Co-Trustee Mike's written objections to the October 2011 settlement, Matt ignored it and proceeded to settle the case on terms enormously deficient to that which he and Yacovelle had passed up. Matt Durst alleges that his authority came from the letter delegating "ministerial" duties to him.

126.    This delegation of authority (limited as it was) was a reference to the Revocable Trust dated May 10, 2007. There is no document of any sort nor is there any contention that Co-Trustee Mike Durst or I extending that delegation to the Irrevocable Trust dated December 24, 2007.

127.    There is no better indication of whether Matt Durst was intended by me to be given the scope of authority that would have him analyzing, valuing, negotiating and consummating a deal on a 10% interest in an $85,000,000.00 center (cost) then

29

appraised at 94.5 million. The best indication of how ridiculous such authority would have been is Matt's deposition on April 28, 2015 (Exhibit "BB").

> A.    ...I don't understand cap rate...

(Deposition of Matt Durst 145 at 22-23)

> Q.    And do you have any training, formal training in financial matters?
>
> A.    No.

(Matt Durst 146 at 22-24)

> Q.    Do you have any training in real estate matters?
>
> A.    He's [Steven Durst] the expert. I'm not the expert. The answer is no.

(Matt Durst 146 at 25; 147 at 1-3)

> Q.    Okay.    Do you have any experience with appraisals?
>
> A.    No.

(Matt Durst 147 at 11-13)

> Q.    ...Do you know the criteria that's used by an appraiser to value real estate?
>
> A.    No.
>
> Q.    Do you know how to evaluate the value of a commercial property?
>
> A.    No.

(Matt Durst 148 at 4-9)

128.  That is why Matt's ministerial authority did not extend to something as involved as the disposition of commercial real estate worth Three to Four Million Dollars if you knew how to value it.

129.  While this Certification is replete with specific actions taken by or caused by Yacovelle it is the cover-up regarding Parker Benjamin that is most troubling and the subsequent efforts by Yacovelle to smear Mr. D'Elia and myself for altering the value on the note when he knew that was the value reached by Parker Benjamin.

130.  In this Court's August 5, 2013 Opinion, partial summary judgment was granted to Defendant Matthew Durst.  The basis for this Opinion was the Court's finding that the settlement that was reached in the Superior Court matter was not subject to attack because it was precluded by the Doctrine of Collateral Estoppel.

131.  It is important to note, however, that on Page 9 of the Opinion there is the following language:

> Further, Defendant maintains that he is not seeking to preclude Plaintiffs from arguing their willful misconduct, breach of fiduciary duty claims or from arguing whether Defendant had authority to enter into the settlement agreement.

132.  This highlights the critical issue in this case.  Did Defendant Matthew Durst (and his attorney John Yacovelle) exceed their authority in entering into the Superior Court settlement?  And if they did exceed that authority, then what is my remedy?

133.  There is no dispute that the Trust document required the consent of Matt and Mike in order to take action on Trust business.  It is further undisputed that while the Trust was revocable, Matt Durst was given the authority to make ministerial

665a

decisions on his own and without consultation with Co-Trustee Mike. Decisions other than ministerial in nature need to be consented to by both Trustees.

134.    One of the reasons for this ministerial delegation to Matt, was the fact that the Trust was revocable thereby giving me full control and authority to overrule decisions made by Matt.

135.    But when the Trust was converted to Irrevocable, I no longer had that power. Matt, however, continued to treat the Trust as if it was his own and without regard to consultation with Mike. This is clear evidence that Matt exceeded his authority as a Trustee.

136.    More importantly, Matt enters into the settlement wherein he conveys the Trust's most significant and valued asset (the 10% interest in Union Mill Shopping Center) despite the fact that he knows it is encumbered by my $500,000.00 Note. Matt further enters into the settlement without consultation with Co-Trustee Mike and without consultation with me as Grantor/Trustee

137.    This clear violation of his fiduciary responsibilities cannot go unaddressed. It was clear that he exceeded his authority by entering into the settlement. If that is true then there must be a remedy for that wrongdoing.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: August 7, 2015

Steven Durst

F:\FILES\7933 (Steve Durst v. Matthew Durst (District Court Case)\Pleadings\certification of steven durst in support of motion to reconsider version 3.doc

## EXHIBIT LIST

Exhibit "A"    October 25, 2007 email from Kelley Peck to Matt Durst

Exhibit "B"    Goodmill LLC Operating Agreement page 18 (Section 7.04(a))

Exhibit "C"    April 28, 2015 Deposition of Kelley Peck, page 43, lines 18-23

Exhibit "D"    John Yacovelle email of June 18, 2011

Exhibit "E"    April 28, 2015 Deposition of Kelley Peck, page 28, lines 7-14

Exhibit "F"    April 28, 2015 Deposition of Kelley Peck, page 48, lines 23-24 and page 49, lines 5-7

Exhibit "G"    November 28, 2011 letter from Kelley Peck to the Connecticut Probate Court

Exhibit "H"    Kelley Peck email regarding reconsideration of strategy

Exhibit "I"    Connecticut Court Orders of April 3, 2013 and May 24, 2013

Exhibit "J"    April 28, 2015 Deposition of Kelley peck, pages 76-77

Exhibit "K"    October 13, 2011 letter from Kelley Peck

Exhibit "L"    Probate Court Accounting

Exhibit "M"    April 28, 2015 Deposition of Kelley Peck, page 17

Exhibit "N"    April 28, 2015 Deposition of Kelly Peck, page 42, lines 17-20

Exhibit "O"    April 28, 2015 Deposition of Kelly Peck, page 52, lines 7 to 8

Exhibit "P"    April 28, 2015 Deposition of Kelly Peck, page 50

Exhibit "Q"    Deposition of Bruce Goodman, page 128, lines 1&2

Exhibit "R"    Assignment of Rights to Receive Distributions from Goodmill, LLC

Exhibit "S"    August 14, 2007 letter from Bruce Goodman to Matt Durst

Exhibit "T"    Matt Durst and John Yacovelle indicate lack of expertise

Exhibit "U"    January 2, 2012 Letter Brief from John Yacovelle to Judge McDonnell

# EXHIBIT LIST

Exhibit "V"   December 19, 2007 email from Matt Durst to Kelley Peck

Exhibit "W"   Matt Durst email to John Yacovelle

Exhibit "X"   Robinson & Cole's redacted invoices

Exhibit "Y"   John Yacovelle's accusations against Steven Durst and Vincent D'Elia

Exhibit "Z"   December 28, 2011 email from John Yacovelle to Stephen Hladik

Exhibit "AA"   December 29, 2006 Matt Durst authorization letter

Exhibit "BB"   April 28, 2015 Deposition of Matt Durst, page 145

F:\FILES\7933 (Steve Durst v. Matthew Durst (District Court Case)\Pleadings\Exhibit list.doc

# EXHIBIT "B"

Company only upon the vote or consent of the Members holding the majority of the Voting Rights, and then, only upon such terms and conditions as determined by the Members holding the majority of the Voting Rights.

    7.04    Buy Out in the Event of a Termination of Employment.

        (a)    In the event that either Steven Durst or Christopher Anderson ceases to be employed by Goodman Management, LLC for any reason whatsoever (hereinafter referred to as "Former Employee"), then Bruce A. Goodman shall have the option to purchase the entire Membership Interest of the Former Employee (the interest of Matthew Durst, Trustee under the Jake Ball Trust Agreement in the event that Steven Durst ceases to be employed by Goodman Management, LLC) at a price equal to the "Net Operating Income" of the Property (for the preceding calendar year) divided by .09, less all debts, obligations and mortgages of the Company (including but not limited to the outstanding balance due under the Goodman Loans) times the Percentage Interest of the Membership Interest held by the Former Employee. "Net Operating Income" shall mean annual rents received during the preceding calendar year less annual unreimbursed operating and capital expenses and repairs, professional fees and management fees incurred during the preceding calendar year. The Net Operating Income shall be determined by the accountants regularly engaged by the Company. The annual Net Income distributions to Former Employee, shall be prorated as of the date of closing on the sale of the Former Employee's Membership Interest.

        (b)    The purchase price for the Membership Interest shall be paid by Bruce A. Goodman in equal monthly installments over a term of sixty (60) months with interest on the unpaid balance calculated at seven (7%) percent per annum.

        (c)    Bruce A. Goodman may exercise his option to purchase the Former Employee's Membership Interest by forwarding written notice to Former Employee (the "Exercise Notice") within one hundred eighty (180) days of the date of termination of former Employee's employment with Goodman Management, LLC. In the event that Bruce A. Goodman exercises his option under this Section 7.04, settlement of the purchase of Former Employee's Membership Interest shall occur within sixty (60) days of the date of the Exercise Notice. The time and place of settlement, and deliveries at settlement, shall be governed by the provisions of Section 7.01(d)(ii) hereof.

        (d)    The provisions of this Section 7.04 shall supersede and prevail over any inconsistent provision of this Agreement.

**EXHIBIT "E"**

26

1  essentially the same?
2      A.    Yes, except the provisions to make it
3  irrevocable and exclude Steve.
4      Q.    Right, and does Steve have the same
5  ability to remove trustees under the revocable as he
6  did under the irrevocable one?
7      A.    No, certainly not.
8      Q.    Why not?
9      A.    Because this was done for tax planning
10 purposes, and if a grantor retains the power to
11 remove a trustee, he is deemed to have all the same
12 powers as the trustee and that would cause it to be
13 includable in his estate under prevailing case law.
14     Q.    And would you characterize this
15 irrevocable trust as a grantor's trust?
16     A.    Yes.
17     Q.    What does that term mean?
18     A.    It is an income tax term which means
19 that any income attributes are attributable to the
20 grantor and are reportable by him on his personal
21 tax return.
22     Q.    So the trust itself doesn't pay taxes?
23     A.    Correct.
24     Q.    Can I have that back, please?
25     A.    Sure.

CRUZ & COMPANY, LLC

27

1      Q.    Thank you.
2             Do you recall when the first time was
3  when you saw the Goodmill, LLC operating agreement,
4  DMD-2?
5      A.    I do not.
6      Q.    Okay, did you get that from Matt?
7      A.    I am not sure if it was Matt who gave
8  it to me or Steve or Steve's counsel.
9      Q.    Okay. And who is Steve's counsel?  Do
10 you know?
11     A.    Jeff Hoffman.
12     Q.    Jeff Hoffman, okay. And at the same
13 time as the execution of the Jake Ball Trust
14 irrevocable document there was also a note and
15 collateral assignments signed, was there not?
16     A.    Yes.
17     Q.    I am going to show you DMD-9 and
18 DMD-10, and ask if you can identify them.
19     A.    Nine is captioned Non-Negotiable
20 Promissory Note. Ten is marked Collateral
21 Assignment of Limited Liability Company Interest.
22     Q.    And do you recognize those documents?
23     A.    Yes.
24     Q.    Who prepared those documents?
25     A.    I did.

28

1      Q.    And what was the purpose of these
2  documents?
3      A.    To provide a promissory note whereby
4  Steve would be paid for the value of a part of his
5  interest in — the trust interest in Goodmill, and
6  basically, to buy his right to revoke the trust.
7      Q.    At the time you prepared the collateral
8  assignment of limited liability company interest,
9  DMD-10, you already had a copy of the Goodmill, LLC
10 operating agreement, did you not?
11     A.    Yes.
12     Q.    And you had reviewed it before writing
13 the collateral assignment of limited liability?
14     A.    Yes.
15     Q.    And I am going to direct your attention
16 to Section 7.01 of the Goodmill, LLC operating
17 agreement, 7.01 transfer of interest, admission of
18 additional members' buy out, and ask you to read
19 paragraph A into the record, please.
20     A.    "Restrictions on transfer:  Except as
21 otherwise provided in Section 7.01 (B) and
22 Section 7.01 (C) of this agreement, no interest may
23 be sold, assigned, transferred, given, bequeathed,
24 donated, mortgaged, pledged, attached, levied upon,
25 ceased by or for creditors, or otherwise encumbered

CRUZ & COMPANY, LLC

29

1  or disposed of, whether by act of the member or by
2  operation of law, without the prior written consent
3  of the manager, which consent may be withheld for
4  any reason or for no reason."
5             MR. D'ELIA:  Off the record.
6             (Whereupon, a discussion is held off
7  the record.)
8      Q.    You indicated that you had read the
9  Goodmill, LLC operating agreement before you
10 prepared the assignment. Paragraph 7.01 (A) appears
11 to require the consent of the manager for such an
12 assignment, does it not?
13     A.    It requires the consent when the
14 interest is transferred, but the interest was never
15 transferred.
16     Q.    It uses the word assign, "may not be
17 sold, assigned, transferred, given." And this was a
18 collateral assignment.  Did it not require the
19 consent of the managing member?
20            MR. O'CONNOR:  Objection to form.  You
21 can answer.
22     Q.    You can answer.
23            MR. LEISE:  Objection.
24     A.    I don't know that it required the
25 consent of the managing member.  It was — it was

# EXHIBIT "F"

46

1    A.    Okay.

2    Q.    Before you do anything further, I
3 improperly did not give the other attorneys an
4 opportunity to see it.  So before we go any further,
5 I will let him take a look.

6         MR. LEISE:  I am okay with the
7 document.  I would prefer her not read it in,
8 though.  It is not her e-mail.  Would you like to
9 make copies of it?  Would that help?

10        MR. D'ELIA:  No, I want her to read it
11 because I want to ask her about what it says.  I
12 know that she is not the author of it.

13        MR. LEISE:  Well, she can answer
14 questions without reading it in.

15        MR. D'ELIA:  No problem.

16    Q.    You see in that paragraph where it says
17 that Ed Heath and yourself had a phone conversation
18 with John Yacovelle?

19    A.    Yes.

20    Q.    Does that refresh your recollection as
21 to a conversation you had with Mr. Yacovelle?

22    A.    I don't remember the exact
23 conversation, but I don't disagree it happened.

24    Q.    Do you see the conclusion that was
25 reached with regard to the claim against Parker

CRUZ & COMPANY, LLC

47

1 Benjamin?

2    A.    I see what John Yacovelle said in the
3 e-mail.

4    Q.    Okay, and do you agree with his
5 conclusion?

6    A.    I don't -- I don't know whether I
7 agree or disagree.

8    Q.    You don't know?

9    A.    I mean, he understood -- I mean, there
10 are several conclusions in here.

11    Q.    Okay.

12    A.    One is that regarding the timing and
13 one is regarding the value.

14    Q.    Okay.  In the e-mail there is a
15 reference that you, meaning the trust, could not
16 have relied on the appraisal value of 841.  Do you
17 agree with that statement?

18    A.    I am not sure that I do.  I think that
19 there were drafts of the appraisal and there were
20 discussions about the general terms.  Whether the
21 841 specifically was known on December 21st, I don't
22 recall exactly the dates when the drafts came in.

23        I mean, I do know that they knew the
24 value was going to be under a million dollars.  They
25 expected that it would be under that amount.

CRUZ & COMPANY, LLC

48

1    Q.    You understand that one of the issues
2 with regard to the valuation of 841 or 600, or
3 whatever, had to do with Section 7.04 of what has
4 been marked DMD-2, which is the Goodmill operating
5 agreement.  Is that correct?

6         MR. LEISE:  Objection to the form of
7 the question.

8    A.    I don't understand the question.

9    Q.    Well, then don't answer it.

10        You are familiar with Section 7.04 of
11 the Goodmill, LLC operating agreement marked DMD-2
12 for identification?

13    A.    I am.

14    Q.    Okay, and have you had a chance to read
15 7.04?

16    A.    Uh-huh.

17        MR. D'ELIA:  Off the record.

18        (Whereupon, a discussion is held off
19 the record.)

20        MR. D'ELIA:  Back on the record.

21    Q.    You have had a chance to review 7.04?

22    A.    Yes.

23    Q.    And what effect did 7.04 have on the
24 valuation of the Goodmill, LLC property?

25        MR. LEISE:  Objection to the form of

CRUZ & COMPANY, LLC

49

1 the question.

2         MR. O'CONNOR:  Same.

3    Q.    You can answer.

4         MR. LEISE:  You can answer.

5    A.    Well, I didn't do the valuation, so I
6 am not sure of the exact scope of the impact that it
7 had.  But there are a variety of factors that go
8 into the appraisal of a company; one of them is the
9 restrictions that exist in an operating agreement or
10 any other governing document with respect to the
11 interest.  And it is one of the factors that gets
12 considered.

13    Q.    But how did you feel that 7.04 impacted
14 on the value?

15    A.    That there was a risk that at some
16 point in the future this would be operative if there
17 was a termination of employment, and that goes into
18 the assessment of what a willing buyer would pay a
19 willing seller; each being aware of all the facts,
20 and neither being under any compulsion to buy or
21 sell, which is the standard of the I.R.S.

22    Q.    When the DMV-8 and 8(A) documents --
23 strike that.

24        With regard to the December 21, 2007
25 agreement concerning the $600,000 or $841,000

CRUZ & COMPANY, LLC

# EXHIBIT "H"

675a

Pursuant to the rules of professional conduct set forth in Circular 230, as promulgated by the United States Department of the Treasury, unless we expressly state otherwise in this communication, nothing contained in this communication was intended or written to be used by any taxpayer for the purpose of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Code of 1986, and it cannot be used by any taxpayer for such purpose. No one, without our express prior written permission, may use or refer to any tax advice in this communication in promoting, marketing or recommending a partnership or other entity, investment plan or arrangement relating to any one or more taxpayers.

**From:** Peck, Kelley Galica
**Sent:** Monday, December 12, 2011 9:23 AM
**To:** 'Vincent D'Elia (delia@delialawfirm.com)
**Subject:** FW: Jake Ball Trust

Attorney D'Elia

I received the e-mail below from Erica Durst. Three of her siblings sent virtually verbatim requests to delay the hearing. The court has already declined my request for a 2 week hearing. The court will use its own timeframe.

I am, however, concerned by the mixed messages. We agreed to move as quickly as possible to have the account settled so that Matt could resign before any further action is necessary in New Jersey. Also, his cooperation to this point was predicated on the agreement that he would be allowed to present his account without incident and resign upon court approval. Please let me know if that has changed.

If the beneficiaries have questions, they should compose them and present them to me immediately. If they intend to object, I will need to advise the court and I will advise Matt to reconsider his strategy. I have a call scheduled with Matt at 3:00 today to confirm how he should proceed – if I do not hear from you before then, I will assume the worst and plan accordingly.

Kelley


**Kelley Galica Peck**

**Robinson & Cole** LLP
280 Trumbull Street
Hartford, CT 06103-3597
Direct 860-275-8332 | Fax 860-275-8299
kpeck@rc.com | www.rc.com
Bio | Contact Card

Boston    Providence    Hartford    New London
Stamford    New York    Albany    White Plains    Sarasota



Please consider the environment before printing this e-mail

Pursuant to the rules of professional conduct set forth in Circular 230, as promulgated by the United States Department of the Treasury, unless we expressly state otherwise in this communication, nothing contained in this communication was intended or written to be used by any taxpayer for the purpose of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Code of 1986, and it cannot be used by any taxpayer for such purpose. No one, without our express prior written permission, may use or refer to any tax advice in this communication in promoting, marketing or recommending a partnership or other entity, investment plan or arrangement relating to any one or more taxpayers.

**From:** Erica Durst [mailto:ericadurst@gmail.com]
**Sent:** Friday, December 09, 2011 11:38 AM
**To:** Peck, Kelley Galica
**Subject:** Jake Ball Trust

**EXHIBIT "I"**

economy for another jurisdiction to cover ground already litigated and in some instances resolved, in this Court. While the New Jersey Court may also acquire jurisdiction over this matter, it does not appear to have "exclusive" jurisdiction, therefore the Motion to Dismiss is denied.

However, the Court finds rulings as to some portions of the account could result in res judicata or collateral estoppel regarding tangential issues in the New Jersey Federal District Court. Therefore, the Court finds that it is appropriate to rule only on the portions of the account which ruling would not impact the matters in other jurisdictions.

Wherefore it is ORDERED and DECREED that:

Schedule A-1    The Court finds that the amounts placed in escrow with the firm of Robinson and Cole by the Trustee are owned by the Trust and shall be included in the account with the payments approved by the Court's Decree dated June 12, 2012 subtracted from the balance.

Schedule A-2    Approved in its entirety

Schedule A-3    Approved in its entirety

Schedule A-4    Approved in its entirety

Schedule B-1    Approved only to the extent that the amounts reported were the actual monies paid. The Court defers to other jurisdictions to rule on the reasonableness of the amounts paid, the characterization of certain items as administration expenses, reimbursements to the Trustee and Trustees' fees.

Schedule B-2    Approved in its entirety

It is hereby ORDERED and DECREED that:

1.    The accounting submitted by Matthew Durst shall be accepted for accounting purposes only.  The Court acknowledges that it has not ruled on the accuracy, fairness or propriety of said accounting as the Court did not reach any legal and/or factual conclusions concerning the accounting.

2.    The acceptance of this accounting is without prejudice to the claims of Steven Durst, Reuben Durst or any other present or future claimant including but not limited to the ongoing litigation pending in the Superior Court of New Jersey, Cumberland County, Chancery Division, captioned Matthew Durst, Trustee of the Jake Ball Trust v. Goodmill, LLC, et. al., Docket No. _____ and/or ongoing litigation pending in the Superior Court of New Jersey, Cumberland County, Chancery Division and captioned "Jake Ball Trust, Steven Durst and Reuben Durst v. Matthew Durst", Docket No.: C-9-12.

3.    In addition to legal fees reflected as paid in the accounting, additional fees to Robinson & Cole LLP not to exceed $13,500 are hereby approved.  The $9,000 retainer currently held by Robinson & Cole LLP shall be applied towards payment of these fees.

4.    Within 5 days from the date hereof, Robinson & Cole, LLP, on behalf of Matthew Durst as Trustee, shall transfer to Reuben Durst, Trustee, funds remaining in its escrow account, estimated at approximately $30,105, being the original $35,000 reduced by $4,500 for the payment of the balance of the $13,500 in additional legal fees due to Robinson & Cole LLP and by the $395 probate fee paid.

5.    Any additional trust funds received by Matthew Durst as Trustee after the date of this Consent Order shall be transferred by Matthew Durst to Reuben Durst immediately.

6.    Upon execution of this Order and upon Matthew's Durst compliance with the transfer of funds required by this Order, Matthew Durst shall be deemed to have resigned as a Trustee of the Jake Ball Trust and his resignation shall be deemed accepted by said Trust.  Matthew Durst shall thereafter have no say concerning Trust business.

7.    Nothing in this decree shall preclude a future fiduciary from renegotiating the terms of the promissory note dated December 24, 2007 payable by the Trust to Steven Durst, or from subsequently changing the amounts of principal and interest due and payable to Steven Durst under the promissory note.

8.    The parties hereto all permanently waive any right to appeal this Consent Order.  Said waiver is freely given and is deemed to be with prejudice.

It is further ORDERED and DECREED that:

Matthew Durst, Co-trustee, shall amend the account in accordance with the foregoing findings and file the amended account with the Court.

The schedules, or portions thereof, are approved in accordance with the foregoing findings.

The Petitioner's Motion to Dismiss is denied.

Dated at Simsbury this 24th day of May, 2013.

Cynthia C. Becker, Judge

# EXHIBIT "J"

74

1   in escrow. It wasn't among the things the Court
2   ordered paid, although there is a copy of the
3   Court's decree. If I could see that, I could tell
4   you exactly what was paid.
5          Q.    Sure. Do you recall submitting a bill
6   for approval together with the -- at the time that
7   the escrow was put in?
8          MR. LEISE:  Bill for approval by the
9   Probate Court?
10         Q.    Strike that whole question. It made no
11  sense.
12         MR. LEISE:  Thank you.
13         Q.    Do you recall submitting a bill for
14  legal services to the Probate Court to be paid for
15  by the trust?
16         MR. LEISE:  For approval by the Court?
17         Q.    For approval by the Court, yes, thank
18  you.
19         A.    Yes, it is common practice for the
20  Probate Court to review legal fees and she was given
21  a copy of the bill.
22         MR. LEISE:  Just so the record is
23  clear, she --
24         A.    She being the judge.
25         Q.    Judge Becker is she?

CRUZ & COMPANY, LLC

75

1          A.    Yes.
2          Q.    And that bill was for approximately
3   $28,000?
4          A.    I don't recall. I would have to see
5   it.
6          Q.    Okay.
7          MR. D'ELIA:  Mark this.
8          (Exhibit Peck-8, Page 5 of a bill
9   issued by Robinson & Cole, LLP entitled Outstanding
10  Invoices on the Matter dated August 10, 2012, is
11  marked for identification by the court reporter.)
12         Q.    Ms. Peck, I am going to show you what
13  has been marked Peck-8 for identification. It is a
14  one-page document. Do you recognize it?
15         A.    It appears to be the -- page 5 of a
16  bill issued by Robinson & Cole, LLP.
17         Q.    Does that exhibit refresh your
18  recollection of what you submitted to the Probate
19  Court for approval?
20         A.    It refreshes my recollection that
21  there were bills of $28,388.60. I do not recall
22  that this was submitted to the Court. I don't know
23  if this was the bill submitted or something else was
24  submitted.
25         Q.    You don't recall?

CRUZ & COMPANY, LLC

76

1          A.    I don't recall.
2          MR. D'ELIA:  Off the record.
3          (Whereupon, a discussion is held off
4   the record.)
5          MR. D'ELIA:  Back on the record.
6          Q.    Ms. Peck, I appreciate your indulgence
7   and your patience while I tried to find a document I
8   had earlier today and for some reason I cannot find,
9   but there was an e-mail you sent, I believe to me,
10  acknowledging the dispute between the trustees, and
11  indicating that you were, assuming there was a
12  dispute, that you were going to have to revise your
13  strategy. Do you remember that e-mail?
14         A.    I don't think those were the exact
15  words, but I remember having -- sending an e-mail
16  about new information that came up and that things
17  would change --
18         Q.    Okay.
19         A.    -- because of that.
20         Q.    Do you recall using the expression,
21  "revise my strategy," or words to that effect?
22         A.    No, I didn't use that expression.
23         Q.    You didn't use that expression?
24         A.    (Gesturing.)
25         Q.    Did you indicate that you would advise

CRUZ & COMPANY, LLC

77

1   Matt to revise his strategy?
2          A.    You know, I don't think I ever used
3   the term revised strategy in any context. I did
4   indicate that if there were disputes, it would
5   change how things proceeded because the initial
6   plan, which I believe you are aware of, was that
7   Matt would prepare an accounting, it would go to
8   court, it would be accepted and he would resign and
9   turn over everything.
10         Nowhere in that original plan was there
11  an objection built into it. So if there is going to
12  be an objection, that would require substantially
13  more work. It would be involved in the -- the
14  Probate Court would then hold a hearing, it would
15  listen to the objection, evidence would be
16  presented, and it would result in a judgment by the
17  Court.
18         Whereas, an un-objected to accounting
19  is approved pro forma. So there would be a
20  substantial difference in a filing of an accounting
21  that is approved in about two weeks versus an
22  objected-to accounting in which there is a contest
23  hearing.
24         So I am certain that I did communicate
25  at some point when I learned that there were

CRUZ & COMPANY, LLC

# EXHIBIT "K"

684a

# ROBINSON & COLE LLP

KELLEY GALICA PECK

280 Trumbull Street
Hartford, CT 06103-3597
Main (860) 275-8200
Fax (860) 275-8299
kpeck@rc.com
Direct (860) 275-8332

October 13, 2011

**Via Electronic Mail Only**
Steve Durst
23 Oakwood Drive
Medford, NJ  06070

Rueben H. Durst, Jr.
846 Drewry Street
Atlanta, GA  30306

Matthew Durst
20 Woodcliff Drive
Simsbury, CT  06070

Re:    Jake Ball Trust

Dear Steve, Mike and Matt:

It has come to my attention that a disagreement has arisen among the three of you with respect to the settlement of a claim between the irrevocable Jake Ball Trust, of which Steve is the Grantor and Matt and Mike are co-Trustees, regarding the Goodmill, LLC and Bruce Goodman. Both the Trust and Steve have been and continue to be represented by counsel in New Jersey and Pennsylvania with respect to that litigation. I have not and will not represent any of the parties regarding that litigation.

As a result of the disagreement regarding resolution of that claim, and requests from trust beneficiaries and Mike, Matt has elected to resign as Trustee. Prior to his resignation taking effect, Matt will prepare and file an accounting of his conduct as Trustee with the Simsbury Regional Probate Court. You have asked that I assist Matt in the process of preparing and filing the accounting and transitioning the assets of the Trust to Mike as sole Trustee. Ordinarily, I would not accept such a role because of the conflict of interest among you and the fact that I represented Matt as Trustee and Mike and Steve regarding estate planning matters. However, I recognize that all of

*Law Offices*
BOSTON
PROVIDENCE
HARTFORD
NEW LONDON
STAMFORD
WHITE PLAINS
NEW YORK CITY
ALBANY
SARASOTA
www.rc.com    11326323-v1

# ROBINSON & COLE LLP

Steve, Rueben and Matthew Durst
October 13, 2011
Page 2

you are in agreement that Matt should resign and that it would be costly and time-consuming to retain separate counsel at this point. 

Each of you recognizes that a conflict exists among you regarding the Trust and the Goodmill/Goodman litigation. I will not represent any of you with respect to that matter and each of you will continue to use the counsel retained for the purposes of representing your interests in those matters. In the process of representing Matt, I may learn information regarding that matter. I will not share anything I learn regarding that matter with any of you without the express consent of the person who provided that information.

 You consented to my continued representation of Matt for the purpose of effecting his resignation as Trustee of the Jake Ball Trust, filing and obtaining approval of his accounting as Trustee with the court and transitioning the trust assets to Mike as the sole remaining Trustee.

In addition to Matt's role as Trustee of the Jake Ball Trust, he is named as fiduciary in the other estate planning documents for Steve and Mike and as a manager of two LLCs in which Mike and Steve have interests. He also is a fiduciary in Rosalie Durst's estate planning documents. Matt has resigned or declined to act in business or fiduciary capacity under those documents. I will not act as attorney for Steve and  Mike personally. I also will not act as attorney for Rosalie Durst. Each of you should retain separate estate planning counsel who can advise you with respect to any changes you may need to make. I will forwarding all original documents to you so that you can have local counsel review those documents and make any necessary changes to your estate planning documents.

Once Matt's resignation from the Jake Ball Trust is effective and the accounting process is complete, there will no longer be a connection to Connecticut and it makes no sense for the Trust or Mike to retain me as counsel for the Trust. As such, I will not act as attorney for the Trust.

I anticipate that it will take at least 30 - 60 days to complete the court accounting process. Each of Mike and the beneficiaries will receive a copy of the accounting and will receive notice of the hearing, which they may attend and present any objections.  The court will issue a decree either accepting or modifying the accounting after the hearing. Although the court will have 120 days in which to issue a decree, ordinarily it will issue the decree immediately if there are no objections by the parties and no concerns raised by the court.

# ROBINSON & COLE LLP

Steve, Rueben and Matthew Durst
October 13, 2011
Page 3

After you review this letter, please contact me if you have questions. If you are in agreement with my continued representation of Matt as set forth above, please sign and return this letter to me as soon as you are able. Each of you should feel free to consult your own attorney prior to signing this letter.

Sincerely,

Kelley Galica Peck
KGP:lmc

We understand that a conflict of interest exists among us related to the Jake Ball Trust and we waive that conflict and consent to the representation of Matthew Durst by Robinson & Cole LLP as set forth above.

Steve Durst

10/14/11
Date

Rueben Durst,
Individually and as Trustee
Of the Jake Ball Trust

Date

Matthew Durst,
Individually and as Trustee
Of the Jake Ball Trust

Date

# EXHIBIT "L"

ADMINISTRATION ACCOUNT                                 STATE OF CONNECTICUT                    RECORDED:

COURT OF PROBATE

| To: Court of Probate, District of Simsbury Regional | | |
|---|---|---|
| Jake Ball Trust | District No. | PD-09 |

| FIDUCIARY'S NAME | POSITION OF TRUST |
|---|---|
| Matthew Durst | Co-Trustee |

The fiduciary hereby exhibits this account to said court for allowance and makes oath that the same is a true and complete account of all receipts and disbursements made in said capacity from March 04, 2006 to October 31, 2011.

The fiduciary, therefore, makes application for allowance and approval of said account.

| THIS ACCOUNT CONSISTS OF 79 PAGES | DATE | The representations contained herein are made under the penalties of false statement. |
|---|---|---|
| | 11/28/11 | Matthew Durst Co-Trustee |

" EXHIBIT        "

PLAINTIFF'S
EXHIBIT
D-MD16
2-2-15 TS

Jake Ball Trust

### A. PRINCIPAL CHARGES

| | | |
|---|---|---|
| Principal on Hand as shown in Inventory or Account on File, Schedule A-1 | $ | (499,191.09) |
| Additional Principal Received, Schedule A-2 | | 812,361.73 |
| Gain on Sale or Redemption of Principal, Schedule A-3 | | 705,793.67 |
| Transfers of Income to Principal, Schedule A-4 | | 17,321.36 |
| **TOTAL PRINCIPAL CHARGES** | $ | 1,036,285.67 |

### B. PRINCIPAL CREDITS

| | | |
|---|---|---|
| Administration Expenses, Schedule B-1 | | 317,402.05 |
| Loss on Sale or Redemption of Principal, Schedule B-2 | | 208,290.55 |
| Principal Distributions to Beneficiaries, Schedule B-3 | | 390,317.13 |
| Principal on Hand, Schedule B-4 | | 120,275.94 |
| **TOTAL PRINCIPAL CREDITS** | $ | 1,036,285.67 |

### C. INFORMATIONAL SCHEDULES - PRINCIPAL

Purchases, Schedule C-1
Capital Changes On Principal Assets, Schedule C-2
Principal Sales, Redemptions and Distributions With no Gain or Loss, Schedule C-3

### D. INCOME CHARGES

| | | |
|---|---|---|
| Dividends Received, Schedule D-1 | | 2,510.65 |
| Interest Received, Schedule D-2 | | 5,210.71 |
| Other Income Received, Schedule D-3 | | 9,600.00 |
| **TOTAL INCOME CHARGES** | $ | 17,321.36 |

### E. INCOME CREDITS

| | | |
|---|---|---|
| Transfers of Income to Principal, Schedule E-1 | | 17,321.36 |
| **TOTAL INCOME CREDITS** | $ | 17,321.36 |

### F. INFORMATIONAL SCHEDULES - INCOME

### G. CASH ACCOUNT AND RECONCILIATION

Principal Cash Account, Schedule G-1
Income Cash Account, Schedule G-2

Jake Ball Trust

## Index to Schedules

| Schedule | Title | Page |
|---|---|---|
| Schedule A-1 | Principal on Hand as Shown in Inventory or Account on File | 1 |
| Schedule A-2 | Additional Principal Received | 2 |
| Schedule A-3 | Gain on Sale or Redemption of Principal | 3 |
| Schedule A-4 | Transfers of Income to Principal | 9 |
| Schedule B-1 | Administration Expenses | 10 |
| Schedule B-2 | Loss on Sale or Redemption of Principal | 16 |
| Schedule B-3 | Principal Distributions to Beneficiaries | 25 |
| Schedule B-4 | Principal on Hand | 36 |
| Schedule C-1 | Purchases | 37 |
| Schedule C-2 | Capital Changes on Principal Assets | 44 |
| Schedule C-3 | Principal Sales, Redemptions and Distributions With No Gain or Loss | 63 |
| Schedule D-1 | Dividends Received | 69 |
| Schedule D-2 | Interest Received | 70 |
| Schedule D-3 | Other Income Received | 73 |
| Schedule E-1 | Transfers of Income to Principal | 74 |
| Schedule G-1 | Principal Cash Reconciliation | 75 |
| Schedule G-2 | Income Cash Reconciliation | 76 |

**Jake Ball Trust**

Schedule A-1

Principal on Hand as Shown in Inventory or Account on File

| | | Inventory Value 03/04/2006 | | |
|---|---|---|---|---|
| **Cash and Cash Equivalents** | | | | |
| Northwestern Community Savings Account No. 55000371422 | $ | 805.91 | | |
| **Total Cash and Cash Equivalents** | | | $ | 805.91 |
| | | | | |
| **Miscellaneous** | | | | |
| 10% interest in Goodmill LLC | $ | 1.00 | | |
| 10% interest in Reserve at Union Lake LLC | | 1.00 | | |
| 99% interest in Zack & Jack Realty Associates LP | | 1.00 | | |
| **Total Miscellaneous** | | | | 3.00 |

| Face Amount | | | | | |
|---|---|---|---|---|---|
| | **Liabilities** | | | | |
| (500,000) | Goodmill LLC Note (owed to Steve Durst) | $ | (500,000.00) | | |
| | **Total Liabilities** | | | | (500,000.00) |
| | **Total Schedule A-1** | | | $ | (499,191.09) |

Jake Ball Trust

Schedule A-2

**Additional Principal Received**

| Date Received | | Inventory Value |
|---|---|---|
| 03/31/2006 | Goodman Realty Commission Payment $ | 125,000.00 |
| 07/08/2006 | Goodman Realty Commission Payment | 250,000.00 |
| 11/24/2006 | Contributions from Steven Durst (Commissions from Goodman Realty and Goodman LLC) | 7,500.00 |
| 05/11/2007 | Contributions from Steven Durst (Commissions from Goodman Realty and Goodman LLC) | 8,333.00 |
| 05/12/2007 | Contributions from Steven Durst (Commissions from Goodman Realty and Goodman LLC) | 8,333.00 |
| 05/15/2007 | Contributions from Steven Durst (Commissions from Goodman Realty and Goodman LLC) | 8,125.00 |
| 05/19/2007 | Contributions from Steven Durst (Commissions from Goodman Realty and Goodman LLC) | 8,125.00 |
| 07/06/2007 | Contribution from Steven Durst (payment from Friedman Schuman Applebaum et al; Zack/Jack mortgage) | 150,000.00 |
| 07/21/2007 | Deposit for potential sale of 1600 Hunting Park building | 10,000.00 |
| 12/31/2007 | Contribution from Steven Durst (loan from Goodman Properties securing 23 Oakwood residence) | 213,395.73 |
| 09/16/2008 | Contribution from Goodman Properties for life insurance premium for Steve Durst | 9,275.00 |
| 10/14/2008 | Wire transfer from Steve Durst | 5,000.00 |
| 10/15/2009 | Contribution from Goodman Properties for life insurance premium for Steve Durst | 9,275.00 |
| Total Schedule A-2 | | $     812,361.73 |

Jake Ball Trust

Schedule A-3

Gain on Sale or Redemption of Principal

| LPL Financial Sale | | Proceeds | | Inventory Value | | Gain |
|---|---|---|---|---|---|---|
| 12/05/2006 | 1,000 Shares Comcast Corp New Cl A | $ 40,570.71 | $ | 35,265.30 | $ | 5,305.41 |
| 06/25/2007 | 6,000 Shares Comcast Corp New Cl A | 166,843.91 | | 141,061.22 | | 25,782.69 |
| 05/30/2008 | 100 Shares Apple Inc Common | 18,886.93 | | 12,564.46 | | 6,322.47 |
| Total Sale | | | | | | |
| Total | | $ 226,301.55 | $ | 188,890.98 | $ | 37,410.57 |
| Charles Schwab Sale | | $ 226,301.55 | $ | 188,890.98 | $ | 37,410.57 |
| 02/11/2009 | 4,540 Shares Geron Corp Common | $ 33,528.24 | $ | 17,098.40 | $ | 16,429.84 |
| 02/11/2009 | 760 Shares Geron Corp Common | 5,612.66 | | 2,862.29 | | 2,750.37 |
| 02/11/2009 | 1,400 Shares Geron Corp Common | 10,339.11 | | 5,272.63 | | 5,066.48 |
| 02/11/2009 | 2,800 Shares Geron Corp Common | 20,678.21 | | 10,545.27 | | 10,132.94 |
| 02/11/2009 | 300 Shares Geron Corp Common | 2,215.52 | | 1,129.85 | | 1,085.67 |
| 02/11/2009 | 1,200 Shares Geron Corp Common | 8,862.09 | | 4,519.40 | | 4,342.69 |
| 02/11/2009 | 1,200 Shares Geron Corp Common | 8,862.09 | | 4,519.40 | | 4,342.69 |
| 02/11/2009 | 2,300 Shares Geron Corp Common | 16,985.67 | | 8,662.19 | | 8,323.48 |
| 02/19/2009 | 40 Shares Geron Corp Common | 230.60 | | 150.65 | | 79.95 |
| 02/19/2009 | 100 Shares Geron Corp Common | 576.51 | | 376.62 | | 199.89 |

Schedule A-3 (Continued)

| Charles Schwab Sale | | Proceeds | Inventory Value | Gain |
|---|---|---|---|---|
| 02/19/2009 | 1,151 Shares Geron Corp Common | $ 6,635.60 | $ 4,334.86 | $ 2,300.74 |
| 02/19/2009 | 1,500 Shares Geron Corp Common | 8,647.60 | 5,649.25 | 2,998.35 |
| 02/19/2009 | 2,277 Shares Geron Corp Common | 13,127.06 | 8,575.56 | 4,551.50 |
| 02/19/2009 | 4,972 Shares Geron Corp Common | 28,663.93 | 18,725.38 | 9,938.55 |
| 02/19/2009 | 10,000 Shares Geron Corp Common | 57,650.70 | 37,661.68 | 19,989.02 |
| 04/27/2009 | 300 Shares Hartford Finl Svcs Group Inc Common | 2,746.59 | 2,404.33 | 342.26 |
| 04/27/2009 | 200 Shares Hartford Finl Svcs Group Inc Common | 1,831.06 | 1,602.88 | 228.18 |
| 04/27/2009 | 500 Shares Hartford Finl Svcs Group Inc Common | 4,577.64 | 4,007.21 | 570.43 |
| 04/27/2009 | 100 Shares Hartford Finl Svcs Group Inc Common | 915.53 | 801.44 | 114.09 |
| 04/27/2009 | 100 Shares Hartford Finl Svcs Group Inc Common | 915.53 | 801.44 | 114.09 |
| 04/27/2009 | 100 Shares Hartford Finl Svcs Group Inc Common | 915.53 | 801.44 | 114.09 |
| 04/27/2009 | 100 Shares Hartford Finl Svcs Group Inc Common | 915.53 | 801.44 | 114.09 |
| 04/27/2009 | 100 Shares Hartford Finl Svcs Group Inc Common | 915.53 | 801.44 | 114.09 |
| 04/27/2009 | 500 Shares Hartford Finl Svcs Group Inc Common | 4,577.63 | 4,007.21 | 570.42 |
| 04/28/2009 | 500 Shares Ford Mtr Co Del Com Par $0.01 | 2,539.64 | 1,076.86 | 1,462.78 |

Schedule A-3 (Continued)

| Charles Schwab Sale | | Proceeds | Inventory Value | Gain |
|---|---|---|---|---|
| 04/28/2009 | 300 Shares Ford Mtr Co Del Com Par $0.01 | $    1,523.78 | $    646.11 | $    877.67 |
| 04/28/2009 | 200 Shares Ford Mtr Co Del Com Par $0.01 | 1,015.85 | 430.74 | 585.11 |
| 04/28/2009 | 1,000 Shares Ford Mtr Co Del Com Par $0.01 | 5,079.27 | 2,153.72 | 2,925.55 |
| 04/28/2009 | 1,000 Shares Ford Mtr Co Del Com Par $0.01 | 5,079.27 | 2,153.72 | 2,925.55 |
| 04/28/2009 | 2,000 Shares Ford Mtr Co Del Com Par $0.01 | 10,158.55 | 4,307.43 | 5,851.12 |
| 04/28/2009 | 10,000 Shares Ford Mtr Co Del Com Par $0.01 | 50,792.73 | 21,537.15 | 29,255.58 |
| 05/04/2009 | 3,000 Shares General Electric Co Common | 38,840.05 | 38,138.95 | 701.10 |
| 05/05/2009 | 138 Shares Sperian Protection Ord F | 6,183.14 | 6,116.80 | 66.34 |
| 05/06/2009 | 500 Shares Glaxosmithkline Plc Sponsored Adr | 15,660.64 | 15,483.95 | 176.69 |
| 05/07/2009 | 50 Shares Ford Mtr Co Del Com Par $0.01 | 284.47 | 107.69 | 176.78 |
| 05/07/2009 | 100 Shares Ford Mtr Co Del Com Par $0.01 | 570.94 | 215.37 | 355.57 |
| 05/07/2009 | 4,850 Shares Ford Mtr Co Del Com Par $0.01 | 27,462.62 | 10,445.52 | 17,017.10 |
| 05/07/2009 | 50 Shares Ford Mtr Co Del Com Par $0.01 | 284.97 | 107.69 | 177.28 |
| 05/07/2009 | 250 Shares Ford Mtr Co Del Com Par $0.01 | 1,437.37 | 538.43 | 898.94 |
| 05/07/2009 | 1,000 Shares Ford Mtr Co Del Com Par $0.01 | 5,709.49 | 2,153.71 | 3,555.78 |
| 05/07/2009 | 1,800 Shares Ford Mtr Co Del Com Par $0.01 | 10,331.09 | 3,876.69 | 6,454.40 |

Schedule A-3 (Continued)

| Charles Schwab<br>Sale | | Proceeds | Inventory Value | Gain |
|---|---|---|---|---|
| 05/07/2009 | 16,900 Shares<br>Ford Mtr Co Del<br>Com Par $0.01 | $ 95,694.51 | $ 36,397.77 | $ 59,296.74 |
| 06/05/2009 | 500 Shares<br>Gamestop Corp New<br>Cl A | 11,966.24 | 11,879.48 | 86.76 |
| 06/05/2009 | 500 Shares<br>Gamestop Corp New<br>Cl A | 12,021.24 | 11,879.47 | 141.77 |
| 07/22/2009 | 300 Shares<br>Cit Group Inc<br>Common | 262.12 | 242.16 | 19.96 |
| 07/22/2009 | 400 Shares<br>Cit Group Inc<br>Common | 349.73 | 322.88 | 26.85 |
| 07/22/2009 | 1,500 Shares<br>Cit Group Inc<br>Common | 1,310.01 | 1,210.80 | 99.21 |
| 07/22/2009 | 1,800 Shares<br>Cit Group Inc<br>Common | 1,572.01 | 1,452.96 | 119.05 |
| 08/03/2009 | 20,000 Shares<br>Rite Aid Corp<br>Common<br>New York Stock Exchange | 29,990.27 | 21,411.95 | 8,578.32 |
| 08/13/2009 | 50,000 Shares<br>Sirius Satellite Radio Inc<br>Common<br>NASDAQ Stocks | 25,985.38 | 23,008.95 | 2,976.43 |
| 08/21/2009 | 10,000 Shares<br>Rite Aid Corp<br>Common<br>New York Stock Exchange | 15,790.64 | 10,705.98 | 5,084.66 |
| 08/24/2009 | 10,000 Shares<br>Rite Aid Corp<br>Common<br>New York Stock Exchange | 15,790.64 | 10,705.97 | 5,084.67 |
| 08/31/2009 | 3,000 Shares<br>Penske Automotive Group, Inc.<br>Common | 52,609.69 | 45,722.97 | 6,886.72 |
| 09/10/2009 | 400 Shares<br>Penske Automotive Group, Inc.<br>Common | 7,146.03 | 6,096.40 | 1,049.63 |
| 09/10/2009 | 1,600 Shares<br>Penske Automotive Group, Inc.<br>Common | 28,584.10 | 24,385.58 | 4,198.52 |

Schedule A-5 (Continued)

| Charles Schwab Sale | | Proceeds | Inventory Value | Gain |
|---|---|---|---|---|
| 09/16/2009 | 100 Shares Advanced Micro Devices Inc Common | $ 571.86 | $ 561.20 | $ 10.66 |
| 09/16/2009 | 200 Shares Advanced Micro Devices Inc Common | 1,143.75 | 1,122.40 | 21.35 |
| 09/16/2009 | 300 Shares Advanced Micro Devices Inc Common | 1,715.65 | 1,683.59 | 32.06 |
| 09/16/2009 | 600 Shares Advanced Micro Devices Inc Common | 3,430.72 | 3,367.19 | 63.53 |
| 09/16/2009 | 1,800 Shares Advanced Micro Devices Inc Common | 10,290.37 | 10,101.57 | 188.80 |
| 09/17/2009 | 3,000 Shares Advanced Micro Devices Inc Common | 17,240.60 | 16,835.95 | 404.65 |
| 01/11/2010 | 5,000 Shares Advanced Micro Devices Inc Common | 46,089.86 | 44,258.95 | 1,830.91 |
| 03/12/2010 | 200 Shares Hartford Finl Svcs Group Inc Common | 5,489.71 | 1,602.88 | 3,886.83 |
| 03/12/2010 | 300 Shares Hartford Finl Svcs Group Inc Common | 8,234.56 | 2,404.33 | 5,830.23 |
| 03/12/2010 | 500 Shares Hartford Finl Svcs Group Inc Common | 13,724.27 | 4,007.21 | 9,717.06 |
| 03/12/2010 | 1,000 Shares Hartford Finl Svcs Group Inc Common | 27,448.53 | 8,014.42 | 19,434.11 |
| 03/12/2010 | 1,000 Shares Hartford Finl Svcs Group Inc Common | 27,448.53 | 8,014.42 | 19,434.11 |
| 03/12/2010 | 2,500 Shares Hartford Finl Svcs Group Inc Common | 68,621.33 | 20,036.05 | 48,585.28 |
| 03/12/2010 | 2,500 Shares Hartford Finl Svcs Group Inc Common | 68,621.33 | 20,036.04 | 48,585.29 |
| 05/07/2010 | 100 Shares Dendreon Corp Common | 4,799.32 | 3,949.88 | 849.44 |

Schedule A-3 (Continued)

| Charles Schwab Sale | | Proceeds | | Inventory Value | | Gain |
|---|---|---|---|---|---|---|
| 05/07/2010 | 200 Shares Dendreon Corp Common | $ 9,598.64 | $ | 7,899.76 | $ | 1,698.88 |
| 05/07/2010 | 200 Shares Dendreon Corp Common | 9,598.65 | | 7,899.77 | | 1,698.88 |
| 05/07/2010 | 400 Shares Dendreon Corp Common | 19,197.29 | | 15,799.53 | | 3,397.76 |
| 05/07/2010 | 600 Shares Dendreon Corp Common | 28,795.93 | | 23,699.29 | | 5,096.64 |
| 05/07/2010 | 2,700 Shares Rait Financial Trust Common | 9,314.04 | | 7,107.11 | | 2,206.93 |
| 05/07/2010 | 3,200 Shares Rait Financial Trust Common | 11,038.86 | | 8,423.24 | | 2,615.62 |
| 05/07/2010 | 5,700 Shares Rait Financial Trust Common | 19,662.97 | | 15,003.89 | | 4,659.08 |
| 05/07/2010 | 8,400 Shares Rait Financial Trust Common | 28,977.00 | | 22,111.00 | | 6,866.00 |
| 05/07/2010 | 5,000 Shares Rait Financial Trust Common | 17,248.22 | | 13,161.31 | | 4,086.91 |
| 05/07/2010 | 5,000 Shares Rait Financial Trust Common | 17,248.21 | | 13,161.30 | | 4,086.91 |
| 03/07/2011 | 38,000 Shares Citigroup Inc Common | 172,507.74 | | 150,817.90 | | 21,689.84 |
| 06/09/2011 | 25,000 Shares Ford Mtr Co Del Com Par $0.01 | 341,984.48 | | 152,505.67 | | 189,478.81 |
| Total Sale | | | | | | |
| Total | | $ 1,712,995.06 | $ | 1,044,611.96 | $ | 668,383.10 |
| Total Schedule A-3 | | $ 1,712,995.06 | $ | 1,044,611.96 | $ | 668,383.10 |
| | | $ 1,939,296.61 | $ | 1,233,502.94 | $ | 705,793.67 |

Jake Ball Trust
Schedule A-4
Transfers of Income to Principal

| Transfers to Principal | | Distribution Value |
|---|---|---|
| 03/12/2007 | Transfer From:<br>Northwestern Community Bank<br>Certificate of Deposit No. 55000459541<br>To:<br>Northwestern Community Bank<br>Certificate of Deposit No. 55000459541 | $    2,632.70 |
| 08/13/2007 | Transfer From:<br>LPL Cash Account<br>To:<br>Charles Schwab Cash Account | 84.15 |
| 10/31/2011 | Transfer From:<br>Northwestern Community Bank<br>Checking Account No. 55000459393<br>To:<br>Northwestern Community Bank<br>Checking Account No. 55000459393 | 11,008.20 |
| 10/31/2011 | Transfer From:<br>Charles Schwab Cash Account<br>To:<br>Charles Schwab Cash Account | 2,587.71 |
| 10/31/2011 | Transfer From:<br>Pershing Money Market Account<br>To:<br>Pershing Money Market Account | 1,008.60 |
| Total Schedule A-4 | | $    17,321.36 |

Jake Ball Trust
Schedule B-1
Principal Administration Expenses

| Date Paid | | | Amount Paid | Total Paid |
|---|---|---|---|---|
| | Charles Schwab | | | |
| 12/31/2009 | Margin interest charge | | $ 1,224.05 | |
| | Total Charles Schwab | | | $ 1,224.05 |
| | Christa Grolier | | | |
| 01/05/2008 | Tax preparation | | $ 1,000.00 | |
| | Total Christa Grolier | | | $ 1,000.00 |
| | D'Elia Law Firm | | | |
| 01/19/2007 | Legal fees | | $ 1,800.00 | |
| | Total D'Elia Law Firm | | | $ 1,800.00 |
| | Federal Express | | | |
| 08/02/2007 | Overnight delivery | | $ 23.84 | |
| 10/15/2007 | Overnight delivery | | 23.14 | |
| 12/10/2007 | Overnight delivery | | 23.85 | |
| 12/31/2007 | Overnight delivery | | 28.85 | |
| 03/31/2009 | Overnight delivery | | 20.55 | |
| 04/07/2009 | Overnight delivery | | 22.45 | |
| 11/12/2009 | Overnight delivery | | 21.25 | |
| 05/04/2010 | Overnight delivery | | 25.99 | |
| 07/23/2010 | Overnight delivery | | 39.37 | |
| 02/02/2011 | Mailing package to John Yacovelle | | 35.92 | |
| 02/23/2011 | Overnight delivery | | 28.16 | |
| 07/19/2011 | Ovenight delivery | | 33.15 | |
| | Total Federal Express | | | $ 326.52 |
| | Halloran & Sage | | | |
| 03/05/2007 | Legal fees | | $ 5,956.00 | |
| 06/01/2007 | Legal fees | | 1,249.83 | |
| 07/20/2007 | Legal fees | | 1,082.38 | |
| 08/31/2007 | Legal fees | | 2,515.00 | |
| 01/05/2008 | Legal fees | | 5,253.17 | |
| 03/06/2008 | Legal fees | | 896.79 | |
| 11/06/2008 | Legal fees | | 2,175.00 | |
| 10/16/2009 | Legal fees | | 1,466.78 | |
| 01/04/2010 | Legal fees | | 2,376.84 | |
| 05/20/2010 | Legal fees | | 1,112.78 | |
| 10/03/2010 | Legal fees | | 1,390.00 | |
| 10/14/2010 | Legal fees | | 250.00 | |
| | Total Halloran & Sage | | | $ 25,724.57 |
| | Hughes, Kalbrenner & Ozorowski | | | |
| 07/06/2011 | Legal fees | | $ 1,050.00 | |

Schedule B-1 (Continued)

| Date Paid | Hughes, Kalbrenner & Ozorowski (Continued) | Amount Paid | Total Paid |
|---|---|---|---|
| | Total Hughes, Kalbrenner & Ozorowski | | $ 1,050.00 |
| | John Kern | | |
| 10/15/2011 | Mediator/litigation | $ 2,900.00 | |
| | Total John Kern | | $ 2,900.00 |
| | John Yacovelle | | |
| 07/30/2010 | Legal fees | $ 6,930.00 | |
| 09/12/2010 | Legal fees | 9,207.50 | |
| 10/03/2010 | Legal fees | 3,900.00 | |
| 10/08/2010 | Legal fees | 15.00 | |
| 12/26/2010 | Legal fees | 18,190.00 | |
| 03/04/2011 | Legal fees | 12,212.00 | |
| 05/31/2011 | Legal fees | 10,500.00 | |
| 06/13/2011 | Legal fees | 733.25 | |
| 06/27/2011 | Legal fees | 2,418.75 | |
| 10/04/2011 | Legal fees | 20,000.00 | |
| 10/15/2011 | Legal fees | 6,774.95 | |
| | Total John Yacovelle | | $ 90,881.45 |
| | LPL Financial Services | | |
| 08/13/2007 | 2007 fees and transfer expenses | $ 48.96 | |
| | Total LPL Financial Services | | $ 48.96 |
| | Matt Durst Reimbursements | | |
| 11/05/2010 | Dinner with Steve | $ 99.49 | |
| 04/16/2011 | Simsbury Inn, meeting with Steve | 178.08 | |
| 05/14/2011 | May deposition | 194.00 | |
| 08/02/2011 | Steve Durst CA wedding | 1,272.40 | |
| 10/01/2011 | Travel, food, lodging, lost wages | 1,000.00 | |
| | Total Matt Durst Reimbursements | | $ 2,743.97 |
| | Matt Durst Trustee fees | | |
| 12/31/2007 | 2007 Trustee fee | $ 3,000.00 | |
| 12/31/2008 | 2008 Trustee fees | 7,342.92 | |
| 12/31/2009 | 2009 Trustee fee | 5,230.27 | |
| 12/31/2010 | 2010 Trustee fee | 4,619.88 | |
| 10/31/2011 | 2011 Trustee fee | 3,257.19 | |
| | Total Matt Durst Trustee fees | | $ 23,450.26 |
| | Mike Durst | | |
| 07/12/2007 | Trustee fee (payment to Broad Street Dental) | $ 25,000.00 | |
| | Total Mike Durst | | $ 25,000.00 |

702a    (11)

Schedule B-1 (Continued)

| Date Paid | Miscellaneous administration expenses | | Amount Paid | Total Paid |
|---|---|---|---|---|
| 11/04/2006 | reimburse Mike Durst for Steve Durst lodging in Orlando, Florida | $ | 1,550.00 | |
| | Total Miscellaneous administration expenses | | | $ 1,550.00 |
| | **Morris & Clemm** | | | |
| 08/17/2010 | Retainer for litigation | $ | 7,500.00 | |
| 10/19/2010 | Legal fees | | 4,990.54 | |
| 11/24/2010 | Legal fees | | 4,124.38 | |
| 12/22/2010 | Legal fees | | 4,085.84 | |
| 01/25/2011 | Legal fees | | 5,212.70 | |
| 02/27/2011 | Legal fees | | 5,786.04 | |
| 03/22/2011 | Legal fees | | 6,788.12 | |
| 04/19/2011 | Legal fees | | 7,200.40 | |
| 05/31/2011 | Legal fees | | 4,400.00 | |
| 06/27/2011 | Legal fees | | 3,100.00 | |
| 07/22/2011 | Legal fees | | 10,947.48 | |
| 09/01/2011 | Legal fees | | 1,995.00 | |
| 09/30/2011 | Legal fees | | 488.80 | |
| | Total Morris & Clemm | | | $ 66,619.30 |
| | **Northwestern Community Bank** | | | |
| 10/19/2006 | Stop payment Check 1009 | $ | 22.00 | |
| 10/30/2006 | Certificate of Deposit Account No. 55000471892 Penalty | | 121.31 | |
| 11/14/2006 | Certificate of Deposit Account No. 55000459541 Penalty | | 34.30 | |
| 12/12/2006 | Certificate of Deposit Account No. 55000459541 Penalty | | 274.87 | |
| 01/30/2007 | Certificate of Deposit Account No. 55000459541 Penalty | | 52.97 | |
| 02/09/2007 | Certificate of Deposit Account No. 55000459541 Penalty | | 64.16 | |
| 03/06/2007 | Certificate of Deposit Account No. 55000459541 Penalty | | 64.76 | |
| 07/12/2007 | Wire fee | | 25.00 | |
| 12/10/2007 | Bank charge | | 40.00 | |
| 10/14/2008 | Wire fee | | 20.00 | |
| 10/08/2009 | Service charge | | 2.00 | |
| 11/05/2009 | Service charge | | 2.00 | |
| 12/04/2009 | Service charge | | 2.00 | |

Schedule B-1 (Continued)

| Date Paid | | Amount Paid | Total Paid |
|---|---|---|---|
| | **Northwestern Community Bank (Continued)** | | |
| 01/05/2010 | Service charge | $ 2.00 | |
| 02/05/2010 | Service charge | 2.00 | |
| 03/05/2010 | Service charge | 2.00 | |
| 04/05/2010 | Service charge | 2.00 | |
| 05/05/2010 | Service charge | 2.00 | |
| 06/04/2010 | Service charge | 2.00 | |
| 07/02/2010 | Service charge | 2.00 | |
| 08/05/2010 | Service charge | 2.00 | |
| 09/03/2010 | Service charge | 2.00 | |
| 10/05/2010 | Service charge | 2.00 | |
| 11/24/2010 | Stop payment charge | 2.00 | |
| 03/16/2011 | Overdraft charge | 25.00 | |
| 03/25/2011 | Stop payment charge | 28.00 | |
| 06/03/2011 | Service charge | 25.00 | |
| 07/05/2011 | Service charge | 2.00 | |
| 08/02/2011 | Check order fee | 2.00 | |
| 08/05/2011 | Service charge | 102.25 | |
| 08/19/2011 | Bank charge | 2.00 | |
| | Total  Northwestern Community Bank | 25.00 | |
| | **Note to Goodman Properties for Zack & Jack** | | $ 956.62 |
| 01/05/2008 | | $ 6,000.00 | |
| | Total  Note to Goodman Properties for Zack & Jack | | $ 6,000.00 |
| | **P. Benjamin** | | |
| 10/31/2007 | Appraisal (Goodmill, LLC interest) | $ 2,500.00 | |
| | Total  P. Benjamin | | $ 2,500.00 |
| | **Pershing** | | |
| 08/29/2008 | Asset management fee | $ 75.00 | |
| 08/31/2009 | Asset management fee | 75.00 | |
| | Total  Pershing | | $ 150.00 |
| | **Robinson & Cole LLP** | | |
| 03/22/2011 | Legal fees | $ 1,890.00 | |
| 06/13/2011 | Tax preparation | 1,090.00 | |
| 09/13/2011 | Legal fees | 4,772.75 | |
| 10/07/2011 | Legal fees | 2,140.00 | |
| 10/13/2011 | Legal fees | 13,000.00 | |
| | Total  Robinson & Cole LLP | | $ 22,892.75 |
| | **Staples** | | |
| 09/06/2006 | Office supplies | $ 36.62 | |

Schedule B-1 (Continued)

| Date Paid | | Amount Paid | Total Paid |
|---|---|---|---|
| | **Staples (Continued)** | | |
| 08/23/2007 | Fax and printer cartridges | $    137.77 | |
| 08/23/2007 | Fax machine cartridge | 137.77 | |
| 08/17/2008 | Supplies | 14.00 | |
| 09/16/2008 | Printer | 191.82 | |
| 11/05/2008 | Supplies | 76.82 | |
| 12/07/2008 | Shredder | 99.61 | |
| 03/31/2009 | Supplies | 24.34 | |
| 09/22/2009 | Supplies | 119.72 | |
| 10/23/2009 | External hard drive | 148.39 | |
| 07/06/2010 | Copy documents | 100.59 | |
| 07/22/2010 | Copy documents | 57.12 | |
| 09/21/2010 | Printer cartridge | 121.12 | |
| 12/13/2010 | Supplies for John Yacovelle | 34.26 | |
| 12/13/2010 | Copies for John Yacovelle | 56.21 | |
| 12/14/2010 | Mailing to John Yacovelle | 46.76 | |
| 01/17/2011 | Printer cartridge | 190.78 | |
| 03/05/2011 | Desktop computer | 1,500.00 | |
| 10/31/2011 | Computer purchase | 1,000.00 | |
| | **Total  Staples** | | $    4,093.70 |
| | **Thomas Beneche, Esq.** | | |
| 07/18/2006 | Legal fees | $    1,000.00 | |
| | **Total  Thomas Beneche, Esq.** | | $    1,000.00 |
| | **United States Treasury** | | |
| 07/31/2007 | Federal withholding | $    4.73 | |
| 08/08/2007 | Federal withholding reversal | (4.73) | |
| | **Total  United States Treasury** | | $    0.00 |
| | **USPS** | | |
| 09/13/2006 | Overnight delivery | $    14.40 | |
| 09/18/2006 | Overnight delivery | 14.46 | |
| 11/14/2006 | Overnight delivery | 14.40 | |
| 12/12/2006 | Overnight delivery | 14.40 | |
| 02/09/2007 | Overnight delivery | 14.40 | |
| 02/27/2007 | Overnight delivery | 19.19 | |
| 03/01/2007 | Overnight delivery | 20.00 | |
| 03/01/2007 | Overnight delivery | 18.80 | |
| 07/10/2007 | Overnight delivery | 23.04 | |
| 08/09/2010 | Overnight delivery | 18.36 | |
| 08/17/2010 | Overnight delivery | 38.85 | |
| 12/02/2010 | Overnight delivery | 15.90 | |

*(handwritten annotation next to Computer purchase: "11/1/08  #1323  s/b a reimb to mert!")*

Schedule B-1 (Continued)

| Date Paid | | Amount Paid | Total Paid |
|---|---|---|---|
| | USPS (Continued) | | |
| 01/19/2011 | Overnight delivery | $ 16.00 | |
| 06/18/2011 | Overnight delivery | 20.55 | |
| | Total USPS | | $ 262.75 |
| | **Verizon** | | |
| 04/14/2010 | Matt's cell phone | $ 358.23 | |
| 06/22/2010 | Phone internet access | 90.00 | |
| 07/29/2010 | Cell phone utilization | 400.00 | |
| 09/28/2010 | Excessive phone time overage | 119.52 | |
| 12/20/2010 | Internet access for cell phone, 6 months | 180.00 | |
| 04/16/2011 | 4 months internet access | 120.00 | |
| 07/26/2011 | 4 months internet access | 120.00 | |
| | Total Verizon | | $ 1,387.75 |
| | **West Coast Life Insurance** | | |
| 10/13/2008 | Annual life insurance premium for Steve Durst | $ 9,275.00 | |
| 10/15/2009 | Annual life insurance premium for Steve Durst | 9,275.00 | |
| 10/08/2010 | Quarterly life insurance premium for Steve Durst | 2,457.88 | |
| 01/14/2011 | Quarterly life insurance premium for Steve Durst | 2,457.88 | |
| 04/18/2011 | Quarterly life insurance premium for Steve Durst | 2,457.88 | |
| 07/19/2011 | Quarterly life insurance premium for Steve Durst | 2,457.88 | |
| 10/14/2011 | Quarterly life insurance premium for Steve Durst | 2,457.88 | |
| | Total West Coast Life Insurance | | $ 30,839.40 |
| | **Zack & Jack Associates LP** | | |
| 03/24/2009 | Building upgrade at Hunting Park, PA | $ 3,000.00 | |
| | Total Zack & Jack Associates LP | | $ 3,000.00 |
| | Total Schedule B-1 | | $ 317,402.05 |

706a    (15)

Jake Ball Trust

## Schedule B-2
### Loss on Sale or Redemption of Principal

| | | Proceeds | Inventory Value | Loss |
|---|---|---|---|---|
| **Retired as Worthless** | | | | |
| 02/26/2011 | 0 Face $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | $ 0.00 | $ 5,500.00 | $ 5,500.00 |
| | settlement negotiated by Steve | | | |
| **Total Retired as Worthless** | | $ 0.00 | $ 5,500.00 | $ 5,500.00 |
| **LPL Financial** | | | | |
| **Sale** | | | | |
| 11/13/2008 | 900 Shares Apple Inc Common | $ 80,086.60 | $ 113,080.14 | $ 32,993.54 |
| 02/06/2009 | 200 Shares Geron Corp Common | 1,597.40 | 1,800.02 | 202.62 |
| 02/06/2009 | 200 Shares Geron Corp Common | 1,597.40 | 1,800.02 | 202.62 |
| 02/06/2009 | 500 Shares Geron Corp Common | 3,993.49 | 4,500.05 | 506.56 |
| 02/06/2009 | 1,100 Shares Geron Corp Common | 8,785.67 | 9,900.10 | 1,114.43 |
| 02/11/2009 | 800 Shares Geron Corp Common | 5,908.06 | 7,200.07 | 1,292.01 |
| 02/11/2009 | 2,200 Shares Geron Corp Common | 16,247.17 | 19,800.21 | 3,553.04 |
| **Total Sale** | | | | |
| **Total** | | $ 118,215.79 | $ 158,080.61 | $ 39,864.82 |
| **Charles Schwab** | | $ 118,215.79 | $ 158,080.61 | $ 39,864.82 |
| **Sale** | | | | |
| 03/16/2009 | 200 Shares Geron Corp Common | $ 879.01 | $ 952.98 | $ 73.97 |
| 03/16/2009 | 339 Shares Geron Corp Common | 1,486.54 | 1,615.30 | 128.76 |
| 03/16/2009 | 1,000 Shares Geron Corp Common | 4,385.08 | 4,764.90 | 379.82 |
| 03/16/2009 | 2,400 Shares Geron Corp Common | 10,572.19 | 11,435.75 | 863.56 |

Schedule B-2 (Continued)

| Charles Schwab Sale | | Proceeds | | Inventory Value | | Loss |
|---|---|---|---|---|---|---|
| 03/16/2009 | 16,061 Shares Geron Corp Common | $ 70,428.73 | $ | 76,529.02 | $ | 6,100.29 |
| 03/16/2009 | 126 Shares Geron Corp Common | 546.22 | | 600.38 | | 54.16 |
| 03/16/2009 | 7,518 Shares Geron Corp Common | 32,591.11 | | 35,822.50 | | 3,231.39 |
| 03/19/2009 | 3,674 Shares Geron Corp Common | 15,927.07 | | 17,506.23 | | 1,579.16 |
| 03/19/2009 | 8,682 Shares Geron Corp Common | 37,637.14 | | 41,368.84 | | 3,731.70 |
| 03/27/2009 | 10,000 Shares Advanta Corp Cl A | 7,187.00 | | 7,812.95 | | 625.95 |
| 03/27/2009 | 5,000 Shares American Intl Group Inc Common | 5,041.02 | | 7,322.95 | | 2,281.93 |
| 04/24/2009 | 5,000 Shares General Mtrs Corp Common | 8,290.83 | | 19,108.95 | | 10,818.12 |
| 05/04/2009 | 1,500 Shares Freightcar Amer Inc Common | 28,310.32 | | 29,093.95 | | 783.63 |
| 05/05/2009 | 5,000 Shares Skinny Nutritional Corp. Common | 522.75 | | 677.24 | | 154.49 |
| 05/05/2009 | 15,000 Shares Skinny Nutritional Corp. Common | 1,568.24 | | 2,031.71 | | 463.47 |
| 05/07/2009 | 7,000 Shares Alcoa Inc Common | 69,989.25 | | 70,008.95 | | 19.70 |
| 05/29/2009 | 2,000 Shares American Intl Group Inc Common | 3,398.72 | | 3,637.75 | | 239.03 |
| 05/29/2009 | 12,793 Shares American Intl Group Inc Common | 21,738.73 | | 23,268.84 | | 1,530.11 |
| 05/29/2009 | 2,000 Shares American Intl Group Inc Common | 3,398.72 | | 3,637.74 | | 239.02 |

Schedule B-2 (Continued)

| Charles Schwab Sale | | Proceeds | Inventory Value | Loss |
|---|---|---|---|---|
| 05/29/2009 | 3,000 Shares American Intl Group Inc Common | $ 5,098.08 | $ 5,456.62 | $ 358.54 |
| 05/29/2009 | 8,000 Shares American Intl Group Inc Common | 13,594.87 | 14,550.98 | 956.11 |
| 05/29/2009 | 207 Shares American Intl Group Inc Common | 351.75 | 376.51 | 24.76 |
| 06/05/2009 | 100 Shares Yrc Worldwide Inc Common | 272.77 | 324.27 | 51.50 |
| 06/05/2009 | 75 Shares Yrc Worldwide Inc Common | 204.58 | 243.21 | 38.63 |
| 06/05/2009 | 500 Shares Yrc Worldwide Inc Common | 1,363.83 | 1,621.37 | 257.54 |
| 06/19/2009 | 2,393 Shares American Intl Group Inc Common | 3,632.98 | 4,352.56 | 719.58 |
| 06/19/2009 | 2,607 Shares American Intl Group Inc Common | 3,957.87 | 4,741.80 | 783.93 |
| 06/22/2009 | 1,500 Shares Alcoa Inc Common | 16,040.63 | 16,702.45 | 661.82 |
| 06/25/2009 | 1,500 Shares Keycorp New Common | 7,495.85 | 8,210.37 | 714.52 |
| 07/10/2009 | 3,000 Shares Citigroup Inc Common | 7,825.32 | 9,316.87 | 1,491.55 |
| 07/10/2009 | 3,000 Shares Citigroup Inc Common | 7,825.32 | 9,316.87 | 1,491.55 |
| 07/13/2009 | 2,000 Shares Citigroup Inc Common | 5,296.28 | 6,211.24 | 914.96 |
| 07/13/2009 | 3,000 Shares Citigroup Inc Common | 7,944.42 | 9,316.87 | 1,372.45 |
| 07/13/2009 | 1,000 Shares Keycorp New Common | 5,190.91 | 5,473.58 | 282.67 |

Schedule B-2 (Continued)

| Charles Schwab Sale | | Proceeds | Inventory Value | Loss |
|---|---|---|---|---|
| 07/29/2009 | 3,000 Shares Cit Group Inc Common | $ 2,361.28 | $ 2,892.71 | $ 531.43 |
| 08/12/2009 | 1,000 Shares Cit Group Inc Common | 1,176.98 | 1,511.06 | 334.08 |
| 08/12/2009 | 2,000 Shares Cit Group Inc Common | 2,353.97 | 3,022.13 | 668.16 |
| 08/25/2009 | 600 Shares Geron Corp Common | 3,885.81 | 4,382.27 | 496.46 |
| 08/25/2009 | 600 Shares Geron Corp Common | 3,886.41 | 4,382.26 | 495.85 |
| 08/25/2009 | 800 Shares Geron Corp Common | 5,181.89 | 5,843.02 | 661.13 |
| 09/14/2009 | 139 Shares Geron Corp Common | 993.48 | 1,015.22 | 21.74 |
| 09/14/2009 | 1,861 Shares Geron Corp Common | 13,297.47 | 13,592.33 | 294.86 |
| 09/17/2009 | 2,000 Shares Citigroup Inc Common | 8,696.20 | 8,855.50 | 159.30 |
| 09/17/2009 | 1,000 Shares Citigroup Inc Common | 4,348.10 | 4,427.75 | 79.65 |
| 09/17/2009 | 1,000 Shares Citigroup Inc Common | 4,348.10 | 4,427.75 | 79.65 |
| 09/17/2009 | 1,000 Shares Citigroup Inc Common | 4,348.09 | 4,427.75 | 79.66 |
| 09/22/2009 | 9,000 Shares Rite Aid Corp Common New York Stock Exchange | 17,726.32 | 18,485.24 | 758.92 |
| 09/22/2009 | 16,000 Shares Rite Aid Corp Common New York Stock Exchange | 31,513.46 | 32,862.66 | 1,349.20 |
| 09/22/2009 | 23,000 Shares Sirius Satellite Radio Inc Common NASDAQ Stocks | 15,205.62 | 16,437.12 | 1,231.50 |

Schedule B-2 (Continued)

| Charles Schwab Sale | | Proceeds | Inventory Value | Loss |
|---|---|---|---|---|
| 09/22/2009 | 20,000 Shares Sirius Satellite Radio Inc Common NASDAQ Stocks | $ 13,222.28 | $ 14,293.15 | $ 1,070.87 |
| 09/22/2009 | 10,000 Shares Sirius Satellite Radio Inc Common NASDAQ Stocks | 6,611.14 | 7,146.58 | 535.44 |
| 10/27/2009 | 5,000 Shares Citigroup Inc Common | 21,447.21 | 22,138.74 | 691.53 |
| 10/27/2009 | 5,000 Shares Citigroup Inc Common | 21,447.21 | 22,138.74 | 691.53 |
| 10/27/2009 | 10,000 Shares Citigroup Inc Common | 42,894.42 | 44,277.47 | 1,383.05 |
| 10/30/2009 | 5,000 Shares General Electric Co Common | 74,589.13 | 85,408.95 | 10,819.82 |
| 11/02/2009 | 100 Shares Ldk Solar Co Ltd Sponsored Adr | 609.88 | 759.03 | 149.15 |
| 11/02/2009 | 100 Shares Ldk Solar Co Ltd Sponsored Adr | 609.88 | 759.03 | 149.15 |
| 11/02/2009 | 100 Shares Ldk Solar Co Ltd Sponsored Adr | 609.88 | 759.03 | 149.15 |
| 11/02/2009 | 100 Shares Ldk Solar Co Ltd Sponsored Adr | 609.88 | 759.03 | 149.15 |
| 11/02/2009 | 300 Shares Ldk Solar Co Ltd Sponsored Adr | 1,829.65 | 2,277.09 | 447.44 |
| 11/02/2009 | 3,000 Shares Ldk Solar Co Ltd Sponsored Adr | 18,296.57 | 22,770.91 | 4,474.34 |
| 11/02/2009 | 5,300 Shares Ldk Solar Co Ltd Sponsored Adr | 32,323.89 | 40,228.60 | 7,904.71 |
| 11/12/2009 | 9,000 Shares Motorola Inc Common | 78,739.92 | 79,534.74 | 794.82 |
| 11/12/2009 | 1,000 Shares Motorola Inc Common | 8,748.88 | 8,837.19 | 88.31 |

Schedule B-2 (Continued)

| Charles Schwab<br>Sale | | Proceeds | Inventory Value | Loss |
|---|---|---|---|---|
| 12/09/2009 | 5,000 Shares<br>Motorola Inc<br>Common | $ 42,139.96 | $ 44,185.97 | $ 2,046.01 |
| 12/15/2009 | 20,000 Shares<br>Sirius Satellite Radio Inc<br>Common<br>NASDAQ Stocks | 12,052.74 | 13,008.95 | 956.21 |
| 12/17/2009 | 200 Shares<br>Rait Financial Trust<br>Common | 271.90 | 345.11 | 73.21 |
| 12/17/2009 | 1,800 Shares<br>Rait Financial Trust<br>Common | 2,448.92 | 3,105.97 | 657.05 |
| 12/17/2009 | 2,992 Shares<br>Rait Financial Trust<br>Common | 4,037.76 | 5,162.82 | 1,125.06 |
| 12/17/2009 | 4,108 Shares<br>Rait Financial Trust<br>Common | 5,584.90 | 7,088.53 | 1,503.63 |
| 12/17/2009 | 4,700 Shares<br>Rait Financial Trust<br>Common | 6,389.73 | 8,110.05 | 1,720.32 |
| 12/17/2009 | 6,200 Shares<br>Rait Financial Trust<br>Common | 8,367.01 | 10,698.36 | 2,331.35 |
| 12/23/2009 | 1,000 Shares<br>Ldk Solar Co Ltd<br>Sponsored Adr | 6,770.87 | 7,590.30 | 819.43 |
| 12/28/2009 | 100 Shares<br>Rait Financial Trust<br>Common | 126.90 | 172.55 | 45.65 |
| 12/28/2009 | 100 Shares<br>Rait Financial Trust<br>Common | 126.90 | 172.55 | 45.65 |
| 12/28/2009 | 100 Shares<br>Rait Financial Trust<br>Common | 125.90 | 172.55 | 46.65 |
| 12/28/2009 | 200 Shares<br>Rait Financial Trust<br>Common | 253.81 | 345.11 | 91.30 |
| 12/28/2009 | 900 Shares<br>Rait Financial Trust<br>Common | 1,143.06 | 1,552.99 | 409.93 |
| 12/28/2009 | 1,000 Shares<br>Rait Financial Trust<br>Common | 1,269.06 | 1,725.54 | 456.48 |

Schedule B-2 (Continued)

| Charles Schwab Sale | | Proceeds | Inventory Value | Loss |
|---|---|---|---|---|
| 12/28/2009 | 1,000 Shares Rait Financial Trust Common | $ 1,260.06 | $ 1,725.54 | $ 465.48 |
| 12/28/2009 | 1,500 Shares Rait Financial Trust Common | 1,890.11 | 2,588.31 | 698.20 |
| 12/28/2009 | 5,100 Shares Rait Financial Trust Common | 6,421.28 | 8,800.27 | 2,378.99 |
| 02/18/2010 | 500 Shares General Electric Co Common | 8,081.44 | 8,371.79 | 290.35 |
| 03/05/2010 | 10,000 Shares Federal Natl Mtg Assn Common | 9,915.92 | 12,608.95 | 2,693.03 |
| 03/05/2010 | 2,000 Shares General Electric Co Common | 32,350.63 | 33,487.16 | 1,136.53 |
| 05/19/2010 | 5,000 Shares Citigroup Inc Common | 18,748.84 | 18,991.56 | 242.72 |
| 05/19/2010 | 5,000 Shares Citigroup Inc Common | 18,748.84 | 18,991.56 | 242.72 |
| 05/19/2010 | 5,000 Shares Citigroup Inc Common | 18,748.84 | 18,991.56 | 242.72 |
| 05/19/2010 | 3,000 Shares Citigroup Inc Common | 11,249.30 | 11,394.94 | 145.64 |
| 05/19/2010 | 3,000 Shares Citigroup Inc Common | 11,249.30 | 11,394.94 | 145.64 |
| 05/19/2010 | 5,000 Shares Citigroup Inc Common | 18,748.84 | 18,991.56 | 242.72 |
| 05/19/2010 | 2,000 Shares Citigroup Inc Common | 7,499.54 | 7,596.62 | 97.08 |
| 05/19/2010 | 10,000 Shares Citigroup Inc Common | 37,497.68 | 37,983.12 | 485.44 |
| 05/19/2010 | 15,000 Shares Citigroup Inc Common | 56,246.51 | 56,974.69 | 728.18 |

Schedule B-2 (Continued)

| Charles Schwab Sale | | Proceeds | Inventory Value | Loss |
|---|---|---|---|---|
| 05/28/2010 | 100 Shares Dendreon Corp Common | $ 4,428.12 | $ 4,720.30 | $ 292.18 |
| 05/28/2010 | 800 Shares Dendreon Corp Common | 35,424.24 | 37,762.39 | 2,338.15 |
| 05/28/2010 | 100 Shares Dendreon Corp Common | 4,428.13 | 4,720.30 | 292.17 |
| 06/02/2010 | 150 Shares Avanir Pharmaceuticals Cl A New | 355.54 | 379.15 | 23.61 |
| 06/02/2010 | 5,000 Shares Biosante Pharmaceuticals Inc Com New | 9,540.88 | 12,008.95 | 2,468.07 |
| 06/02/2010 | 5,000 Shares Titan Medical Inc. | 1,121.39 | 2,285.85 | 1,164.46 |
| 06/07/2010 | 800 Shares Sirius Satellite Radio Inc Common NASDAQ Stocks | 779.24 | 920.90 | 141.66 |
| 06/07/2010 | 7,200 Shares Sirius Satellite Radio Inc Common NASDAQ Stocks | 7,012.55 | 8,288.05 | 1,275.50 |
| 06/10/2010 | 2,000 Shares Dendreon Corp Common | 75,089.78 | 94,405.96 | 19,316.18 |
| 07/26/2011 | 10,000 Shares Ford Mtr Co Del Com Par $0.01 | 57,989.94 | 61,002.26 | 3,012.32 |
| 07/28/2011 | 100 Shares Ford Mtr Co Del Com Par $0.01 | 545.51 | 610.02 | 64.51 |
| 07/28/2011 | 1,000 Shares Ford Mtr Co Del Com Par $0.01 | 5,466.31 | 6,100.23 | 633.92 |
| 07/28/2011 | 100 Shares Ford Mtr Co Del Com Par $0.01 | 545.63 | 610.02 | 64.39 |
| 07/28/2011 | 100 Shares Ford Mtr Co Del Com Par $0.01 | 546.63 | 610.02 | 63.39 |
| 07/28/2011 | 100 Shares Ford Mtr Co Del Com Par $0.01 | 545.63 | 610.02 | 64.39 |

Schedule B-2 (Continued)

| Charles Schwab Sale | | Proceeds | Inventory Value | Loss |
|---|---|---|---|---|
| 07/28/2011 | 900 Shares Ford Mtr Co Del Com Par $0.01 | $ 4,919.69 | $ 5,490.20 | $ 570.51 |
| 07/28/2011 | 100 Shares Ford Mtr Co Del Com Par $0.01 | 545.52 | 610.02 | 64.50 |
| 07/28/2011 | 1,200 Shares Ford Mtr Co Del Com Par $0.01 | 6,491.01 | 7,320.27 | 829.26 |
| 07/28/2011 | 67 Shares Ford Mtr Co Del Com Par $0.01 | 361.74 | 408.72 | 46.98 |
| 07/28/2011 | 5,197 Shares Ford Mtr Co Del Com Par $0.01 | 28,064.68 | 31,702.88 | 3,638.20 |
| 07/28/2011 | 300 Shares Ford Mtr Co Del Com Par $0.01 | 1,633.90 | 1,830.07 | 196.17 |
| 07/28/2011 | 700 Shares Ford Mtr Co Del Com Par $0.01 | 3,793.42 | 4,270.16 | 476.74 |
| 07/28/2011 | 5,136 Shares Ford Mtr Co Del Com Par $0.01 | 27,734.24 | 31,330.77 | 3,596.53 |
| 10/13/2011 | 2,000 Shares AspenBio Pharma | 5,170.95 | 24,741.10 | 19,570.15 |
| Total Sale | | | | |
| Total | | $ 1,484,208.35 | $ 1,647,134.08 | $ 162,925.73 |
| Total Schedule B-2 | | $ 1,484,208.35 | $ 1,647,134.08 | $ 162,925.73 |
| | | $ 1,602,424.14 | $ 1,810,714.69 | $ 208,290.55 |

Jake Ball Trust
Schedule B-3
Principal Distributions to Beneficiaries

| | | Distribution Value | |
|---|---|---|---|
| **Ben Durst** | | | |
| 10/27/2006 | Cash Camp Jewell | | |
| 06/19/2007 | Cash Camp Jewell | $ | 682.50 |
| **Total To Or For Beneficiary** | | 182.50 | |
| **Jasmyne Durst** | | | $ 865.00 |
| 07/27/2007 | Cash Trip | | |
| **Total To Or For Beneficiary** | | $ 1,785.00 | |
| **Jill Durst** | | | $ 1,785.00 |
| 08/01/2007 | Cash Purchase Jill's Mazda | | |
| 08/30/2007 | Cash Restaurant School, tuition | $ | 17,400.00 |
| 08/31/2007 | Cash The Restaurant School, tuition | | 946.00 |
| 09/04/2009 | Cash Camden County college course reimbursement | | 1,931.25 |
| 09/09/2010 | Cash College tuition, Fall 2010 | | 900.00 |
| 12/22/2010 | Cash Reimbursement for classes | | 700.00 |
| 12/22/2010 | Cash Tuition | | 972.00 |
| 05/11/2011 | Cash Tuition | | 962.50 |
| **Total To Or For Beneficiary** | | 725.00 | |
| **Mattthew Durst, Jr.** | | | $ 24,536.75 |
| 10/27/2006 | Cash Camp Jewell | | |
| 02/15/2007 | Cash GMRC, running camp | $ | 682.50 |
| 06/19/2007 | Cash Camp Jewell | | 250.00 |
| 04/10/2008 | Cash The Run In, running shoes | | 182.50 |
| 04/20/2008 | Cash The Run In, running shoes | | 124.02 |
| 04/21/2009 | Cash Deposit for UD housing / admissions | | 124.02 |
| 07/17/2009 | Cash 1/2 Fall 2009 tuition payment | | 500.00 |
| 08/15/2009 | Cash Books | | 4,800.00 |
| 08/16/2009 | Cash Supplies | | 984.00 |
| | | | 350.00 |

Schedule B-3 (Continued)

| Mattthew Durst, Jr. (Continued) | | Distribution Value |
|---|---|---|
| 09/17/2009 | Cash<br>Tutition, housing | |
| 10/14/2009 | Cash<br>Tuition, housing | $ 2,500.00 |
| 01/04/2010 | Cash<br>Tuition, housing | 1,075.00 |
| 03/24/2010 | Cash<br>Student loan payment | 5,117.56 |
| 03/24/2010 | Cash<br>Tuition, housing | 2,812.98 |
| 05/20/2010 | Cash<br>Tuition, housing | 4,996.00 |
| 07/06/2010 | Cash<br>Tuition payment | 1,000.00 |
| 08/12/2010 | Cash<br>Student loan payment | 12,000.00 |
| 08/24/2010 | Cash<br>School supplies | 2,829.67 |
| 11/26/2010 | Cash<br>Winter tuition | 2,000.00 |
| 12/15/2010 | Cash<br>Tuition payment | 1,462.00 |
| 01/25/2011 | Cash<br>Student loan | 1,800.00 |
| 01/25/2011 | Cash<br>Tuition | 3,347.97 |
| 02/07/2011 | Cash<br>Meal plan | 7,009.95 |
| 05/14/2011 | Cash<br>Rent and one time lawn maintenance fee | 300.00 |
| 05/24/2011 | Cash<br>Tuition | 688.34 |
| 06/18/2011 | Cash<br>Rent | 12,120.00 |
| 07/14/2011 | Cash<br>Rent and books | 650.00 |
| 07/22/2011 | Cash<br>Student loan | 1,150.00 |
| 08/21/2011 | Cash<br>Rent, utilities | 3,360.71 |
| 08/22/2011 | Cash<br>Rent, food, utilities, 3 mos. escrow | 1,000.00 |
| 08/22/2011 | Cash<br>Meal plan | 3,000.00 |
| 09/27/2011 | Cash<br>Rent, utilities, food | 336.00 |
| **Total To Or For Beneficiary** | | 1,000.00 |
| | | $ 79,553.22 |

**Schedule B-3 (Continued)**

| Rosalie Durst | | Distribution Value |
|---|---|---|
| 05/04/2006 | Cash<br>Gloucester property taxes for Rosalie<br>(per Steve) | |
| 02/09/2007 | Cash<br>Ameri Health, health insurance | $ 16,000.00 |
| 04/01/2007 | Cash<br>Ameri Health, health insurance | 375.00 |
| 05/15/2007 | Cash<br>Ameri Health, health insurance | 750.00 |
| 06/01/2007 | Cash<br>Ameri Health, health insurance | 375.00 |
| 08/15/2007 | Cash<br>Ameri Health, health insurance | 375.00 |
| 08/17/2007 | Cash<br>Prudential Financial, life insurance | 375.00 |
| 09/17/2007 | Cash<br>Ameri Health, health insurance | 1,805.00 |
| 09/19/2007 | Cash<br>Ameri Health, health insurance | 375.00 |
| 10/03/2007 | Cash<br>Prudential Financial, life insurance | 375.00 |
| 11/06/2007 | Cash<br>Ameri Health, health insurance | 475.00 |
| 12/30/2007 | Cash<br>Ameri Health, health insurance | 375.00 |
| 01/23/2008 | Cash<br>Ameri Health, health insurance | 750.00 |
| 03/06/2008 | Cash<br>Ameri Health, health insurance | 375.00 |
| 04/07/2008 | Cash<br>Ameri Health, health insurance | 442.00 |
| 05/19/2008 | Cash<br>Ameri Health, health insurance | 442.00 |
| 06/16/2008 | Cash<br>Ameri Health, health insurance | 442.00 |
| 07/09/2008 | Cash<br>Ameri Health, health insurance | 442.00 |
| 08/08/2008 | Cash<br>Ameri Health, health insurance | 442.00 |
| 08/25/2008 | Cash<br>Prudential Life Insurance, Rosalie Durst<br>Revocable Life Insurance Trust<br>premium | 442.00 |
| 08/26/2008 | Cash<br>Ameri Health, health insurance | 2,275.00 |
| 10/21/2008 | Cash<br>Ameri Health, health insurance | 442.00 |
| 12/10/2008 | Cash<br>Ameri Health, health insurance | 442.00 |
| | | 442.00 |

Schedule B-3 (Continued)

| Rosalie Durst (Continued) | | Distribution Value |
|---|---|---|
| 01/09/2009 | Cash<br>Ameri Health, health insurance | $ 442.00 |
| 02/11/2009 | Cash<br>Ameri Health, health insurance | 442.00 |
| 02/24/2009 | Cash<br>Ameri Health, health insurance | 496.00 |
| 03/31/2009 | Cash<br>Ameri Health, health insurance | 492.00 |
| 05/05/2009 | Cash<br>Ameri Health, health insurance | 494.00 |
| 06/10/2009 | Cash<br>Ameri Health, health insurance | 494.00 |
| 07/06/2009 | Cash<br>Ameri Health, health insurance | 494.00 |
| 07/20/2009 | Cash<br>Ameri Health, health insurance | 494.00 |
| 08/16/2009 | Cash<br>Prudential Life Insurance premium | 2,275.00 |
| 10/14/2009 | Cash<br>Ameri Health, health insurance | 494.00 |
| 10/28/2009 | Cash<br>Ameri Health, health insurance | 494.00 |
| 12/01/2009 | Cash<br>Ameri Health, health insurance | 494.00 |
| 01/04/2010 | Cash<br>Ameri Health, health insurance | 494.00 |
| 02/14/2010 | Cash<br>Ameri Health, health insurance | 494.00 |
| 03/08/2010 | Cash<br>Ameri Health, health insurance | 494.00 |
| 03/28/2010 | Cash<br>Ameri Health, health insurance | 568.00 |
| 04/26/2010 | Cash<br>Ameri Health, health insurance | 568.00 |
| 06/17/2010 | Cash<br>Ameri Health, health insurance | 568.00 |
| 06/18/2010 | Cash<br>Ameri Health, health insurance | 568.00 |
| 08/12/2010 | Cash<br>Ameri Health, health insurance | 568.00 |
| 08/30/2010 | Cash<br>Prudential Life Insurance premium | 568.00 |
| 09/12/2010 | Cash<br>Ameri Health, health insurance | 2,275.00 |
| 10/03/2010 | Cash<br>Ameri Health, health insurance | 568.00 |
| 10/26/2010 | Cash<br>Ameri Health, health insurance | 568.00 |
| | | 568.00 |

719a    (28)

Schedule B-3 (Continued)

| Rosalie Durst (Continued) | | Distribution Value |
|---|---|---|
| 12/13/2010 | Cash<br>Ameri Health, health insurance | |
| 12/22/2010 | Cash<br>Ameri Health, health insurance | $ 568.00 |
| 01/26/2011 | Cash<br>Ameri Health, health insurance | 568.00 |
| 03/05/2011 | Cash<br>Ameri Health, health insurance | 568.00 |
| 03/22/2011 | Cash<br>Ameri Health, health insurance | 568.00 |
| 04/25/2011 | Cash<br>Ameri Health, health insurance | 568.00 |
| 05/31/2011 | Cash<br>Ameri Health, health insurance | 568.00 |
| 06/18/2011 | Cash<br>Ameri Health, health insurance | 568.00 |
| 07/19/2011 | Cash<br>Ameri Health, health insurance | 568.00 |
| 07/22/2011 | Cash<br>Prudential Life Insurance premium | 568.00 |
| 09/30/2011 | Cash<br>Ameri Health, health insurance | 2,275.00 |
| 10/14/2011 | Cash<br>Ameri Health, health insurance | 568.00 |
| **Total To Or For Beneficiary** | | 568.00 |

| | | $ 53,536.00 |
|---|---|---|

| Steve Durst | | |
|---|---|---|
| 04/18/2006 | Cash<br>Riordan Real Estate | |
| 06/20/2006 | Cash<br>Monihan Realty | $ 10,000.00 |
| 06/20/2006 | Cash<br>Phoenix Environmental | 3,300.00 |
| 07/28/2006 | Cash<br>Monihan Realty | 1,750.00 |
| 07/28/2006 | Cash<br>David Loring Racing | 8,000.00 |
| 08/25/2006 | Cash<br>Reimbursement for Loren's Envoy<br>monthly payment | 5,000.00 |
| 08/25/2006 | Cash<br>Joseph Cuzzupe | 620.00 |
| 09/12/2006 | Cash<br>State of New Jersey, taxes | 750.00 |
| 09/12/2006 | Cash<br>State of New Jersey, taxes | 878.11 |
| 09/12/2006 | Cash<br>State of New Jersey, taxes | 3,786.29 |
| 09/12/2006 | Cash<br>State of New Jersey, taxes | 2,879.04 |
| | | 4,928.49 |

Schedule B-3 (Continued)

| Steve Durst (Continued) | | | Distribution Value |
|---|---|---|---|
| 09/12/2006 | Cash | | |
| | State of New Jersey, taxes | $ | 110.00 |
| 09/15/2006 | Cash | | |
| | Dolchin, Slotkin & Todd | | 10,000.00 |
| 09/15/2006 | Cash | | |
| | Vincent & D'Elia | | 1,250.00 |
| 09/15/2006 | Cash | | |
| | Joseph Cuzzupe | | 750.00 |
| 10/20/2006 | Cash | | |
| | David Loring Racing | | 10,000.00 |
| 01/19/2007 | Cash | | |
| | Monihan Realty | | 4,650.00 |
| 07/10/2007 | Cash | | |
| | Monihan Realty | | 8,000.00 |
| 07/11/2007 | Cash | | |
| | Francine Nachlas | | 1,000.00 |
| 07/21/2007 | Cash | | |
| | Food for shore house | | 3,000.00 |
| 07/21/2007 | Cash | | |
| | Monihan Realty | | 5,000.00 |
| 07/26/2007 | Cash | | |
| | Shore house reimbursement | | 2,000.00 |
| 07/27/2007 | Cash | | |
| | Deposit from shore house | | 2,000.00 |
| 10/18/2007 | Cash | | |
| | Cash | | 4,800.00 |
| 12/10/2007 | Cash | | |
| | Medford taxes | | 1,836.74 |
| 12/11/2007 | Cash | | |
| | Medford taxes | | 1,925.00 |
| **Total To Or For Beneficiary** | | $ | **98,213.67** |
| Erica Henao | | | |
| 10/19/2006 | Cash | | |
| | Down payment for Erica's first monthly rent | $ | 1,650.00 |
| 10/31/2006 | Cash | | |
| | Beneficiary distribution | | 3,000.00 |
| 11/14/2006 | Cash | | |
| | WCI Communities, property purchase for Erica/John | | 5,000.00 |
| 11/24/2006 | Cash | | |
| | WCI Communities, property purchase for Erica/John | | 25,000.00 |
| 02/27/2007 | Cash | | |
| | WCI Communities, property purchase for Erica/John | | 3,008.94 |
| 06/01/2007 | Cash | | |
| | WCI Communities, property purchase for Erica/John | | 26,000.00 |

Schedule B-3 (Continued)

| Erica Henao (Continued) | | Distribution Value |
|---|---|---|
| 07/10/2007 | Cash<br>Computer payoff | |
| 01/05/2008 | Cash<br>Credit card balance payoff | $    2,400.00 |
| 06/27/2008 | Cash<br>Loan | 6,000.00 |
| 07/03/2008 | Cash<br>Loan | 6,999.35 |
| 07/22/2008 | Cash<br>Loan repayment | 20,000.00 |
| 10/29/2008 | Cash<br>Loan repayment | (2,346.69) |
| 12/07/2008 | Cash<br>Loan repayment | (2,348.69) |
| 02/10/2009 | Cash<br>Loan repayment | (2,348.69) |
| 02/20/2009 | Cash<br>Repayment of loan | (2,348.69) |
| 04/30/2009 | Cash<br>Student loan | (2,348.69) |
| 05/01/2009 | Cash<br>Cash | 253.00 |
| 05/14/2009 | Cash<br>Student loan | 600.00 |
| 06/02/2009 | Cash<br>Repayment of loan | 253.00 |
| 06/10/2009 | Cash<br>Student loan | (2,348.09) |
| 07/09/2009 | Cash<br>Repayment of loan | 253.00 |
| 07/09/2009 | Cash<br>Student loan | (2,348.09) |
| 07/16/2009 | Cash<br>Loan repayment | 253.00 |
| 08/31/2009 | Cash<br>Student loan | (2,341.00) |
| 09/14/2009 | Cash<br>Student loan | 253.00 |
| 10/15/2009 | Cash<br>Student loan | 253.00 |
| 11/13/2009 | Cash<br>Student loan | 253.00 |
| 12/04/2009 | Cash<br>Student loan | 253.00 |
| 05/21/2010 | Cash<br>Graduate school | 253.00 |
| 08/07/2010 | Cash<br>Graduate school expenses | 1,000.00 |
| Total To Or For Beneficiary | | 2,000.00 |
| | | $    86,156.66 |

Schedule B-3 (Continued)

| Loren Mague | | Distribution Value |
|---|---|---|
| 06/20/2006 | Cash<br>Return deposit Envoy | |
| 09/07/2006 | Cash<br>PNC Bank/Loren's Envoy | $ 6,500.00 |
| 10/06/2006 | Cash<br>PNC bank, Loren's Envoy | 309.55 |
| 11/04/2006 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 12/04/2006 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 01/13/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 01/19/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 03/06/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 04/10/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 05/15/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 06/01/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 06/21/2007 | Cash<br>Kent Haag, Esq. for Timmy/Loren re<br>Timmy' son Anthony non-payment child<br>support | 309.55 |
| 07/10/2007 | Cash<br>PNC Bank, Loren's Envoy | 1,954.00 |
| 08/15/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 09/01/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 10/08/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 11/06/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 12/15/2007 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 01/14/2008 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 02/05/2008 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 02/27/2008 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 04/07/2008 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 05/12/2008 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| | | 309.55 |

Schedule B-3 (Continued)

| Loren Mague (Continued) | | Distribution Value |
|---|---|---|
| 06/01/2008 | Cash<br>PNC Bank, Loren's Envoy | |
| 07/09/2008 | Cash<br>PNC Bank, Loren's Envoy | $      309.55 |
| 08/08/2008 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 08/25/2008 | Cash<br>Loan repayment | 309.55 |
| 09/01/2008 | Cash<br>PNC Bank, Loren's Envoy | (2,400.00) |
| 10/14/2008 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 11/10/2008 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 12/10/2008 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 12/20/2008 | Cash<br>Loan repayment | 309.55 |
| 01/09/2009 | Cash<br>PNC Bank, Loren's Envoy | (2,348.69) |
| 02/11/2009 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 02/20/2009 | Cash<br>PNC Bank, Loren's Envoy | 0.00 |
| 04/06/2009 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 04/26/2009 | Cash<br>Loan repayment | 309.55 |
| 05/05/2009 | Cash<br>PNC Bank, Loren's Envoy | (2,348.09) |
| 06/10/2009 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 07/09/2009 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 07/26/2009 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 09/14/2009 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 10/15/2009 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 11/12/2009 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 11/13/2009 | Cash<br>2009 Distribution | 19,207.82 |
| 12/04/2009 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| 01/15/2010 | Cash<br>PNC Bank, Loren's Envoy | 309.55 |
| | | 309.55 |

Schedule B-3 (Continued)

| Loren Mague (Continued) | | | Distribution Value |
|---|---|---|---|
| 02/15/2010 | Cash<br>PNC Bank, Loren's Envoy | $ | 309.55 |
| 03/08/2010 | Cash<br>PNC Bank, Loren's Envoy | | 309.55 |
| 04/21/2010 | Cash<br>PNC Bank, Loren's Envoy | | 309.55 |
| 05/04/2010 | Cash<br>Loan to Loren | | 319.55 |
| 05/17/2010 | Cash<br>PNC Bank, Loren's Envoy | | 26,000.00 |
| 06/12/2010 | Cash<br>PNC Bank, Loren's Envoy | | 309.55 |
| 07/06/2010 | Cash<br>PNC Bank, Loren's Envoy | | 309.55 |
| 08/16/2010 | Cash<br>PNC Bank, Loren's Envoy | | 309.55 |
| 08/17/2010 | Cash<br>Loan repayment | | 309.55 |
| 09/12/2010 | Cash<br>PNC Bank, Loren's Envoy | | (5,475.46) |
| 09/22/2010 | Cash<br>Loan repayment | | 309.55 |
| 10/03/2010 | Cash<br>PNC Bank, Loren's Envoy | | (2,227.73) |
| 10/26/2010 | Cash<br>Repayment of loan | | 309.55 |
| 11/10/2010 | Cash<br>PNC Bank, Loren's Envoy | | (2,237.73) |
| 11/24/2010 | Cash<br>Repayment of loan | | 309.55 |
| 12/04/2010 | Cash<br>PNC Bank, Loren's Envoy | | (2,237.73) |
| 12/26/2010 | Cash<br>Repayment of loan | | 309.55 |
| 01/14/2011 | Cash<br>PNC Bank, Loren's Envoy | | (2,237.73) |
| 01/17/2011 | Cash<br>Repayment of loan | | 309.55 |
| 02/18/2011 | Cash<br>PNC Bank, Loren's Envoy | | (5,072.63) |
| 03/05/2011 | Cash<br>PNC Bank, Loren's Envoy | | 309.55 |
| 04/15/2011 | Cash<br>PNC Bank, Loren's Envoy | | 309.55 |
| 05/08/2011 | Cash<br>PNC Bank, Loren's Envoy | | 309.55 |
| 09/01/2011 | Cash<br>School books, clothes for kids | | 309.55 |

Total To Or For Beneficiary                1,250.00

$      45,670.83

Schedule B-3 (Continued)

Total Schedule B-3

$      390,317.13

Jake Ball Trust
Schedule B-4
Principal On Hand

| | | | | Inventory Value |
|---|---|---|---|---|
| | **Cash and Cash Equivalents** | | | |
| | Northwestern Community Bank Checking Account No. 55000459393 | $ | 91,686.03 | |
| | Charles Schwab Cash Account | | 31,942.33 | |
| | Total Cash and Cash Equivalents | | | $ 123,628.36 |
| **No. of Shares** | **Stocks** | | | |
| 75,000 | Useful Technologies | $ | 25,000.00 | |
| | Total Stocks | | | $ 25,000.00 |
| | **Miscellaneous** | | | |
| | 10% interest in Goodmill LLC | $ | | |
| | 10% interest in Reserve at Union Lake LLC | | 1.00 * | |
| | 99% interest in Zack & Jack Realty Associates LP | | 1.00 * | |
| | Total Miscellaneous | | 1.00 * | |
| **Face Amount** | **Liabilities** | | | $ 3.00 |
| (28,355.42) | Goodmill LLC Note (owed to Steve Durst) | | | |
| | Total Liabilities | $ | (28,355.42) | |
| | Total Schedule B-4 | | | $ (28,355.42) |
| | | | | $ 120,275.94 |

\* The value of these business interests is undetermined and the subject of on-going litigation in New Jersey and Pennsylvania. There is a settlement agreement pending, but incomplete, that would provide $80,000 to the Trust in exchange for all three business interests and would relieve the Trust of over $1,300,000 in liabilities.

Jake Ball Trust
Schedule C-1
Principal Purchases

Investments Made

| Description / Date | Shares | Transaction | Cost |
|---|---|---|---|
| $3,000 loan to James Rael as a beneficiary for law school | | | Cost |
| 06/27/2008 | | Purchased | |
| $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | | | $   3,000.00 |
| 07/10/2007 | | Purchased | |
| Useful Technologies | | | |
| 09/13/2006 | | Purchased | 50,000.00 |
| LPL Financial | 75,000 Shs. | Purchased | |
| Apple Inc Common | | | 25,000.00 |
| 06/25/2007 | 100 Shs. | Purchased | |
| 06/25/2007 | 900 Shs. | Purchased | 12,564.46 |
| Comcast Corp New Cl A | | | 113,080.14 |
| 08/30/2006 | 5,000 Shs. | Purchased | |
| Geron Corp Common | | | 176,326.52 |
| 12/05/2006 | 200 Shs. | Purchased | |
| 12/05/2006 | 200 Shs. | Purchased | 1,793.77 |
| 12/05/2006 | 500 Shs. | Purchased | 1,805.95 |
| 12/05/2006 | 1,100 Shs. | Purchased | 4,504.73 |
| 12/05/2006 | 800 Shs. | Purchased | 9,921.57 |
| 12/05/2006 | 2,200 Shs. | Purchased | 7,215.69 |
| Charles Schwab | | | 19,758.76 |
| Advanced Micro Devices Inc Common | | | |
| 09/11/2009 | 100 Shs. | Purchased | |
| 09/11/2009 | 200 Shs. | Purchased | 554.20 |
| 09/11/2009 | 300 Shs. | Purchased | 1,108.40 |
| 09/11/2009 | 600 Shs. | Purchased | 1,662.60 |
| 09/11/2009 | 1,800 Shs. | Purchased | 3,325.19 |
| 09/11/2009 | 3,000 Shs. | Purchased | 9,975.56 |
| 12/09/2009 | 5,000 Shs. | Purchased | 17,045.95 |
| Advanta Corp Cl A | | | 44,258.95 |
| 03/16/2009 | 10,000 Shs. | Purchased | |
| Alcoa Inc Common | | | 7,812.95 |
| 05/04/2009 | 7,000 Shs. | Purchased | |
| 06/05/2009 | 1,500 Shs. | Purchased | 70,008.95 |
| American Intl Group Inc Common | | | 16,702.45 |
| 03/20/2009 | 5,000 Shs. | Purchased | |
| 04/14/2009 | 2,000 Shs. | Purchased | 7,322.95 |
| | | | 3,208.95 |

Schedule C-1 (Continued)

Investments Made

Charles Schwab

Cost

**American Intl Group Inc**
**Common**

| Date | Shares | | Cost |
|------|--------|-----------|------|
| 05/05/2009 | 3,000 Shs. | Purchased | |
| 05/05/2009 | 8,000 Shs. | Purchased | $ 4,808.95 |
| 05/07/2009 | 207 Shs. | Purchased | 12,808.95 |
| 05/07/2009 | 2,000 Shs. | Purchased | 404.78 |
| 05/07/2009 | 12,793 Shs. | Purchased | 3,920.90 |
| 05/07/2009 | 2,393 Shs. | Purchased | 25,080.00 |
| 05/07/2009 | 2,607 Shs. | Purchased | 4,679.38 |

**AspenBio Pharma**

| Date | Shares | | Cost |
|------|--------|-----------|------|
| 10/01/2010 | 2,000 Shs. | Purchased | 5,110.89 |

**Avanir Pharmaceuticals**
**Cl A New**

| Date | Shares | | Cost |
|------|--------|-----------|------|
| 10/09/2009 | 150 Shs. | Purchased | 24,741.10 |

**Biosante Pharmaceuticals Inc**
**Com New**

| Date | Shares | | Cost |
|------|--------|-----------|------|
| 05/05/2010 | 5,000 Shs. | Purchased | 379.15 |

**Cit Group Inc**
**Common**

| Date | Shares | | Cost |
|------|--------|-----------|------|
| 07/17/2009 | 300 Shs. | Purchased | 12,008.95 |
| 07/17/2009 | 400 Shs. | Purchased | 242.17 |
| 07/17/2009 | 1,500 Shs. | Purchased | 322.89 |
| 07/17/2009 | 1,800 Shs. | Purchased | 1,210.71 |
| 07/24/2009 | 3,000 Shs. | Purchased | 1,453.03 |
| 07/24/2009 | 1,000 Shs. | Purchased | 2,892.71 |
| 08/07/2009 | 2,000 Shs. | Purchased | 964.24 |

**Citigroup Inc**
**Common**

| Date | Shares | | Cost |
|------|--------|-----------|------|
| 06/19/2009 | 3,000 Shs. | Purchased | 3,568.95 |
| 06/22/2009 | 3,000 Shs. | Purchased | 9,488.95 |
| 06/22/2009 | 2,000 Shs. | Purchased | 9,365.37 |
| 06/25/2009 | 3,000 Shs. | Purchased | 6,243.58 |
| 07/29/2009 | 2,000 Shs. | Purchased | 9,063.95 |
| 08/07/2009 | 1,000 Shs. | Purchased | 6,148.95 |
| 08/12/2009 | 1,000 Shs. | Purchased | 3,988.95 |
| 08/13/2009 | 1,000 Shs. | Purchased | 3,778.95 |
| 08/13/2009 | 5,000 Shs. | Purchased | 4,101.49 |
| 08/25/2009 | 5,000 Shs. | Purchased | 20,507.46 |
| 08/31/2009 | 10,000 Shs. | Purchased | 23,658.95 |
| 11/12/2009 | 5,000 Shs. | Purchased | 48,508.95 |
| 11/27/2009 | 5,000 Shs. | Purchased | 20,708.95 |
| 12/08/2009 | 5,000 Shs. | Purchased | 20,458.95 |
| 12/14/2009 | 3,000 Shs. | Purchased | 19,358.95 |
| | | | 11,108.95 |

**Schedule C-1 (Continued)**

**Investments Made**

**Charles Schwab**

| | Shares | | Cost |
|---|---|---|---|
| **Citigroup Inc Common** | | | |
| 12/17/2009 | 3,000 Shs. | Purchased | |
| 12/17/2009 | 5,000 Shs. | Purchased | $ 9,578.95 |
| 12/23/2009 | 2,000 Shs. | Purchased | 15,808.95 |
| 03/05/2010 | 10,000 Shs. | Purchased | 6,568.95 |
| 03/12/2010 | 15,000 Shs. | Purchased | 34,708.95 |
| 01/01/2011 | 38,000 Shs. | Purchased | 63,008.95 |
| | | | 150,817.90 |
| **Dendreon Corp Common** | | | |
| 04/12/2010 | 100 Shs. | Purchased | |
| 04/12/2010 | 200 Shs. | Purchased | 3,949.48 |
| 04/12/2010 | 200 Shs. | Purchased | 7,898.79 |
| 04/12/2010 | 400 Shs. | Purchased | 7,898.99 |
| 04/12/2010 | 600 Shs. | Purchased | 15,797.99 |
| 05/10/2010 | 100 Shs. | Purchased | 23,702.98 |
| 05/10/2010 | 100 Shs. | Purchased | 4,720.30 |
| 05/10/2010 | 800 Shs. | Purchased | 4,720.30 |
| 05/10/2010 | 2,000 Shs. | Purchased | 37,762.39 |
| | | | 94,405.96 |
| **Federal Natl Mtg Assn Common** | | | |
| 12/28/2009 | 10,000 Shs. | Purchased | |
| | | | 12,608.95 |
| **Ford Mtr Co Del Com Par $0.01** | | | |
| 11/07/2008 | 500 Shs. | Purchased | |
| 12/08/2008 | 300 Shs. | Purchased | 972.95 |
| 12/26/2008 | 200 Shs. | Purchased | 951.95 |
| 02/09/2009 | 1,000 Shs. | Purchased | 478.95 |
| 02/10/2009 | 1,000 Shs. | Purchased | 1,922.95 |
| 02/25/2009 | 2,000 Shs. | Purchased | 1,922.95 |
| 02/26/2009 | 10,000 Shs. | Purchased | 4,227.95 |
| 02/26/2009 | 50 Shs. | Purchased | 20,248.63 |
| 02/26/2009 | 100 Shs. | Purchased | 101.24 |
| 02/26/2009 | 4,850 Shs. | Purchased | 202.49 |
| 03/16/2009 | 50 Shs. | Purchased | 9,820.59 |
| 03/16/2009 | 250 Shs. | Purchased | 113.24 |
| 03/16/2009 | 1,000 Shs. | Purchased | 566.22 |
| 03/16/2009 | 1,800 Shs. | Purchased | 2,264.90 |
| 03/16/2009 | 16,900 Shs. | Purchased | 4,076.82 |
| 06/01/2010 | 25,000 Shs. | Purchased | 38,276.77 |
| 01/01/2011 | 100 Shs. | Purchased | 155,008.95 |
| 01/01/2011 | 1,000 Shs. | Purchased | 600.04 |
| | | | 6,000.36 |

Schedule C-1 (Continued)

Investments Made

| | | | Cost |
|---|---|---|---|
| **Charles Schwab** | | | |
| **Ford Mtr Co Del** | | | |
| **Com Par $0.01** | | | |
| 01/01/2011 | 100 Shs. | Purchased | |
| 01/01/2011 | 100 Shs. | Purchased | $ 600.04 |
| 01/01/2011 | 100 Shs. | Purchased | 600.04 |
| 01/01/2011 | 900 Shs. | Purchased | 600.04 |
| 01/01/2011 | 100 Shs. | Purchased | 5,400.32 |
| 01/01/2011 | 1,200 Shs. | Purchased | 600.04 |
| 01/01/2011 | 67 Shs. | Purchased | 7,200.43 |
| 01/01/2011 | 5,197 Shs. | Purchased | 402.02 |
| 01/01/2011 | 300 Shs. | Purchased | 31,183.88 |
| 01/01/2011 | 700 Shs. | Purchased | 1,800.11 |
| 01/01/2011 | 5,136 Shs. | Purchased | 4,200.25 |
| 01/01/2011 | 10,000 Shs. | Purchased | 30,819.47 |
| **Freightcar Amer Inc Common** | | | 59,995.34 |
| 05/01/2009 | 1,500 Shs. | Purchased | |
| **Gamestop Corp New Cl A** | | | 29,093.95 |
| 05/29/2009 | 500 Shs. | Purchased | |
| 05/29/2009 | 500 Shs. | Purchased | 11,879.47 |
| **General Electric Co Common** | | | 11,879.48 |
| 05/01/2009 | 3,000 Shs. | Purchased | |
| 09/22/2009 | 5,000 Shs. | Purchased | 38,138.95 |
| 01/11/2010 | 500 Shs. | Purchased | 85,408.95 |
| 01/11/2010 | 2,000 Shs. | Purchased | 8,371.79 |
| **General Mtrs Corp Common** | | | 33,487.16 |
| 03/27/2009 | 5,000 Shs. | Purchased | |
| **Geron Corp Common** | | | 19,108.95 |
| 06/25/2007 | 300 Shs. | Purchased | |
| 06/25/2007 | 1,200 Shs. | Purchased | 2,172.04 |
| 06/25/2007 | 1,200 Shs. | Purchased | 8,700.01 |
| 06/25/2007 | 2,300 Shs. | Purchased | 8,700.38 |
| 05/19/2008 | 4,540 Shs. | Purchased | 16,680.50 |
| 10/13/2008 | 760 Shs. | Purchased | 18,861.65 |
| 10/13/2008 | 1,400 Shs. | Purchased | 1,987.09 |
| 10/13/2008 | 2,800 Shs. | Purchased | 3,660.43 |
| 10/13/2008 | 40 Shs. | Purchased | 7,320.85 |
| 11/20/2008 | 100 Shs. | Purchased | 104.58 |
| 11/20/2008 | 1,151 Shs. | Purchased | 326.48 |
| | | | 3,757.78 |

Schedule C-1 (Continued)

Investments Made

Charles Schwab

| | | | Cost |
|---|---|---|---|
| Geron Corp Common | | | |
| 11/20/2008 | 1,500 Shs. | Purchased | |
| 11/20/2008 | 2,277 Shs. | Purchased | $ 4,897.19 |
| 11/20/2008 | 4,972 Shs. | Purchased | 7,433.94 |
| 11/20/2008 | 10,000 Shs. | Purchased | 16,232.56 |
| 02/26/2009 | 200 Shs. | Purchased | 29,247.95 |
| 02/26/2009 | 339 Shs. | Purchased | 1,002.98 |
| 02/26/2009 | 1,000 Shs. | Purchased | 1,700.05 |
| 02/26/2009 | 2,400 Shs. | Purchased | 5,014.90 |
| 02/26/2009 | 16,061 Shs. | Purchased | 12,035.75 |
| 02/27/2009 | 126 Shs. | Purchased | 80,544.27 |
| 02/27/2009 | 3,674 Shs. | Purchased | 568.88 |
| 02/27/2009 | 7,518 Shs. | Purchased | 16,587.73 |
| 02/27/2009 | 8,682 Shs. | Purchased | 33,943.00 |
| 07/10/2009 | 600 Shs. | Purchased | 39,198.34 |
| 07/10/2009 | 600 Shs. | Purchased | 4,369.49 |
| 07/10/2009 | 800 Shs. | Purchased | 4,370.68 |
| 07/13/2009 | 139 Shs. | Purchased | 5,825.98 |
| 07/13/2009 | 1,861 Shs. | Purchased | 1,018.10 |
| Glaxosmithkline Plc Sponsored Adr | | | 13,630.85 |
| 04/27/2009 | 500 Shs. | Purchased | |
| Hartford Finl Svcs Group Inc Common | | | 15,483.95 |
| 11/03/2008 | 300 Shs. | Purchased | |
| 01/30/2009 | 200 Shs. | Purchased | 4,476.95 |
| 02/06/2009 | 500 Shs. | Purchased | 2,756.75 |
| 02/17/2009 | 100 Shs. | Purchased | 5,512.95 |
| 02/17/2009 | 100 Shs. | Purchased | 1,056.39 |
| 02/17/2009 | 100 Shs. | Purchased | 1,056.39 |
| 02/17/2009 | 100 Shs. | Purchased | 1,056.40 |
| 02/19/2009 | 100 Shs. | Purchased | 1,056.40 |
| 02/19/2009 | 500 Shs. | Purchased | 1,056.43 |
| 02/20/2009 | 200 Shs. | Purchased | 4,187.95 |
| 02/25/2009 | 300 Shs. | Purchased | 1,567.14 |
| 02/27/2009 | 500 Shs. | Purchased | 2,350.68 |
| 03/16/2009 | 1,000 Shs. | Purchased | 3,262.95 |
| 03/20/2009 | 1,000 Shs. | Purchased | 7,762.95 |
| | 2,500 Shs. | Purchased | 6,312.95 |
| | 2,500 Shs. | Purchased | 18,060.45 |
| | | | 18,610.45 |

Schedule C-1 (Continued)

| Investments Made | | | Cost |
|---|---|---|---|
| Charles Schwab | | | |
| Keycorp New Common | | | |
| 06/05/2009 | 1,500 Shs. | Purchased | |
| 06/05/2009 | 1,000 Shs. | Purchased | $ 8,210.37 |
| Ldk Solar Co Ltd Sponsored Adr | | | 5,473.58 |
| 10/27/2009 | 100 Shs. | Purchased | |
| 10/27/2009 | 100 Shs. | Purchased | 759.01 |
| 10/27/2009 | 100 Shs. | Purchased | 759.03 |
| 10/27/2009 | 100 Shs. | Purchased | 759.05 |
| 10/27/2009 | 300 Shs. | Purchased | 759.09 |
| 10/27/2009 | 3,000 Shs. | Purchased | 2,276.82 |
| 10/27/2009 | 5,300 Shs. | Purchased | 22,772.69 |
| 10/27/2009 | 1,000 Shs. | Purchased | 40,226.44 |
| Motorola Inc Common | | | 7,590.89 |
| 10/30/2009 | 9,000 Shs. | Purchased | |
| 11/02/2009 | 1,000 Shs. | Purchased | 79,208.95 |
| 11/02/2009 | 5,000 Shs. | Purchased | 8,891.49 |
| Penske Automotive Group, Inc. Common | | | 44,457.46 |
| 06/02/2009 | 3,000 Shs. | Purchased | |
| 06/02/2009 | 400 Shs. | Purchased | 45,725.37 |
| 06/02/2009 | 1,600 Shs. | Purchased | 6,092.72 |
| Rait Financial Trust Common | | | 24,386.86 |
| 11/17/2009 | 200 Shs. | Purchased | |
| 11/17/2009 | 1,800 Shs. | Purchased | 344.06 |
| 11/17/2009 | 2,992 Shs. | Purchased | 3,096.54 |
| 11/17/2009 | 4,108 Shs. | Purchased | 5,147.13 |
| 11/17/2009 | 4,700 Shs. | Purchased | 7,066.99 |
| 11/17/2009 | 6,200 Shs. | Purchased | 8,080.70 |
| 11/17/2009 | 100 Shs. | Purchased | 10,727.85 |
| 11/17/2009 | 100 Shs. | Purchased | 173.03 |
| 11/17/2009 | 100 Shs. | Purchased | 173.03 |
| 11/17/2009 | 200 Shs. | Purchased | 173.03 |
| 11/17/2009 | 900 Shs. | Purchased | 346.06 |
| 11/17/2009 | 1,000 Shs. | Purchased | 1,557.27 |
| 11/17/2009 | 1,000 Shs. | Purchased | 1,730.30 |
| 11/17/2009 | 1,500 Shs. | Purchased | 1,730.30 |
| 11/17/2009 | 5,100 Shs. | Purchased | 2,595.45 |
| 04/19/2010 | 2,700 Shs. | Purchased | 8,824.51 |
| 04/19/2010 | 3,200 Shs. | Purchased | 6,535.21 |
| | | | 7,745.43 |

Schedule C-1 (Continued)

Investments Made

Charles Schwab

Rait Financial Trust
Common                                                                          Cost

| Date | Shares | | | Cost |
|---|---|---|---|---|
| 04/19/2010 | 5,700 Shs. | Purchased | | |
| 04/19/2010 | 8,400 Shs. | Purchased | $ | 13,853.55 |
| 04/23/2010 | 5,000 Shs. | Purchased | | 20,415.76 |
| 04/26/2010 | 5,000 Shs. | Purchased | | 14,908.95 |

Rite Aid Corp
Common
New York Stock Exchange                                                         15,508.95

| 05/07/2009 | 20,000 Shs. | Purchased | | |
| 05/29/2009 | 10,000 Shs. | Purchased | | 18,014.95 |
| 05/29/2009 | 10,000 Shs. | Purchased | | 12,404.48 |
| 09/16/2009 | 9,000 Shs. | Purchased | | 12,404.47 |
| 09/17/2009 | 16,000 Shs. | Purchased | | 17,738.95 |

Sirius Satellite Radio Inc
Common
NASDAQ Stocks                                                                   33,608.95

| 08/03/2009 | 50,000 Shs. | Purchased | | |
| 08/21/2009 | 23,000 Shs. | Purchased | | 23,008.95 |
| 09/10/2009 | 20,000 Shs. | Purchased | | 17,258.95 |
| 09/11/2009 | 10,000 Shs. | Purchased | | 13,808.95 |
| 11/12/2009 | 20,000 Shs. | Purchased | | 6,808.95 |
| 02/18/2010 | 800 Shs. | Purchased | | 13,008.95 |
| 02/18/2010 | 7,200 Shs. | Purchased | | 920.90 |

Skinny Nutritional Corp.
Common                                                                          8,288.05

| 04/16/2009 | 5,000 Shs. | Purchased | | |
| 04/16/2009 | 15,000 Shs. | Purchased | | 677.24 |

Sperian Protection Ord F                                                        2,031.71
| 04/27/2009 | 138 Shs. | Purchased | | |

Titan Medical Inc.                                                              6,116.80
| 11/19/2009 | 5,000 Shs. | Purchased | | |

Yrc Worldwide Inc
Common                                                                          2,285.85

| 10/29/2008 | 100 Shs. | Purchased | | |
| 10/30/2008 | 75 Shs. | Purchased | | 412.95 |
| 02/25/2009 | 500 Shs. | Purchased | | 327.95 |

Total Purchases                                                                 1,447.95

                                                                       $    3,116,717.63

Juke Ball Trust

Schedule C-2

Capital Changes on Principal Assets

| | | | Inventory Value |
|---|---|---|---|
| **Exchanges and Stock Distributions** | | | |
| $3,000 loan to James Rael as a beneficiary for law school | | | |
| 06/27/2008 | | Purchased | |
| 09/22/2008 | | Return of principal | $    3,000.00 |
| | | Repayment of loan | (3,000.00) |
| | | | |
| **$50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase** | | | |
| 07/10/2007 | | Purchased | |
| 07/26/2009 | | Return of principal | 50,000.00 |
| 09/12/2009 | | Return of principal | (1,000.00) |
| 10/09/2009 | | Return of principal | (1,000.00) |
| 11/12/2009 | | Return of principal | (1,000.00) |
| 12/07/2009 | | Return of principal | (1,000.00) |
| 01/19/2010 | | Return of principal | (1,000.00) |
| 04/09/2010 | | Return of principal | (1,000.00) |
| 05/01/2010 | | Return of principal | (1,000.00) |
| 06/03/2010 | | Return of principal | (1,000.00) |
| 07/08/2010 | | Return of principal | (1,000.00) |
| 08/17/2010 | | Return of principal | (1,000.00) |
| 09/09/2010 | | Return of principal | (1,000.00) |
| 09/15/2010 | | Return of principal | (1,000.00) |
| 10/25/2010 | | Return of principal | (1,000.00) |
| 11/24/2010 | | Return of principal | (1,000.00) |
| 01/14/2011 | | Return of principal | (500.00) |
| 02/06/2011 | | Return of principal | (10,000.00) |
| 02/26/2011 | | Return of principal | (10,000.00) |
| 02/26/2011 | | Return of principal | (10,000.00) |
| | | Retired as worthless settlement negotiated by Steve | (5,500.00) |
| | | | |
| **10% interest in Goodmill LLC** | | | |
| 03/04/2006 | | Received | |
| | | On Hand | 1.00 |
| | | | $    1.00 |
| **10% interest in Reserve at Union Lake LLC** | | | |
| 03/04/2006 | | Received | |
| | | On Hand | 1.00 |
| | | | $    1.00 |
| **99% interest in Zack & Jack Realty Associates LP** | | | |
| 03/04/2006 | | Received | |
| | | On Hand | 1.00 |
| | | | $    1.00 |

*Can Have
shew
or "unknown"*

Schedule C-2 (Continued)

Exchanges and Stock Distributions
Goodmill LLC Note (owed to Steve Durst)

|  |  |  | Inventory Value |
|---|---|---|---|
| 03/04/2006 |  |  |  |
| 12/31/2007 | (500,000) | Face | Received |
| 12/31/2007 | 80,000 | Face | Redeemed | $ (500,000.00) |
| 01/05/2008 | 414 | Face | Redeemed | 80,000.00 |
| 01/05/2008 | 90,000 | Face | Redeemed | 414.00 |
| 01/05/2008 | 3,000 | Face | Redeemed | 90,000.00 |
| 01/05/2008 | 6,500 | Face | Redeemed | 3,000.00 |
| 01/05/2008 | 8,000 | Face | Redeemed | 6,500.00 |
| 04/07/2008 | 8,000 | Face | Redeemed | 8,000.00 |
| 05/19/2008 | 462 | Face | Redeemed | 8,000.00 |
| 06/01/2008 | 438 | Face | Redeemed | 462.00 |
| 06/16/2008 | 1,650 | Face | Redeemed | 438.00 |
| 07/09/2008 | 876 | Face | Redeemed | 1,650.00 |
| 08/08/2008 | 438 | Face | Redeemed | 876.00 |
| 09/15/2008 | 438 | Face | Redeemed | 438.00 |
| 10/22/2008 | 438 | Face | Redeemed | 438.00 |
| 11/15/2008 | 438 | Face | Redeemed | 438.00 |
| 01/09/2009 | 438 | Face | Redeemed | 438.00 |
| 02/05/2009 | 438 | Face | Redeemed | 438.00 |
| 02/05/2009 | 1,134.1 | Face | Redeemed | 438.00 |
| 02/08/2009 | 1,050 | Face | Redeemed | 1,134.10 |
| 02/11/2009 | 1,068.3 | Face | Redeemed | 1,050.00 |
| 02/20/2009 | 438 | Face | Redeemed | 1,068.30 |
| 04/07/2009 | 490 | Face | Redeemed | 438.00 |
| 04/13/2009 | 3,000 | Face | Redeemed | 490.00 |
| 05/05/2009 | 490 | Face | Redeemed | 3,000.00 |
| 05/06/2009 | 980 | Face | Redeemed | 490.00 |
| 05/11/2009 | 2,000 | Face | Redeemed | 980.00 |
| 06/10/2009 | 2,000 | Face | Redeemed | 2,000.00 |
| 09/17/2009 | 490 | Face | Redeemed | 2,000.00 |
| 11/12/2009 | 494 | Face | Redeemed | 490.00 |
| 11/21/2009 | 47,846.09 | Face | Redeemed | 494.00 |
| 05/20/2010 | 47,846.09 | Face | Redeemed | 47,846.09 |
| 06/11/2010 | 2,000 | Face | Redeemed | 47,846.09 |
| 07/23/2010 | 10,000 | Face | Redeemed | 2,000.00 |
| 08/17/2010 | 10,000 | Face | Redeemed | 10,000.00 |
| 08/30/2010 | 2,000 | Face | Redeemed | 10,000.00 |
| 09/11/2010 | 2,500 | Face | Redeemed | 2,000.00 |
| 10/02/2010 | 6,000 | Face | Redeemed | 2,500.00 |
| 10/18/2010 | 11,000 | Face | Redeemed | 6,000.00 |
| 11/03/2010 | 7,000 | Face | Redeemed | 11,000.00 |
| 11/12/2010 | 1,500 | Face | Redeemed | 7,000.00 |
| 12/02/2010 | 7,000 | Face | Redeemed | 1,500.00 |
| 12/17/2010 | 6,500 | Face | Redeemed | 7,000.00 |
|  | 9,500 | Face | Redeemed | 6,500.00 |
|  |  |  |  | 9,500.00 |

Schedule C-2 (Continued)

| Exchanges and Stock Distributions | | | | | Inventory Value |
|---|---|---|---|---|---|
| 12/26/2010 | 15,000 | Face | Redeemed | $ | 15,000.00 |
| 01/09/2011 | 1,800 | Face | Redeemed | | 1,800.00 |
| 01/19/2011 | 5,000 | Face | Redeemed | | 5,000.00 |
| 02/08/2011 | 5,000 | Face | Redeemed | | 5,000.00 |
| 02/22/2011 | 5,500 | Face | Redeemed | | 5,500.00 |
| 03/08/2011 | 2,000 | Face | Redeemed | | 2,000.00 |
| 03/22/2011 | 5,500 | Face | Redeemed | | 5,500.00 |
| 04/02/2011 | 3,500 | Face | Redeemed | | 3,500.00 |
| 04/19/2011 | 6,000 | Face | Redeemed | | 6,000.00 |
| 05/01/2011 | 5,000 | Face | Redeemed | | 5,000.00 |
| 05/01/2011 | 1,000 | Face | Redeemed | | 1,000.00 |
| 05/14/2011 | 1,300 | Face | Redeemed | | 1,300.00 |
| 05/23/2011 | 2,250 | Face | Redeemed | | 2,250.00 |
| 06/07/2011 | 2,250 | Face | Redeemed | | 2,250.00 |
| 06/18/2011 | 7,500 | Face | Redeemed | | 7,500.00 |
| 06/28/2011 | 8,750 | Face | Redeemed | | 8,750.00 |
| 07/19/2011 | 2,250 | Face | Redeemed | | 2,250.00 |
| 08/17/2011 | 3,500 | Face | Redeemed | | 3,500.00 |
| 09/13/2011 | 2,250 | Face | Redeemed | | 2,250.00 |
| | (28,355.42) | Face | On Hand | $ | (28,355.42) |
| **Useful Technologies** | | | | | |
| 09/13/2006 | 75,000 | Shs. | Purchased | | |
| | 75,000 | Shs. | On Hand | | 25,000.00 |
| **LPL Financial** | | | | $ | 25,000.00 |
| **Apple Inc** | | | | | |
| **Common** | | | | | |
| 06/25/2007 | 900 | Shs. | Purchased | | |
| 06/25/2007 | 100 | Shs. | Purchased | | 113,080.14 |
| | 1,000 | Shs. | On Hand | | 12,564.46 |
| 05/30/2008 | (100) | Shs. | Sold | $ | 125,644.60 |
| | 900 | Shs. | On Hand | | (12,564.46) |
| 11/13/2008 | (900) | Shs. | Sold | $ | 113,080.14 |
| | | | | | (113,080.14) |
| **Comcast Corp New** | | | | | |
| **Cl A** | | | | | |
| 08/30/2006 | 5,000 | Shs. | Purchased | | |
| 12/05/2006 | (1,000) | Shs. | Sold | | 176,326.52 |
| | 4,000 | Shs. | On Hand | | (35,265.30) |
| 02/21/2007 | 2,000 | Shs. | Received as a stock distribution | $ | 141,061.22 |
| | | | | | 0.00 |
| | 6,000 | Shs. | On Hand | | 141,061.22 |
| 06/25/2007 | (6,000) | Shs. | Sold | $ | (141,061.22) |

Schedule C-2 (Continued)

| Exchanges and Stock Distributions | | | | Inventory Value |
|---|---|---|---|---|
| LPL Financial | | | | |
| Geron Corp | | | | |
| Common | | | | |
| 12/05/2006 | 800 | Shs. | Purchased | |
| 12/05/2006 | 2,200 | Shs. | Purchased | $ 7,215.69 |
| 12/05/2006 | 200 | Shs. | Purchased | 19,758.76 |
| 12/05/2006 | 200 | Shs. | Purchased | 1,793.77 |
| 12/05/2006 | 500 | Shs. | Purchased | 1,805.95 |
| 12/05/2006 | 1,100 | Shs. | Purchased | 4,504.73 |
| 02/06/2009 | 5,000 | Shs. | On Hand | 9,921.57 |
| | (200) | Shs. | Sold | $ 45,000.47 |
| 02/06/2009 | 4,800 | Shs. | On Hand | (1,800.02) |
| | (200) | Shs. | Sold | $ 43,200.45 |
| 02/06/2009 | 4,600 | Shs. | On Hand | (1,800.02) |
| | (500) | Shs. | Sold | $ 41,400.43 |
| 02/06/2009 | 4,100 | Shs. | On Hand | (4,500.05) |
| | (1,100) | Shs. | Sold | $ 36,900.38 |
| 02/11/2009 | 3,000 | Shs. | On Hand | (9,900.10) |
| | (800) | Shs. | Sold | $ 27,000.28 |
| 02/11/2009 | 2,200 | Shs. | On Hand | (7,200.07) |
| | (2,200) | Shs. | Sold | $ 19,800.21 |
| | | | | (19,800.21) |
| Charles Schwab | | | | |
| Advanced Micro Devices Inc | | | | |
| Common | | | | |
| 09/11/2009 | 100 | Shs. | Purchased | |
| 09/11/2009 | 200 | Shs. | Purchased | 554.20 |
| 09/11/2009 | 300 | Shs. | Purchased | 1,108.40 |
| 09/11/2009 | 600 | Shs. | Purchased | 1,662.60 |
| 09/11/2009 | 1,800 | Shs. | Purchased | 3,325.19 |
| 09/11/2009 | 3,000 | Shs. | Purchased | 9,975.56 |
| 09/16/2009 | 6,000 | Shs. | On Hand | 17,045.95 |
| | (100) | Shs. | Sold | $ 33,671.90 |
| 09/16/2009 | 5,900 | Shs. | On Hand | (561.20) |
| | (200) | Shs. | Sold | $ 33,110.70 |
| 09/16/2009 | 5,700 | Shs. | On Hand | (1,122.40) |
| | (300) | Shs. | Sold | $ 31,988.30 |
| 09/16/2009 | 5,400 | Shs. | On Hand | (1,683.59) |
| | (600) | Shs. | Sold | $ 30,304.71 |
| 09/16/2009 | 4,800 | Shs. | On Hand | (3,367.19) |
| | (1,800) | Shs. | Sold | $ 26,937.52 |
| 09/17/2009 | 3,000 | Shs. | On Hand | (10,101.57) |
| 12/09/2009 | (3,000) | Shs. | Sold | $ 16,835.95 |
| | 5,000 | Shs. | Purchased | (16,835.95) |
| | 5,000 | Shs. | On Hand | 44,258.95 |
| | | | | $ 44,258.95 |

|  |  |  |  | Inventory Value |
|---|---|---|---|---|
| **Exchanges and Stock Distributions** |  |  |  |  |
| **Charles Schwab** |  |  |  |  |
| 01/11/2010 | (5,000) | Shs. | Sold |  |
| **Advanta Corp Cl A** |  |  |  | $ (44,258.95) |
| 03/16/2009 | 10,000 | Shs. | Purchased |  |
| 03/27/2009 | (10,000) | Shs. | Sold | 7,812.95 |
| **Alcoa Inc Common** |  |  |  | (7,812.95) |
| 05/04/2009 | 7,000 | Shs. | Purchased |  |
| 05/07/2009 | (7,000) | Shs. | Sold | 70,008.95 |
| 06/05/2009 | 1,500 | Shs. | Purchased | (70,008.95) |
|  | 1,500 | Shs. | On Hand | 16,702.45 |
| 06/22/2009 | (1,500) | Shs. | Sold | $ 16,702.45 |
| **American Intl Group Inc Common** |  |  |  | (16,702.45) |
| 03/20/2009 | 5,000 | Shs. | Purchased |  |
| 03/27/2009 | (5,000) | Shs. | Sold | 7,322.95 |
| 04/14/2009 | 2,000 | Shs. | Purchased | (7,322.95) |
| 05/05/2009 | 3,000 | Shs. | Purchased | 3,208.95 |
| 05/05/2009 | 8,000 | Shs. | Purchased | 4,808.95 |
| 05/07/2009 | 207 | Shs. | Purchased | 12,808.95 |
| 05/07/2009 | 2,000 | Shs. | Purchased | 404.78 |
| 05/07/2009 | 12,793 | Shs. | Purchased | 3,920.90 |
| 05/07/2009 | 2,393 | Shs. | Purchased | 25,080.00 |
| 05/07/2009 | 2,607 | Shs. | Purchased | 4,679.38 |
| 05/29/2009 | 33,000 | Shs. | On Hand | 5,110.89 |
|  | (2,000) | Shs. | Sold | $ 60,022.80 |
| 05/29/2009 | 31,000 | Shs. | On Hand | (3,637.75) |
|  | (12,793) | Shs. | Sold | $ 56,385.05 |
| 05/29/2009 | 18,207 | Shs. | On Hand | (23,268.84) |
|  | (2,000) | Shs. | Sold | $ 33,116.21 |
| 05/29/2009 | 16,207 | Shs. | On Hand | (3,637.74) |
|  | (3,000) | Shs. | Sold | $ 29,478.47 |
| 05/29/2009 | 13,207 | Shs. | On Hand | (5,456.62) |
|  | (8,000) | Shs. | Sold | $ 24,021.85 |
| 05/29/2009 | 5,207 | Shs. | On Hand | (14,550.98) |
|  | (207) | Shs. | Sold | $ 9,470.87 |
| 06/19/2009 | 5,000 | Shs. | On Hand | (376.51) |
|  | (2,393) | Shs. | Sold | $ 9,094.36 |
| 06/19/2009 | 2,607 | Shs. | On Hand | (4,352.56) |
|  | (2,607) | Shs. | Sold | $ 4,741.80 |
|  |  |  |  | (4,741.80) |

Schedule C-2 (Continued)

| | | | | Inventory Value |
|---|---|---|---|---|
| **Exchanges and Stock Distributions** | | | | |
| **Charles Schwab** | | | | |
| **AspenBio Pharma** | | | | |
| 10/01/2010 | 2,000 | Shs. | Purchased | $ 24,741.10 |
| 10/13/2011 | (2,000) | Shs. | Sold | (24,741.10) |
| **Avanir Pharmaceuticals** | | | | |
| **Cl A New** | | | | |
| 10/09/2009 | 150 | Shs. | Purchased | 379.15 |
| 06/02/2010 | (150) | Shs. | Sold | (379.15) |
| **Biosante Pharmaceuticals Inc** | | | | |
| **Com New** | | | | |
| 05/05/2010 | 5,000 | Shs. | Purchased | 12,008.95 |
| 06/02/2010 | (5,000) | Shs. | Sold | (12,008.95) |
| **Cit Group Inc** | | | | |
| **Common** | | | | |
| 07/17/2009 | 300 | Shs. | Purchased | |
| 07/17/2009 | 400 | Shs. | Purchased | 242.17 |
| 07/17/2009 | 1,500 | Shs. | Purchased | 322.89 |
| 07/17/2009 | 1,800 | Shs. | Purchased | 1,210.71 |
| | 4,000 | Shs. | On Hand | 1,453.03 |
| 07/22/2009 | (300) | Shs. | Sold | $ 3,228.80 |
| | 3,700 | Shs. | On Hand | (242.16) |
| 07/22/2009 | (400) | Shs. | Sold | $ 2,986.64 |
| | 3,300 | Shs. | On Hand | (322.88) |
| 07/22/2009 | (1,500) | Shs. | Sold | $ 2,663.76 |
| | 1,800 | Shs. | On Hand | (1,210.80) |
| 07/22/2009 | (1,800) | Shs. | Sold | $ 1,452.96 |
| 07/24/2009 | 3,000 | Shs. | Purchased | (1,452.96) |
| 07/24/2009 | 1,000 | Shs. | Purchased | 2,892.71 |
| | 4,000 | Shs. | On Hand | 964.24 |
| 07/29/2009 | (3,000) | Shs. | Sold | $ 3,856.95 |
| | 1,000 | Shs. | On Hand | (2,892.71) |
| 08/07/2009 | 2,000 | Shs. | Purchased | 964.24 |
| | 3,000 | Shs. | On Hand | 3,568.95 |
| 08/12/2009 | (1,000) | Shs. | Sold | $ 4,533.19 |
| | 2,000 | Shs. | On Hand | (1,511.06) |
| 08/12/2009 | (2,000) | Shs. | Sold | $ 3,022.13 |
| | | | | (3,022.13) |
| **Citigroup Inc** | | | | |
| **Common** | | | | |
| 06/19/2009 | 3,000 | Shs. | Purchased | |
| 06/22/2009 | 3,000 | Shs. | Purchased | 9,488.95 |
| 06/22/2009 | 2,000 | Shs. | Purchased | 9,365.37 |
| 06/25/2009 | 3,000 | Shs. | Purchased | 6,243.58 |
| | 11,000 | Shs. | On Hand | 9,063.95 |
| | | | | $ 34,161.85 |

Schedule C-2 (Continued)

| Exchanges and Stock Distributions | | | | Inventory Value |
|---|---|---|---|---|
| **Charles Schwab** | | | | |
| 07/10/2009 | (3,000) | Shs. | Sold | $ (9,316.87) |
| 07/10/2009 | 8,000 | Shs. | On Hand | $ 24,844.98 |
| | (3,000) | Shs. | Sold | (9,316.87) |
| 07/13/2009 | 5,000 | Shs. | On Hand | $ 15,528.11 |
| | (2,000) | Shs. | Sold | (6,211.24) |
| 07/13/2009 | 3,000 | Shs. | On Hand | $ 9,316.87 |
| 07/29/2009 | (3,000) | Shs. | Sold | (9,316.87) |
| 08/07/2009 | 2,000 | Shs. | Purchased | 6,148.95 |
| 08/12/2009 | 1,000 | Shs. | Purchased | 3,988.95 |
| 08/13/2009 | 1,000 | Shs. | Purchased | 3,778.95 |
| 08/13/2009 | 1,000 | Shs. | Purchased | 4,101.49 |
| 08/25/2009 | 5,000 | Shs. | Purchased | 20,507.46 |
| 08/31/2009 | 5,000 | Shs. | Purchased | 23,658.95 |
| | 10,000 | Shs. | Purchased | 48,508.95 |
| 09/17/2009 | 25,000 | Shs. | On Hand | 110,693.70 |
| | (2,000) | Shs. | Sold | $ (8,855.50) |
| 09/17/2009 | 23,000 | Shs. | On Hand | 101,838.20 |
| | (1,000) | Shs. | Sold | $ (4,427.75) |
| 09/17/2009 | 22,000 | Shs. | On Hand | 97,410.45 |
| | (1,000) | Shs. | Sold | $ (4,427.75) |
| 09/17/2009 | 21,000 | Shs. | On Hand | 92,982.70 |
| | (1,000) | Shs. | Sold | $ (4,427.75) |
| 10/27/2009 | 20,000 | Shs. | On Hand | 88,554.95 |
| | (5,000) | Shs. | Sold | $ (22,138.74) |
| 10/27/2009 | 15,000 | Shs. | On Hand | 66,416.21 |
| | (5,000) | Shs. | Sold | $ (22,138.74) |
| 10/27/2009 | 10,000 | Shs. | On Hand | 44,277.47 |
| 11/12/2009 | (10,000) | Shs. | Sold | $ (44,277.47) |
| 11/27/2009 | 5,000 | Shs. | Purchased | 20,708.95 |
| 12/08/2009 | 5,000 | Shs. | Purchased | 20,458.95 |
| 12/14/2009 | 5,000 | Shs. | Purchased | 19,358.95 |
| 12/17/2009 | 3,000 | Shs. | Purchased | 11,108.95 |
| 12/17/2009 | 3,000 | Shs. | Purchased | 9,578.95 |
| 12/23/2009 | 5,000 | Shs. | Purchased | 15,808.95 |
| 03/05/2010 | 2,000 | Shs. | Purchased | 6,568.95 |
| 03/12/2010 | 10,000 | Shs. | Purchased | 34,708.95 |
| | 15,000 | Shs. | Purchased | 63,008.95 |
| 05/19/2010 | 53,000 | Shs. | On Hand | 201,310.55 |
| | (5,000) | Shs. | Sold | $ (18,991.56) |
| 05/19/2010 | 48,000 | Shs. | On Hand | 182,318.99 |
| | (5,000) | Shs. | Sold | $ (18,991.56) |
| 05/19/2010 | 43,000 | Shs. | On Hand | 163,327.43 |
| | (5,000) | Shs. | Sold | $ (18,991.56) |
| | 38,000 | Shs. | On Hand | $ 144,335.87 |

Schedule C-2 (Continued)

| Exchanges and Stock Distributions<br>Charles Schwab | | | | Inventory<br>Value |
|---|---|---|---|---|
| 05/19/2010 | (3,000) | Shs. | Sold | |
| | 35,000 | Shs. | On Hand | $ (11,394.94) |
| 05/19/2010 | (3,000) | Shs. | Sold | $ 132,940.93 |
| | 32,000 | Shs. | On Hand | (11,394.94) |
| 05/19/2010 | (5,000) | Shs. | Sold | $ 121,545.99 |
| | 27,000 | Shs. | On Hand | (18,991.56) |
| 05/19/2010 | (2,000) | Shs. | Sold | $ 102,554.43 |
| | 25,000 | Shs. | On Hand | (7,596.62) |
| 05/19/2010 | (10,000) | Shs. | Sold | $ 94,957.81 |
| | 15,000 | Shs. | On Hand | (37,983.12) |
| 05/19/2010 | (15,000) | Shs. | Sold | $ 56,974.69 |
| 01/01/2011 | 38,000 | Shs. | Purchased | (56,974.69) |
| | 38,000 | Shs. | On Hand | 150,817.90 |
| 03/07/2011 | (38,000) | Shs. | Sold | $ 150,817.90 |
| | | | | (150,817.90) |
| **Dendreon Corp**<br>**Common** | | | | |
| 04/12/2010 | 100 | Shs. | Purchased | |
| 04/12/2010 | 200 | Shs. | Purchased | |
| 04/12/2010 | 200 | Shs. | Purchased | 3,949.48 |
| 04/12/2010 | 400 | Shs. | Purchased | 7,898.79 |
| 04/12/2010 | 600 | Shs. | Purchased | 7,898.99 |
| | 1,500 | Shs. | On Hand | 15,797.99 |
| 05/07/2010 | (100) | Shs. | Sold | 23,702.98 |
| | 1,400 | Shs. | On Hand | $ 59,248.23 |
| 05/07/2010 | (200) | Shs. | Sold | (3,949.88) |
| | 1,200 | Shs. | On Hand | $ 55,298.35 |
| 05/07/2010 | (200) | Shs. | Sold | (7,899.76) |
| | 1,000 | Shs. | On Hand | $ 47,398.59 |
| 05/07/2010 | (400) | Shs. | Sold | (7,899.77) |
| | 600 | Shs. | On Hand | $ 39,498.82 |
| 05/07/2010 | (600) | Shs. | Sold | (15,799.53) |
| 05/10/2010 | 100 | Shs. | Purchased | $ 23,699.29 |
| 05/10/2010 | 100 | Shs. | Purchased | (23,699.29) |
| 05/10/2010 | 800 | Shs. | Purchased | 4,720.30 |
| | 2,000 | Shs. | Purchased | 4,720.30 |
| 05/28/2010 | 3,000 | Shs. | On Hand | 37,762.39 |
| | (100) | Shs. | Sold | 94,405.96 |
| 05/28/2010 | 2,900 | Shs. | On Hand | $ 141,608.95 |
| | (800) | Shs. | Sold | (4,720.30) |
| 05/28/2010 | 2,100 | Shs. | On Hand | $ 136,888.65 |
| | (100) | Shs. | Sold | (37,762.39) |
| | 2,000 | Shs. | On Hand | $ 99,126.26 |
| | | | | (4,720.30) |
| | | | | $ 94,405.96 |

| Exchanges and Stock Distributions | | | | Inventory Value |
|---|---|---|---|---|
| **Charles Schwab** | | | | |
| 06/10/2010 | (2,000) | Shs. | Sold | |
| **Federal Natl Mtg Assn Common** | | | | $ (94,405.96) |
| 12/28/2009 | 10,000 | Shs. | Purchased | |
| 03/05/2010 | (10,000) | Shs. | Sold | 12,608.95 |
| **Ford Mtr Co Del Com Par $0.01** | | | | (12,608.95) |
| 11/07/2008 | 500 | Shs. | Purchased | |
| 12/08/2008 | 300 | Shs. | Purchased | 972.95 |
| 12/26/2008 | 200 | Shs. | Purchased | 951.95 |
| 02/09/2009 | 1,000 | Shs. | Purchased | 478.95 |
| 02/10/2009 | 1,000 | Shs. | Purchased | 1,922.95 |
| 02/25/2009 | 2,000 | Shs. | Purchased | 1,922.95 |
| 02/26/2009 | 10,000 | Shs. | Purchased | 4,227.95 |
| 02/26/2009 | 50 | Shs. | Purchased | 20,248.63 |
| 02/26/2009 | 100 | Shs. | Purchased | 101.24 |
| 02/26/2009 | 4,850 | Shs. | Purchased | 202.49 |
| 03/16/2009 | 50 | Shs. | Purchased | 9,820.59 |
| 03/16/2009 | 250 | Shs. | Purchased | 113.24 |
| 03/16/2009 | 1,000 | Shs. | Purchased | 566.22 |
| 03/16/2009 | 1,800 | Shs. | Purchased | 2,264.90 |
| 03/16/2009 | 16,900 | Shs. | Purchased | 4,076.82 |
| 04/28/2009 | 40,000 | Shs. | On Hand | 38,276.77 |
| | (500) | Shs. | Sold | $ 86,148.60 |
| 04/28/2009 | 39,500 | Shs. | On Hand | (1,076.86) |
| | (300) | Shs. | Sold | $ 85,071.74 |
| 04/28/2009 | 39,200 | Shs. | On Hand | (646.11) |
| | (200) | Shs. | Sold | $ 84,425.63 |
| 04/28/2009 | 39,000 | Shs. | On Hand | (430.74) |
| | (1,000) | Shs. | Sold | $ 83,994.89 |
| 04/28/2009 | 38,000 | Shs. | On Hand | (2,153.72) |
| | (1,000) | Shs. | Sold | $ 81,841.17 |
| 04/28/2009 | 37,000 | Shs. | On Hand | (2,153.72) |
| | (2,000) | Shs. | Sold | $ 79,687.45 |
| 04/28/2009 | 35,000 | Shs. | On Hand | (4,307.43) |
| | (10,000) | Shs. | Sold | $ 75,380.02 |
| 05/07/2009 | 25,000 | Shs. | On Hand | (21,537.15) |
| | (50) | Shs. | Sold | $ 53,842.87 |
| 05/07/2009 | 24,950 | Shs. | On Hand | (107.69) |
| | (100) | Shs. | Sold | $ 53,735.18 |
| 05/07/2009 | 24,850 | Shs. | On Hand | (215.37) |
| | (4,850) | Shs. | Sold | $ 53,519.81 |
| | 20,000 | Shs. | On Hand | (10,445.52) |
| | | | | $ 43,074.29 |

Schedule C-2 (Continued)

Exchanges and Stock Distributions
Charles Schwab

| Date | Shares | | Transaction | Inventory Value |
|------|-------:|---|-------------|----------------:|
| 05/07/2009 | (50) | Shs. | Sold | |
| | 19,950 | Shs. | On Hand | $ (107.69) |
| 05/07/2009 | (250) | Shs. | Sold | $ 42,966.60 |
| | 19,700 | Shs. | On Hand | (538.43) |
| 05/07/2009 | (1,000) | Shs. | Sold | $ 42,428.17 |
| | 18,700 | Shs. | On Hand | (2,153.71) |
| 05/07/2009 | (1,800) | Shs. | Sold | $ 40,274.46 |
| | 16,900 | Shs. | On Hand | (3,876.69) |
| 06/01/2010 | (16,900) | Shs. | Sold | $ 36,397.77 |
| 01/01/2011 | 25,000 | Shs. | Purchased | (36,397.77) |
| 01/01/2011 | 100 | Shs. | Purchased | 155,008.95 |
| 01/01/2011 | 1,000 | Shs. | Purchased | 600.04 |
| 01/01/2011 | 100 | Shs. | Purchased | 6,000.36 |
| 01/01/2011 | 100 | Shs. | Purchased | 600.04 |
| 01/01/2011 | 100 | Shs. | Purchased | 600.04 |
| 01/01/2011 | 900 | Shs. | Purchased | 600.04 |
| 01/01/2011 | 100 | Shs. | Purchased | 5,400.32 |
| 01/01/2011 | 1,200 | Shs. | Purchased | 600.04 |
| 01/01/2011 | 67 | Shs. | Purchased | 7,200.43 |
| 01/01/2011 | 5,197 | Shs. | Purchased | 402.02 |
| 01/01/2011 | 300 | Shs. | Purchased | 31,183.88 |
| 01/01/2011 | 700 | Shs. | Purchased | 1,800.11 |
| 01/01/2011 | 5,136 | Shs. | Purchased | 4,200.25 |
| | 10,000 | Shs. | Purchased | 30,819.47 |
| 06/09/2011 | 50,000 | Shs. | On Hand | 59,995.34 |
| | (25,000) | Shs. | Sold | $ 305,011.33 |
| 07/26/2011 | 25,000 | Shs. | On Hand | (152,505.67) |
| | (10,000) | Shs. | Sold | $ 152,505.66 |
| 07/28/2011 | 15,000 | Shs. | On Hand | (61,002.26) |
| | (100) | Shs. | Sold | $ 91,503.40 |
| 07/28/2011 | 14,900 | Shs. | On Hand | (610.02) |
| | (1,000) | Shs. | Sold | $ 90,893.38 |
| 07/28/2011 | 13,900 | Shs. | On Hand | (6,100.23) |
| | (100) | Shs. | Sold | $ 84,793.15 |
| 07/28/2011 | 13,800 | Shs. | On Hand | (610.02) |
| | (100) | Shs. | Sold | $ 84,183.13 |
| 07/28/2011 | 13,700 | Shs. | On Hand | (610.02) |
| | (100) | Shs. | Sold | $ 83,573.11 |
| 07/28/2011 | 13,600 | Shs. | On Hand | (610.02) |
| | (900) | Shs. | Sold | $ 82,963.09 |
| 07/28/2011 | 12,700 | Shs. | On Hand | (5,490.20) |
| | (100) | Shs. | Sold | $ 77,472.89 |
| 07/28/2011 | 12,600 | Shs. | On Hand | (610.02) |
| | (1,200) | Shs. | Sold | $ 76,862.87 |
| | | | | (7,320.27) |

Schedule C-2 (Continued)

| Exchanges and Stock Distributions | | | | Inventory Value |
|---|---|---|---|---|
| **Charles Schwab** | | | | |
| 07/28/2011 | 11,400 | Shs. | On Hand | $ 69,542.60 |
| | (67) | Shs. | Sold | (408.72) |
| 07/28/2011 | 11,333 | Shs. | On Hand | $ 69,133.88 |
| | (5,197) | Shs. | Sold | (31,702.88) |
| 07/28/2011 | 6,136 | Shs. | On Hand | $ 37,431.00 |
| | (300) | Shs. | Sold | (1,830.07) |
| 07/28/2011 | 5,836 | Shs. | On Hand | $ 35,600.93 |
| | (700) | Shs. | Sold | (4,270.16) |
| 07/28/2011 | 5,136 | Shs. | On Hand | $ 31,330.77 |
| | (5,136) | Shs. | Sold | (31,330.77) |
| **Freightcar Amer Inc Common** | | | | |
| 05/01/2009 | 1,500 | Shs. | Purchased | 29,093.95 |
| 05/04/2009 | (1,500) | Shs. | Sold | (29,093.95) |
| **Gamestop Corp New Cl A** | | | | |
| 05/29/2009 | 500 | Shs. | Purchased | 11,879.47 |
| 05/29/2009 | 500 | Shs. | Purchased | 11,879.48 |
| 06/05/2009 | 1,000 | Shs. | On Hand | $ 23,758.95 |
| | (500) | Shs. | Sold | (11,879.48) |
| 06/05/2009 | 500 | Shs. | On Hand | $ 11,879.47 |
| | (500) | Shs. | Sold | (11,879.47) |
| **General Electric Co Common** | | | | |
| 05/01/2009 | 3,000 | Shs. | Purchased | 38,138.95 |
| 05/04/2009 | (3,000) | Shs. | Sold | (38,138.95) |
| 09/22/2009 | 5,000 | Shs. | Purchased | 85,408.95 |
| 10/30/2009 | 5,000 | Shs. | On Hand | $ 85,408.95 |
| 01/11/2010 | (5,000) | Shs. | Sold | (85,408.95) |
| 01/11/2010 | 500 | Shs. | Purchased | 8,371.79 |
| | 2,000 | Shs. | Purchased | 33,487.16 |
| 02/18/2010 | 2,500 | Shs. | On Hand | $ 41,858.95 |
| | (500) | Shs. | Sold | (8,371.79) |
| 03/05/2010 | 2,000 | Shs. | On Hand | $ 33,487.16 |
| | (2,000) | Shs. | Sold | (33,487.16) |
| **General Mtrs Corp Common** | | | | |
| 03/27/2009 | 5,000 | Shs. | Purchased | 19,108.95 |
| 04/24/2009 | (5,000) | Shs. | Sold | (19,108.95) |

Schedule C-2 (Continued)

| Exchanges and Stock Distributions | | | | Inventory Value |
|---|---|---|---|---|
| Charles Schwab | | | | |
| Geron Corp | | | | |
| Common | | | | |
| 06/25/2007 | | | | |
| 06/25/2007 | 300 | Shs. | Purchased | |
| 06/25/2007 | 1,200 | Shs. | Purchased | $ 2,172.04 |
| 06/25/2007 | 1,200 | Shs. | Purchased | 8,700.01 |
| 05/19/2008 | 2,300 | Shs. | Purchased | 8,700.38 |
| 10/13/2008 | 4,540 | Shs. | Purchased | 16,680.50 |
| 10/13/2008 | 760 | Shs. | Purchased | 18,861.65 |
| 10/13/2008 | 1,400 | Shs. | Purchased | 1,987.09 |
| 10/13/2008 | 2,800 | Shs. | Purchased | 3,660.43 |
| 11/20/2008 | 40 | Shs. | Purchased | 7,320.85 |
| 11/20/2008 | 100 | Shs. | Purchased | 104.58 |
| 11/20/2008 | 1,151 | Shs. | Purchased | 326.48 |
| 11/20/2008 | 1,500 | Shs. | Purchased | 3,757.78 |
| 11/20/2008 | 2,277 | Shs. | Purchased | 4,897.19 |
| 11/20/2008 | 4,972 | Shs. | Purchased | 7,433.94 |
| | 10,000 | Shs. | Purchased | 16,232.56 |
| 02/11/2009 | 34,540 | Shs. | On Hand | 29,247.95 |
| | (4,540) | Shs. | Sold | $ 130,083.43 |
| 02/11/2009 | 30,000 | Shs. | On Hand | (17,098.40) |
| | (760) | Shs. | Sold | $ 112,985.03 |
| 02/11/2009 | 29,240 | Shs. | On Hand | (2,862.29) |
| | (1,400) | Shs. | Sold | $ 110,122.74 |
| 02/11/2009 | 27,840 | Shs. | On Hand | (5,272.63) |
| | (2,800) | Shs. | Sold | $ 104,850.11 |
| 02/11/2009 | 25,040 | Shs. | On Hand | (10,545.27) |
| | (300) | Shs. | Sold | $ 94,304.84 |
| 02/11/2009 | 24,740 | Shs. | On Hand | (1,129.85) |
| | (1,200) | Shs. | Sold | $ 93,174.99 |
| 02/11/2009 | 23,540 | Shs. | On Hand | (4,519.40) |
| | (1,200) | Shs. | Sold | $ 88,655.59 |
| 02/11/2009 | 22,340 | Shs. | On Hand | (4,519.40) |
| | (2,300) | Shs. | Sold | $ 84,136.19 |
| 02/19/2009 | 20,040 | Shs. | On Hand | (8,662.19) |
| | (40) | Shs. | Sold | $ 75,474.00 |
| 02/19/2009 | 20,000 | Shs. | On Hand | (150.65) |
| | (100) | Shs. | Sold | $ 75,323.35 |
| 02/19/2009 | 19,900 | Shs. | On Hand | (376.62) |
| | (1,151) | Shs. | Sold | $ 74,946.73 |
| 02/19/2009 | 18,749 | Shs. | On Hand | (4,334.86) |
| | (1,500) | Shs. | Sold | $ 70,611.87 |
| 02/19/2009 | 17,249 | Shs. | On Hand | (5,649.25) |
| | (2,277) | Shs. | Sold | $ 64,962.62 |
| | 14,972 | Shs. | On Hand | (8,575.56) |
| | | | | $ 56,387.06 |

Schedule C-2 (Continued)

**Exchanges and Stock Distributions**
**Charles Schwab**

| Date | Shares | | Type | Inventory Value |
|---|---|---|---|---|
| 02/19/2009 | (4,972) | Shs. | Sold | |
| | 10,000 | Shs. | On Hand | $ (18,725.38) |
| 02/19/2009 | (10,000) | Shs. | Sold | $ 37,661.68 |
| 02/26/2009 | 200 | Shs. | Purchased | (37,661.68) |
| 02/26/2009 | 339 | Shs. | Purchased | 1,002.98 |
| 02/26/2009 | 1,000 | Shs. | Purchased | 1,700.05 |
| 02/26/2009 | 2,400 | Shs. | Purchased | 5,014.90 |
| 02/26/2009 | 16,061 | Shs. | Purchased | 12,035.75 |
| 02/27/2009 | 3,674 | Shs. | Purchased | 80,544.27 |
| 02/27/2009 | 7,518 | Shs. | Purchased | 16,587.73 |
| 02/27/2009 | 8,682 | Shs. | Purchased | 33,943.00 |
| 02/27/2009 | 126 | Shs. | Purchased | 39,198.34 |
| | 40,000 | Shs. | On Hand | 568.88 |
| 03/16/2009 | (200) | Shs. | Sold | $ 190,595.90 |
| | 39,800 | Shs. | On Hand | (952.98) |
| 03/16/2009 | (339) | Shs. | Sold | $ 189,642.92 |
| | 39,461 | Shs. | On Hand | (1,615.30) |
| 03/16/2009 | (1,000) | Shs. | Sold | $ 188,027.62 |
| | 38,461 | Shs. | On Hand | (4,764.90) |
| 03/16/2009 | (2,400) | Shs. | Sold | $ 183,262.72 |
| | 36,061 | Shs. | On Hand | (11,435.75) |
| 03/16/2009 | (16,061) | Shs. | Sold | $ 171,826.97 |
| | 20,000 | Shs. | On Hand | (76,529.02) |
| 03/16/2009 | (126) | Shs. | Sold | $ 95,297.95 |
| | 19,874 | Shs. | On Hand | (600.38) |
| 03/16/2009 | (7,518) | Shs. | Sold | $ 94,697.57 |
| | 12,356 | Shs. | On Hand | (35,822.50) |
| 03/19/2009 | (3,674) | Shs. | Sold | $ 58,875.07 |
| | 8,682 | Shs. | On Hand | (17,506.23) |
| 03/19/2009 | (8,682) | Shs. | Sold | $ 41,368.84 |
| 07/10/2009 | 600 | Shs. | Purchased | (41,368.84) |
| 07/10/2009 | 600 | Shs. | Purchased | 4,369.49 |
| 07/10/2009 | 800 | Shs. | Purchased | 4,370.68 |
| 07/13/2009 | 139 | Shs. | Purchased | 5,825.98 |
| 07/13/2009 | 1,861 | Shs. | Purchased | 1,018.10 |
| | 4,000 | Shs. | On Hand | 13,630.85 |
| 08/25/2009 | (600) | Shs. | Sold | $ 29,215.10 |
| | 3,400 | Shs. | On Hand | (4,382.27) |
| 08/25/2009 | (600) | Shs. | Sold | $ 24,832.83 |
| | 2,800 | Shs. | On Hand | (4,382.26) |
| 08/25/2009 | (800) | Shs. | Sold | $ 20,450.57 |
| | 2,000 | Shs. | On Hand | (5,843.02) |
| 09/14/2009 | (139) | Shs. | Sold | $ 14,607.55 |
| | 1,861 | Shs. | On Hand | (1,015.22) |
| | | | | $ 13,592.33 |

747a        (56)

Schedule C-2 (Continued)

| | | | | | Inventory Value |
|---|---|---|---|---|---|
| **Exchanges and Stock Distributions** | | | | | |
| Charles Schwab | | | | | |
| 09/14/2009 | (1,861) | Shs. | Sold | | |
| | | | | $ | (13,592.33) |
| **Glaxosmithkline Plc** | | | | | |
| **Sponsored Adr** | | | | | |
| 04/27/2009 | 500 | Shs. | Purchased | | |
| 05/06/2009 | (500) | Shs. | Sold | | 15,483.95 |
| | | | | | (15,483.95) |
| **Hartford Finl Svcs Group Inc** | | | | | |
| **Common** | | | | | |
| 11/03/2008 | 300 | Shs. | Purchased | | |
| 01/30/2009 | 200 | Shs. | Purchased | | 4,476.95 |
| 02/06/2009 | 500 | Shs. | Purchased | | 2,756.75 |
| 02/17/2009 | 100 | Shs. | Purchased | | 5,512.95 |
| 02/17/2009 | 100 | Shs. | Purchased | | 1,056.39 |
| 02/17/2009 | 100 | Shs. | Purchased | | 1,056.39 |
| 02/17/2009 | 100 | Shs. | Purchased | | 1,056.40 |
| 02/19/2009 | 100 | Shs. | Purchased | | 1,056.40 |
| 02/19/2009 | 500 | Shs. | Purchased | | 1,056.43 |
| 02/19/2009 | 200 | Shs. | Purchased | | 4,187.95 |
| 02/20/2009 | 300 | Shs. | Purchased | | 1,567.14 |
| 02/25/2009 | 500 | Shs. | Purchased | | 2,350.68 |
| 02/27/2009 | 1,000 | Shs. | Purchased | | 3,262.95 |
| 03/16/2009 | 1,000 | Shs. | Purchased | | 7,762.95 |
| 03/20/2009 | 2,500 | Shs. | Purchased | | 6,312.95 |
| | 2,500 | Shs. | Purchased | | 18,060.45 |
| 04/27/2009 | 10,000 | Shs. | On Hand | | 18,610.45 |
| | (300) | Shs. | Sold | $ | 80,144.18 |
| 04/27/2009 | 9,700 | Shs. | On Hand | | (2,404.33) |
| | (200) | Shs. | Sold | $ | 77,739.85 |
| 04/27/2009 | 9,500 | Shs. | On Hand | | (1,602.88) |
| | (500) | Shs. | Sold | $ | 76,136.97 |
| 04/27/2009 | 9,000 | Shs. | On Hand | | (4,007.21) |
| | (100) | Shs. | Sold | $ | 72,129.76 |
| 04/27/2009 | 8,900 | Shs. | On Hand | | (801.44) |
| | (100) | Shs. | Sold | $ | 71,328.32 |
| 04/27/2009 | 8,800 | Shs. | On Hand | | (801.44) |
| | (100) | Shs. | Sold | $ | 70,526.88 |
| 04/27/2009 | 8,700 | Shs. | On Hand | | (801.44) |
| | (100) | Shs. | Sold | $ | 69,725.44 |
| 04/27/2009 | 8,600 | Shs. | On Hand | | (801.44) |
| | (100) | Shs. | Sold | $ | 68,924.00 |
| 04/27/2009 | 8,500 | Shs. | On Hand | | (801.44) |
| | (500) | Shs. | Sold | $ | 68,122.56 |
| 03/12/2010 | 8,000 | Shs. | On Hand | | (4,007.21) |
| | (200) | Shs. | Sold | $ | 64,115.35 |
| | | | | | (1,602.88) |

Schedule C-2 (Continued)

| Exchanges and Stock Distributions<br>Charles Schwab | | | | Inventory<br>Value |
|---|---|---|---|---|
| 03/12/2010 | 7,800 | Shs. | On Hand | |
| | (300) | Shs. | Sold | $ 62,512.47 |
| 03/12/2010 | 7,500 | Shs. | On Hand | (2,404.33) |
| | (500) | Shs. | Sold | $ 60,108.14 |
| 03/12/2010 | 7,000 | Shs. | On Hand | (4,007.21) |
| | (1,000) | Shs. | Sold | $ 56,100.93 |
| 03/12/2010 | 6,000 | Shs. | On Hand | (8,014.42) |
| | (1,000) | Shs. | Sold | $ 48,086.51 |
| 03/12/2010 | 5,000 | Shs. | On Hand | (8,014.42) |
| | (2,500) | Shs. | Sold | $ 40,072.09 |
| 03/12/2010 | 2,500 | Shs. | On Hand | (20,036.05) |
| | (2,500) | Shs. | Sold | $ 20,036.04 |
| **Keycorp New<br>Common** | | | | (20,036.04) |
| 06/05/2009 | | | | |
| 06/05/2009 | 1,500 | Shs. | Purchased | |
| | 1,000 | Shs. | Purchased | 8,210.37 |
| 06/25/2009 | 2,500 | Shs. | On Hand | 5,473.58 |
| | (1,500) | Shs. | Sold | $ 13,683.95 |
| 07/13/2009 | 1,000 | Shs. | On Hand | (8,210.37) |
| | (1,000) | Shs. | Sold | $ 5,473.58 |
| **Ldk Solar Co Ltd<br>Sponsored Adr** | | | | (5,473.58) |
| 10/27/2009 | | | | |
| 10/27/2009 | 100 | Shs. | Purchased | |
| 10/27/2009 | 100 | Shs. | Purchased | 759.01 |
| 10/27/2009 | 100 | Shs. | Purchased | 759.03 |
| 10/27/2009 | 100 | Shs. | Purchased | 759.05 |
| 10/27/2009 | 300 | Shs. | Purchased | 759.09 |
| 10/27/2009 | 3,000 | Shs. | Purchased | 2,276.82 |
| 10/27/2009 | 5,300 | Shs. | Purchased | 22,772.69 |
| | 1,000 | Shs. | Purchased | 40,226.44 |
| 11/02/2009 | 10,000 | Shs. | On Hand | 7,590.89 |
| | (100) | Shs. | Sold | $ 75,903.02 |
| 11/02/2009 | 9,900 | Shs. | On Hand | (759.03) |
| | (100) | Shs. | Sold | $ 75,143.99 |
| 11/02/2009 | 9,800 | Shs. | On Hand | (759.03) |
| | (100) | Shs. | Sold | $ 74,384.96 |
| 11/02/2009 | 9,700 | Shs. | On Hand | (759.03) |
| | (100) | Shs. | Sold | $ 73,625.93 |
| 11/02/2009 | 9,600 | Shs. | On Hand | (759.03) |
| | (300) | Shs. | Sold | $ 72,866.90 |
| 11/02/2009 | 9,300 | Shs. | On Hand | (2,277.09) |
| | (3,000) | Shs. | Sold | $ 70,589.81 |
| | 6,300 | Shs. | On Hand | (22,770.91) |
| | | | | $ 47,818.90 |

Schedule C-2 (Continued)

| | | | | | Inventory Value |
|---|---|---|---|---|---|
| **Exchanges and Stock Distributions** | | | | | |
| **Charles Schwab** | | | | | |
| 11/02/2009 | (5,300) | Shs. | Sold | | |
| | 1,000 | Shs. | On Hand | $ | (40,228.60) |
| 12/23/2009 | (1,000) | Shs. | Sold | $ | 7,590.30 |
| | | | | | (7,590.30) |
| **Motorola Inc** | | | | | |
| **Common** | | | | | |
| 10/30/2009 | 9,000 | Shs. | Purchased | | |
| 11/02/2009 | 1,000 | Shs. | Purchased | | 79,208.95 |
| 11/02/2009 | 5,000 | Shs. | Purchased | | 8,891.49 |
| | 15,000 | Shs. | On Hand | | 44,457.46 |
| 11/12/2009 | (9,000) | Shs. | Sold | $ | 132,557.90 |
| | 6,000 | Shs. | On Hand | | (79,534.74) |
| 11/12/2009 | (1,000) | Shs. | Sold | $ | 53,023.16 |
| | 5,000 | Shs. | On Hand | | (8,837.19) |
| 12/09/2009 | (5,000) | Shs. | Sold | $ | 44,185.97 |
| | | | | | (44,185.97) |
| **Penske Automotive Group, Inc.** | | | | | |
| **Common** | | | | | |
| 06/02/2009 | 3,000 | Shs. | Purchased | | |
| 06/02/2009 | 400 | Shs. | Purchased | | 45,725.37 |
| 06/02/2009 | 1,600 | Shs. | Purchased | | 6,092.72 |
| | 5,000 | Shs. | On Hand | | 24,386.86 |
| 08/31/2009 | (3,000) | Shs. | Sold | $ | 76,204.95 |
| | 2,000 | Shs. | On Hand | | (45,722.97) |
| 09/10/2009 | (400) | Shs. | Sold | $ | 30,481.98 |
| | 1,600 | Shs. | On Hand | | (6,096.40) |
| 09/10/2009 | (1,600) | Shs. | Sold | $ | 24,385.58 |
| | | | | | (24,385.58) |
| **Rait Financial Trust** | | | | | |
| **Common** | | | | | |
| 11/17/2009 | 200 | Shs. | Purchased | | |
| 11/17/2009 | 1,800 | Shs. | Purchased | | 344.06 |
| 11/17/2009 | 2,992 | Shs. | Purchased | | 3,096.54 |
| 11/17/2009 | 4,108 | Shs. | Purchased | | 5,147.13 |
| 11/17/2009 | 4,700 | Shs. | Purchased | | 7,066.99 |
| 11/17/2009 | 6,200 | Shs. | Purchased | | 8,080.70 |
| 11/17/2009 | 100 | Shs. | Purchased | | 10,727.85 |
| 11/17/2009 | 100 | Shs. | Purchased | | 173.03 |
| 11/17/2009 | 100 | Shs. | Purchased | | 173.03 |
| 11/17/2009 | 200 | Shs. | Purchased | | 173.03 |
| 11/17/2009 | 900 | Shs. | Purchased | | 346.06 |
| 11/17/2009 | 1,000 | Shs. | Purchased | | 1,557.27 |
| 11/17/2009 | 1,000 | Shs. | Purchased | | 1,730.30 |
| 11/17/2009 | 1,500 | Shs. | Purchased | | 1,730.30 |
| | 5,100 | Shs. | Purchased | | 2,595.45 |
| | | | | | 8,824.51 |

Schedule C-2 (Continued)

**Exchanges and Stock Distributions**
**Charles Schwab**

| | | | | | Inventory Value |
|---|---|---|---|---|---|
| | | | | | |
| 12/17/2009 | 30,000 | Shs. | On Hand | $ | 51,766.25 |
| | (200) | Shs. | Sold | | (345.11) |
| 12/17/2009 | 29,800 | Shs. | On Hand | $ | 51,421.14 |
| | (1,800) | Shs. | Sold | | (3,105.97) |
| 12/17/2009 | 28,000 | Shs. | On Hand | $ | 48,315.17 |
| | (2,992) | Shs. | Sold | | (5,162.82) |
| 12/17/2009 | 25,008 | Shs. | On Hand | $ | 43,152.35 |
| | (4,108) | Shs. | Sold | | (7,088.53) |
| 12/17/2009 | 20,900 | Shs. | On Hand | $ | 36,063.82 |
| | (4,700) | Shs. | Sold | | (8,110.05) |
| 12/17/2009 | 16,200 | Shs. | On Hand | $ | 27,953.77 |
| | (6,200) | Shs. | Sold | | (10,698.36) |
| 12/28/2009 | 10,000 | Shs. | On Hand | $ | 17,255.41 |
| | (100) | Shs. | Sold | | (172.55) |
| 12/28/2009 | 9,900 | Shs. | On Hand | $ | 17,082.86 |
| | (100) | Shs. | Sold | | (172.55) |
| 12/28/2009 | 9,800 | Shs. | On Hand | $ | 16,910.31 |
| | (100) | Shs. | Sold | | (172.55) |
| 12/28/2009 | 9,700 | Shs. | On Hand | $ | 16,737.76 |
| | (200) | Shs. | Sold | | (345.11) |
| 12/28/2009 | 9,500 | Shs. | On Hand | $ | 16,392.65 |
| | (900) | Shs. | Sold | | (1,552.99) |
| 12/28/2009 | 8,600 | Shs. | On Hand | $ | 14,839.66 |
| | (1,000) | Shs. | Sold | | (1,725.54) |
| 12/28/2009 | 7,600 | Shs. | On Hand | $ | 13,114.12 |
| | (1,000) | Shs. | Sold | | (1,725.54) |
| 12/28/2009 | 6,600 | Shs. | On Hand | $ | 11,388.58 |
| | (1,500) | Shs. | Sold | | (2,588.31) |
| 12/28/2009 | 5,100 | Shs. | On Hand | $ | 8,800.27 |
| 04/19/2010 | (5,100) | Shs. | Sold | | (8,800.27) |
| 04/19/2010 | 2,700 | Shs. | Purchased | | 6,535.21 |
| 04/19/2010 | 3,200 | Shs. | Purchased | | 7,745.43 |
| 04/19/2010 | 5,700 | Shs. | Purchased | | 13,853.55 |
| 04/23/2010 | 8,400 | Shs. | Purchased | | 20,415.76 |
| 04/26/2010 | 5,000 | Shs. | Purchased | | 14,908.95 |
| | 5,000 | Shs. | Purchased | | 15,508.95 |
| 05/07/2010 | 30,000 | Shs. | On Hand | $ | 78,967.85 |
| | (2,700) | Shs. | Sold | | (7,107.11) |
| 05/07/2010 | 27,300 | Shs. | On Hand | $ | 71,860.74 |
| | (3,200) | Shs. | Sold | | (8,423.24) |
| 05/07/2010 | 24,100 | Shs. | On Hand | $ | 63,437.50 |
| | (5,700) | Shs. | Sold | | (15,003.89) |
| 05/07/2010 | 18,400 | Shs. | On Hand | $ | 48,433.61 |
| | (8,400) | Shs. | Sold | | (22,111.00) |

Schedule C-2 (Continued)

| Exchanges and Stock Distributions | | | | Inventory Value |
|---|---|---|---|---|

**Charles Schwab**

| | | | | |
|---|---|---|---|---|
| 05/07/2010 | 10,000 | Shs. | On Hand | $ 26,322.61 |
| | (3,000) | Shs. | Sold | (13,161.31) |
| 05/07/2010 | 5,000 | Shs. | On Hand | $ 13,161.30 |
| | (5,000) | Shs. | Sold | (13,161.30) |

**Rite Aid Corp**
**Common**
**New York Stock Exchange**

| | | | | |
|---|---|---|---|---|
| 05/07/2009 | 20,000 | Shs. | Purchased | |
| 05/29/2009 | 10,000 | Shs. | Purchased | 18,014.95 |
| 05/29/2009 | 10,000 | Shs. | Purchased | 12,404.48 |
| 08/03/2009 | 40,000 | Shs. | On Hand | 12,404.47 |
| | (20,000) | Shs. | Sold | $ 42,823.90 |
| 08/21/2009 | 20,000 | Shs. | On Hand | (21,411.95) |
| | (10,000) | Shs. | Sold | $ 21,411.95 |
| 08/24/2009 | 10,000 | Shs. | On Hand | (10,705.98) |
| 09/16/2009 | (10,000) | Shs. | Sold | $ 10,705.97 |
| 09/17/2009 | 9,000 | Shs. | Purchased | (10,705.97) |
| | 16,000 | Shs. | Purchased | 17,738.95 |
| 09/22/2009 | 25,000 | Shs. | On Hand | 33,608.95 |
| | (9,000) | Shs. | Sold | $ 51,347.90 |
| 09/22/2009 | 16,000 | Shs. | On Hand | (18,485.24) |
| | (16,000) | Shs. | Sold | $ 32,862.66 |
| | | | | (32,862.66) |

**Sirius Satellite Radio Inc**
**Common**
**NASDAQ Stocks**

| | | | | |
|---|---|---|---|---|
| 08/03/2009 | 50,000 | Shs. | Purchased | |
| 08/13/2009 | (50,000) | Shs. | Sold | 23,008.95 |
| 08/21/2009 | 23,000 | Shs. | Purchased | (23,008.95) |
| 09/10/2009 | 20,000 | Shs. | Purchased | 17,258.95 |
| 09/11/2009 | 10,000 | Shs. | Purchased | 13,808.95 |
| | 53,000 | Shs. | On Hand | 6,808.95 |
| 09/22/2009 | (23,000) | Shs. | Sold | $ 37,876.85 |
| | 30,000 | Shs. | On Hand | (16,437.12) |
| 09/22/2009 | (20,000) | Shs. | Sold | $ 21,439.73 |
| | 10,000 | Shs. | On Hand | (14,293.15) |
| 09/22/2009 | (10,000) | Shs. | Sold | $ 7,146.58 |
| 11/12/2009 | 20,000 | Shs. | Purchased | (7,146.58) |
| | 20,000 | Shs. | On Hand | 13,008.95 |
| 12/15/2009 | (20,000) | Shs. | Sold | $ 13,008.95 |
| 02/18/2010 | 800 | Shs. | Purchased | (13,008.95) |
| 02/18/2010 | 7,200 | Shs. | Purchased | 920.90 |
| | 8,000 | Shs. | On Hand | 8,288.05 |
| 06/07/2010 | (800) | Shs. | Sold | $ 9,208.95 |
| | | | | (920.90) |

Schedule C-2 (Continued)

| Exchanges and Stock Distributions<br>Charles Schwab | | | | Inventory<br>Value |
|---|---|---|---|---|
| 06/07/2010 | 7,200 | Shs. | On Hand | $ 8,288.05 |
| | (7,200) | Shs. | Sold | (8,288.05) |
| **Skinny Nutritional Corp.**<br>**Common** | | | | |
| 04/16/2009 | | | | |
| 04/16/2009 | 5,000 | Shs. | Purchased | |
| | 15,000 | Shs. | Purchased | 677.24 |
| 05/05/2009 | 20,000 | Shs. | On Hand | 2,031.71 |
| | (5,000) | Shs. | Sold | $ 2,708.95 |
| 05/05/2009 | 15,000 | Shs. | On Hand | (677.24) |
| | (15,000) | Shs. | Sold | $ 2,031.71 |
| **Sperian Protection Ord F** | | | | (2,031.71) |
| 04/27/2009 | | | | |
| 05/05/2009 | 138 | Shs. | Purchased | |
| | (138) | Shs. | Sold | 6,116.80 |
| **Titan Medical Inc.** | | | | (6,116.80) |
| 11/19/2009 | | | | |
| 06/02/2010 | 5,000 | Shs. | Purchased | |
| | (5,000) | Shs. | Sold | 2,285.85 |
| **Yrc Worldwide Inc**<br>**Common** | | | | (2,285.85) |
| 10/29/2008 | | | | |
| 10/30/2008 | 100 | Shs. | Purchased | |
| 02/25/2009 | 75 | Shs. | Purchased | 412.95 |
| | 500 | Shs. | Purchased | 327.95 |
| 06/05/2009 | 675 | Shs. | On Hand | 1,447.95 |
| | (100) | Shs. | Sold | $ 2,188.85 |
| 06/05/2009 | 575 | Shs. | On Hand | (324.27) |
| | (75) | Shs. | Sold | $ 1,864.58 |
| 06/05/2009 | 500 | Shs. | On Hand | (243.21) |
| | (500) | Shs. | Sold | $ 1,621.37 |
| | | | | (1,621.37) |

Jake Ball Trust

Schedule C-3

Principal Sales, Redemptions and Distributions with no Gain or Loss

| Redemption | | Proceeds or Distribution Value | Inventory Value |
|---|---|---|---|
| 12/31/2007 | -80,000 Face Goodmill LLC Note (owed to Steve Durst) | $ (80,000.00) | $ (80,000.00) |
| 12/31/2007 | -414 Face Goodmill LLC Note (owed to Steve Durst) | (414.00) | (414.00) |
| 01/05/2008 | -90,000 Face Goodmill LLC Note (owed to Steve Durst) | (90,000.00) | (90,000.00) |
| 01/05/2008 | -3,000 Face Goodmill LLC Note (owed to Steve Durst) | (3,000.00) | (3,000.00) |
| 01/05/2008 | -6,500 Face Goodmill LLC Note (owed to Steve Durst) | (6,500.00) | (6,500.00) |
| 01/05/2008 | -8,000 Face Goodmill LLC Note (owed to Steve Durst) | (8,000.00) | (8,000.00) |
| 01/05/2008 | -8,000 Face Goodmill LLC Note (owed to Steve Durst) | (8,000.00) | (8,000.00) |
| 04/07/2008 | -462 Face Goodmill LLC Note (owed to Steve Durst) | (462.00) | (462.00) |
| 05/19/2008 | -438 Face Goodmill LLC Note (owed to Steve Durst) | (438.00) | (438.00) |
| 06/01/2008 | -1,650 Face Goodmill LLC Note (owed to Steve Durst) | (1,650.00) | (1,650.00) |
| 06/16/2008 | -876 Face Goodmill LLC Note (owed to Steve Durst) | (876.00) | (876.00) |
| 07/09/2008 | -438 Face Goodmill LLC Note (owed to Steve Durst) | (438.00) | (438.00) |
| 08/08/2008 | -438 Face Goodmill LLC Note (owed to Steve Durst) | (438.00) | (438.00) |
| 09/15/2008 | -438 Face Goodmill LLC Note (owed to Steve Durst) | (438.00) | (438.00) |
| 10/22/2008 | -438 Face Goodmill LLC Note (owed to Steve Durst) | (438.00) | (438.00) |

Schedule C-3 (Continued)

| Redemption | | Proceeds or Distribution Value | Inventory Value |
|---|---|---|---|
| 11/15/2008 | -438 Face Goodmill LLC Note (owed to Steve Durst) | $ (438.00) | $ (438.00) |
| 01/09/2009 | -438 Face Goodmill LLC Note (owed to Steve Durst) | (438.00) | (438.00) |
| 02/05/2009 | -1,134.1 Face Goodmill LLC Note (owed to Steve Durst) | (1,134.10) | (1,134.10) |
| 02/05/2009 | -1,050 Face Goodmill LLC Note (owed to Steve Durst) | (1,050.00) | (1,050.00) |
| 02/08/2009 | -1,068.3 Face Goodmill LLC Note (owed to Steve Durst) | (1,068.30) | (1,068.30) |
| 02/11/2009 | -438 Face Goodmill LLC Note (owed to Steve Durst) | (438.00) | (438.00) |
| 02/20/2009 | -490 Face Goodmill LLC Note (owed to Steve Durst) | (490.00) | (490.00) |
| 04/07/2009 | -3,000 Face Goodmill LLC Note (owed to Steve Durst) | (3,000.00) | (3,000.00) |
| 04/13/2009 | -490 Face Goodmill LLC Note (owed to Steve Durst) | (490.00) | (490.00) |
| 05/05/2009 | -980 Face Goodmill LLC Note (owed to Steve Durst) | (980.00) | (980.00) |
| 05/06/2009 | -2,000 Face Goodmill LLC Note (owed to Steve Durst) | (2,000.00) | (2,000.00) |
| 05/11/2009 | -2,000 Face Goodmill LLC Note (owed to Steve Durst) | (2,000.00) | (2,000.00) |
| 06/10/2009 | -490 Face Goodmill LLC Note (owed to Steve Durst) | (490.00) | (490.00) |
| 09/17/2009 | -494 Face Goodmill LLC Note (owed to Steve Durst) | (494.00) | (494.00) |
| 11/12/2009 | -47,846.09 Face Goodmill LLC Note (owed to Steve Durst) | (47,846.09) | (47,846.09) |
| 11/21/2009 | -47,846.09 Face Goodmill LLC Note (owed to Steve Durst) | (47,846.09) | (47,846.09) |

Schedule C-3 (Continued)

| Redemption | | Proceeds or Distribution Value | Inventory Value |
|---|---|---|---|
| 05/20/2010 | -2,000 Face Goodmill LLC Note (owed to Steve Durst) | $  (2,000.00) | $  (2,000.00) |
| 06/11/2010 | -10,000 Face Goodmill LLC Note (owed to Steve Durst) | (10,000.00) | (10,000.00) |
| 07/23/2010 | -10,000 Face Goodmill LLC Note (owed to Steve Durst) | (10,000.00) | (10,000.00) |
| 08/17/2010 | -2,000 Face Goodmill LLC Note (owed to Steve Durst) | (2,000.00) | (2,000.00) |
| 08/30/2010 | -2,500 Face Goodmill LLC Note (owed to Steve Durst) | (2,500.00) | (2,500.00) |
| 09/11/2010 | -6,000 Face Goodmill LLC Note (owed to Steve Durst) | (6,000.00) | (6,000.00) |
| 10/02/2010 | -11,000 Face Goodmill LLC Note (owed to Steve Durst) | (11,000.00) | (11,000.00) |
| 10/18/2010 | -7,000 Face Goodmill LLC Note (owed to Steve Durst) | (7,000.00) | (7,000.00) |
| 11/03/2010 | -1,500 Face Goodmill LLC Note (owed to Steve Durst) | (1,500.00) | (1,500.00) |
| 11/12/2010 | -7,000 Face Goodmill LLC Note (owed to Steve Durst) | (7,000.00) | (7,000.00) |
| 12/02/2010 | -6,500 Face Goodmill LLC Note (owed to Steve Durst) | (6,500.00) | (6,500.00) |
| 12/17/2010 | -9,500 Face Goodmill LLC Note (owed to Steve Durst) | (9,500.00) | (9,500.00) |
| 12/26/2010 | -15,000 Face Goodmill LLC Note (owed to Steve Durst) | (15,000.00) | (15,000.00) |
| 01/09/2011 | -1,800 Face Goodmill LLC Note (owed to Steve Durst) | (1,800.00) | (1,800.00) |
| 01/19/2011 | -5,000 Face Goodmill LLC Note (owed to Steve Durst) | (5,000.00) | (5,000.00) |
| 02/08/2011 | -5,000 Face Goodmill LLC Note (owed to Steve Durst) | (5,000.00) | (5,000.00) |

Schedule C-3 (Continued)

| Redemption | | Proceeds or Distribution Value | Inventory Value |
|---|---|---|---|
| 02/22/2011 | -5,500 Face Goodmill LLC Note (owed to Steve Durst) | $ (5,500.00) | $ (5,500.00) |
| 03/08/2011 | -2,000 Face Goodmill LLC Note (owed to Steve Durst) | (2,000.00) | (2,000.00) |
| 03/22/2011 | -5,500 Face Goodmill LLC Note (owed to Steve Durst) | (5,500.00) | (5,500.00) |
| 04/02/2011 | -3,500 Face Goodmill LLC Note (owed to Steve Durst) | (3,500.00) | (3,500.00) |
| 04/19/2011 | -6,000 Face Goodmill LLC Note (owed to Steve Durst) | (6,000.00) | (6,000.00) |
| 05/01/2011 | -5,000 Face Goodmill LLC Note (owed to Steve Durst) | (5,000.00) | (5,000.00) |
| 05/01/2011 | -1,000 Face Goodmill LLC Note (owed to Steve Durst) | (1,000.00) | (1,000.00) |
| 05/14/2011 | -1,300 Face Goodmill LLC Note (owed to Steve Durst) | (1,300.00) | (1,300.00) |
| 05/23/2011 | -2,250 Face Goodmill LLC Note (owed to Steve Durst) | (2,250.00) | (2,250.00) |
| 06/07/2011 | -2,250 Face Goodmill LLC Note (owed to Steve Durst) | (2,250.00) | (2,250.00) |
| 06/18/2011 | -7,500 Face Goodmill LLC Note (owed to Steve Durst) | (7,500.00) | (7,500.00) |
| 06/28/2011 | -8,750 Face Goodmill LLC Note (owed to Steve Durst) | (8,750.00) | (8,750.00) |
| 07/19/2011 | -2,250 Face Goodmill LLC Note (owed to Steve Durst) | (2,250.00) | (2,250.00) |
| 08/17/2011 | -3,500 Face Goodmill LLC Note (owed to Steve Durst) | (3,500.00) | (3,500.00) |
| 09/13/2011 | -2,250 Face Goodmill LLC Note (owed to Steve Durst) | (2,250.00) | (2,250.00) |
| **Total Redemption** | | **$ (471,644.58)** | **$ (471,644.58)** |

Schedule C-3 (Continued)

| Return of Principal | | Proceeds or Distribution Value | Inventory Value |
|---|---|---|---|
| 09/22/2008 | $3,000 loan to James Rael as a beneficiary for law school | $ 3,000.00 | $ 3,000.00 |
| | Repayment of loan | | |
| 07/26/2009 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 09/12/2009 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 10/09/2009 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 11/12/2009 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 12/07/2009 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 01/19/2010 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 04/09/2010 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 05/01/2010 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 06/03/2010 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 07/08/2010 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 08/17/2010 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 09/09/2010 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |

Schedule C-3 (Continued)

| Return of Principal | | Proceeds or Distribution Value | Inventory Value |
|---|---|---|---|
| 09/15/2010 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | $ 1,000.00 | $ 1,000.00 |
| 10/25/2010 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 1,000.00 | 1,000.00 |
| 11/24/2010 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 500.00 | 500.00 |
| 01/14/2011 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 10,000.00 | 10,000.00 |
| 02/06/2011 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 10,000.00 | 10,000.00 |
| 02/26/2011 | $50,000 Note Receivable due from Steve Trumbo for Weekly Fantasy Football LLC stock purchase | 10,000.00 | 10,000.00 |
| **Total Return of Principal** | | $ 47,500.00 | $ 47,500.00 |
| **Total Schedule C-3** | | $ (424,144.58) | $ (424,144.58) |

Jake Ball Trust
Schedule D-1
Dividends Received

**Charles Schwab**

**Alcoa Inc**
**Common**

12/31/2009    2009 Dividends

$    210.00

$    210.00

**General Electric Co**
**Common**

12/31/2010    2010 Dividends

200.00

**Glaxosmithkline Plc**
**Sponsored Adr**

200.00

12/31/2009    2009 Dividends

204.65

**Hartford Finl Svcs Group Inc**
**Common**

204.65

12/31/2009    2009 Dividends
12/31/2010    2010 Dividends

1,096.00

800.00

**Total**

1,896.00

**Total Schedule D-1**

$    2,510.65

$    2,510.65

Jake Ball Trust
Schedule D-2
Interest Received

**Northwestern Community Savings**
Account No. 55000371422

| Date | | Amount |
|---|---|---|
| 03/31/2006 | Interest | $ |
| 04/28/2006 | Interest | 1.20 |
| 04/28/2006 | Interest | 13.17 |
| 06/30/2006 | Interest | 5.65 |
| 07/31/2006 | Interest | 4.32 |
| 08/31/2006 | Interest | 3.01 |
| 09/29/2006 | Interest | 3.02 |
| 10/31/2006 | Interest | 2.03 |
| 11/30/2006 | Interest | 1.01 |
| 12/29/2006 | Interest | 0.25 |
| 01/19/2007 | Interest | 0.17 |
| 02/20/2007 | Interest | 0.19 |
| 03/30/2007 | Interest | 0.16 |
| 04/30/2007 | Interest | 4.06 |
| 05/31/2007 | Interest | 6.52 |
| 06/29/2007 | Interest | 6.52 |
| 07/31/2007 | Interest | 6.10 |
| 08/31/2007 | Interest | 2.60 |
| 09/21/2007 | Interest | 0.12 |
| 10/31/2007 | Interest | 0.11 |
| 11/30/2007 | Interest | 5.13 |
| 12/31/2007 | Interest | 0.12 |
| 01/31/2008 | Interest | 0.12 |
| 02/29/2008 | Interest | 0.12 |
| 03/31/2008 | Interest | 0.11 |
| 04/30/2008 | Interest | 0.12 |
| 05/31/2008 | Interest | 0.12 |
| 06/30/2008 | Interest | 0.10 |
| 07/31/2008 | Interest | 0.10 |
| 08/31/2008 | Interest | 0.10 |
| 09/30/2008 | Interest | 0.09 |
| 10/31/2008 | Interest | 0.10 |
| 11/30/2008 | Interest | 0.10 |
| 12/31/2008 | Interest | 0.09 |
| 01/30/2009 | Interest | 0.10 |
| 02/28/2009 | Interest | 0.09 |
| 03/31/2009 | Interest | 0.08 |
| 04/30/2009 | Interest | 0.08 |
| 05/31/2009 | Interest | 0.06 |
| | | 0.05 |

Schedule D-2 (Continued)

**Northwestern Community Savings**
**Account No. 55000371422 (Continued)**

| | | | |
|---|---|---|---|
| 06/30/2009 | Interest | $ | 0.05 |
| 07/31/2009 | Interest | | 0.05 |
| 08/31/2009 | Interest | | 0.03 |
| 09/30/2009 | Interest | | 0.01 |
| 10/30/2009 | Interest | | 0.01 |
| 11/30/2009 | Interest | | 0.01 |
| 12/31/2009 | Interest | | 0.01 |
| 01/29/2010 | Interest | | 0.01 |
| 02/26/2010 | Interest | | 0.01 |
| 03/31/2010 | Interest | | 0.01 |
| 04/30/2010 | Interest | | 0.01 |
| 06/30/2010 | Interest | | 0.01 |
| 11/30/2010 | Interest | | 0.60 |
| 12/27/2010 | Interest | | 0.27 |
| 01/31/2011 | Interest | | 0.28 |
| 02/28/2011 | Interest | | 0.04 |
| 03/31/2011 | Interest | | 0.05 |
| 04/29/2011 | Interest | | 0.02 |

**Charles Schwab Cash Account** $ 68.67

| | | | |
|---|---|---|---|
| 12/31/2007 | 2007 Interest | | 49.24 |
| 12/31/2008 | 2008 Interest | | 24.75 |
| 12/31/2009 | 2009 Interest | | 2.97 |
| 12/31/2010 | 2010 Interest | | 0.10 |

**LPL Cash Account** 77.06

| | | |
|---|---|---|
| 07/31/2007 | Interest 01/01/2007-12/31/2007 (per 1099-INT) | 84.15 |

84.15

**Northwestern Community Bank**
**Certificate of Deposit No. 55000459541** 84.15

| | | |
|---|---|---|
| 04/30/2006 | Interest | 163.00 |
| 05/31/2006 | Interest | 300.27 |
| 06/30/2006 | Interest | 274.01 |
| 07/31/2006 | Interest | 284.19 |
| 08/31/2006 | Interest | 285.25 |
| 09/30/2006 | Interest | 267.82 |
| 10/31/2006 | Interest | 296.62 |
| 11/30/2006 | Interest | 268.84 |
| 12/29/2006 | Interest | 181.53 |
| 01/31/2007 | Interest | 164.77 |
| 02/28/2007 | Interest | 109.73 |

Case: 15-4045    Document: 003112366698    Page: 151    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD   Document 122-14   Filed 08/10/15   Page 76 of 80 PageID: 2573

Schedule D-2 (Continued)

**Northwestern Community Bank**
**Certificate of Deposit No. 55000459541**
**(Continued)**

| | | | | |
|---|---|---|---|---|
| 03/30/2007 | Interest | | $ | 36.67 |

**Northwestern Community Bank**
**Certificate of Deposit No. 55000471892**

| | | | | |
|---|---|---|---|---|
| | | | $ | 2,632.70 |
| 07/31/2006 | Interest | | | |
| 08/31/2006 | Interest | 486.74 | | |
| 09/30/2006 | Interest | 780.79 | | |
| 10/30/2006 | Interest | 41.61 | | |
| | | 30.39 | | |

**Pershing Money Market Account**

| | | | | |
|---|---|---|---|---|
| | | | | 1,339.53 |
| 07/31/2007 | Interest | | | |
| 08/31/2007 | Interest | 16.88 | | |
| 10/31/2007 | Interest | 130.13 | | |
| 12/31/2007 | Interest | 221.49 | | |
| 01/31/2008 | Interest | 128.20 | | |
| 02/20/2008 | Interest | 99.55 | | |
| 03/31/2008 | Interest | 87.01 | | |
| 04/30/2008 | Interest | 89.20 | | |
| 05/30/2008 | Interest | 73.57 | | |
| 06/30/2008 | Interest | 62.92 | | |
| 07/31/2008 | Interest | 41.20 | | |
| 08/29/2008 | Interest | 10.05 | | |
| 09/30/2008 | Interest | 8.77 | | |
| 10/30/2008 | Interest | 10.29 | | |
| 11/28/2008 | Interest | 14.80 | | |
| 12/31/2008 | Interest | 5.92 | | |
| 01/30/2009 | Interest | 4.03 | | |
| 02/28/2009 | Interest | 2.74 | | |
| 03/31/2009 | Interest | 1.20 | | |
| 04/30/2009 | Interest | 0.47 | | |
| 05/29/2009 | Interest | 0.11 | | |
| 06/30/2009 | Interest | 0.06 | | |
| | | 0.01 | | |

**Total Schedule D-2**

| | | | | |
|---|---|---|---|---|
| | | 1,008.60 | | |
| | | $ | 5,210.71 | |

Jake Ball Trust

Schedule D-3

Other Income Received

**10% interest in Goodmill LLC**

| Date | Description | | Amount |
|------|-------------|---|--------|
| 04/08/2008 | Partnership Income | $ | 1,600.00 |
| 06/16/2008 | Partnership Income | | 1,600.00 |
| 07/22/2008 | Partnership Income | | 1,600.00 |
| 08/17/2008 | Partnership Income | | 1,600.00 |
| 09/16/2008 | Partnership Income | | 1,600.00 |
| 10/27/2008 | Partnership Income | | 1,600.00 |

**Total Schedule D-3**

$  9,600.00

$  9,600.00

Jake Ball Trust
Schedule E-1
Transfers of Income to Principal

| Transfers to Principal | | Distribution Value |
|---|---|---|
| 03/12/2007 | Transfer From:<br>Northwestern Community Bank<br>Certificate of Deposit No. 55000459541<br>To:<br>Northwestern Community Bank<br>Certificate of Deposit No. 55000459541 | $ 2,632.70 |
| 08/13/2007 | Transfer From:<br>LPL Cash Account<br>To:<br>Charles Schwab Cash Account | 84.15 |
| 10/31/2011 | Transfer From:<br>Northwestern Community Bank<br>Checking Account No. 55000459393<br>To:<br>Northwestern Community Bank<br>Checking Account No. 55000459393 | 11,008.20 |
| 10/31/2011 | Transfer From:<br>Charles Schwab Cash Account<br>To:<br>Charles Schwab Cash Account | 2,587.71 |
| 10/31/2011 | Transfer From:<br>Pershing Money Market Account<br>To:<br>Pershing Money Market Account | 1,008.60 |
| Total Schedule E-1 | | $ 17,321.36 |

Jake Ball Trust
Schedule G-1
Principal Cash Reconciliation

| Schedule | | Receipts | |
|---|---|---|---:|
| A-1 | Principal on Hand as Shown in Inventory or Account on File | | 805.91 |
| A-2 | Additional Principal Received | $ | |
| A-3 | Proceeds - Gains on Sale or Redemption | | 812,361.73 |
| A-4 | Transfers of Income To Principal | | 1,939,296.61 |
| B-2 | Proceeds - Loss on Sale or Redemption | | 17,321.36 |
| C-3 | Proceeds - No Gain/Loss on Sale or Redemption | | 1,602,424.14 |
| | | | (424,144.58) |
| | | $ | 3,948,065.17 |

| | | Disbursements | |
|---|---|---|---:|
| B-1 | Administration Expenses | $ | 317,402.05 |
| B-3 | Principal Distributions to Beneficiaries | | 390,317.13 |
| C-1 | Purchases | | 3,116,717.63 |
| B-4 | Principal on Hand | | 123,628.36 |
| | | $ | 3,948,065.17 |

Jake Ball Trust

Schedule G-2

Income Cash Reconciliation

| Schedule | | Receipts | | |
|---|---|---|---|---|
| | | | $ | |
| D-1 | Dividends Received | | | 2,510.65 |
| D-2 | Interest Received | | | 5,210.71 |
| D-3 | Other Income Collected | | | 9,600.00 |
| | | | $ | 17,321.36 |

| | | Disbursements | | |
|---|---|---|---|---|
| E-1 | Transfers of Income To Principal | | $ | |
| | | | | 17,321.36 |
| | | | $ | 17,321.36 |

# EXHIBIT "M"

768a

14

1  Steve's estate planning goals were.  And then we
2  made further amendments to the trust that
3  incorporated additional goals and objectives.
4      Q.      Again, I am going to show you a
5  document marked DSD-2 at a prior deposition and ask
6  if you can identify it.
7      A.      This document is a letter dated
8  December 29, 2006, sent via e-mail only to Matthew
9  Durst as a trustee of the Jake Ball Trust.
10     Q.      And was this your letter with your
11 recommendations and suggestions?
12     A.      Yes.
13     Q.      And subsequent to the -- issuing this
14 December 29, 2006 letter, did you have any -- you
15 indicated you had conversations with Steve Durst?
16     A.      I did.
17     Q.      And it was over the phone?
18     A.      I had some on the phone and some in
19 person.
20     Q.      And what were the nature of those
21 conversations?
22     A.      Discussions regarding his goals and
23 objectives with respect to his family and his taxes
24 and the trust and his estate planning in general.
25     Q.      Okay, and again, what were those

CRUZ & COMPANY, LLC

15

1  objectives and concerns?
2      A.      As I understood them, that he wanted
3  to -- he had an asset that he believed was going to
4  grow substantially in value, and he wanted to
5  protect it from taxes for the benefit of his family
6  and -- by family, I mean his extended family
7  including his children and his nieces and nephews.
8      Q.      And other than talking with Steve, you
9  also talked with Matt?
10     A.      I did.
11     Q.      And what was the nature of that
12 conversation?
13     A.      Same thing, often the conversations
14 were with both of them at the same time.  There were
15 discussions about how to implement the goals and
16 objectives.
17     Q.      And subsequent to those conversations,
18 what happened next?
19     A.      Well, we had -- I mean, we had
20 conversations for years, so I mean, after the
21 initial conversation, ultimately I prepared a draft
22 document.
23     Q.      Okay.  And you prepared a draft
24 document.  I am going to show you what has been
25 marked DMD-7 and ask if you can identify it.

CRUZ & COMPANY, LLC

16

1      A.      This document is a document entitled
2  Jake Ball Trust Agreement, By and Between Steven
3  Durst, as Grantor and Matthew Durst and Reuben H.
4  Durst, as Trustees, dated December -- I am sorry.
5  Dated November 29, 2004, as amended and restated on
6  May 10, 2007.
7      Q.      And who prepared that document?
8      A.      I prepared this document.
9      Q.      Okay.  And would you characterize this
10 document as a revocable or irrevocable trust?
11     A.      It is a revocable trust.
12     Q.      What about this first amendment and
13 restatement makes it revocable?
14     A.      Article 1, grantor retained powers.
15     Q.      I direct your attention to Article 9 on
16 page 10.  Article 9(B), additional and successor
17 trustees, you wrote that paragraph that, it would be
18 fair to say, that allowed Steve to replace a trustee
19 at any time in his discretion?
20     A.      Yes, that is the essence of that
21 paragraph.
22     Q.      Okay.
23     A.      And I did write it.
24     Q.      And you did write it.  Again, with
25 paragraph C on the next page, page 11, removal and

CRUZ & COMPANY, LLC

17

1  replacement by a majority of beneficiaries, this was
2  another way that a trustee could be replaced, was it
3  not, by a majority of the eligible income
4  beneficiaries?
5      A.      Yes.
6      Q.      And could those majority of eligible
7  income beneficiaries replace a trustee at any time?
8      A.      They could replace some trustees at
9  any time.
10     Q.      Okay, what trustees could they --
11     A.      "Any trustee other than a trustee who
12 is related to me..." -- me being Steven Durst,
13 "...by blood or marriage."
14     Q.      By the way, in addition to the trust
15 documents, did you also prepare wills for Steve
16 Durst?
17     A.      I prepared a will.
18     Q.      A will for him?
19     A.      (Gesturing.)
20     Q.      Did you prepare any other documents for
21 Steve Durst?
22             MR. O'CONNOR:  You have to say yes or
23 no.
24             THE WITNESS:  I am thinking.
25             MR. O'CONNOR:  I thought you were

CRUZ & COMPANY, LLC

169a

# EXHIBIT "Q"

770a

125

1  on this job?

2  A   For Shop Rite?

3  Q   -- that could have gone back to this date?

4  A   Well, they built the balance of the shopping

5  center. They built every building.

6  Q   They did all of it. And maybe, is that about

7  when they would have started? See, the reason I'm

8  asking is because the amendment here is in September

9  '06.

10  A   Right.

11  Q   When everybody agreed on what was to take place.

12  A   Okay.

13  Q   They give you a contract date of '05?

14  A   Okay.

15  Q   And so then you don't know what's related

16  exclusively to the Shop Rite or what might have to do

17  with something else. You're satisfied everything in

18  here was Shop Rite?

19  A   Well, I can --

20       MR. HLADIK:  If you know.

21       THE WITNESS:  Can I show him a spread sheet?

22       MR. HLADIK:  No, no, no.

23  A   This is Shop Rite.

24  Q   It's all Shop Rite?

25  A   Absolutely.

126

1  Q   This contract was completely performed and paid

2  for, is that right?

3  A   Yes.

4  Q   And basically 125 a foot?

5  A   Yes, a little more.

6  Q   Square foot?

7  A   A little more.

8       MR. YACOVELLE:  With the reservation of the

9  right to apply for an order concerning discovery of the

10  Steve Durst employment relationship and compensation,

11  particularly as it relates to Goodmill, that's all I

12  have now.

13       MR. HLADIK:  Your reservation was a little

14  broader than the two questions I believe that I directed

15  him not to answer.

16       MR. YACOVELLE:  Which two did you direct him

17  not to answer?

18       MR. HLADIK:  I don't recall. There were

19  two.

20       MR. YACOVELLE:  Let me just ask a couple

21  questions and see.

22       MR. HLADIK:  No, we're done. You indicated

23  you're done.

24       MR. YACOVELLE:  Well, no, you've only

25  directed him not to answer two questions you said.

127

1       MR. HLADIK:  I believe that's what you had

2  the court reporter mark.

3       MR. YACOVELLE:  What were you going to say?

4       THE WITNESS:  I was going to ask if I could

5  talk to my attorney for 12 seconds.

6       MR. YACOVELLE:  Sure.

7       MR. HLADIK:  Absolutely.

8            (Off the record)

9       MR. HLADIK:  I have no questions for the

10  witness.

11       MR. YACOVELLE:  Do you have anything

12  additional on the subject of things like this?

13       MR. HLADIK:  We're not getting into

14  compensation agreements with Stephen Durst.

15       MR. YACOVELLE:  Right, that's what I heard

16  you say, you don't want to get into his compensation

17  agreement negotiations.

18       MR. HLADIK:  Now you're putting words in my

19  mouth.

20       MR. YACOVELLE:  Employment agreement.

21       MR. HLADIK:  That has nothing to do with

22  this case.

23       MR. YACOVELLE:  Of course it has nothing to

24  do with it. We've been having this conversation for a

25  long time. I think Matt Durst has nothing to do with

128

1  this case. What I think truthfully is Steve Durst has

2  everything to do it with it. That's okay.

3       MR. HLADIK:  That's a deposition for a

4  different day, Mr. Stephen Durst.

5       MR. YACOVELLE:  Other than exploration of

6  the Steve Durst, Goodmill, Goodman Management, Goodman

7  Properties relationships, that's all I have.

8       MR. HLADIK:  Very good.

9       MR. YACOVELLE:  We'll see what we're going

10  to do about that.

11

12            (Deposition concludes 1:05 p.m.)

13

# EXHIBIT "S"

BRUCE A. GOODMAN
636 OLD YORK ROAD, 2ND FLOOR
JENKINTOWN, PA 19046

AUGUST 14, 2007

Matthew Durst, Trustee of
The Jake Ball Trust

**RE: $1,200,000 loan from Bruce A. Goodman to Zack & Jack Realty Associates, L.P. (the "Loan")**

Dear Matt:

As you are aware, in connection with the above captioned loan you executed a Pledge Surety Agreement and Pledge Agreement, both dated June 29, 2007, in my favor in connection with the Loan.

In consideration of your executing, as Trustee of the Jake Ball Trust, an Assignment of Rights to Receive Distributions from Goodmill, LLC on this date, I hereby terminate the Pledge Agreement dated June 29, 2007.

Sincerely,

Bruce A. Goodman

{P:\WDOX\CLIENTS\000252\00244\00098218.DOC.1}

# EXHIBIT "V"

Case: 15-4045    Document: 003112366698    Page: 163    Date Filed: 07/28/2016
Case 2:12-cv-05255-JBS-AMD   Document 122-24   Filed 08/10/15   Page 2 of 2 PageID: 2600
Signing Meeting

Page 1 of 4

## Carol Kulik

**From:**     Durst, Matt [MDurst@stfranciscare.org]
**Sent:**     Wednesday, December 19, 2007 1:10 PM
**To:**       Peck, Kelley
**Cc:**       Steve Durst
**Subject:** RE: Signing Meeting

Hi Kelley,

I want to review the purpose of the meeting on Friday, 12.21/2007.
1  To review the re-assessment that Paul Ruby has completed for the Goodmill Shopping Center and sign the documents converting the JB Revocable Trust to an Irrevocable status as we had discussed.
2  Fund the existing Steve Durst Irrevocable Life Insurance Trust with the current $1, 500,000.00 10 year term policy as we had discussed.
3. Discuss the involvement of Halloran & Sage in preparing the 2007 tax returns for all facets of the  JB Trust as well as Steve's personal income tax retern for 2007.

Is there anything else that we will need to review, discuss or ammend?

Matt


**From:** Peck, Kelley [mailto:peck@halloran-sage.com]
**Sent:** Monday, December 17, 2007 11:22 AM
**To:** Durst, Matt
**Subject:** RE: Signing Meeting

OK
see you then

Kelley


Kelley Galica Peck, JD, LLM
Halloran & Sage  LLP
Telephone  860-297-4632
mailto:peck@halloran-sage.com


IRS Circular 230 Disclosure:  In compliance with Treasury Department Regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used by any taxpayer, and cannot be used, for the purpose of: (i) avoiding penalties under the Internal Revenue Code that may be imposed on the taxpayer, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein


**From:** Durst, Matt [mailto:MDurst@stfranciscare.org]
**Sent:** Monday, December 17, 2007 10:20 AM
**To:** Peck, Kelley

2/19/2007



# EXHIBIT "W"

Print

http://us.mg1.mail.yahoo.com/dc/launch?.gx=1&.rand=855hjs8...

I have already contacted Kelley Peck and notified her of Steve's request.
My questions for you are as follows:

1. Can the Trust be eliminated without placing me in a position that compromises me personally secondary to all the legal proceedings in NJ and PA?

2. What about my recent request to start malpractice proceedings against Peter Friedman, how is that now best handled in lieu of Steve's request?

3. What would be the status of the ZJ legal proceedings ongoing with 1600 Hunting Park?

4. What happens to the Jake Ball Trust litigation in NJ and the Goodmill Shopping Center and the Reserve property?"

I am certain that Steve has spoken to Fred S. about the above request and would like to to speak to Fred S. to get his "take" on what Steve is doing and his view on what should be done with the lawsuits that involve the Trust and his capacity as Steve's attorney.
Finally, after you are able to sort through this mess, please email Kelley Peck or call her to discuss Steve's request, the potential liabilities/risks and the Trusts ability to satisfies Steve's request in a legal/practical manner without placing me @ risk personally in any manner whatsoever.
Kelley Peck's email is                and her direct phone # is 860-275-8332.

Thank you

Matt Durst

11/2/10 10:24 AM

# EXHIBIT "Y"

778a

Case 15-4045   Document: 003112366698   Page: 167   Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD   Document 122-27   Filed 08/10/15   Page 2 of 3 PageID: 2608

Case 1:12-cv-05255-JBS-JS   Document 21   Filed 02/11/13   Page 7 of 35 PageID: 695

On May 19, 2008, nearly 5 months after execution of the above Agreement, an appraisal was sent by Parker Benjamin, Inc., to Kelley Peck, Esq., attorney for the Trust, valuing the Goodmill interest at $841,000. A copy of the first page of the appraisal is attached as Exhibit 3. (MDurst Aff. par.3). There are certain problems with that appraisal, and our position is that it is worthless as a statement of value. The point here is that someone took the original Agreement, left it otherwise intact, but changed the $600,000 valuation to $841,000, attached it as Exhibit "P" and filed it with this Court. While we do not know who changed the document, we do know that it was filed by the attorney for the plaintiffs. We also know that the alteration work was "sloppy", not only in appearance but in another respect as well. If Your Honor looks at our Exhibit 2, and adds up the figures in paragraphs 1-6 of the first Whereas clause, you will see that they approximate the total of $980,000 as set forth in the first Whereas clause on page 2. Whoever altered the document did not change that figure, so that even though the valuation of Goodmill increased by $241,000, the $980,000 remained the same.

It is our position that Exhibit P should receive no consideration from the court, now or at any other time in this case, because it is bogus. (Aside, of course, from consideration in case of a Motion for Sanctions, or in an exercise of the Supervisory power of the court). Certainly the Agreement as originally signed by the defendant has been altered and the valuation figure can have no binding effect on the defendant. In the event that any of the factual statements made in this point I of the Argument are disputed, I invite defense counsel to say so and will request a hearing on the matter at the convenience of the Court.

As one judge observed,

3

Case: 15-4045    Document: 003112366698    Page: 168    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 122-27    Filed 08/10/15    Page 3 of 3 PageID: 2609

Case 1:12-cv-05255-JBS-JS    Document 21    Filed 02/11/13    Page 8 of 35 PageID: 696

"In this Court's view, an attorney who accuses his adversary of violating the duty of candor to the tribunal [as these plaintiffs did at p. 11 of their Brief], should be especially careful to make certain that his own recitation of the facts is accurate..."
**Hernandez v. Guglielmo, Case No. 2:09-cv-00830-LDG-GWF, (D. Nevada 2011).**

## II. THE CLAIM THAT A DUTY WAS OWED BY COUNSEL FOR MATTHEW DURST, TRUSTEE OF THE JAKE BALL TRUST, TO SOME OF THE BENEFICIARIES OF THE TRUST HAS APPARENTLY BEEN ABANDONED.

Although the primary purpose of these briefs as directed by the court was to focus on the issue of whether a duty was owed by the attorney for Trustee Matthew Durst to some of the beneficiaries said to be represented by Mr. D'Elia, I see no reference to the issue in the Brief filed by plaintiffs and have concluded that this is now a non-issue.

Ironically, the case heavily-relied on by the plaintiffs on another issue (see Point III, *infra,* specifically buries their beneficiary argument. In **Borissoff v. Taylor & Faust, 5 Cal.Rptr.3d 735 (2004),** the state Supreme Court observed:

"Furthermore, when a fiduciary hires an attorney for guidance in administering a trust, the fiduciary alone, in his or her capacity as fiduciary, is the attorney's client. (Cit. omitted). The trust is not the client, because 'a trust is not a person but rather a fiduciary *relationship* with respect to property'. (Cit. omitted). Neither is the beneficiary the client, because fiduciaries and beneficiaries are separate persons with distinct legal interests. (Cit. omitted)."

This view is consistent with the New Jersey cases on the subject of duty owed to beneficiaries., though they typically involve estate beneficiaries, **Barner v. Sheldon, 292 N.J. Super. 258, 255-66 (Law Div. 1995),** aff'd

4

**MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP**
(A Limited Liability Partnership formed in Pennsylvania)
457 Haddonfield Road, Suite 600
Cherry Hill, NJ 08002
(856) 488-7700
Attorneys for former defendant Robinson & Cole LLP

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **REUBEN DURST, TRUSTEE, STEVEN DURST, INDIVIDUALLY AND AS TRUSTEE,** : <br> **Plaintiffs,** : <br> : <br> : <br> **v.** : <br> : <br> : <br> **MATTHEW DURST, INDIVIDUALLY AND AS TRUSTEE, HALLORAN & SAGE, LLP, AND KELLEY GALICA-PECK,** : <br> : <br> **Defendants.** : | **CIVIL ACTION** <br> **No.: 1:12-cv-05255-JBS-AMD** <br><br><br><br><br><br> **Returnable: September 21, 2015** |

## CERTIFICATION OF KRISTEN E. POLOVOY, ESQUIRE
## IN SUPPORT OF ROBINSON & COLE LLP'S
## RESPONSE BRIEF IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR RECONSIDERATION

I, Kristen E. Polovoy, Esquire, being of full age, hereby certify as follows:

1.    I am an attorney licensed to practice law in the State of New Jersey, and I am employed by the law firm of Montgomery, McCracken, Walker & Rhoads, LLP, which is counsel for Robinson & Cole LLP ("R&C") in this case.

3953332v1

Case: 15-4045   Document: 003112366698   Page: 170   Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD   Document 122-27   Filed 08/10/15   Page 3 of 3 PageID: 2609

Case 1:12-cv-05255-JBS-JS   Document 21   Filed 02/11/13   Page 8 of 35 PageID. 696

"In this Court's view, an attorney who accuses his adversary
of violating the duty of candor to the tribunal [as these plaintiffs
did at p. 11 of their Brief], should be especially careful to make
certain that his own recitation of the facts is accurate..."
**Hernandez v. Guglielmo, Case No. 2:09-cv-00830-LDG-GWF,
(D. Nevada 2011).**

## II. THE CLAIM THAT A DUTY WAS OWED BY COUNSEL FOR MATTHEW DURST, TRUSTEE OF THE JAKE BALL TRUST, TO SOME OF THE BENEFICIARIES OF THE TRUST HAS APPARENTLY BEEN ABANDONED.

Although the primary purpose of these briefs as directed by the court
was to focus on the issue of whether a duty was owed by the attorney for
Trustee Matthew Durst to some of the beneficiaries said to be represented
by Mr. D'Elia, I see no reference to the issue in the Brief filed by plaintiffs
and have concluded that this is now a non-issue.

Ironically, the case heavily-relied on by the plaintiffs on another issue
(see Point III, *infra,* specifically buries their beneficiary argument.   In
**Borissoff v. Taylor & Faust, 5 Cal.Rptr.3d 735 (2004),** the state Supreme
Court observed:

"Furthermore, when a fiduciary hires an attorney for guidance in
administering a trust, the fiduciary alone, in his or her capacity as
fiduciary, is the attorney's client. (Cit. omitted).  The trust is not
the client, because 'a trust is not a person but rather a fiduciary
*relationship* with respect to property'.  (Cit. omitted).  Neither is the
beneficiary the client, because fiduciaries and beneficiaries are
separate persons with distinct legal interests.  (Cit. omitted)."

This view is consistent with the New Jersey cases on the subject of duty
owed to beneficiaries., though they typically involve estate beneficiaries,
**Barner v. Sheldon, 292 N.J. Super. 258, 255-66 (Law Div. 1995),** aff'd

4

2.    The facts set forth in this Certification are limited to procedural matters and are true to my personal knowledge.

3.    The Certification is offered in support of R&C's Opposition to Plaintiffs' Motion for Reconsideration.

4.    Attached hereto as Exhibit 1 is a true and correct copy of the Transcript of Telephonic Hearing held in the above-caption matter on April 9, 2015.  The Transcript is contained in the record as Document 121, but is not yet publicly available on Pacer.

5.    Attached hereto as Exhibit 2 is a true and correct copy of the court's decision in *Canete v. Barnabas Health Sys.*, 2013 U.S. Dist. LEXIS 133910 (D.N.J. Sept. 18, 2013).

6.    Attached hereto as Exhibit 3 is a true and correct copy of the court's decision in *Irwin Katz & Assocs., Inc. v. Concepts in Health, Inc.*, 2015 U.S. Dist. LEXIS 90225 (D.N.J. July 13, 2015).

7.    Attached hereto as Exhibit 4 is a true and correct copy of the court's decision in *Kamienski v. Attorney General of N.J.*, 2012 U.S. Dist. LEXIS 74122 (D.N.J. June 9, 2015).

8.    Attached hereto as Exhibit 5 is a true and correct copy of the court's decision in *Ledgestone Associates, LLC v. Internet Methods*, 2008 U.S. Dist. LEXIS 49081 (D.N.J. June 27, 2008).

-2-

9.     Attached hereto as Exhibit 6 is a true and correct copy of the court's decision in *Levinson v. Regal Ware, Inc.,* 1989 U.S. Dist. LEXIS 18373 (D.N.J. Dec. 1, 1989).

10.     Attached hereto as Exhibit 7 is a true and correct copy of the court's decision in *Lighthouse Point Marina & Yacht Club, LLC v. Int'l Marine Underwriters,* 2015 U.S. Dist. LEXIS 57556 (D.N.J. May 1, 2015).

11.     Attached hereto as Exhibit 8 is a true and correct copy of the court's decision in *Rios v. City of Bayonne,* 2015 U.S. Dist. LEXIS 65137 (D.N.J. May 19, 2015).

12.     Attached hereto as Exhibit 9 is a true and correct copy of the court's decision in *United States v. Pechiney Plastics Packaging, Inc.,* 2012 U.S. Dist. LEXIS 114255 (D.N.J. Aug. 14, 2012).

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


                                          s/Kristen E. Polovoy
Dated:  September 8, 2015                  Kristen E. Polovoy


-3-

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - -

```
STEVEN DURST, et al.,          :   CIVIL ACTION NO. 12-05255
          Plaintiffs          :
                              :
     v.                       :   Camden, New Jersey
                              :   April 9, 2015
MATTHEW DURST, et al.,        :   2:05 o'clock p.m.
          Defendants          :
```
. . . . . . . . . . . . .

TELEPHONE STATUS CONFERENCE/MOTION HEARING
BEFORE THE HONORABLE ANN MARIE DONIO
UNITED STATES MAGISTRATE JUDGE

- - -

APPEARANCES:

For the Plaintiffs:      VINCENT D'ELIA, ESQUIRE
                         The D'Elia Law Firm, LLC
                         13000 Lincoln Drive West
                         Suite 300
                         Marlton, NJ   08053

For the Defendant        JOHN ANTHONY YACOVELLE, ESQUIRE
Matthew Durst:           8438 Mackall Road
                         St. Leonard, MD   20685

For the Defendant        WILLIAM F. O'CONNOR, JR., ESQUIRE
Halloran & Sage, LLP:    McElroy Deutsch
                         Mulvaney & Carpenter, LLP
                         1300 Mount Kemble Avenue
                         P.O. Box 2075
                         Morristown, NJ   07962-2075

For the Defendant        CHRISTOPHER PHILIP LEISE, ESQUIRE
Kelley Galica-Peck:      White & Williams, LLP
                         Liberty View
                         457 Haddonfield Road
                         Suite 400
                         Cherry Hill, NJ   08002-2220

Laws Transcription Service
48 W. LaCrosse Avenue
Lansdowne, PA 19050
(610)623-4178

2

Deputy Clerk/ESR:        Susan Bush

Transcribed by:          Tracey J. Williams, CET

(Proceedings recorded by Liberty Court Player digital sound
recording; transcript produced by AAERT-certified
transcriber.)

- - -

3

1          (The following telephone conference occurred at 2:05

2     o'clock p.m.:)

3          MR. D'ELIA:  Good afternoon, your Honor, this is

4     Vincent D'Elia and I represent the plaintiff -- plaintiffs.

5          MR. YACOVELLE:  Good afternoon, Judge, John

6     Yacovelle for the defendant Matt Durst.

7          MR. LEISE:  Your Honor, Christopher Leise for Kelley

8     Peck.

9          MR. O'CONNOR:  Hello, your Honor, Bill O'Connor,

10    McElroy Deutsch Mulvaney & Carpenter, for Halloran & Sage.

11         THE COURT:  All right.  Thank you, Counsel.  Is that

12    everyone?

13         MR. O'CONNOR:  Yes, I believe so.

14         THE COURT:  All right.  This is in the matter of

15    Durst v. Durst, Case Number 12-5255.  This is a conference

16    call being electronically recorded, the attorneys are

17    appearing by telephone.  And this conference has been set up

18    pursuant to a prior Court order of January 29th -- entered

19    January 29th, requiring there be any scheduling order today

20    -- conference under the scheduling order setting the

21    telephone conference for today.

22         Since that order was entered, two motions have been

23    filed and now I understand are fully briefed, first a motion

24    by plaintiff filed on February 20th to file a second amended

25    complaint.  That motion is opposed by a number of parties.

4

1    Mr. O'Connor has filed opposition.  Robinson & Cole, which is

2    not even in the case anymore, has filed that; is that

3    correct?

4              COUNSEL:  Correct.

5              COUNSEL:  That's correct.

6              THE COURT:  So they're not on the phone today, are

7    they?

8              COUNSEL:  No, Judge.

9              THE COURT:  All right.  And of course this --

10   counsel for Ms. Peck has filed opposition.

11             And subsequent to the motion, there's another motion

12   filed on -- just a week and a half ago on March 27th to

13   extend the time to complete discovery.  That motion is

14   Document Number 111.  It's opposed by, again, Mr. O'Connor

15   and Mr. Peck (sic).  I don't think I have any position papers

16   in either respect from Mr. Yacovelle; is that correct?

17             MR. YACOVELLE:  No position on either one, Judge.

18             THE COURT:  All right.  Are the parties ready to

19   argue their positions?

20             MR. D'ELIA:  I am, your Honor.  It's Vince D'Elia.

21             MR. O'CONNOR:  Yes, Judge.  Bill O'Connor for

22   Halloran & Sage.

23             MR. LEISE:  Yes, your Honor.

24             THE COURT:  All right, let me start with the motion

25   to extend discovery.  The motion was filed seeking to extend

5

1     discovery in connection with a number of depositions that

2     were cancelled.  The depositions were scheduled prior to the

3     expiration of the discovery end date and it appears that

4     there was agreement by counsel for the cancellation.  And I

5     just want to see if I can make sure I have the parties'

6     positions specifically and let's begin with plaintiffs'

7     Counsel.

8             How much time are you putting aside the motion to

9     amend, how much time are you looking for by way of extension

10    in your motion?

11            MR. D'ELIA:  Judge, if I could be heard.  I had

12    looked through everything before I got on the call and I was

13    looking -- alls I need to do in terms of discovery at this

14    point is the defendant Matthew Durst and the defendant Kelley

15    Peck.  If I could do that in the next ten days or two weeks,

16    I'm fine.

17            I was going to respectfully request that I be given

18    the opportunity to take those two depositions on or before

19    May 11th, which is 30 days from now.  And I have no problem

20    and I almost prefer a -- kind of a May 11th do-or-die kind of

21    order, if it would please the Court.

22            The -- I'm going to -- in expanding my answer,

23    Judge, and I appreciate the opportunity to discuss it, I have

24    -- if I can get those two depositions in, I have a potential

25    motion which I believe is going to either 99-percent resolve

6

1    the case and will resolve it much earlier than any of us

2    anticipated, or it's going to -- if nothing else, it's going

3    to narrow the issues.  And my motion, without disclosing too

4    much strategy, has to do -- that I'm proposing has to do with

5    defining the parameters under which the settlement which was

6    entered into in the state court action is subject to any

7    attack at all.

8            There was a decision by Judge Simandle that said

9    that the settlement was res judicata or collateral -- subject

10   to collateral estoppel, but in that same order he said this

11   does not preclude the plaintiffs from pursuing certain claims

12   with regard to the defendants regarding exceeding authority

13   and some other theories.  The question becomes, does that

14   leave the settlement open to discussion or is oral discussion

15   with regard to the settlement closed.

16           If I can get those two depositions in and I can make

17   this motion, I suspect we're going to have -- we're going to

18   be well on our way to resolution of the case well in advance

19   of what would be required.  So to cut my long-winded response

20   to a minimum, I would ask that I have a depositions must be

21   completed by May 11th do-or-die and the burden should be on

22   me.

23           I do point out that the day before the scheduled

24   depositions we had about eight inches of snow in our area and

25   it ran havoc with everybody.  And that precluded my client

7

1    Steven Durst from being here, because he was away on business

2    in Florida and was precluded from getting back.  I understand

3    the criticism that I could have gone ahead with the

4    deposition anyway.  If this was a rear-end collision case, I

5    probably would have, but given his intimate knowledge of the

6    case and given his understanding, if there was any kind of --

7    anything in the deposition that was a little off of what I

8    thought, I just needed him there.  I did not think that that

9    was unreasonable, however the other attorneys have criticized

10   me for it and I understand.

11          I would also point out that Mr. Durst, Steven Durst,

12   the person who was delayed because of the snowstorm, has been

13   at every motion, he's been at every hearing, he's been at

14   every deposition.  And I know in the past when I had asked

15   for some time with regard to responding to motions -- or

16   appearing at motions or a return date for argument on the

17   motion, one of the questions the Court asked us -- and I said

18   it was because I needed Mr. Durst there, the Court had asked,

19   had he been at everything else, and the answer is yes, he's

20   been at everything.  I needed him there for those

21   depositions, it would have been a waste of all of our times

22   for me to not have him there.

23          And for those reasons, Judge, I would just ask you

24   to give me a little bit of time to do those two depositions

25   and so we can move forward in a more expeditious manner.  And

8

1    I'll submit on that, Judge.

2         THE COURT:  All right, thank you.  Now, let me just

3    make sure I have the understanding that these two

4    depositions, one was scheduled for February 24th --

5         COUNSEL:  Judge, I can't hear you, I'm sorry.

6         COUNSEL:  I'm having trouble hearing you too, Judge.

7    I'm sorry.

8         THE COURT:  Is that better?

9         COUNSEL:  Oh, much better.

10        COUNSEL:  Yes.

11        THE COURT:  All right, let me make sure I understand

12   the position.  One of the depositions were scheduled for

13   February the 24th; is that correct?

14        MR. D'ELIA:  Well, depositions were scheduled for

15   the 23rd, 24th and 25th.

16        THE COURT:  And none went forward, right?

17        MR. D'ELIA:  None went forward for a bunch of

18   different reasons that are explained in the pleadings.

19        THE COURT:  All right, but you've only mentioned two

20   depositions you wish to take, there's no other --

21        MR. D'ELIA:  The other one was Mr. Yacovelle's

22   deposition of my client Matthew (sic) Durst and --

23        MR. YACOVELLE:  You mean Mike?

24        MR. D'ELIA:  Yeah.

25        MR. YACOVELLE:  Okay.

793a

9

1         MR. D'ELIA:  Did I say Matthew?  I'm sorry.

2         THE COURT:  All right.

3         MR. D'ELIA:  Yeah, the other one was --

4         THE COURT:  All right, that was scheduled of one of

5    the plaintiffs and you don't have a position on whether that

6    needs to be done.  You're not looking to take your own

7    client's deposition; is that right?

8         MR. D'ELIA:  Who is that question directed to?

9         THE COURT:  Mr. D'Elia.  You want to take --

10        MR. D'ELIA:  My client's -- my client Steven Durst's

11   deposition was taken earlier in the month and my client

12   Reuben Durst's deposition was one of the ones that was

13   cancelled, that was a deposition being taken by Mr.

14   Yacovelle.  And I would be glad to cooperate with Mr.

15   Yacovelle in producing Reuben.

16        THE COURT:  Okay.  Mr. Yacovelle has no position on

17   the motion; is that correct?

18        MR. YACOVELLE:  No, I don't have a position on it,

19   Judge, except it came up under unusual circumstances and it

20   was described as something that counsel agreed on and I'm not

21   sure that's exactly correct.  What actually happened was that

22   Mr. D'Elia attempted to reach me during the night and

23   unsuccessfully, but we did talk at 5:00 a.m. and he told me

24   he could not proceed in the absence of Steven Durst.  And so

25   there really wasn't anything to talk about, he was not

10

1    proceeding. I had to call my client, who was on the road

2    from Connecticut in snow, and turn him around and send him

3    back. So that's actually what happened.

4              THE COURT: All right. But --

5              MR. YACOVELLE: It wasn't --

6              THE COURT: -- you don't dispute that the

7    depositions were duly scheduled, they were scheduled prior to

8    the expiration of the deadline, that there was snow on the

9    day of one of the depositions, and that the plaintiff Mr.

10   Steven Durst had wanted to attend -- and in fact I think the

11   submissions include a copy of the air flight ticket -- and

12   the flight had been cancelled. You don't dispute any of

13   that, do you? You don't have a position on the motion, is

14   what you said?

15             MR. YACOVELLE: Right.

16             THE COURT: Okay. Mr. O'Connor?

17             MR. O'CONNOR: Yes, your Honor.

18             THE COURT: All right, I'm having a hard time

19   understanding the opposition on the motion to extend time for

20   the limited purpose of taking depositions that were scheduled

21   prior to the expiration of the deadline.

22             MR. O'CONNOR: Judge, our criticism is not lodged at

23   Mr. D'Elia, our criticism is lodged at his client. All the

24   other parties and all the other lawyers were either en route

25   or ready to go to the deposition, there was nothing

11

1   precluding anybody else from being there.  It was raining in

2   New Jersey where I live and I was ready to get in my car to

3   go to the deposition.  And then we receive word that because

4   his client insists on attending we can't -- it cannot go

5   forward, you know.

6          And now we are -- we are now three years into the

7   case and we will now have to prepare again for depositions

8   that should have been done already.  I know for a fact that

9   Ms. Peck will have to be prepped again for her deposition.

10  She's in Connecticut, that will be costly.  I'll have to get

11  ready again for Matt Durst's deposition again.  This is --

12  it's expensive now.  And the only reason we're going through

13  this exercise is because somebody wasn't paying attention and

14  got caught, you know, with a flight that got cancelled.  And,

15  Judge, for what it's worth, I don't know that the papers

16  actually show that that flight was cancelled, I think it's

17  more like a press release about how there were thousands of

18  cancellations, you know, at airports around the country.

19         So my position was simply that, you know, in the

20  absence of an order, we can't take any more fact discovery at

21  this point in time and, further, the only reason it hasn't

22  been done is because of the plaintiff.

23         THE COURT:  All right, but you don't disagree that

24  Mr. Durst, Mr. Steven Durst, has a right to appear at

25  depositions, do you?

12

1          MR. O'CONNOR:  No.  As I said in my papers, Judge,

2   he certainly has a right, but I don't know that he has a

3   right to insist that the schedule be disrupted to such a

4   degree that it's been because he, you know, took a gamble and

5   he lost on his flight that was supposed to get in at 12:30 in

6   the morning, a few hours before the deposition was cancelled.

7   That was my point in that regard, Judge.

8          THE COURT:  All right.  Anything from Mr. Leise?

9   Did I say that right?  Mr. Leise?

10         MR. LEISE:  Mr. Leise, yes, that's better.  No, your

11  Honor, I would simply reiterate what Mr. O'Connor just said,

12  that's all.

13         THE COURT:  All right.  Anything further from either

14  counsel, any other counsel?

15         MR. D'ELIA:  Judge, I have nothing further.  Again,

16  I would respectfully request a -- and I have no problem with

17  a do-or-die date, but I just need these depositions in order

18  to be fully prepared.  I do think Mr. Durst had the right to

19  be there and I think it was unfortunate that we got an

20  unexpected six or eight inches of snow, I submit, Judge.

21         THE COURT:  All right, thank you.

22         Presently before the Court is an application to

23  extend the time to complete factual discovery.  Currently,

24  the current schedule required factual discovery to be

25  concluded by March 2nd, 2015.  The application is limited in

13

1    its request, it's a request to take two depositions that were

2    previously scheduled within the time period, that is the

3    deposition of Kelley Peck, a named defendant, and the

4    deposition of Matthew Durst, a named defendant.

5         Plaintiff raises the application and asserts there

6    is good cause for the extension, because the deposition was

7    cancelled when as an officer of the Court plaintiff

8    represents -- plaintiffs' counsel represents, the plaintiff's

9    plane flight to New Jersey -- or Philadelphia was cancelled

10   as a result of a snowstorm, and the plaintiff was therefore

11   unable to attend the depositions that were duly noticed and

12   scheduled before the expiration of the discovery end date.

13        Mr. Yacovelle also had a deposition noticed and

14   scheduled.  He makes no application in connection with this

15   motion and takes no position.

16        Mr. O'Connor and Mr. Leise on behalf of their

17   clients oppose the motion, claiming that there's no good

18   cause and that plaintiff -- plaintiff could have gone forward

19   with his counsel without plaintiff, and that plaintiff should

20   have made better arrangements to make sure that there was

21   ample time to arrive in New Jersey in order to take the

22   deposition.

23        A scheduling order may be modified for good cause

24   under Federal Rule of Civil Procedure 16(4), and clearly the

25   United States Magistrate Judge in administering and resolving

14

1   scheduling issues may in the exercise of discretion upon the

2   finding of good cause extend the discovery deadline.

3           In this case, in light of the proffer by the

4   plaintiff, in light of the limited nature of the request, in

5   light of the fact that the depositions that are being sought

6   were properly scheduled before the expiration of the

7   deadline, in light of the fact that the plaintiff has the

8   right to attend depositions, had every intent to attend the

9   depositions and that there was snow that interfered with

10   that, I find good cause to provide a limited extension of the

11   factual discovery.

12           I note that good cause requires a showing that the

13   delay stemmed from mistake, excusable neglect or other factor

14   which might understandably account for the failure of counsel

15   to undertake to comply with the scheduling order, that's

16   citing Caper, C-a-p-e-r, v. Federal Express Ground Package

17   Systems, 2012 Westlaw 5818137 at 2, District of New Jersey,

18   November 15th, 2012.

19           The good cause standard generally relies upon the

20   diligence of the moving party.  I see no basis to preclude

21   depositions of witnesses that were parties that were

22   scheduled prior to the expiration of this scheduling deadline

23   that were delayed or cancelled because of a party's inability

24   to make it into New Jersey because of snow.

25           I will note that this extension is limited to

15

1  depositions of Kelley Peck and Matthew Durst, and that the

2  depositions must be completed no later than May 11th, 2015,

3  on dates and times convenient to all counsel. And if you're

4  unable to reach agreement on the dates and times, you should

5  advise the Court no later than a week from today, in which

6  time I'll pick the dates and times.

7          Now, I'll note that there was another deposition

8  that was noticed, but there's been no application with

9  respect to that deposition. Is there any application at this

10 time?

11         MR. YACOVELLE: Well, yes, your Honor, there's an

12 application with respect to that deposition. And frankly, I

13 never thought that there was an application going to be

14 necessary, because Mr. D'Elia, as he said a few minutes ago,

15 was perfectly willing to produce his client. So I assume

16 he's still willing to --

17         THE COURT: All right.

18         MR. YACOVELLE: -- and if that's so --

19         THE COURT: Okay. Mr. O'Connor and Mr. Leise, do

20 you object in light of the Court's ruling to the extension of

21 time, including the deposition of Mr. Reuben Durst?

22         MR. O'CONNOR: No, your Honor.

23         MR. LEISE: No, your Honor.

24         THE COURT: And Mr. D'Elia has already agreed to

25 that. So my order --

16

1        MR. D'ELIA:  We agree.

2        THE COURT:  -- will be as follows.  The discovery

3   end date is hereby extended for the limited purpose of

4   deposing these three parties who were previously noticed on

5   dates and times convenient to all counsel, and all three

6   depositions must be completed by May 11th, 2015.

7        Anything further with respect to this motion?

8        MR. D'ELIA:  Judge, in --

9        MR. YACOVELLE:  Uh --

10        MR. D'ELIA:  Okay, John, go ahead.

11        MR. YACOVELLE:  Yeah, the only thing I was going to

12   say is I'm looking at the order, the previous order, and I

13   see dates in here April 1st, May 1st, June 13th.  I'm

14   wondering if they're all going to get extended or what's

15   going to happen with them.

16        MR. D'ELIA:  That's exactly where I was going.  Your

17   Honor, in my motion I had asked for amendment of the

18   scheduling order to provide additional time for -- I needed

19   these depositions in order to complete my work on getting an

20   expert, that you did have a dispositive motion date of May

21   29, which if I can get depositions done and get my

22   transcripts quick enough, that May 29 date may still be good.

23   And I think, based on the dispositive motion I described

24   earlier, needing or not needing experts may become academic

25   after that point.

17

1          I don't know what to suggest.  I was pretty

2    definitive about what I suggested in terms of deposition

3    deadlines and what have you, but I didn't know if you wanted

4    to -- and I'm submitting to the Court, just making

5    suggestions, with regard to experts' reports and disclosures

6    if we could, A, hold that until a conference shortly after

7    May 11, as early as May 12, as far as I'm concerned, or if

8    your Honor wanted to assign the dates to it now.  I just need

9    to get the depositions done in order to complete that work.

10          THE COURT:  All right.  Anything from Mr. Leise or

11    Mr. O'Connor on that issue?

12          MR. LEISE:  No, Judge.

13          THE COURT:  All right, let me do this.  I generally,

14    when I extend fact discovery, I extend expert discovery.  All

15    expert reports on behalf of the plaintiff shall be served no

16    later than June 11th.  Any rebuttal reports shall be served

17    no later than July 10th.  Expert depositions shall be

18    completed no later than July 30th.  And dispositive motions,

19    they may be filed sooner, but no later than August the 14th.

20          All right, is there anything further with respect to

21    the schedule?

22          MR. LEISE:  Your Honor, this is Christopher Leise.

23    We do have that motion to amend --

24          THE COURT:  I'm going to address that next.

25          MR. LEISE:  -- I don't know if your Honor --

18

1          THE COURT:  Are you ready to argue that motion at

2     this time?

3          MR. LEISE:  No, my point is that it has been opposed

4     and it would obviously impact the schedule, that's what --

5          THE COURT:  I'm going to resolve that motion right

6     now.  Are you ready to make that argument?

7          MR. LEISE:  Okay.

8          THE COURT:  Are we ready to hear argument?  That's

9     my question.  Are the parties ready to address the motion to

10    amend?

11         MR. LEISE:  Yes, Judge.

12         MR. D'ELIA:  Yes, your Honor.

13         THE COURT:  Okay.  Now, let me just start to make

14    sure we don't need another part here.  I had an opposition

15    filed by a non-party, a party that was previously in the case

16    and has since been dismissed out of the case, and the concern

17    by that party was that the motion should have been -- those

18    amended pleadings should not have included pleadings against

19    that party.

20         Mr. D'Elia, what's your position on that?

21         MR. D'ELIA:  We agreed with that and I believe my

22    associate had signed a consent order to that regard.

23         THE COURT:  All right.  So you don't intend --

24         MR. D'ELIA:  But we agreed with that, that was over

25    -- that was purely my fault, I mean, that was oversight on my

19

1   part.  I should have been more careful in drafting it and I

2   wasn't and it's my fault.  If there's a sanction, make it on

3   me.  But, no, we agreed with them.

4           THE COURT:  All right.  So you don't -- have you

5   advised --  and let's see, there was a consent order

6   submitted by that firm and you indicated that you sign that

7   consent order?

8           MR. D'ELIA:  I believe my associate did.  If -- I

9   believe it was signed and I'm saying, if it isn't signed,

10   I'll sign it.

11           THE COURT:  No, I think it's attached as an e-filed

12   signature.  So that takes care of that portion.

13           Now you're seeking to amend the complaint to add an

14   additional party and to expand upon your claims against Ms.

15   Peck; is that correct?

16           MR. D'ELIA:  Yes, your Honor, that's correct.

17           THE COURT:  All right.  Now, when was the deadline

18   for you to file an amended complaint?

19           MR. D'ELIA:  Uh --

20           (Pause.)

21           MR. D'ELIA:  I am trying to find the prior

22   scheduling order, Judge.  I apologize for not having that.

23           THE COURT:  I'll just note for the record that in

24   the September 5th, 2014 scheduling order, the order indicated

25   that there would be no further motions to amend the pleadings

20

1    without leave of Court and that the time period had been

2    previously set forth in a prior order of the Court.

3            So back in -- after a series of amendments, back in

4    September the Court indicated no other motions to amend

5    without leave -- or to join new parties without leave of

6    Court, that's back in September.  Now, what happened since

7    September to today?  What new information came to light that

8    would support your application that you did not know or under

9    the exercise of reasonable diligence could not have known?

10           MR. D'ELIA:  Judge, I cannot tell you that some new

11   information came upon me, I cannot tell you that additional

12   information became available, it was information that was

13   available.  And as a result of reviewing the file and

14   discussing it with the client, they had asked that we proceed

15   with this application.

16           I understand the concerns about the time.  The claim

17   is consistent with the claim against Ms. Peck in terms of

18   missing Section 704 and the damages that flow from that.  I

19   understand the Court's concern, I understand the defendants'

20   concern, but I think it's appropriate to make sure we have

21   all the parties before the Court.

22           THE COURT:  All right.  Who opposes the motion?

23           MR. O'CONNOR:  Judge, Bill O'Connor for Halloran &

24   Sage.

25           THE COURT:  Yes.  Your position, please.

21

1          MR. O'CONNOR:  Judge, it's threefold.  First, the

2   motion is untimely for the reasons in our papers, to wit the

3   several orders that have been entered previously regarding

4   the deadlines for amendments.  Two, it's prejudicial to my

5   client because of the additional resources that are going to

6   have to be expended in dealing with the modified claim

7   against Ms. Peck, as well as this new claim.  And, three, the

8   claim is futile for the reasons in our papers, which are that

9   the claim fails on its face because of proximate cause

10  reasons, Judge.  Mr. Durst testified himself at his

11  deposition that it would be, quote, "pure speculation" to try

12  to imagine what would have happened had he gone back to his

13  co-member in the LLC and asked to modify the operating

14  agreement.  And for that reason he can't sustain a claim

15  against Parker Benjamin or a claim on that basis against Ms.

16  Peck, or her former firm for that matter.

17         THE COURT:  All right.  Anybody else?

18         MR. LEISE:  Yes, your Honor, this is Mr. Leise.  I

19  agree with everything in the brief that was filed by Halloran

20  & Sage, but I do want to emphasize that there is evidence I

21  think before you on this motion that this claim against the

22  appraising firm was under active consideration by the moving

23  party quite some time ago.  So not only has nothing changed,

24  but it was under consideration months, if not years ago.

25         And the last obvious point is that to grant this

22

1   motion would throw the entire schedule in this case into

2   chaos for obvious reasons with the addition of a new party at

3   this time.

4         THE COURT:  All right.  Anything in response?

5         MR. D'ELIA:  Yes, your Honor.  In terms of the

6   speculation, I understand the cite that came out of the

7   transcript of Mr. Durst's deposition.  It is taken out of

8   context.  We have -- the questions weren't asked.  There was

9   a previous occasion where he went back to his employer about

10  this paragraph in another contract and it was changed.  So it

11  wouldn't be -- I think the question, if you look at the

12  question and the answer, I don't think it's direct on the

13  issue of what do we think the Goodman firm would have done in

14  response to this.  I think we are going to be able to present

15  evidence to show that it would have been changed, it would

16  have changed the outcome but for the fact that both Ms. Peck

17  and the appraiser both missed it.

18        As an aside, it seemed confusing to me that anyone

19  was going to oppose this because, if the claim is valid,

20  there's going to be two defendants answering instead of one.

21  I don't know why Ms. Peck would want them out of the case.

22  I'm trying to just complete the loop.  Subject to criticism

23  for not doing it sooner, I knew that was coming.  But to

24  round out the case and complete the case, discovery is going

25  to be the same as far as I'm concerned.

23

1          And with that, Judge, I'll submit.

2          THE COURT:  All right.

3          MR. O'CONNOR:  Judge, can I say one thing for the

4   record?  I'm sorry --

5          THE COURT:  Just state --

6          MR. O'CONNOR:  -- Bill O'Connor.  I --

7          THE COURT:  Just state your name, please.

8          MR. O'CONNOR:  It's Bill O'Connor, Judge.  I just

9   have to correct something for the record.  What Mr. D'Elia

10  said about the record in the case is wrong.  There was

11  another limited liability company involving these parties and

12  at one point in time Mr. Durst renegotiated his interest in

13  that company with Mr. Goodman.  It's a different company,

14  it's a different issue, it's a different provision of a

15  different agreement.

16         This -- Mr. Durst never renegotiated this provision

17  with Mr. Goodman on another deal, because as Mr. Durst

18  testified in his deposition he had never had this in any

19  agreement with Mr. Goodman ever before.  Mr. Durst's position

20  is that he was hoodwinked by Mr. Goodman, because Mr. Goodman

21  had gotten sick of him and was just waiting for the day when

22  he could get rid of him, and that is what happened here.

23         So to say that this deal here was similar to another

24  deal which Mr. Durst successfully modified is completely

25  incorrect, Judge.  That's all I wanted to point out.

24

1          MR. D'ELIA:  Real quick, Judge.  We have a factual

2   dispute there and I could spend the next 20 minutes

3   discussing the history of -- and so could Mr. Yacovelle about

4   the history of those contracts, but I don't think it's for

5   today's discussion.  I'll submit and wait for your Honor's

6   decision.

7          THE COURT:  All right.  Well, I'm going to rule from

8   the bench right now and I reserve the right to edit the

9   transcript consistent with the local rules with respect to

10   issuing an oral opinion.  But for the reasons that follow,

11   I'm going to deny the motion to amend as untimely.

12          Let me note first of all that the motion to amend

13   seeks to assert additional claims against one of the current

14   parties and to assert claims against a new party.  This is a

15   2012 case, it's been going through a number of pleadings and

16   a number of motions.

17          In my order dated September 5th, 2014, the Court

18   indicated that no further motions to amend pleadings or join

19   new parties could be made without leave of Court, and this

20   followed a number of efforts by the plaintiff to file amended

21   complaints.  Specifically, in an order that's Document Number

22   73 on the docket, the Court denied a previous motion for

23   leave to file a second amended complaint back in July of 2014

24   and for the reasons set forth in that lengthy order.

25          The case law dealing with amendments to the

25

1   complaint are set forth in that order, Document Number 73,

2   and will be set forth right now briefly.

3        Under Federal Rule of Civil Procedure 15(a), "Leave

4   to amend shall be freely given when justice so requires.  The

5   court may deny a motion to amend on the grounds that the

6   amendment would cause undue delay or prejudice, or the

7   amendment would be futile.  While leave to amend generally is

8   granted freely in accordance with those motions that are made

9   outside of scheduling orders, the parties must also resort to

10  Rule 16 to see if there is good cause for extending the time

11  for filing motions to amend."

12       Now, here I'll also note that the parties opposed

13  the bringing in of a third party who's not here.  And

14  generally case law would support the finding that parties not

15  impacted by the amendment, that is the amendment doesn't seek

16  to name claims against them, have no standing to oppose a

17  motion to amend on futility grounds.  They do, however, have

18  standing to oppose the motion on undue delay or prejudice

19  grounds.  And therefore I am not addressing the futility

20  argument raised by the defendants with respect to the

21  proposed third-party claim against the appraiser.  Rather, I

22  am addressing solely the issue of undue delay.

23       Now, plaintiff has been very candid.  There is no

24  new facts that have arisen that give rise to bringing in this

25  claim this late in the game.  But for the snowstorm, factual

26

1    discovery would be completed.  And we just heard argument

2    just a few minutes ago on whether I should permit additional

3    discovery to conclude the case in light of the snow that led

4    to the cancellation of the plaintiff's flight, which

5    precluded plaintiff from attending the last three depositions

6    scheduled in this case at the end of February.

7         While I found good cause to extend the discovery

8    deadline for those depositions, if I were to grant this

9    motion I would be reopening the entire case.  Clearly, a new

10   party would have to be served, that party would have to

11   answer, discovery would have to be revisited, and

12   depositions, which the plaintiffs' counsel has just agreed

13   should be concluded no later than May 11th, would have to be

14   postponed or retaken.

15        In light of the fact that that delay causes

16   prejudice to the parties and that there is no justification

17   for the delay, and that is there's been no showing whatsoever

18   that the claims that are being sought now could not have been

19   brought earlier or that in some cases delay may be warranted

20   when there's been new evidence.  But as I indicated,

21   plaintiff has demonstrated I think with candor to the Court

22   that there's really no reason that the claim is being brought

23   now as opposed to earlier.

24        In light of that, the Court notes that under Rule

25   15(a) and as an alternative argument to the extent Rule 16

27

1    applies because of the Court's order, prior orders, the

2    motion should be denied on undue delay and prejudice grounds.

3    Accordingly, the motion to amend is denied.

4         The motion to extend discovery is granted, as set

5    forth in the record, and a new scheduling order will be

6    entered.

7         Is there anything further for today?

8         MR. D'ELIA:  Nothing further from myself, Vince

9    D'Elia.  Judge, thank you for your consideration.

10        MR. YACOVELLE:  Thank you, your Honor.

11        MR. O'CONNOR:  Thank you very much, your Honor.

12        MR. LEISE:  Thank you very much, Judge.

13        THE COURT:  All right, Counsel.  You all have a good

14   day.  We are adjourned.  Thank you.

15        MR. D'ELIA:  Have a great day, everybody.

16        (Proceedings adjourned at 2:43 o'clock p.m.)

17                         * * *

CERTIFICATION

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


s:/Geraldine C. Laws, CET           Date 7/30/15
Laws Transcription Service

# EXHIBIT 2



No *Shepard's* Signal™
As of: August 20, 2015 3:51 PM EDT

## *Canete v. Barnabas Health Sys.*

United States District Court for the District of New Jersey

September 18, 2013, Filed

Civil Action No. 12-7222 (ES)

**Reporter**
2013 U.S. Dist. LEXIS 133910; 2013 WL 5305236

BERNARD T. CANETE, Plaintiff, v. BARNABAS HEALTH SYSTEM, NEWARK BETH ISRAEL MEDICAL CENTER, JOHN BRENNAN, ZACHARY LIPNER, JOANNE REILLY, MARY ELLEN WIGGINS, HELEN HARTNEY, JOHN DOES 1-10, JANE DOES 1-10, ABC CORPORATIONS A THROUGH Z, Defendants.

**Notice:** NOT FOR PUBLICATION

**Counsel:** [*1] For BERNARD T. CANETE, Plaintiff: LURETHA M. STRIBLING, LEAD ATTORNEY, CLARK, NJ.

For BARNABAS HEALTH SYSTEM, HELEN HARTNEY, MARY ELLEN WIGGINS, ZACHARY LIPNER, JOHN BRENNAN, CEO, NEWARK BETH ISRAEL MEDICAL CENTER, Defendants: RYAN SEAN CAREY, LEAD ATTORNEY, APRUZZESE, MCDERMOTT, MASTRO & MURPHY, PC, LIBERTY CORNER, NJ.

**Judges:** Esther Salas, United States District Judge.

**Opinion by:** Esther Salas

# Opinion

### SALAS, DISTRICT JUDGE

This matter comes before the Court upon motion by Defendants Barnabas Health[1], Newark Beth Israel Medical Center ("NBIMC"), John Brennan, Zachary Lipner, Mary Ellen Wiggins[2], Helen Hartney, John Does 1-10, Jane Does

1-10, and ABC Corporations A through Z (collectively, "Defendants")[3] seeking partial dismissal of Plaintiff's Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*.

The Court has considered the parties' submissions in support of and in opposition to the instant motion, and decides this matter without oral argument pursuant to *Fed. R. Civ. P. 78(b)*. For the reasons set [*2] forth below, the Court GRANTS Defendants' motion for partial dismissal.

## I. Background

Plaintiff Bernard T. Canete ("Plaintiff") is a sixty-eight year-old Registered Nurse presently assigned to the Crisis Unit in the Emergency Department at NBIMC. (D.E. No. 1, Plaintiff's Complaint ("Compl.") ¶¶ 10-11). Plaintiff is originally from the Philippines, and has worked at NBIMC for twenty-two years. (*Id.* ¶¶ 11-12). Plaintiff is also a veteran of the United States Army, having attained the level of Lieutenant Colonel. (*Id.* ¶¶ 12-13). Defendant Brennan, MD, is the CEO of NBIMC. (*Id.* ¶ 4). Defendant Lipner is the Vice President of Human Resources at NBIMC. (*Id.* ¶ 5). Defendant Wiggins is the Assistant Vice President of Patient Care Services at NBIMC. (*Id.* ¶ 7). Defendant Hartney is the Director of Psychiatric Emergency Screening Services at NBIMC. (*Id.* ¶ 8).

On August 14, 2012, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") against NBIMC alleging discrimination on the bases of age, race, national origin, retaliation, disability, and military service. (D.E. No. 13-3, Cert. of Ryan S. Carey, Esq., Ex. 2, Charge). Per EEOC

---

[1] Improperly pled as "Barnabas Health System."

[2] Improperly pled as "Maryellen Wiggins."

[3] Defendant Joanne Reilly has not yet been served by Plaintiff so the instant motion is filed on behalf of all Defendants, except Joanne Reilly.

Case: 15-4045    Document: 003112366698    Page: 204    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-3    Filed 09/08/15    Page 3 of 8 PageID: 3268

Page 2 of 7

2013 U.S. Dist. LEXIS 133910, *3

policy, the [*3] EEOC mailed a copy of Plaintiff's Charge to NBIMC, thereby formally notifying Defendants of Plaintiff's allegations of discrimination. (D.E. No. 15-1, Brief in Support of the Opposition to Defendant's Motion for Partial Dismissal Pursuant to *Federal Rule of Civil Procedure 12(b)(6)* ("Pl. Br.") 21). On August 30, 2012, the EEOC issued a Dismissal and Notice of Suit Rights to Plaintiff. (*Id.* at 22).

Plaintiff filed the instant lawsuit on November 21, 2012, alleging (1) discrimination on the basis of age; (2) discrimination on the basis of race; (3) violation of the Conscientious Employee Protection Act ("CEPA"); (4) discrimination on the basis of military status; (5) discrimination on the basis of a disability; (6) harassment and hostile work environment; (7) violation of the Nurse Practice Act ("NPA"); (8) aiding and abetting wrongful behavior; and (9) breach of privacy in violation of policy.

On January 4, 2013, Defendants moved for partial dismissal of Plaintiff's Complaint. Specifically, Defendants request that this Court (1) dismiss all age discrimination claims against all Defendants under the Civil Rights Act of 1964, Title VII ("Title VII"), and dismiss all age discrimination claims [*4] against John Brennan, Zachary Lipner, Joanne Reilly, Mary Ellen Wiggins, Helen Hartney, John Does 1-10, and Jane Does 1-10 (collectively, "Individual Defendants") under the Age Discrimination in Employment Act of 1967 ("ADEA"); (2) dismiss all disability discrimination claims against all Defendants under Title VII and dismiss all disability discrimination claims against all Individual Defendants under the Age Discrimination Act ("ADA"); (3) dismiss all hostile work environment claims against all Individual Defendants under Title VII; (4) dismiss all claims against all Individual Defendants under the NPA; and (5) dismiss all breach of privacy claims against all Individual Defendants. (D.E. No. 13-1, Defendants' Brief in Support of Motion for Partial Dismissal of Plaintiff's Complaint Pursuant to *Fed. R. Civ. Proc. 12(b)(6)* ("Def. Br.") 1-2).

Defendants further move to bar Plaintiff from asserting any claims of discrimination, harassment, or retaliation that pre-date June 13, 2012 because Plaintiff's EEOC Charge stated that such alleged actions happened no earlier or later than June 13, 2012. (*Id.* at 3). And as such, Plaintiff failed to exhaust its administrative remedies regarding any alleged claim [*5] or event that pre-dates June 13, 2012.

## II. Legal Standard

In evaluating the sufficiency of a complaint under *Rule 12(b)(6)*, a court must "accept all well-pleaded factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).* But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929).* Thus, "'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element[s]." *Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 322 (3d. Cir. 2008)* (quoting *Twombly, 550 U.S. at 556*).

When deciding a *Rule 12(b)(6)* motion, "a court must consider only the complaint, exhibits attached [thereto], matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these [*6] documents." *Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir 2010).* "[I]f a complaint is subject to a *Rule 12(b)(6)* dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips, 515 F.3d at 245* (citation omitted).

## III. Analysis

As an initial matter, the Court notes that Plaintiff concedes the dismissal of several claims. First, Plaintiff concedes the dismissal of his age and disability discrimination claims under Title VII as to all Defendants. (*See* Pl. Br. 11 ("It appears that the Civil Rights Act of 1964, Title VII provides no protection to employees based on age or disability.")). Second, Plaintiff concedes the dismissal of his claim alleging Defendants violated the NPA. (*See id.* at 25 ("It is conceded that a private cause of action is unavailable for violation of the Nurse Practice Act.")). Accordingly, Plaintiff requests that the Court allow him "to amend the Complaint to replace Violation of the Nurse Practice Act with a more cognizable cause of action." (*Id.*). Third, although Plaintiff does not outright concede the dismissal of his breach of privacy claim, he "request[s] that the Court allow Plaintiff to amend this [*7] cause of action to identify greater details of those involved in the breach of Plaintiff's privacy." (*Id.* at 26).

Therefore, the Court grants Defendants' motion with prejudice as to Plaintiff's claims of (1) age and disability discrimination against all Defendants under Title VII; and (2) violation of the NPA. The Court grants Defendants' motion without prejudice as to Plaintiff's breach of privacy

Case: 15-4045    Document: 003112366698    Page: 205    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-3    Filed 09/08/15    Page 4 of 8 PageID: 3269

Page 3 of 7

2013 U.S. Dist. LEXIS 133910, *7

claim against all Individual Defendants. The Court now addresses the remaining claims at issue.

### A. Individual Liability Under the ADA, the ADEA, and Title VII

First, Defendants submit that Plaintiff's claims under the ADA, the ADEA, and Title VII as to Individual Defendants must be dismissed because neither the ADA, the ADEA, nor Title VII provide for individual liability. (Def. Br. 8-11). "When addressing the question of individual liability under the ADA, the ADEA, and Title VII, courts look to case law under all three statutes." *DeJoy v. Comcast Cable Commc'ns Inc., 941 F. Supp. 468, 474 (D.N.J. 1996)*; *see also Kohn v. AT&T Corp., 58 F. Supp. 2d 393, 419 (D.N.J. 1999)* ("When addressing the question of individual liability under these statutes . . . case law interpreting any of these statutes [*8] is relevant."). As the Third Circuit explains, "the ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well." *Newman v. GHS Osteopathic, 60 F.3d 153, 157 (3d Cir. 1995)*.

Specifically, "the ADA, ADA and Title VII definitions of 'employer' are virtually identical."[4] *DeJoy, 941 F. Supp. at 474*; *see also Verdecchia v. Douglas A. Prozan, Inc., 274 F. Supp. 2d 712, 723 (W.D. Pa. 2003)* ("The ADA and ADEA define eligible defendants identically to, and is interpreted consistently with, Title VII."). Third Circuit precedent clearly establishes that individual employees cannot be held liable under Title VII. *See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1077-78 (3d Cir. 1996)* ("Congress did not intend to hold individual employees liable under Title VII."); *Dici v. Commonwealth of Pa., 91 F.3d 542, 552 (3d Cir. 1996)* ("[W]e conclude, for the reasons previously given by the court in *Sheridan* and the other courts of appeals, that individual employees cannot [*9] be held liable under Title VII.").

The Third Circuit extended this reasoning to the ADA, finding that "there appears to be no individual liability for damages under Title I of the ADA." *Koslow v. Commonwealth of Pa., 302 F.3d 161, 178 (3d Cir. 2002)*. Furthermore, "[d]istrict court decisions in this Circuit have similarly [*10] rejected individual employee liability under [the ADA, the ADEA, and Title VII]." *Kohn, 58 F. Supp. 2d at 420* (citation omitted); *see also Eckhaus v. Consol. Rail Corp., No. 00-5748, 2003 U.S. Dist. LEXIS 25045, 2003 WL 23205042, at *15 (D.N.J. Dec. 24, 2003)* ("[C]ourts have treated ADEA claims against individuals much like those claims brought pursuant to the ADA and Title VII.") (citation omitted).

To be sure, Plaintiff does not cite to a single case supporting the proposition that the ADEA, the ADA, or Title VII provide for individual liability.[5] In light of the Third Circuit's clear precedent rejecting Plaintiff's position, the Court dismisses Plaintiff's claims under Title VII, the ADEA, and the ADA as to Individual Defendants.

### B. Scope of Plaintiff's Discrimination Claims

Defendants argue that Plaintiff's claims must be limited to those that occurred on June 13, 2012 because the EEOC could not have been expected to investigate any other claims based upon the information contained in the Charge. (Def. Br. 13-15). Accordingly, Defendants move for an Order barring Plaintiff from pursuing claims of discrimination, harassment, or retaliation that pre-date June 13, 2012. (*Id.* at 3).

Prior to commencing a lawsuit under Title VII, the ADA, or the ADEA, a plaintiff must first file a charge with the EEOC. *Webb v. City of Phila., 562 F.3d 256, 262 (3d Cir. 2009)* (noting the administrative exhaustion requirement in the context of Title VII claims) (citation omitted); *see also Snyder v. Baxter Healthcare, Inc., 393 Fed. Appx. 905, 908 (3d Cir. 2010)* ("[I]n order to maintain an action under the

---

[4]    The ADEA defines "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . [or] any agent of such a person . . . ." *29 U.S.C. § 630(b) (West 2013)*. The ADA defines "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year . . . and any agent of such person . . . ." *42 U.S.C. § 12111(5)(A) (West 2009)*. Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." *42 U.S.C. § 2000e(b) (West 2013)*.

[5]    It seems Plaintiff is attempting to bring a claim of individual liability through a theory of agency. (*See* Pl. Op. Br. 12-16). Nonetheless, the Court cannot at this time accept such a claim because Plaintiff's allegations in the Complaint do not support such a theory. Moreover, it is well settled "that a party cannot amend his complaint in a brief submitted in opposition to a motion to dismiss." *Pineda v. West Asset Mgmt., Inc., 2011 U.S. Dist. LEXIS 145973, at *8 (D.N.J. Dec. 20, 2011)* [*11] (citing *Frederico v. Home Depot, 507 F.3d 188, 201-02 (3d Cir 2007)*).

Case: 15-4045    Document: 003112366698    Page: 206    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-3    Filed 09/08/15    Page 5 of 8 PageID: 3270

Page 4 of 7

2013 U.S. Dist. LEXIS 133910, *10

ADA or the ADEA, a Plaintiff is required to file a charge with the EEOC."). The purpose of this administrative exhaustion requirement

> is to initiate the statutory scheme for remedying discrimination. Once the EEOC receives a charge, it is required to give notice to [*12] the employer and to make an investigation to determine whether there is reasonable cause to believe that the charge is true. If cause is found, the EEOC must attempt to use informal means of achieving a settlement of the dispute. If no reasonable cause is found, or if reconciliation attempts prove futile within a certain time, the charging party is issued a notice of his right to bring a civil action. Only after such a letter is received is a civil action permitted.

*Hicks v. ABT Assocs., Inc., 572 F.2d 960, 963 (3d Cir. 1978)* (citations omitted).

"Because the EEOC is required to serve notice on the employer against whom the charges are made, this standard also allows an employer to be put on notice of the claims likely to be filed against it." *Barzanty v. Verizon Pa., Inc., 361 Fed. App'x. 411, 414 (3d Cir. 2010)* (citation omitted).

Accordingly, "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of the proceedings before the Commission." *Robinson v. Dalton, 107 F.3d 1018, 1025-26 (3d Cir. 1997)* (quoting [*13] *Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976)*). Moreover, a plaintiff's discrimination claims in a civil action must be "reasonably within the scope of the charge filed with the EEOC. Otherwise, the charging party could greatly expand an investigation simply by alleging new and different facts when he was contacted by the Commission following his charge." *Hicks, 572 F.2d at 967.*

To be sure, a plaintiff pursuing discrimination claims in federal court is not strictly limited to those claims "checked off in the box section on the front page of the Charge, nor even to the specific claims that the EEOC investigated pursuant to the Charge." *Carr v. N.J., No. 9-913, 2010 U.S. Dist. LEXIS 59987, 2010 WL 2539782, at *4 (D.N.J. June 17, 2010)* (citing *Hicks, 572 F.2d at 963, 966).* "Rather, the permitted scope of the lawsuit is any claim that should have been included in a reasonable investigation conducted by the EEOC, based upon the information contained in the Charge." *Id.* (citing *Ostapowicz, 541 F.2d at 398-99*).

Here, Plaintiff's Charge[6] indicated that (1) the "earliest" date of the alleged discrimination was June 13, 2010; (2) the "latest" date of the alleged discrimination was June 13, 2012; and [*14] (3) the discrimination was not ongoing. (*See* Charge). Plaintiff attempts to broaden the scope of his claims by relying on his EEOC Intake Questionnaire filed on June 22, 2012. (Pl. Br. 19). Specifically, Plaintiff argues that his Intake Questionnaire "provided numerous facts that supported his various claims of discrimination which dated back to about 2011," and that he "should not be barred from raising all claims initially cited in the Intake Questionnaire." (*Id.* at 19, 23).

Plaintiff's argument is without merit. In *Barzanty,* the Third Circuit considered whether a plaintiff could pursue a hostile work environment claim where she included the claim in her Intake Questionnaire but not in her Charge of Discrimination. *Barzanty, 361 Fed. App'x. at 412-13.* The Third Circuit explicitly rejected the plaintiff's argument, holding that "[a] plaintiff cannot be allowed to transfer the allegations [*16] mentioned only in the questionnaire to the charge itself." *Barzanty, 361 Fed. App'x. at 415.* The Court explained that "the EEOC Charge Form and the Intake Questionnaire serve different purposes." *Id. at 415.* Specifically,

> an Intake Questionnaire facilitates "pre-charge filing counseling" and allows the Commission to determine

---

[6]  The Court notes that "[i]n deciding a *Rule 12(b)(6)* motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010); see also Ruddy v. U.S. Postal Serv, 455 F. App'x 279, 283 (3d Cir. 2011)* ("The Magistrate Judge and District Court properly relied on Ruddy's EEOC file, which Ruddy referenced in his complaint and which is integral to his claim."); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)* (holding "that a court may consider an undisputedly authentic document [*15] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document"); *Gillyard v. Geithner, No. 2012 U.S. Dist. LEXIS 78893, 2012 WL 2036504, at *3 n.3 (E.D. Pa. June 5, 2012)* ("In this case, Defendant puts forth several administrative documents for the Court to consider. Plaintiff does not dispute the authenticity of such documents and Plaintiff bases his claims, in part, on such documents . . . [t]herefore, the Court will consider these documents in deciding Defendant's Motion to Dismiss.") (internal citations omitted); *Rogan v. Giant Eagle, Inc., 113 F. Supp. 2d 777, 782 (W.D. Pa. 2000)* (finding that EEOC charge and dismissal and right to sue letter are central to a plaintiff's claim and do not convert a motion to dismiss into a summary judgment motion).

Case: 15-4045    Document: 003112366698    Page: 207    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-3    Filed 09/08/15    Page 6 of 8 PageID: 3271

Page 5 of 7

2013 U.S. Dist. LEXIS 133910, *16

whether it has jurisdiction to pursue a charge. Moreover, the Intake Questionnaire is not shared with the employer during the pendency of the EEOC investigation. On the other hand, an EEOC Charge Form serves to define the scope of the Commission's investigation and to notify the defendant of the charges against it. A plaintiff cannot be allowed to transfer the allegations mentioned only in the questionnaire to the charge itself. Not only would this be circumventing the role of the Commission, but it would be prejudicial to the employer.

*Id.* (footnotes and citations omitted).

Thus, the Court held that the plaintiff's hostile work environment claim was "outside the scope of her charge of discrimination." *Id.* Courts in this District routinely apply the holding in *Barzanty* to confine the scope of a plaintiff's discrimination claims to those claims that reasonably arise [*17] from the plaintiff's EEOC charge. *See Noble v. Maxim Healthcare Servs., Inc., No. 12-2227, 2012 U.S. Dist. LEXIS 102666, 2012 WL 3019443, at *10 (D.N.J. July 24, 2012)* (barring plaintiff from asserting hostile work environment and harassment claims where plaintiff included the claims in his Intake Questionnaire but not in his Charge of Discrimination); *Carr, 2010 U.S. Dist. LEXIS 59987, 2010 WL 2539782, at *4* ("[W]hile courts may construe a Charge liberally to determine the proper scope of a reasonable EEOC investigation and the ensuing litigation, they have declined to use the Intake Questionnaire for that purpose."); *see also Roman v. Waste Mgmt. of N.J., No. 10-4337, 2011 U.S. Dist. LEXIS 50910, 2011 WL 1807642, at *6 (D.N.J. May 12, 2011)* (barring plaintiff from asserting claims of disparate impact and retaliation where plaintiff "did not include in his EEOC charge anything to suggest his claims for disparate impact or retaliation."); *Ventura v. Montclair State Univ., No. 08-5792, 2011 U.S. Dist. LEXIS 12823, 2011 WL 550720, at *7-8 (D.N.J. Feb. 9, 2011)* (barring plaintiff from asserting a hostile work environment claim where plaintiff included the claim in a letter mailed to the EEOC but not in his EEOC charge).

Furthermore, Plaintiff's reliance on *Hicks* and *Robinson* is misplaced. In *Hicks,* the [*18] plaintiff filed suit in federal court alleging race and sex discrimination. *Hicks, 572 F.2d at 962.* The district court dismissed the sex discrimination claim because the plaintiff did not include such claim in his initial EEOC charge. *Id. at 963.* On appeal, the Third Circuit remanded because there remained genuine issues of material fact as to whether the plaintiff reasonably attempted to amend his charge to include the sex discrimination claim. *Id. at 964.* The Third Circuit explained that an improper refusal by the EEOC to permit the plaintiff to amend his

charge "would create an excuse for the failure to file a sex discrimination charge." *Id.*

In *Robinson,* plaintiff filed a Title VII action alleging that he was fired from the Navy in retaliation for previously filing racial discrimination charges with the EEOC. *107 F.3d at 1019.* The district court dismissed the retaliatory discharge claim because plaintiff did not include such claim in an official EEOC charge. *Id. at 1020.* On appeal, the Third Circuit remanded because there remained genuine issues of material fact as to whether the EEOC improperly failed to investigate plaintiff's retaliatory discharge claim. *Id. at 1026.* Specifically, [*19] the Third Circuit explained that plaintiff's three initial EEOC charges could have contained sufficient information to warrant an EEOC investigation into the retaliatory discharge claim. *Id.*

As Defendants point out, *Hicks* and *Robinson* involve plaintiffs who "were proactive about modifying and/or amending their respective EEOC Charges, but were rebuffed by the EEOC." (Def. Reply Br. 9 n.1). In both instances, the Third Circuit sought to prevent "[t]he individual employee [from being] penalized by the improper conduct of the Commission." *Hicks, 572 F.2d at 964-65.*

Here, Plaintiff Canete—and his attorney—signed the EEOC Charge and indicated that the "earliest" and "latest" date on which the discriminatory conduct took place was June 13, 2012. (Def. Reply Br. 8; Charge). Notably, Plaintiff did not check the box in the Charge to claim a continuing discriminatory action, nor did Plaintiff include any claims of discriminatory conduct that pre-date June 13, 2012 in the text portion of the Charge. (*Id.*). Moreover, Plaintiff made no attempt to modify or amend his Charge. (Def. Reply Br. 9 n.1).

To be sure, Plaintiff alleges several failures on the part of the EEOC in conducting its review of Plaintiff's [*20] charges. Specifically, Plaintiff asserts that the EEOC (1) failed to conduct a proper investigation, i.e., failed to investigate the claims asserted by Plaintiff in his Intake Questionnaire; (2) failed to notify him of the status of the investigation; and (3) failed to engage in conciliation. (Pl. Br. 22-23). Plaintiff argues that these failures constitute "narrow action by the EEOC as discussed in *Hicks,*" and should not result in a bar to Plaintiff's claims that pre-date June 13, 2012. (*Id.* at 23).

First, as discussed *supra,* the EEOC conducts its investigation based on the information contained in the charge. *Barzanty, 361 Fed App'x at 413.* Importantly, any claims discovered by the EEOC during its investigation must be "reasonably

Case: 15-4045    Document: 003112366698    Page: 208    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-3    Filed 09/08/15    Page 7 of 8 PageID: 3272

Page 6 of 7

2013 U.S. Dist. LEXIS 133910, *20

within the scope of the charge filed with the EEOC." *Hicks, 572 F.2d at 967.* Because the charge stated that the "earliest" and "latest" date on which the discriminatory conduct took place was June 13, 2012, any claims that pre-date June 13, 2012 are not "reasonably within the scope of the charge."

Similarly, the fact that the EEOC did not notify Plaintiff of the status of its investigation does not excuse Plaintiff from failing to assert in his Charge claims [*21] that pre-date June 13, 2012. As noted in *Hicks,* even if the EEOC had discovered additional claims by communicating directly with the employee during its investigation, those claims must still be "reasonably within the scope of the charge." *See id.* ("The district court must further find that the . . . claims which would have been uncovered were reasonably within the scope of the charge filed with the EEOC. Otherwise, the charging party could greatly expand an investigation simply by alleging new and different facts when he was contacted by the Commission following his charge.").

Indeed, courts have liberally construed charge language and required the EEOC to investigate more than is explicitly presented in the Charge. However, all have done so when a non-lawyer layperson filled out the Charge. *See Hicks, 572 F.2d at 965* ("We have recognized that the individuals who draft charges are often not well vested in the art of legal description" and as a result, "the scope of the original charge should be liberally construed."); *Sanchez v. Standard Brands, Inc., 431 F.2d 455, 462-63 n. 4 (5th Cir. 1970)* (noting that a layperson filling out a charge of discrimination might have difficulty articulating [*22] legal basis for alleged discrimination); *EEOC v. E.I. DuPont de Nemours & Co., 373 F.Supp. 1321, 1335 (D. Del. 1974)* (explaining that the "precise language of the charge . . . provides less guidance for subsequent proceedings than the general character of the grievances to which the charge alludes" and that the charge is often drawn by a layperson who "perceives only dimly the nature and cause of the discrimination").

Here, as mentioned *supra,* Plaintiff was not a layperson acting without counsel when he filled out and signed the Charge. Instead, he was represented by Ms. Luretha M. Stribling, Esq., the very attorney presently moving before this Court. Ms. Stribling was a signatory to the Charge. As such, the Court is not persuaded by Plaintiff's attempt to misplace blame on the EEOC.

Finally, Plaintiff submits that the EEOC's "failure to conciliate" constitutes improper conduct. (Pl. Br. 22.) Indeed, the EEOC "must attempt to use informal means of achieving a settlement of the dispute" if it finds sufficient evidence of statutory violations. *Hicks, 572 F.2d at 963.* But "if no reasonable cause is found . . . the charging party is issued a notice of his right to bring a civil action." *Id.* [*23] Here, the EEOC conducted an investigation based on the information Plaintiff provided in his Charge, found insufficient evidence of statutory violations, and properly issued a Dismissal and Notice of Rights. (*See* D.E. No. 1-1, Compl., Ex. 1, EEOC Dismissal and Notice of Rights). Notably, Plaintiff and his attorney had the opportunity to seek an amendment of their Charge, but failed to do so.

Thus, the Court grants Defendants' motion seeking to bar Plaintiff from asserting any claims of discrimination that pre-date June 13, 2012. In sum, Plaintiff's remaining claims include: Count 1 (age discrimination against Barnabas Health and NBIMC under the ADEA and against all Defendants under the New Jersey Law Against Discrimination ("NJLAD")); Count 2 (racial discrimination against Barnabas Health and NBIMC under Title VII and against all Defendants under the NJLAD); Count 3 (violation of the Conscientious Employee Protection Act against all Defendants); Count 4 (military status discrimination against all Defendants under the Uniformed Services Employment and Reemployment Rights Act of 1994 and the NJLAD); Count 5 (disability discrimination against Barnabas Health and NBIMC under the ADA and [*24] against all Defendants under the NJLAD); Count 6 (harassment and hostile work environment against Barnabas Health and NBIMC under Title VII and against all Defendants under the NJLAD); and Count 8 (aiding and abetting wrongful behavior against all Defendants under the NJLAD).[7]

## IV. Conclusion

---

[7]    Defendants also request that the Court disregard any arguments raised in Plaintiff's Counsel's Certification because it violates Local Civil Rule 7.2. (Def. Reply Br. 4-5). Plaintiff's Counsel's Certification does indeed contain numerous arguments of fact and law. (*See* D.E. No. 15, Cert. of Counsel in Support of the Opp. to Defendants' Motion for Partial Dismissal Pursuant to *Fed. R. Civ. P. 12(b)(6),* ¶¶ 5, 6, 7-8, 9). Accordingly, the Court grants Defendants' request and notes that Local Civil Rule 7.2(a) restricts affidavits to "statements of fact within the personal knowledge of the affiant." L. Civ. R. 7.2(a). Further, "[a]rguments of the facts and the law shall not be contained in affidavits." *Id.* Doing so "may subject the affiant to appropriate censure, sanctions or both." *Id.* The Court will not go so far as to sanction Plaintiff's Counsel, but will disregard Counsel's affidavit as it is in clear violation [*25] of Local Civil Rule 7.2(a).

2013 U.S. Dist. LEXIS 133910, *24

For the foregoing reasons, Defendants' Motion for Partial Dismissal is granted *without prejudice*.[8] Plaintiff shall have thirty days to file an amended complaint to cure the deficiencies outlined in the Court's Opinion. An accompanying Order shall follow.

/s/ *Esther Salas*

**Esther Salas, U.S.D.J.**

---

[8]   However, as mentioned in Section III of the Opinion, the Court dismisses Plaintiff's claims of (1) age and disability discrimination against all Defendants under Title VII and (2) violation of the NPA *with prejudice*.

# EXHIBIT 3



**A** Neutral
As of: August 20, 2015 3:51 PM EDT

## *Irwin Katz & Assocs. v. Concepts in Health, Inc.*

United States District Court for the District of New Jersey

July 13, 2015, Decided; July 13, 2015, Filed

Civ. Action No.: 3:13-cv-1217(FLW)(LHG)

**Reporter**
2015 U.S. Dist. LEXIS 90225

IRWIN KATZ & ASSOCS., INC., Plaintiff, v. CONCEPTS IN HEALTH, INC. and HOLLY ROSENTHAL, Defendants.

**Notice:** NOT FOR PUBLICATION

**Prior History:** *Irwin Katz & Assocs. v. Concepts in Health, Inc., 2014 U.S. Dist. LEXIS 161680 (D.N.J., Nov. 19, 2014)*

**Counsel:** [*1] For IRWIN KATZ & ASSOC., INC., Plaintiff: PETER JOSEPH PIZZI, LEAD ATTORNEY, CONNELL FOLEY, LLP, ROSELAND, NJ; MARIEL L. BELANGER, CONNELL FOLEY, ROSELAND, NJ.

For CONCEPTS IN HEALTH, INC., HOLLY ROSENTHAL, Defendants: S. REID KAHN, LEAD ATTORNEY, KANE KESSLER, PC, HACKENSACK, NJ.

**Judges:** Hon. Freda L. Wolfson, United States District Judge.

**Opinion by:** Freda L. Wolfson

## Opinion

**WOLFSON, United States District Judge:**

Plaintiff Irwin Katz & Assocs., Inc. ("Plaintiff") brings this action for breach of contract and breach of the covenant of good faith and fair dealing, alleging that Defendants Concepts in Health, Inc. ("CIH") and Holly Rosenthal ("Rosenthal") (collectively "Defendants") by failing to provide compensation upon the sale of, *inter alia*, one of CIH's products, the MidNite Brand. Defendants bring the present Motion for Reconsideration following this Court's opinion dated November 18, 2014, which granted summary judgment on Counts I (breach of contract) and III (reformation), but denied summary judgment as to the claim for breach of the covenant of good faith and fair dealing

(Count II) and the personal liability of Holly Rosenthal. Defendants seek reconsideration on the sole remaining count, asserting that there [*2] has been no showing of ill motive or bad faith. For the reasons expressed below, the Motion for Reconsideration is denied.

**FACTUAL BACKGROUND**

As the November Opinion went into considerable detail on the underlying facts of this case, only a brief recitation of the relevant facts is necessary here.

Irwin Katz ("Katz"), the President and sole shareholder for the Plaintiff company, performed consulting services for Defendants, pursuant to a 2007 Agreement. The final version of the agreement provided that Plaintiff would receive "a percentage of the Proceeds of Sale of the Company," with the exact percentage to be determined based on an "earn-in" schedule, and capped at 4%. The Agreement defined "Proceeds of Sale" as "all outright or timed payments made in exchange for ownership of the company and the right to market the MidNite and all other of the company's brands as a result of the sale of the company after all loans to the company and payments to capital partners have been paid."

At the time the Agreement was signed, CIH's business consisted solely of selling "Midnite," a natural sleep aid developed by Rosenthal. In or around February 2011, CIH introduced the NatuRelief brand, an analgesic [*3] providing relief for minor pain. In or around April 2011, CIH introduced Nature Garden, a form of MidNite for dollar outlets.

Rosenthal wished to sell CIH, and worked with an investment group, Sawaya Segalas and Co. LLC, for that purpose. After one potential sale of CIH fell through, on June 24, 2012, a member of the Sawaya team sent an internal email asking why "we are not selling assets here

Case: 15-4045   Document: 003112366698   Page: 212   Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD   Document 135-4   Filed 09/08/15   Page 3 of 5 PageID: 3276

Page 2 of 4

2015 U.S. Dist. LEXIS 90225, *4

potentially"; however, another team member responded that Rosenthal's intent was "focused on the CIH entity."

In July 2012, Katz asked Rosenthal if there would be an increase in the compensation percentage because the 4% cutoff date, August 1, 2011, had occurred almost a year earlier. A disagreement followed regarding the amount of compensation owed, with Rosenthal initially asserting that Katz was entitled only to a 2.5% "bonus." Katz emailed Rosenthal a copy of the signed Agreement. At her deposition, Katz stated that, upon receiving the Agreement, she realized that Katz would be entitled to 4% upon a sale of CIH, but would not be entitled to any compensation in the event of an asset sale. Thus, any amount she gave him in that event would be a bonus.

On July 19, Rosenthal emailed her financial [*4] consultants, indicating that she "took it upon myself yesterday to calculate my own 'carve out' of NatuRelief expenses." On December 6, 2012, CIH entered into an Asset Purchase Agreement with Meda Consumer Healthcare, Inc. and Meda AB (collectively "Meda"). CIH sold the MidNite brand line, the Nature Garden brand line, and a CVS house brand to Meda; the NatuRelief brand was specifically omitted from the transaction. Rosenthal retained ownership of CIH, and the consideration was paid to CIH.

Following this sale, Katz emailed Rosenthal to ask about his compensation; Rosenthal later testified that, in an oral conversation, she informed Katz that he was not eligible for payment under the Agreement, but that she intended to give him a bonus. Katz sent a letter to Rosenthal disputing this interpretation of the Agreement; Rosenthal terminated Katz's services to CIH a few days later. This action followed.

On September 19, 2013, Plaintiff submitted an Amended Complaint, alleging breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and, in the alternative, reformation of contract (Count III). Following discovery, Defendants filed a Motion for [*5] Summary Judgment, which Plaintiff opposed. Defendants argued the following: on Count I, the only reasonable interpretation of the contract shows that there is no breach of contract; on Count II, that there is no evidence of ill motive to support a claim for a breach of the implied covenant of good faith and fair dealing; and on Count III, there was no unconscionable conduct entitling Plaintiff to reformation. Additionally, Defendants asserted that Rosenthal was not a proper party, and claims against her should be dismissed.

On November 18, 2014, this Court granted summary judgment on Counts I and III, but denied summary judgment

on Count II and with regard to the personal liability of Rosenthal. Defendants now move for reconsideration of the Court's decision on Count II.

## DISCUSSION

Defendants argue that the Court should reconsider its determination that a genuine issue of fact is present with regard Count II, the breach of the covenant of good faith and fair dealing. According to Defendants, Plaintiff failed to meet its initial burden, and did not make a showing of ill motive or bad faith.

*Local Civil Rule 7.1(i)* governs motions for reconsideration and requires the moving party to "set[ ] forth concisely the [*6] matter or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked[.]" *L. Civ. R. 7.1(i)*. The burden on the moving party is quite high and reconsideration is granted very sparingly. To prevail on such a motion, the movant must demonstrate either: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct [a] clear error of law or prevent manifest injustice." *Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010)*.

Notably, a motion seeking reconsideration may not be used by a party to "restate arguments that the court has already considered." *Lawrence v. Emigrant Mortg. Co., Civ. No. 11-3569, 2012 U.S. Dist. LEXIS 150589, 2012 WL 5199228, *2 (D.N.J., Oct. 18, 2012)*. Nor may be such a motion be used "to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *NL Indus., Inc. v. Comm. Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J.1996)*. In other words, "[a] motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple." *Tishcio v. Bontex, Inc., 16 F.Supp.2d 511, 532 (D.N.J.1998)* (internal citation omitted). Further, where a party merely has a difference of opinion with the court's decision, the issue should be raised through the normal appellate process; reconsideration is not the appropriate vehicle. *Dubler v. Hangsterfer's Laboratories, Civ. No. 09-5144, 2012 U.S. Dist. LEXIS 53847, 2012 WL 1332569, *2 (D.N.J., Apr. 17, 2012)* (citing *Bowers v. Nat'l Collegiate Athletic Ass'n, 130 F. Supp. 2d 610, 612 (D.N.J.2001)*). Thus "[t]he only proper ground for granting a motion for reconsideration, therefore, is that the matters [*7] or decisions overlooked, if considered by the court, might reasonably have altered the result reached" *G-69 v. Degnan, 748 F. Supp. 274, 275 (D.N.J. 1990)*.

Applying the above legal standards, Defendant's Motion for Reconsideration fails. Defendant's assertion that Plaintiff

2015 U.S. Dist. LEXIS 90225, *7

did not make a showing of ill motive or bad faith is precisely the argument raised in the original Motion for Summary Judgment. *See* Def. Mot. for Summ. Judg. at 19-23. However, "[t]o support reargument, a moving party must show that dispositive factual matters or controlling decisions of law were overlooked by the court in reaching its prior decision." *Assisted Living Associates of Moorestown, L.L.C. v. Moorestown Twp., 996 F.Supp. 409, 442 (D.N.J.1998)*. Here, Defendants attempt to meet this requirement by asserting that this Court incorrectly held that a statement made by Rosenthal in an affidavit—in which she stated that the sale to Meda was structured as an asset sale based on the advice of her investment bankers—was hearsay. Defendants argue that the statement was offered not for its truth, but to show that the advice was, in fact, given to her, and therefore is not hearsay. Def. Mot. for Recon. at 2.

It is true that "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the [*8] statement is not hearsay" *Gonzalez v. Sec'y of Dep't of Homeland Sec., 678 F.3d 254, 262 (3d Cir. 2012)* (quoting *Fed. R. Evid. 801(c)*, advisory committee's note). However, even if this evidence is admissible, it does not negate the dispute of fact regarding Rosenthal's intent. The timing of Rosenthal's decision to consider an asset sale—immediately after Rosenthal reviewed the Agreement, and after Katz had pressed her on his compensation following a sale—could lead a reasonable jury to conclude that her motivation was to deny Katz his "reasonably expected fruits under the contract." *Wilson v. Amerada Hess Corp., 168 N.J. 236, 251, 773 A.2d 1121 (2001)*. The fact that the some evidence of a different motivation appears in, and only in, Rosenthal's self-serving testimony is insufficient for Defendants to meet their burden of showing that no genuine dispute of material fact exists on this point. *See Jordan v. Cicchi, Civ. No 10-4398, 2014 U.S. Dist. LEXIS 67380, 2014 WL 2009089, at *2 (D.N.J. May 16, 2014)* ("the issue is not whether Plaintiff has relied solely on his own testimony to challenge [a summary judgment motion], but whether Plaintiff's testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's

testimony, despite its self-serving nature." (quoting *Johnson v. MetLife Bank, N.A., 883 F.Supp.2d 542, 549 (E.D. Pa. 2012)*).

Moreover, in the November Opinion, this Court also found that a jury could find that "Rosenthal 'withheld vital information from plaintiff with the [*9] purpose of exploiting the terms of the contract.'" November Op. at 21 (quoting *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Associates, 182 N.J. 210, 227, 864 A.2d 387 (2005)*). This finding would be a sufficient reason to deny summary judgment, and Defendants have not challenged it. Thus, because Defendants' argument cannot "reasonably have altered the result reached," *G-69, 748 F. Supp. at 275*, reconsideration is not appropriate.[1]

Defendants further argue that summary judgment was improper because "Katz admitted under oath that he has absolutely no evidence of bad faith in connection with the asset sale." Def. Mot. for Recon. at 2. However, Katz's personal knowledge of the existence of evidence showing bad faith is not the relevant standard for summary judgment; rather, Defendants must point to "materials in the record" that show that a fact cannot be genuinely disputed. *See Fed. R. Civ. P. 56(c)(1)*. This Court, upon looking at the record, found that a genuine dispute of fact existed, based on the timing of Rosenthal's decision to structure the sale as an asset sale, the lack of record evidence as to advice from her financial advisors on that point, and Rosenthal's withholding of information from Katz as to the nature of the sale and its effect on Katz's compensation. *See* November 18 Opinion at 20-21. Katz's statement that he, personally, did not have evidence of bad faith—when he may not be in possession of relevant information in Defendants' possession—is not sufficient to show that no dispute of fact existed.

## CONCLUSION

For the reasons [*11] expressed herein, Defendant's Motion for Reconsideration is denied. An appropriate Order shall follow.

Date: July 13, 2015

/s/ Freda L. Wolfson

---

[1]   Defendants request permission to submit an affidavit from Sewaya Segalas in order to avoid further proceedings. Def. Mot. for Recon. at 4. However, this Court's prior decision does not solely turn on the lack of evidence from Sewaya; the possibility that Rosenthal withheld information from Katz to exploit the terms of the contract is sufficient, on its own, to deny summary judgment. Moreover, Defendants give no explanation as to why such evidence could not have been submitted with the original Motion for Summary Judgment; it would therefore be inappropriate for the Court to consider it on a Motion for Reconsideration. *See Blystone v. Horn, 664 F.3d 397, 415-16 (3d Cir. 2011)* ("'[N]ew evidence,' for reconsideration purposes, does not refer to evidence that a party submits to the court after an adverse ruling. Rather, new evidence in this context means evidence that a party could not earlier submit to the court because that evidence [*10] was not previously available."). Accordingly, permission to submit an affidavit from Sewaya is denied.

Case: 15-4045   Document: 003112366698   Page: 214   Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD   Document 135-4   Filed 09/08/15   Page 5 of 5 PageID: 3278

Page 4 of 4

2015 U.S. Dist. LEXIS 90225, *11

Hon. Freda L. Wolfson, U.S.D.J.

**ORDER**

**WOLFSON, United States District Judge**:

**THIS MATTER** having been opened to the Court by Defendants Concepts in Health, Inc., and Holly Rosenthal (collectively "Defendants"), through their counsel Kane Kessler, P.C., on a Motion for Reconsideration; it appearing that Plaintiff Irwin Katz & Assocs., Inc., through its counsel Connell Foley, Esq., opposes the motion; pursuant to *Fed.* *R. Civ. P. 78*, for good cause shown, and for the reasons set forth in the Opinion filed on this date;

**IT IS** on this 13th day of July, 2015,

**ORDERED** that Defendants' Motion for Reconsideration is **DENIED**.

/s/ Freda L. Wolfson

Hon. Freda L. Wolfson, U.S.D.J.

# EXHIBIT 4

2015 WL 3616599
Only the Westlaw citation is currently available.
United States District Court,
D. New Jersey.

Paul KAMIENSKI, Plaintiff,
v.
ATTORNEY GENERAL OF The State
of NEW JERSEY, et al., Defendants.
Anthony Alongi, Plaintiff,
v.
Marlene Lynch Ford, et al., Defendants.

Civil Action Nos. 11–3056 (PGS)(DEA), 11–
6243(PGS)(DEA).    |    Filed June 9, 2015.

**Attorneys and Law Firms**

Jerome A. Ballarotto, Trenton, NJ, for Plaintiff.

Luanh Lloyd D'Mello, Office of the Attorney General,
Trenton, NJ, Cynthia Lynn Flanagan, John Michael Bowens,
John D. Mccarthy, Schenck, Price, Smith & King, LLC,
Florham Park, NJ, for Defendants.

**MEMORANDUM OPINION AND ORDER**

ARPERT, United States Magistrate Judge.

*1 This matter comes before the Court on a Motion
by Defendants Marlene Lynch Ford, Thomas F. Kelaher,
James W. Holzapfel, Ronald DeLingy, John Mercun,
Samuel J. Marzarell, E. David Millard, James A. Churchill
and Daniel Mahoney (collectively "Defendants"), for
an Order dismissing Plaintiffs' Complaints pursuant to
Federal Rule of Civil Procedure 37(b)(2)(A)(v) or, in the
alternative, compelling Plaintiffs to respond to Defendants'
interrogatories and requests for the production of documents,
and requesting the revocation of Timothy J. McInnis, Esq.'s
*pro hac vice* admission. *See* Civ. Action No. 11–3056,
Dkt. No. 102.[1] Plaintiffs Alongi and Kamienski oppose
Defendants' Motion.[2] *See* Dkt. Nos. 104, 105. For the
reasons set forth below, Defendants' Motion is DENIED in
its entirety.

**I. BACKGROUND AND PROCEDURAL HISTORY**

Since the parties are intimately familiar with the facts and
procedural history of this case, the Court will only set
forth those facts relevant to Defendants' present Motion.[3]
Kamienski's Complaint was filed on May 26, 2011. *See* Dkt.
No. 1. On October 28, 2011 Defendants filed a Motion for
Summary Judgment in lieu of an Answer, seeking dismissal
of Kamienski's claims brought under New Jersey state law
and 28 U.S.C. § 1983 based on Eleventh Amendment
immunity and qualified and absolute immunity.[4] *See* Dkt.
No. 32. In response, Kamienski voluntarily dismissed his
§ 1983 claims against the personally named Defendants in
their official capacities, but sought to maintain his claims
against Defendants in their individual capacities. *See* Dkt.
No. 37. On September 11, 2012, the Court dismissed Plaintiff
Kamienski's § 1983 claims against the personally named
Defendants in their official capacities and granted Plaintiff
Kamienski leave to amend his Complaint to "add more
specific factual allegations against the personally named
[Defendants]" in their individual capacities. Dkt. No. 57 at
p. 16. In addition, the Court directed the parties to "engage
in limited discovery as to the immunity defense to address
whether any of the [D]efendants:

(1) performed non-prosecutorial functions during the
criminal investigation and during the judicial phase;

(2) had any personal involvement in the alleged
misconduct; and

(3) unreasonably violated [Plaintiff Kamienski's] well-
established constitutional and statutory rights.

*Id.* at p. 10. Pursuant to the Court's Order, Kamienski filed
an Amended Complaint on October 12, 2012. *See* Dkt. No.
60.

The parameters of the Court's limited discovery directive
set forth in the Court's September 11, 2012 Order have
been heavily disputed by the parties. On June 7, 2013,
both parties filed Motions to compel. *See* Dkt. Nos. 71,
72. In their Motion to compel, Defendants claimed that
Plaintiffs had failed to respond to the interrogatories and
document requests served by Defendants. *See* Dkt. No.
71. In opposition, Plaintiffs argued that Defendants were
not entitled to any discovery prior to filing an Answer or
responsive pleading to Kamienski's Complaint. *See* Dkt. Nos.
73, 74. The Court granted Defendants' Motion to compel
finding that "Defendants are entitled to limited discovery on
the topics specified in [the Court's] Order." Dkt. No. 82 at
p. 4. Plaintiff Kamienski then moved for reconsideration of

Case: 15-4045    Document: 003112366698    Page: 217    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-5    Filed 09/08/15    Page 3 of 7 PageID: 3281

Kamienski v. Attorney General of New Jersey, Slip Copy (2015)

the Court's Order granting Defendants' Motion to compel. *See* Dkt. No. 83. In denying Plaintiff Kamienski's Motion for reconsideration, the Court noted the continued confusion surrounding the Court's limited discovery directive and instruction instructed Kamienski to:

> **\*2** Submit any materials or information in his possession responsive to [Defendants'] existing requests, as limited by the categories set forth in Judge Sheridan's Order. If Kamienski is unable to so, he is instructed to identify the problematic requests and seek clarification from Defendants.

Dkt. No. at p. 4.

Defendants' present Motion is based on the assertion that in violation of the Court's September 24, 2013 Order, Plaintiffs still have not adequately responded to Defendants' discovery requests which were the subject of Defendants' June 7, 2013 Motion to compel.[5] As to Kamienski, Defendants assert that in violation of the Court's September 24, 2013 Order granting Defendants' June 7, 2013 Motion to compel, Kamienski has failed to adequately respond to Defendants' interrogatories, which were served on February 25, 2015 and Defendants' requests for the production of documents, which were served on February 28, 2015. Specifically, Defendants assert that Kamienski has "refused to provide any documents requested" and that the answers to their interrogatories provided by Kamienski on February 19, 2014 are "unresponsive". Dkt. No. 102, McCarthy Cert. at ¶ 18–19. In opposition, Kamienski claims that in compliance with the Court's September 24, 2013 Order, "Kamienski served his responses and objections to Defendants' outstanding discovery requests." Dkt. No. 105 at p. 7.

Turning to Alongi, Defendants claim that while Alongi's answers to interrogatories were "relatively responsive", Alongi has "barely" provided any documents to Defendants. In response, Alongi claims that he has complied with the Court's Orders and provided adequate responses to Defendants' discovery requests.

## II. DISCUSSION

### A. Defendants' Motion to Dismiss Plaintiffs' Complaints Pursuant to Fed.R.Civ.P. 37(b)(2)(A)(v)

In their Motion, Defendants request the dismissal of Plaintiffs' Complaints pursuant to Federal Rule of Civil Procedure 37(b)(2)(A) (v) based on Plaintiffs' alleged lack of compliance with this Court's discovery orders directing the parties to engage in limited discovery as to the issue of immunity.[6] Plaintiffs oppose Defendants' Motion and claim that they have complied with the Court's orders and adequately responded to Defendants' discovery requests.

Federal Rule of Civil Procedure 37 authorizes courts to impose sanctions for failure to provide discovery or obey court orders. *See* Fed.R.Civ.P. 37(b)(2). Where such failures have occurred, dismissal may be an appropriate penalty. *Id.* However, "dismissals with prejudice or defaults are drastic sanctions, termed 'extreme' by the Supreme Court, ... and are to be reserved for [such] cases." *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 867–68 (3d Cir.1984) (citing *Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976)). It is well settled that the preference of the Third Circuit is to decide cases on the merits. *Medunic v. Lederer*, 533 F.2d 891, 893–94 (3d Cir.1976).

**\*3** Generally, in determining whether to impose an involuntary order of dismissal, the Court considers the factors set forth in *Poulis*, 747 F.2d at 868. These factors include:

> (1) The extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the plaintiff's conduct; (3) the history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim.

*Id.* No single Poulis factor is determinative and dismissal may be appropriate even if some of the factors are not met. *See Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir.1992); *Hicks v. Feeney*, 850 F.2d 152, 156 (3d Cir.1988).

Defendants' request for dismissal under Rule 37 is based on the assertion that Plaintiffs have violated the Court's September 24, 2013 Order which directed that both Plaintiffs and Defendants are entitled to "equal opportunity to conduct discovery on permitted topics." Dkt. No. 82 at p. 4. While Defendants acknowledge that Plaintiffs have provided responses to Defendants' discovery requests as instructed

Kamienski v. Attorney General of New Jersey, Slip Copy (2015)

by the Court, Defendants contend that the responses are insufficient and therefore violate the Court's discovery directive.

### i. Plaintiff Kamienski

Defendants claim that the answers provided by Kamienski to Defendants' interrogatories are "unresponsive" and that in response to Defendants' documents requests, Kamienski has only provided 107 pages of documents. Kamienski claims that in accordance with the Court's September 24, 2013 Order, Kamienski served his responses and objections to Defendants' outstanding discovery requests, which included "a mix of substantive answers and the production of records, as well as, partial and outright objections to discovery demands." Dkt. No. 105 at p. 7. Kamienski asserts that far from disobeying the Court's orders, his discovery responses followed the Court's December 4, 2013 Order, which clarified the scope of discovery and directed that Plaintiff:

> Submit any materials or information in his possession responsive to [Defendants'] existing requests, as limited by the categories set forth in Judge Sheridan's Order. If Kamienski is unable to so, he is instructed to identify the problematic requests and seek clarification from Defendants.

Dkt. No. 90 at p. 4. Defendants' Motion is based exclusively on Plaintiffs' alleged failure to obey the September 24, 2013 Order and interestingly contains no reference to the Court's subsequent Order of December 4, 2013. While Defendants may not be satisfied with Kamienski's answers to Defendants' interrogatories or with the quantity of documents produced by Kamienski, the Court finds that Kamienski's responses are in compliance with the Court's December 4, 2013 Order.

### ii. Plaintiff Alongi

According to Defendants, while Alongi's answers to Defendants' interrogatories were "relatively responsive", Alongi has "barely provided [Defendants] with any documents despite the fact that he litigated the underlying criminal case for more than three decades." Dkt. No. 102 at ¶ 23. In response, Alongi claims that he has been fully cooperative with Defendants and has produced all documents in his possession relevant to Defendants' requests. Aside from their dissatisfaction with the quantity of documents produced

by Alongi, Defendants have failed to demonstrate any way in which Alongi has failed to comply with Court's orders.

*4 Although Defendants' assert that dismissal of Plaintiffs' Complaints is warranted because Plaintiffs "continue to blatantly disobey the [Court's] September 24, 2013 Order and assert that they either do not have documents, or are not required to produce documents", there is nothing before the Court to suggest that Plaintiffs have, "blatantly" or otherwise, disobeyed any of the Court's Orders. While Defendants may be dissatisfied with the responses provided by Plaintiffs, the Court finds that Plaintiffs, in accordance with the Court's December 4, 2013 Order, submitted the materials in their possession responsive to Defendants' requests and identified and objected to the "problematic" requests. Accordingly, because the Court finds that Plaintiffs have not disobeyed any of the Court's orders or displayed other conduct requiring sanctions, especially the extreme sanction of dismissal, Defendants' Motion to dismiss Plaintiffs' Complaints pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(v) is DENIED. [7]

### B. Defendants' Motion to Compel

In the alternative to dismissal, Defendants seek an Order compelling "Kamienski to provide complete answers to [Defendants'] interrogatories and request for production of documents" and requiring that Alongi "provide complete answers to our request for production of documents and immediately produce all requested documents." Dkt. No. 102 at ¶ 41–42. [8] Plaintiffs oppose Defendants Motion to compel claiming that they have adequately responded to Defendants' discovery requests.

It is well established that the scope of discovery in federal litigation is broad. See Fed.R.Civ.P. 26(b)(1). Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Id.; see also Pearson v. Miller, 211 F.3d 57, 65 (3d Cir.2000). Moreover, information sought by the parties need not be admissible at trial if it is "reasonably calculated" to lead to discovery of admissible evidence. Fed.R.Civ.P. 26.

While the scope of discovery is undoubtedly broad, the Federal Rules also provide that a Court "must limit the frequency or extent of discovery otherwise allowed" if it concludes that: (1) the discovery sought is cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (2)

Kamienski v. Attorney General of New Jersey, Slip Copy (2015)

the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (3) the burden or expense of the proposed discovery outweighs its likely benefit. Fed.R.Civ.P. 26. Further, "the Court has a responsibility to protect privacy and confidentiality interests" and "has authority to fashion a set of limitations that allow as much relevant material to be discovered as possible ... while preventing unnecessary intrusions into legitimate interests that may be harmed by the discovery of material sought." *Schmulovich v. 1161 Rt. 9 LLC*, 2007 U.S. Dist. LEXIS 59705, at *3–4, 2007 WL 2362598 (D.N.J.2007); *see also Pearson*, 211 F.3d at 65; Fed.R.Civ.P. 26(c).

*5 Rule 37(a) allows a party to file a motion to compel discovery where the opposing party fails to respond adequately to a document request propounded pursuant to Rule 34. Fed.R.Civ.P. 37(a)(3)(B). Ultimately, it is within the discretion of the Court to grant a motion to compel disclosure for good cause shown. *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 661 (3d Cir.2003).

Defendants contend that Kamienski's answers to their interrogatories are "wholly inadequate." Dkt. No. 106 at p. 2. In response, Kamienski claims that he provided several substantive answers and stated any objections to Defendants' requests. Specifically, Kamienski objected to several interrogatories as not related to Defendants' immunity defense, outside the scope of Kamienski's knowledge or overly burdensome. Even in light of these objections, Kamienski asserts that he gave his "best response" to Defendants' requests. Dkt. No. 105 at p. 10. In their reply brief, Defendants set forth the interrogatories that have not been answered to their satisfaction and state the basis for their assertion that Kamienski should be required to provide additional information. *See* Dkt. No. 106. As to Defendants' document requests, Defendants initially claim that Kamienski has refused to provide "a single document" and then later claim that Kamienski has only provided 107 pages of documents. Dkt. No. 106 at p. 9–10. In response, Kamienski states that he has provided 220 pages of materials to Defendants and specified proper objections to any documents within his possession which were not produced in response to Defendants' requests.

Turning to Plaintiff Alongi, Defendants argue that while Alongi's answers to their interrogatories were "relatively responsive," he has "provided barely any documents." Dkt. No. 106 at p. 10. Defendants claim that the only documents provided by Alongi were an order of expungement and a

notice of tort claim, and that despite Alongi's reference to his medical records in his response to a question on the tort claim form, he has not provided any of his medical records. In response, Alongi claims that he has produced all responsive records in his possession. Alongi further argues, and the Court agrees, that his medical records are outside the limited scope of discovery defined by the Court's September 11, 2012 Order.

Although Defendants contend that the responses to their discovery requests provided by Plaintiffs are incomplete and evasive, the Court does not wish to engage in the minutia of each interrogatory, document request and response. Since the entry of the Court's September 11, 2012 Order, this case has been mired in disputes and disagreements as to the scope of discovery allowed by the Court's Order and the sufficiency of the parties' answers and objections to discovery requests. More than four years have passed since the filing of this case and almost three years have passed since the Court ordered the parties to engage in limited discovery as to Defendants' immunity defense. At the present juncture, the Court finds that the parties have engaged in adequate discovery as to Defendants' immunity defense to allow this case to move forward and that the interests of justice require that this matter be restored on a path towards resolution. Concluding this lengthy period of discovery, which was intended to be limited, and directing this matter onto a more productive trajectory by requiring Defendants to file an Answer or responsive pleading to the Amended Complaint will move this case forward and will not preclude the parties from engaging in discovery in the future. Accordingly, Defendants' Motion to compel discovery from Plaintiffs Kamienski and Alongi is DENIED, the period of limited discovery permitted by the Court's September 11, 2012 Order is concluded and Defendants are required to respond to Kamienski's Amended Complaint within ten (10) days from the entry of this Order.

## C. Defendants' Motion to Revoke the Pro Hac Vice Admission of Timothy J. McInnis

*6 In addition to seeking the dismissal of Plaintiffs' Complaints, Defendants request that the *pro hac vice* admission of Kamienski's counsel, Timothy J. McInnis, be revoked based on Mr. McInnis' alleged "complete disregard for this [C]ourt's [O]rder of September 24, 2013." Dkt. No. 102 at ¶ 44. In support of their request, Defendants claim that Mr. McInnis has displayed an "utter disregard for this [C]ourt's discovery orders." *Id.* at ¶ 47. According to Defendants, "[b]ecause of Mr. McInnis' failure to abide by

Kamienski v. Attorney General of New Jersey, Slip Copy (2015)

the [Court's] September 24, 2013 Order, more than a year of discovery has been wasted." *Id.* at ¶ 48.

Admission *pro hac vice* is a privilege, and may be revoked as a sanction for unethical behavior. *See Johnson v. Trueblood,* 629 F.2d 302, 304 (3d Cir.1980); L. Civ. R. 101.1(c)(1) (*pro hac vice* admission is "in the discretion of the court"). The Third Circuit has specified that "a violation of any disciplinary standard applicable to members of the bar of the court would justify revocation of *pro hac vice* status." *Johnson,* 629 F.2d at 304. "An attorney admitted *pro hac vice* in the courts of this State or the federal district court is subject to discipline, which may include a denial of future *pro hac vice* admissions by reason of 'countervailing considerations.' " *Arnold, White & Durkee, Professional Corp. v. Gotcha Covered, Inc.,* 314 N.J.Super. 190, 714 A.2d 360, 366 (N.J.App.Div.1998), *cert. denied,* 157 N.J. 543, 724 A.2d 803 (N.J.1998) (citing *Nat'l Ass'n for the Advancement of Colored People v. State of New Jersey,* 312 N.J.Super. 552, 557–59, 563–65, 711 A.2d 1355 (N.J.App.Div.1998)). Although *pro hac vice* admission is a privilege subject to revocation, the Third Circuit has recognized the practitioner's strong interest in the privilege, and as such, has held that prior to revocation "the attorney be given a meaningful opportunity to respond to identified charges." *See Johnson,* 629 F.2d at 303.

While Defendants claim that Mr. McInnis has failed to comply with Orders of this Court and delayed discovery in this case, Defendants have failed to demonstrate a single instance in which Mr. McInnis has displayed unethical behavior warranting the revocation of his *pro hac vice* admission. Defendants' conclusory statement that Mr. McInnis has engaged in "unethical tactics" is unavailing, especially in light of the Court's finding that Kamienski has adequately complied with the Court's discovery orders and Defendants' discovery requests. Contrary to Defendants'

assertion that Plaintiffs have delayed discovery in this matter, the Court finds that Defendants' present Motion, which glaringly fails to comply with the Local Civil Rules, has contributed to the delay in the advancement and resolution of this matter. Accordingly, Defendants' request for the revocation of Mr. McInnis' *pro hac vice* admission is DENIED.

### III. CONCLUSION AND ORDER

**\*7** The Court having considered the papers submitted pursuant to Federal Rule of Civil Procedure 78, and for the reasons set forth above;

IT IS on this 9th day of June, 2015,

ORDERED that Defendants' Motion seeking an Order dismissing Plaintiffs' Complaints pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(v) or, in the alternative, compelling Plaintiffs to respond to Defendants' interrogatories and requests for the production of documents, and requesting the revocation of Timothy J. McInnis, Esq.'s *pro hac vice* admission [Civ. Action. No. 11–3056, Dkt. No. 102] is DENIED in all respects; and it is further

ORDERED that the period of limited discovery ordered by the Court's September 11, 2012 Order is concluded; and it is further

ORDERED that Defendants are required to file an Answer or responsive pleading to Kamienski's Amended Complaint within ten (10) days from the entry of this Order.

### All Citations

Slip Copy, 2015 WL 3616599

Footnotes

1    These two matters were consolidated for purposes of case management and pretrial discovery on February 25, 2013. *See* Civ. Action No. 11–3056, Dkt. No. 66. Defendants' present Motion was filed in Civ. Action No. 11–3056 and seeks to dismiss the Complaints of both Plaintiff Kamienski and Plaintiff Alongi. Unless otherwise noted, all docket entries in this Order refer to docket entries in Civ. Action No. 11–3056.

2    On March 25, 2015, the Court granted a Motion to substitute Julia Palma, Executrix of the Estate of Anthony Alongi, deceased, as the Plaintiff in this action. *See* Civ. Action No. 11–6243, Dkt. No. 32. In the interest of clarity, the Court refers the Plaintiff in this action as Plaintiff Alongi.

3    An extensive factual summary of this matter can be found in the Court's September 12, 2012 Order. *See* Dkt. No. 32.

4    The present Defendants are former and present prosecutors and investigators from the Ocean County Prosecutor's Office.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Kamienski v. Attorney General of New Jersey, Slip Copy (2015)

5    In his opposition, Kamienski identifies several procedural deficiencies with Defendants' Motion. Plaintiff asserts, and the Court agrees, that Defendants' present Motion fails to adhere to the Local Civil Rules in two important respects. First, in violation of Local Civil Rule 7.1, Defendants' Motion does not include a brief or "a statement that no brief is necessary and the reasons therefor." L. Civ. R. 7.1(d). Pursuant to the Local Civil Rules, a request for relief which is not accompanied by either a brief or a statement why no brief is necessary will not be considered by the Court. *See Ledgestone Associates, LLC v. Internet Methods*, 2008 WL 2625353, at *2 (D.N.J. June 27, 2008). Second, under Local Civil Rule 7.2(a):

> [a]ffidavits, declarations and certifications ... shall be restricted to statements of facts within the personal knowledge of the signatory. Argument of the facts and the law shall not be contained in such documents. Legal arguments and summations in such documents will be disregarded by the Court and may subject the signatory to appropriate censure, sanctions or both.

Contrary to the requirements of the Local Civil Rules, the Certification of John D. McCarthy submitted in support of Defendants' Motion is rife with argument and legal conclusions.

Notwithstanding Defendants' lack of compliance with the Local Civil Rules, in the interests of justice and efficiency, the Court will decide Defendants' Motion on the merits. However, the Court notes that the same deficiencies identified in Defendants' present Motion were raised by Plaintiffs in response to Defendants' June 7, 2013 Motion to compel. *See* Dkt. No. 74 at p. 2–3. All counsel are advised that any subsequent Motions which do not comply with the Local Civil Rules will not be considered by the Court and the continued improper use of certifications, affidavits or declarations may subject the signatory to appropriate censure, sanctions or both.

6    The Court notes that beyond the statement that dismissal of Plaintiffs' Complaints is sought pursuant to Rule 37(b)(2)(A)(v), Defendants' Motion to dismiss is completely devoid of any citations to legal authority or discussion of the applicable legal standard.

7    In addition to the dismissal of Plaintiffs Complaints, Defendants request that the Court order sanctions under Rule 37(b)(2)(C). Based on the Court's finding that Plaintiffs have not disobeyed any of the Court's orders, Defendants' request for sanctions pursuant to Rule 37(b)(2)(C) is DENIED.

8    Again, the Court notes that beyond stating that the present Motion to compel is made pursuant to Federal Rule of Civil Procedure 37(a)(3)(B), Defendants' Motion is devoid of any citation to legal authority or discussion of the applicable legal standard.

---

End of Document                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5



**O** Cited
As of: August 20, 2015 3:51 PM EDT

## *Ledgestone Assocs., LLC v. Internet Methods*

United States District Court for the District of New Jersey

June 26, 2008, Decided; June 27, 2008, Filed

Civil Action No. 06-CV-567 (DMC)

**Reporter**
2008 U.S. Dist. LEXIS 49081; 2008 WL 2625353

LEDGESTONE ASSOCIATES, LLC, Plaintiff, v. INTERNET METHODS A/K/A iMETHODS and JIM B. PUGH, Defendants.

**Notice:** NOT FOR PUBLICATION

**Counsel:** [*1] For LEDGESTONE ASSOCIATES, LLC, Plaintiff: ALYSSA A. CIMINO, *LEAD ATTORNEY,* MCELROY DEUTSCH MULVANEY & CARPENTER, NEWARK, NJ; CHARLES A. STANZIALE, JR., *LEAD ATTORNEY,* MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP, NEWARK, NJ.

JIM B. PUGH, **Defendant,** Pro se, TEMPE, AZ.

**Judges:** Dennis M. Cavanaugh, U.S.D.J.

**Opinion by:** Dennis M. Cavanaugh

## Opinion

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon Defendant Jim B. Pugh [1] ("Pugh") and Internet Methods, Inc. a/k/a iMethods's ("iMethods," and collectively, "Defendants") motion to dismiss the Complaint for lack of personal jurisdiction pursuant to *Fed. R. Civ P. 12(b)(2)*; for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6)*; and for failure to include a short plain statement of jurisdiction, grounds and requested relief in the Complaint, pursuant to *Fed. R. Civ. P. 8*. Pursuant to *Fed. R. Civ. P. 78*, no oral argument was heard. After carefully considering the parties' submissions,

and based upon the following, this court finds that Defendants' motions to dismiss are **denied.**

## I. BACKGROUND [2]

Plaintiff Ledgestone Associates, LLC ("Plaintiff") filed the Complaint alleging breach of the covenant of good faith and fair dealing, fraud, negligent misrepresentation, fraudulent non-disclosure, conversion, unjust enrichment and breach of fiduciary duty. Subsequently, Defendants filed this motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(2)*, *Fed. R. Civ. P. 12(b)(6)* and *Fed. R. Civ. P. 8*.

## II. STANDARD OF REVIEW

### A. *Fed. R. Civ. P. 12(b)(2)*

"It is well-established that in deciding a motion to dismiss for lack of jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 457 (3d Cir. 2003)* (citing *Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 368 (3d Cir. 2002)*). When a defendant, however, raises a jurisdictional defense,

the burden falls on the plaintiff to come forward with sufficient facts to establish that jurisdiction is proper. The plaintiff meets this burden and presents a prima facie case for the exercise of personal jurisdiction by "establishing with reasonable [*3] particularity sufficient contacts between the defendant and the forum state."

*Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)* (quoting *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434 (3d Cir.*

---

[1]   Defendant Jim B. Pugh answered the Complaint on behalf of himself individually and on behalf of Internet Methods, Inc. a/k/a iMethods.

[2]   The facts set forth [*2] in this Opinion are taken from the statements in the parties' respective moving papers.

*1987)* (internal citations omitted). Plaintiff must establish that sufficient contacts exist between the Defendants and New Jersey in order to defeat Defendants' challenge to this Court's jurisdiction.

### B. *Fed. R. Civ. P. 12(b)(6)*

In deciding a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*, all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. See *Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998).* If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond a doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court shall dismiss a complaint for failure to state a claim. See *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984).* In Bell Atl. Corp. v. Twombly, the Supreme Court **[\*4]** of the United States clarified the *Fed. R. Civ. P. 12(b)(6)* standard. See *550 U.S. 544, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007).* Specifically, the Court "retired" the language contained in *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957),* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." *Twombly, 127 S.Ct. at 1968* (citing *Conley, 355 U.S. at 45-46).* Instead, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly, 127 S.Ct. at 1965.*

### C. *Fed. R. Civ. P. 8*

"A pleading that states a claim for relief must contain (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief." *Fed. R. Civ. P. 8(a).*

## III. DISCUSSION

### A. *Fed. R. Civ. P. 7(b)(1)* and *L. Civ. R. 7.1(e)*

At the outset, it should be noted **[\*5]** that, as a technical matter, Pugh's motions to dismiss for lack of personal jurisdiction, for failure to state a claim and for failure to

include in the Complaint a short plain statement of jurisdiction, grounds and requested relief should be denied because Pugh fails to comply with *Fed. R. Civ. P. 7(b)(1)* and *L. Civ. R. 7.1(e)* in that he failed to identify grounds, contain a proposed form of order and annex a brief or a statement in lieu of a brief. See *Fed. R. Civ. P. 7(b)(1); L. Civ. R. 7.1(e). Fed. R. Civ. P. 7(b)(1)(B)* requires that all motions "state with particularity the grounds for seeking the order." Additionally, *L. Civ. R. 7.1* comment 4.b. states that "Motions in the District of New Jersey require, at a minimum, a notice of motion and supporting brief or statement *in lieu* of brief and a proposed form o[f] order . . . In the absence of the required papers, the court need not entertain the motion." Comment 4.b.(1) explains that:

> Every motion filed must be supported by "a brief, prepared in accordance with *L. Civ. R.7.2," L. Civ. R. 7.1(d)(1),* or, in cases where legal argument is not necessary such as a motion addressed solely to the court's discretion, by "a statement that **[\*6]** no brief is necessary and the reasons therefore." A request for relief which is not accompanied by either a brief or a statement why a brief is not necessary will not be considered by the court. Citations Omitted.

See, e.g., *Developers Sur. & Indem. Co. v. NDK Gen. Contrs., 2007 U.S. Dist. LEXIS 11279 (D.N.J. Feb. 15, 2007)* (internal citations omitted). Pugh's motion fails to satisfy these minimum requirements.

*Pro se* litigants, however, are permitted more leniency than practicing attorneys. See *Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972); United States v. Albinson, 356 F.3d 278 (3d Cir. 2004).* Therefore, in the interest of justice, this Court has considered Pugh's motions despite their failure to satisfy the requirements prescribed by *Fed. R. Civ. P. 7(b)(1)* and *L. Civ. R. 7.1(e).*

### B. *Fed. R. Civ. P. 12(b)(2)*

Moreover, beyond the motion's procedural deficiencies, the motion is also denied on the merits. The motion purports to seek relief based upon *Fed. R. Civ. P. 12(b)(2)* for lack of personal jurisdiction. To be subject to personal jurisdiction, a defendant that was not personally served with process within the forum state must have a sufficient level of personal or business contact with the **[\*7]** forum state. See *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945).* Personal jurisdiction can be established by demonstrating that the defendant purposefully conducted himself or herself in the forum state such that the defendant could have reasonably anticipated being hauled

2008 U.S. Dist. LEXIS 49081, *7

into court in the forum state. See *World-Wide Volkswagen Corp. v. Woodson*, *444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*. Defendants' deliberate act of contacting and soliciting $ 142,000 from Plaintiff, a New Jersey Corporation, is indicia of conduct from which Defendant could have reasonably anticipated being hauled into a New Jersey court. Defendants' solicitation of Plaintiff ultimately resulted in a Joint Venture Agreement, wherein the parties stipulated that the Joint Venture "will be formally construed as a limited liability company in the State of New Jersey" under the name of Cyber Exchange, LLC with a mailing address of 614 Frelinghuysen Avenue, Newark, New Jersey 07114. The parties' intentional decision to form their limited liability company in the State of New Jersey, as indicated by the stipulated language quoted above, supports Plaintiff's position that the Defendants purposefully availed themselves of the State [*8] of New Jersey and its economy, thus, subjecting the Defendants to personal jurisdiction.

C. *Fed. R. Civ. P. 12(b)(6)*

Pugh further states that the Complaint should be dismissed pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim upon which relief may be granted. Under *Fed. R. Civ. P. 12(b)(6)*, the moving party has the burden of proving that no claim has been stated. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*. To achieve this, the movant must demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley, 355 U.S. at 45-46; Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984); Hughes v. Rowe, 449 U.S. 5, 10, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980)*. Here, the Complaint asserts claims for breach of the covenant of good faith and fair dealing, fraud, negligent misrepresentation, fraudulent non-disclosure, conversion, unjust enrichment and breach of fiduciary duty. Therefore, the motion unequivocally fails to demonstrate that the "[P]laintiff can prove no set of facts in support of" its claims. See *Conley, 355 U.S. at 45-46.*

D. *Fed. R. Civ. P. 8*

Pugh states that the Complaint should be dismissed pursuant [*9] to *Fed. R. Civ. P. 8*. *Fed. R. Civ. P. 8(a)* requires that a complaint contain (1) a short plaint statement of jurisdiction; (2) a statement demonstrating that Plaintiff is entitled to relief; and (3) a statement requesting said relief. Here, diversity jurisdiction exists because Plaintiff is a New Jersey corporation, Pugh is not a resident of New Jersey and the amount in controversy is $ 142,000.00, more than the $ 75,000.01 requirement. See *28 U.S.C. §1332.* The Complaint satisfies the second requirement of *Fed. R. Civ. P. 8(a)* in that the asserted causes of action are clearly, intelligibly and unmistakably articulated in each enumerated Count of the Complaint, all of which would entitle Plaintiff to relief. See *Twombly, 127 S. Ct. at 1976; Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).* In accordance with the third requirement of *Fed. R. Civ. P. 8(a)*, Plaintiff's Complaint requests several forms of relief, including compensatory, consequential and punitive damages.

E. *Pro se May Not Represent Corporation Defendant*

Although Pugh may certainly represent himself *pro se*, it is well-settled that a corporation must have licensed legal counsel to appear in federal court. See *Rowland v. California Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 202, 113 S. Ct. 716, 121 L. Ed. 2d 656 (1993);* [*10] see also *Beale v. DOJ, 2007 U.S. Dist. LEXIS 6837, 8-9 (D.N.J. 2007)*. iMethods has failed to secure licensed legal counsel on its behalf. Pugh may not appear on behalf of the corporation iMethods. Therefore, to date no appearance has been made on behalf of iMethods.

IV. **CONCLUSION**

For the reasons stated, it is the finding of this Court that Defendants' motion to dismiss the Complaint pursuant to *Fed. R. Civ. P. 12(b)(2)*, *Fed. R. Civ. P. 12(b)(6)* and *Fed. R. Civ. P. 8* is denied. An appropriate Order accompanies this Opinion.

/S/ Dennis M. Cavanaugh

Dennis M. Cavanaugh, U.S.D.J.

Date: June 26, 2008

# EXHIBIT 6

 **LexisNexis**

◆ Positive

As of: August 20, 2015 3:51 PM EDT

## *Levinson v. Regal Ware, Inc.*

United States District Court for the District of New Jersey

November 30, 1989, Decided ; December 1, 1989, Filed, Entered

Civil Action No. 89-1298(MTB)

**Reporter**

1989 U.S. Dist. LEXIS 18373; 14 U.S.P.Q.2D (BNA) 1064

MELVIN L. LEVINSON, Plaintiff, v. REGAL WARE, INC., Defendant.

**Subsequent History:** [*1] Reported at: 14 U.S.P.Q.2d at 1066.

**Judges:** BARRY

**Opinion by:** MARYANNE TRUMP BARRY

## Opinion

*ORDER*

This matter having been opened to the Court upon the motion of plaintiff Melvin L. Levinson (hereinafter "Levinson") for reconsideration of this Court's order of October 6, 1989 transferring this case to the United States District Court for the Eastern District of Wisconsin, and the Court having considered the submissions of the parties both in support of and in opposition to the above motion without oral argument, pursuant to *Federal Rule of Civil Procedure 78*; [1] and

it being the opinion of the Court that General Rule 12(I) of the General Rules of the District Court for the District of

New Jersey requires a litigant to file with his or her motion for reconsideration "a memorandum setting forth concisely the matters or controlling decisions which [he or she] believes the Court has overlooked"; and

it being the further opinion of the Court that General Rules 12(I) "does not . . . contemplate a Court looking to matters which were not originally presented for consideration," *see Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F.Supp. 159, 161-162 (D.N.J. 1988)* [*2] (noting *DeLong Corp. v. Raymond International, Inc., 622 F.2d 1135, 1140 (3rd Cir. 1980)*, and that a litigant seeking reconsideration must therefore show that any new evidence presented to the Court was unavailable or unknown at the time of the original hearing, *DeLong, 622 F.2d at 1140*; and

it being the opinion of the Court that Levinson has failed to set out in a concise manner the controlling decisions which he believes the Court has overlooked, and that Levinson has produced no new material for consideration, let alone material which was unavailable to him at the time of this Court's previous decision;

It is on this 30th day of November, 1989,

ORDERED, that Levinson's motion to alter the Court's order of October 27, 1989 is hereby denied.

[*3] MARYANNE TRUMP BARRY, U.S.D.J.

---

[1] As an initial matter, I note that defendant herein, Regal Ware, Inc. (hereinafter "Regal") suggests that this Court lacks subject matter jurisdiction to decide the present motion. I cannot agree. While Regal correctly states as a general matter that a "transferror court . . . loses all jurisdiction over a case once transfer has occurred", Defendant's Memorandum In Opposition To Motion For Reconsideration at 1, transfer has not yet occurred in this case. It is well settled that prior to the physical transfer of the record to the transferee forum, transfer has not occurred and the transferor court retains authority to review its order. *See e.g., Fisher v. United Air Lines, Inc., 218 F.Supp. 223, 224 (S.D.N.Y. 1963)* (power to vacate a transfer order prior to delivery of papers to transferee court); *see also In re Sosa, 229 U.S. App. D.C. 447, 712 F.2d 1479, 1480* (appellate jurisdiction after transfer).


A Neutral
As of: August 20, 2015 3:52 PM EDT

## *Lighthouse Point Marina & Yacht Club, LLC v. Int'l Marine Underwriters*

United States District Court for the District of New Jersey

April 30, 2015, Decided; May 1, 2015, Filed

Civ. No. 14-2974 (WHW)(CLW)

**Reporter**
2015 U.S. Dist. LEXIS 57556

LIGHTHOUSE POINT MARINA & YACHT CLUB, LLC, Plaintiff, v. INTERNATIONAL MARINE UNDERWRITERS, Defendant.

**Notice:** NOT FOR PUBLICATION

**Prior History:** *Lighthouse Point Marina & Yacht Club, LLC v. Int'l Marine Underwriters, 2015 U.S. Dist. LEXIS 6430 (D.N.J., Jan. 20, 2015)*

**Counsel:** [*1] For LIGHTHOUSE POINT MARINA & YACHT CLUB, LLC, Plaintiff: AUDWIN F. LEVASSEUR, LEAD ATTORNEY, The Law Offices of Harbatkin & Levasseur, P.A., Englewood Cliffs, NJ.

For INTERNATIONAL MARINE UNDERWRITERS, Defendant: MARK LEIGH ANTIN, LEAD ATTORNEY, GENNET, KALLMANN, ANTIN & ROBINSON, ESQS., PARSIPPANY, NJ.

**Judges:** William H. Walls, Senior United States District Judge.

**Opinion by:** William H. Walls

## Opinion

### Walls, Senior District Judge

In this dispute over insurance coverage for property damage caused by Superstorm Sandy, the Court imposed sanctions under *Fed. R. Civ. P. 11* on Plaintiff Lighthouse Point Marina & Yacht Club, LLC ("Lighthouse Point"), and its local and out-of-state counsel, for presenting a claim that lacked evidentiary basis. The Voss Law Firm P.C., Bill L. Voss and Scott G. Hunziker (the out-of-state attorneys for Plaintiff, collectively "the Voss Firm"), having retained independent counsel, now move under *Local Rule 7.1 (i)* for

reconsideration of the order imposing sanctions against them. As the Voss Firm contends that the judgment would have been different were it not for its excusable neglect, the Court also construes the motion as one for relief from a judgment under *Federal Rule of Civil Procedure 60(b)*.

Audwin Levasseur, local counsel for Plaintiff, separately requests [*2] reconsideration of the Court's dismissal of the underlying action in November of 2014. ECF Nos. 15-16.

Defendant Atlantic Specialty Insurance Company ("Atlantic Specialty," improperly pled as International Marine Underwriters) requests an award of additional attorneys' fees, in accordance with the Court's Amended Opinion of January 20, 2015.

Decided without oral argument under *Fed. R. Civ. P. 78*, the Voss Firm's motion is denied, Mr. Levasseur's motion is denied, and Defendant's request for additional attorneys' fees is granted.

### FACTUAL AND PROCEDURAL BACKGROUND

Set forth more fully in the Court's earlier opinion, ECF No. 21, the facts are summarized briefly here. The amended complaint, filed in New Jersey Superior Court on April 11, 2013 and removed to this Court on May 9, 2013, alleges that Atlantic Specialty underpaid Lighthouse Point's insurance claim after Superstorm Sandy. ECF No. 1-1. The action was filed by Scott G. Hunziker, Esq. of the Voss Law Firm, P.C. of The Woodlands, Texas, Hunziker Aff. ¶¶ 2, 4, 6, ECF No. 23-2; Compl., ECF No. 1-1 at 7. Lighthouse Point had retained the firm in February of 2013. Ex. A to Hunziker Aff., ECF No. 33-1. The Voss Firm engaged Audwin Levasseur, Esq., of the [*3] firm Harbatkin & Levasseur, P.A., to serve as local counsel. Hunziker Aff. ¶ 6. Both Mr. Hunziker and Mr. Levasseur signed the complaint. ECF No. 1-1 at 7. The name of Bill L. Voss was also listed at the top of the complaint and below Mr. Hunziker's signature. *Id.*

Case: 15-4045    Document: 003112366698    Page: 229    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-7    Filed 09/08/15    Page 4 of 10 PageID: 3293

Page 2 of 8

2015 U.S. Dist. LEXIS 57556, *4

The Voss Firm then sent Atlantic Specialty a settlement demand, alleging property damage of $540,000, and attorneys' fees totaling $135,000. ECF No. 1-1 at 22.

After filing the complaint, the Voss Firm and Mr. Levasseur ignored their responsibilities in the litigation. They did not respond to Defendant's discovery requests, in violation of the Court-ordered case management schedule, the standing discovery order governing Superstorm Sandy cases in this district, *see* ECF No. 8, and the terms of the insurance policy. *See* ECF No. 13-2. Defendant moved to dismiss the complaint. ECF No. 13. Mr. Levasseur and the Voss Firm did not respond to the motion. The Court granted the motion and dismissed the complaint. ECF Nos. 15-16.

In its Answer and motion papers, Defendant alleged that the lawsuit was fraudulent. Answer ¶¶ 27-29, ECF No. 3; Def.'s Mot. to Dismiss, Def.'s Br. at 4, ECF No. 13. Atlantic Specialty's initial inspection after [*4] the storm found wind damage to two fences, and "[n]o damage to any of the 4 buildings." Antin Decl. MTD ¶ 7, Ex. C. It valued the claim at $1,612, and recommended a payment of $612, after applying a $1,000 deductible. *Id.* Defendant also pointed out that the Voss Firm and Mr. Levasseur had filed 250 lawsuits in New Jersey courts, almost identically worded, within a short period of time. *See* Ct.'s Op. at 1-2, ECF No. 21. Several of these cases were dismissed for lack of prosecution. *Id.* at 8.

Having received no information from the Voss Firm or Mr. Levasseur to contradict Defendant's allegation of fraud, the Court issued an Order to Show Cause on November 13, 2014, instructing Plaintiff to provide some evidentiary basis for its claim. ECF No. 14. The order warned that failure to satisfactorily respond could subject Plaintiff and its counsel to sanctions under *Fed. R. Civ. P. 11*. *Id.* The deadline for Plaintiff's response was December 15, 2014. *Id.* The order was entered on the district's CM/ECF system, and both Mr. Levasseur and the Voss Firm received a copy by certified mail. ECF No. 17-1. They did not respond.

The Court imposed sanctions on January 13, 2015, ECF Nos. 19-20, and amended its opinion and order on January [*5] 20, 2015. ECF Nos. 21-22. The Amended Order entered judgment against Lighthouse Point Marina & Yacht Club LLC, Audwin Levasseur, Bill L. Voss, and Scott G. Hunziker, jointly and severally, in the amount of $6,224.90, a sum which represents Defendants' court costs and attorneys' fees to that date. ECF No. 22. It also prohibited Bill L. Voss from seeking *pro hac vice* admission before this judge for one year. *Id.*

The central rationale for sanctions was that Plaintiff had presented no factual basis for the complaint's allegation that

the insurance payment was inadequate. Ct.'s Op. at 9, ECF No. 21. Although the Court considered lesser sanctions, it chose to award attorneys' fees to Defendant and prohibit the *pro hac vice* admission of Bill L. Voss because of:

> "Plaintiff's counsel's apathy when faced with a motion to dismiss, indifference to the Court's Order to Show Cause, noncompliance with earlier orders of this Court, disregard for this district's Hurricane Sandy Case Management Order, negligence in pursuing their client's claim, apparent lack of investigation before and after filing, issuance of a settlement demand with no factual relation to the case, stonewalling of their adversary's [*6] attempts to investigate . . . and the continuing pattern of neglect before other judges in this district."

*Id.* at 10.

On February 3, 2015, the Voss Firm moved for reconsideration of the sanctions against it alone, ECF No. 23, through its newly retained independent counsel. *See* Notice of Appearance by Michael M. DiCicco, Esq., ECF No. 24; Pl.'s Br. in Supp. of Mot. for Recons. 1, ECF No. 23-1 ("the Movants [the Voss Law Firm, P.C., Bill L. Voss and Scott G. Hunziker] submit that the *Rule 11* sanctions entered against them should be withdrawn."). The Voss Firm argues that "the Amended Order if not reconsidered and amended in part will result in manifest injustice because the underlying conduct on which the sanctions are based constitutes excusable neglect." Pl.'s Br. 6. In support, the Voss Firm submits two reports from a private claims adjuster, dated April 18, 2013, detailing wind and flood damage to the Lighthouse Point Marina. Exs. A-B to Hunziker Aff. ECF No. 23-2. The reports state that the adjuster conducted an inspection of the loss, reviewed photos of damages and obtained verbal representations from the insured. *Id.*, Ex. B at 2. The adjuster estimated the actual cash value of the wind damage at [*7] $131,805.75, *id.*, Ex. A at 22; and the actual cash value of the flood damage at $70,388.92. *Id.*, Ex. B at 15.

Mr. Hunziker asserts in an affidavit that he "believed that the Harbatkin Firm was acting responsively to this Court and other Courts," *id.* ¶ 9, and, after the dismissal of this action, "believed wholeheartedly that Levasseur would respond to the Order to Show Cause." *Id.* ¶ 11. To demonstrate Mr. Levasseur's responsiveness and engagement with their joint cases, Mr. Hunziker submits a series of emails he exchanged with Mr. Levasseur. Mr. Hunziker's messages to Mr. Levasseur included the following: "I NEED TO HEAR FROM YOU" (October 15, 2014); "By the way, can you call [a client]. I have spoken to her a

Case: 15-4045    Document: 003112366698    Page: 230    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-7    Filed 09/08/15    Page 5 of 10 PageID: 3294

Page 3 of 8

2015 U.S. Dist. LEXIS 57556, *7

couple of times recently, and she is not happy about not hearing from you" (October 24, 2014); "When can we finally discuss the upcoming trials on these matters?" (October 28, 2014). *Id.*, Ex. C. Mr. Levasseur's responses to many of the messages, but not all, are included. *Id.* Mr. Hunziker also includes an email to Mr. Levasseur from December 22, 2014, attaching Defendant's counsel's letter of the same date, ECF No. 18, stressing that Plaintiff's counsel had not met its deadline [*8] to respond to the Order to Show Cause. Mr. Hunziker wrote, "Please call me on this one ASAP!!" *Id.*, Ex. D.

Mr. Levasseur filed a declaration with the Court on April 3, 2015, detailing his relationship with the Voss Firm. Decl. of Audwin Levasseur, ECF No. 34. In the penultimate paragraph, he "requests that the Court Amend its Order to dismiss Plaintiff's Complaint without prejudice. The extraordinary circumstances underlying the Plaintiff's case warrant that Plaintiff's access to the Court should not be permanently barred on account of the sins of its retained attorneys." *Id.* ¶ 62.

## STANDARD FOR RECONSIDERATION

*Local Civil Rule 7.1(i)* allows a party to move for reconsideration within 14 days after entry of judgment, and directs the moving party to submit "a brief setting forth the matter or controlling decisions which the party believes the Judge . . . has overlooked." *L. Civ. R. 7.1(i)*. The Third Circuit has held that the "purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe ex rel. Lou-Ann v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)* (citation omitted).

Reconsideration motions may not be used to relitigate old matters, nor to raise arguments or present evidence that could have been raised before the entry of judgment. [*9] *See* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2810.1. Such motions will only be granted where (1) an intervening change in the law has occurred, (2) new evidence *not previously available* has emerged, or (3) the need to correct a clear error of law or prevent a manifest injustice arises. *North River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1218 (3d Cir. 1995)* (emphasis added).

## STANDARD FOR RELIEF FROM A JUDGMENT UNDER RULE 60(B)

The Court also considers the Voss Firm's request for relief as arising under *Rule 60(b)*. The rule states, in relevant part,

"[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for mistake, inadvertence, surprise, or excusable neglect." *Fed. R. Civ. P. 60(b)(1)*. "Due to the overriding interest in the finality and repose of judgments, a *Rule 60(b)* motion is considered extraordinary relief which should be granted only where extraordinary justifying circumstances are present." *Katz v. Twp. of Westfall, 287 Fed. App'x 985, 988 (3d Cir. 2008)* (internal quotations and citations omitted).

Although other circumstances may be relevant, the Third Circuit has instructed courts to examine four factors when determining whether neglect was excusable: "(1) the danger of prejudice to the non-movant; (2) the length of the delay and the impact [*10] on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith." *See Ragguette v. Premier Wines & Spirits, 691 F.3d 315, 319, 57 V.I. 886 (3d Cir. 2012)* (citing *Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993)*). "These factors, however, do not establish a mathematical formula; the determination is at bottom an equitable one." *Kanoff v. Better Life Renting Corp., 350 F. App'x 655, 657 (3d Cir. 2009)* (citations omitted). The court continued:

> Though no one factor is dispositive, inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute "excusable" neglect. To summarize, "excusable neglect" describes situations where the court, after weighing the relevant considerations is satisfied that counsel has exhibited substantial diligence, professional competence and has acted in good faith to conform his or her conduct in accordance with the rule, but as the result of some minor neglect, compliance was not achieved.

*Id.* (citations omitted).

## STANDARD FOR RULE 11 SANCTIONS

An attorney who submits a complaint certifies that there is a reasonable basis in fact and law for the claims made, to the best of the attorney's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances. *Fed. R. Civ. P. 11; see also Napier v. Thirty or More Unidentified Federal Agents, etc., 855 F.2d 1080, 1090 (3d Cir. 1988)*. The Third Circuit has instructed that [*11] "[t]he legal standard to be applied when evaluating conduct allegedly violative of *Rule 11* is reasonableness under the circumstances." *Ford Motor Co. v. Summit Motor Products,*

Case: 15-4045    Document: 003112366698    Page: 231    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-7    Filed 09/08/15    Page 6 of 10 PageID: 3295

Page 4 of 8

2015 U.S. Dist. LEXIS 57556, *11

*Inc., 930 F.2d 277, 289 (3d Cir. 1991)* (citations omitted), *cert. denied, 502 U.S. 939, 112 S. Ct. 373, 116 L. Ed. 2d 324 (1991)*. Reasonableness in the context of a *Rule 11* inquiry has been defined as "an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well grounded in law and fact." *Ford Motor Co., 930 F.2d at 289.*

"On its own initiative, the court may enter an order describing the specific conduct that appears to violate *subdivision (b) [of Rule 11]* and directing an attorney, law firm, or party to show cause as to why it has not violated *subdivision (b)* with respect thereto." *Fed. R. Civ. P. 11(c)(1)(B)*. In the case of sanctions imposed *sua sponte* under *Rule 11(c)(3)*, "[t]he party sought to be sanctioned is entitled to particularized notice including, at a minimum, 1) the fact that *Rule 11* sanctions are under consideration, 2) the reasons why sanctions are under consideration, and 3) the form of sanctions under consideration." *Simmerman v. Corino, 27 F.3d 58, 64 (3d Cir. 1994)*. "A District Court has the authority and, indeed, the duty to examine allegations that an attorney appearing before the court has violated his moral and ethical responsibility and to fashion an appropriate remedy, if warranted." *Thomason v. Lehrer, 183 F.R.D. 161, 170 (D.N.J. 1998)*, aff'd, *189 F.3d 465 (3d Cir. 1999)* (citations omitted). Courts have broad discretion "to control the [*12] conduct of those who appear before them" with "an arsenal of sanctions they can impose for unethical behavior." *Id.* (citations omitted). "The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorneys' fees and other expenses directly resulting from the violation." *Fed. R. Civ. P. 11(c)(4)*.

## DISCUSSION

### I. The Voss Firm's Neglect Was Not Excusable

To evaluate the Voss Firm's claim that its failure to timely submit evidence constitutes "excusable neglect" under *Rule 60(b)*, the Court applies the factors set out in *Pioneer*.

### (1) The Delay Did Not Significantly Prejudice the Defendant

The Court dismissed the underlying case on the same day it issued the Order to Show Cause. ECF Nos. 14-16. Because the action against Atlantic Specialty had already been dismissed at the time the Voss Firm missed the deadline to respond to the Order to Show Cause, and the purpose of the

order was to determine the Voss Firm's compliance with *Rule 11*, Atlantic Specialty faced no prejudice from the Voss Firm's delay. If the Court were to vacate sanctions, the detriment to Atlantic Specialty [*13] would consist only in the elimination of its opportunity to collect its attorneys' fees from the Voss Firm. This factor weighs in favor of a finding of excusable neglect.

### (2) The Voss Firm Has Delayed Responding to the Court's Orders Until Now

The Order to Show Cause mandated that the Voss Firm provide a factual basis for the complaint's allegations within one month. The deadline passed without response. The firm was silent for an additional two months after that, despite knowing that the time to respond to the order had expired. Ex. D to Hunziker Decl. It took two more weeks after the Court had filed an amended order imposing sanctions, and three weeks after the original sanctions opinion, for the Voss Firm to submit this motion. Between filing the amended complaint and taking any action in the litigation (moving for reconsideration), the Voss Firm waited ten months. The Court dismissed the underlying action because the Voss Firm ignored repeated requests from their adversary to inspect the property, in violation of the Court-ordered discovery schedule. The pattern of delay here was extensive, weighing against a finding of excusable neglect.

### (3) The Voss Firm Could Have Responded Timely [*14] to the Order to Show Cause

The Voss Firm's stated reason for the delay in responding to the Order to Show Cause is that it "wholeheartedly believed" its local counsel would respond on its behalf. This explanation lacks credibility.

First, the Voss Firm attempts to minimize its role in the litigation, stating that Mr. Levasseur was acting as lead counsel for all jointly filed Superstorm Sandy-related actions in New Jersey. Pl.'s Br. 3. The record shows that the Voss Firm was not simply a silent partner to Mr. Levasseur. The firm commissioned the appraiser's reports and had these documents in its possession throughout the litigation, removing any reliance on Mr. Levasseur to send them to the Court. There is no indication that the reports were ever shared with Mr. Levasseur, leaving uncertainty as to whether he would have been able to submit them. The Voss Firm also held itself out as the point of contact for settlement, sending Defendant a $675,000 settlement demand on its own letterhead.

To the extent that the Voss Firm had turned over day-to-day responsibility for the case to Mr. Levasseur, the Voss Firm

Case: 15-4045    Document: 003112366698    Page: 232    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-7    Filed 09/08/15    Page 7 of 10 PageID: 3296

Page 5 of 8

2015 U.S. Dist. LEXIS 57556, *14

had strong reason to doubt Mr. Levasseur would respond to the Order to Show Cause. [*15] To begin with, he failed to respond to the motion to dismiss in this case. By that point, he had established a pattern of disregarding cases. As early as June of 2014, judges in this district began to grant unopposed motions to dismiss actions filed by the Voss Firm and Mr. Levasseur. *Brusco v. Harleysville Ins. Co., No. CIVA. 14-914 JEI/JS, 2014 U.S. Dist. LEXIS 86794, 2014 WL 2916716 (D.N.J. June 26, 2014)*. By the time this Court issued an Order to Show Cause on November 13, 2014, ECF No. 14, at least five other cases had been dismissed after a lack of prosecution or other neglect. *See Truglia v. Selective Ins. Co., No. CIVA. 13-7531 JAP, 2014 U.S. Dist. LEXIS 155072, 2014 WL 5587978 (D.N.J. Oct. 31, 2014); Castellucci v. Beers, No. CIVA. 13-6691 JAP, 2014 U.S. Dist. LEXIS 152377, 2014 WL 5449863 (D.N.J. Oct. 27, 2014); Vanore v. Narragansett Bay Ins. Co., No. CIVA. 14-373 FLW, 2014 U.S. Dist. LEXIS 139755, 2014 WL 4979691 (D.N.J. Oct. 3, 2014); Bruno v. Narragansett Bay Ins. Co., No. CIVA. 14-382 JAP, 2014 U.S. Dist. LEXIS 137712 2014 WL 4854607 (D.N.J. Sept. 30, 2014)*. Mr. Levasseur flouted another judge's Order to Show Cause a mere four days after this Court threatened sanctions. *See* ECF No. 12, *Dringus v. NJM Ins. Grp.*, 13-cv-6693 (JAP/TJB) (D.N.J. 2014) ("Order to Show Cause Hearing held on 11/17/2014 why this matter should not be dismissed with prejudice. Plaintiff's attorney failed to appear. Report recommending dismissal to be entered."). The frustrated tone of Mr. Hunziker's emails to Mr. Levasseur ("I NEED TO HEAR FROM YOU") does not produce an [*16] impression of confidence. Most devastating for the Voss Firm's avowal that it trusted Mr. Levasseur to respond to the Order to Show Cause, Mr. Hunziker was aware on December 22, 2014 that Mr. Levasseur had failed to act by the Court's December 13th deadline. Ex. D to Hunziker Decl. Knowing this, the firm remained silent for the next six weeks, during which time the Court imposed sanctions.

At no point did it appear that Mr. Levasseur was deceiving the Voss Firm. Even if Mr. Levasseur failed to keep the Voss Firm informed about this case himself, the Voss Firm cannot blame him for its neglect of the communications it received directly from its adversary and the Court. Defendant's counsel attempted to contact the Voss Firm to arrange for an inspection of the property on no fewer than ten occasions, by both telephone and letter, and received no response. Antin Decl. ¶ 14, ECF No. 13-1. The Voss Firm received the Order to Show Cause of November 13, 2014 by certified mail. ECF No. 17-1. The order named them personally. *Id.* They had been in possession of their appraiser's reports since April of 2013. Hunziker Aff. ¶ 8. Their failure to respond to court orders was manifestly unreasonable, [*17] weighing heavily against finding their neglect excusable.

**(4) It Is Unclear Whether the Voss Firm Acted in Good Faith**

Black's Law Dictionary defines "good faith" as "[b]ehaving honestly and frankly, without any intent to defraud or to seek an unconscionable advantage." *Black's Law Dictionary* (10th ed. 2014). Whether the Voss Firm acted in good faith here is uncertain. The failure of the Voss Firm and Mr. Levasseur to prosecute this action is not a one-time instance of administrative error or casual oversight; their neglect has been ongoing and pervasive in this district. In the months following this Court's Order to Show Cause, the Voss Firm and Mr. Levasseur failed to respond to dispositive motions in multiple other cases. *See Melillo v. Selective Ins. Co., No. CIVA. 13-7542 FLW, 2015 U.S. Dist. LEXIS 19724, 2015 WL 716646 (D.N.J. Feb. 19, 2015); Hobson v. Am. Bankers Ins. of Florida, No. CIVA. 14-948 MLC, 2015 U.S. Dist. LEXIS 18541, 2015 WL 668700 (D.N.J. Feb. 17, 2015); Golden v. Beers, No. CIV. 14-1468 NLH/KMW, 2015 U.S. Dist. LEXIS 7048, 2015 WL 273649, at *1 n.2 (D.N.J. Jan. 21, 2015)* (collecting cases where the Voss Firm and Mr. Levasseur failed to comply with court orders or otherwise prosecute actions); *Eun Ju Song v. Bank of Am., N.A., No. CIV. 2:14-3204 WJM, 2015 U.S. Dist. LEXIS 6204, 2015 WL 248436 (D.N.J. Jan. 20, 2015)*. The weakness of Mr. Hunziker's excuse that he trusted Mr. Levasseur to respond, even after repeated and obvious instances of disregard, raises doubts as to the Voss Firm's [*18] good faith. This factor does not support the Voss Firm's motion.

**The Pioneer Factors Weigh Against Finding that the Voss Firm's Neglect was Excusable**

The Voss Firm's counsel concedes that "[t]he Movants seek to explain their conduct, not excuse it." Pl.'s Br. 8. The Court agrees: the explanation for the neglect does not excuse it. Although prejudice to the Defendant is modest, the Voss Firm's history of delay, its indifference to court orders throughout the district, and above all, the meritless nature of its excuse for the prolonged inattention, make relief under *Rule 60(b)* unavailable.

**II. Sanctions Against the Voss Firm Are Not Manifestly Unjust**

The Voss Firm also argues that if the Court does not reverse its sanctions decision based on newly presented evidence, a manifest injustice arises.

"Manifest injustice" is not well-defined in case law. *See Oneida Indian Nation of New York v. Cnty. of Oneida, 214 F.R.D. 83, 99 (N.D.N.Y. 2003)*. More definite is the rule that,

Case: 15-4045    Document: 003112366698    Page: 233    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-7    Filed 09/08/15    Page 8 of 10 PageID: 3297

Page 6 of 8

2015 U.S. Dist. LEXIS 57556, *18

"[w]here evidence is not newly discovered, a party may not submit that evidence in support of a motion for reconsideration." *Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985); see also Gibson v. Mueller, No. CIV 09-6486-NLH-JS, 2012 U.S. Dist. LEXIS 44853, 2012 WL 1079128, at *12 (D.N.J. Mar. 29, 2012)* ("[t]here is a strong policy against entertaining reconsideration motions based on evidence that was readily available at the time that the original motion was heard.") **[*19]** (internal citations omitted). "The court will not, at a late date, consider evidence, which could and should have been submitted earlier. The court is bound not to consider such new materials, lest the strictures of the reconsideration rule erode entirely." *Damiano v. Sony Music Entertainment, 975 F. Supp. 623, 635 (D.N.J. 1997); see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 251-52 (3d Cir. 2010)* (affirming the denial of a motion for reconsideration when "[t]he stated aim of the Plaintiffs' motion was to submit the very evidence the District Court had found they had failed to present in their [original] motion.").

The rule against considering previously available evidence has limited flexibility. Although "courts often take a dim view of issues raised for the first time in post-judgment motions," the Third Circuit has held that when evidence is "so fundamental" to the disposition of the issue, then it is "not consistent with the wise exercise of discretion for the District Court to [decline] even to consider it" as proof of manifest injustice. *Max's Seafood Cafe, 176 F.3d at 678.* The *Max's Seafood Cafe* court found manifest injustice in a district court's refusal to consider newly introduced evidence when, in light of a party's reasonable belief that the opposition's argument lacked merit, the party did not introduce contrary evidence at the time of **[*20]** the original motion. *Id.* In other words, the moving party demonstrated that (1) the newly presented evidence was dispositive, and (2) the party's failure to timely present available evidence was reasonable under the circumstances. *See id.* ("[i]n the circumstances of this case, it is not surprising that [the movant] did not produce [the additional evidence] at the [original] hearing.").

*Max's Seafood Cafe* differs from another Third Circuit case, *DeLong Corp. v. Raymond Int'l, Inc.,* where the movant failed to timely present facts contradictory to the court's decision, and this failure was unreasonable:

"[The moving party] does not assert that the evidentiary material which it later sought to introduce on the motion for reargument was unavailable or unknown to it at the time of the original hearing. Nor does such

reason appear in the record. . . . If these affidavits and exhibits were to be advanced to meet the motion they should have been advanced then. If time were needed to gather and present them, an adjournment should have been requested. It is important to observe that these affidavits and exhibits were in the possession of [plaintiff] or available to it without seeking discovery from **[*21]** [defendant]."

*622 F.2d 1135, 1140 (3d Cir. 1980)* (internal citation omitted), *overruled on other grounds by Croker v. Boeing Co., 662 F.2d 975 (3d Cir. 1981)* (en banc).

Here the Voss Firm does not argue that the Court erred in imposing sanctions under *Rule 11* based on the record at the time. It does not contest that there had been no evidentiary support for the factual contentions of the complaint, despite the Court's order to produce such evidence by a certain date under penalty of specific sanctions. *See* ECF No. 21. Instead, the Voss Firm now submits documents to provide the factual basis the Court had requested. The appraiser's reports suggest that Lighthouse Point suffered more damage during Superstorm Sandy than the $1,612 its insurer adjusted for damage to a fence. *Compare* Exs. A-B to Hunziker Aff. *with* Antin Decl. in Supp. of Mot. to Dismiss ¶ 8. Defendant has not challenged the reports' authenticity. *See* Def.'s Mem. in Opp. to Mot. for Recons., ECF No. 27.

The exhibits provide some support for the complaint's factual allegations. But the question remains: why did the Voss Firm withhold the documents until now? Considering the general rule against untimely submissions, and the rarity of granting a motion for reconsideration, the Court cannot find manifest injustice **[*22]** when the failure to timely submit evidence that the Voss Firm possessed throughout the litigation was inexcusable. The lack of a reasonable basis for failing to produce the evidence in a timely fashion, especially in spite of an Order to Show Cause, distinguishes this case from *Max's Seafood Cafe,* and makes it more akin to *DeLong.* Finding "manifest injustice" in *Max's Seafood Cafe,* the Third Circuit opined that the prior omission of dispositive evidence was "not surprising" under the circumstances. *176 F.3d at 678.* No such circumstances are present here.

"The court must keep in mind that the primary objective of any sanction is to preserve the integrity of the process, rather than to punish the offender." *Mruz v. Caring, Inc., 166 F. Supp. 2d 61, 68 (D.N.J. 2001).* Under these circumstances, with a meritless excuse from the Voss Firm as to why it ignored the litigation for so long, combined with its inattention to multiple other cases in the district, the

Case: 15-4045     Document: 003112366698     Page: 234     Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD     Document 135-7     Filed 09/08/15     Page 9 of 10 PageID: 3298

Page 7 of 8

2015 U.S. Dist. LEXIS 57556, *22

sanctions on the Voss Firm continue to serve a valid objective: encouraging the diligence which attorneys owe to the courts, their adversaries and their clients.

In its earlier opinion, the Court explained the rationale for barring Bill L. Voss from applying for *pro hac vice* status before this judge. ECF [*23] No. 21. After learning that Scott G. Hunziker is not admitted to practice before this Court, *see* Hunziker Aff. ¶ 2, the Court will amend its previous order to prohibit Mr. Hunziker from applying for *pro hac vice* admission before this judge for one year from the date of this opinion. Mr. Levasseur is likewise prohibited from appearing before this judge on matters filed within one year of the date of this opinion.

## III. Mr. Levasseur's Motion for Reconsideration Is Denied

The Court considers Mr. Levasseur's request to reconsider its dismissal of the complaint under both *Local Rule 7.1 (i)* and *Rule 60(b)*. *Local Rule 7.1 (i)* requires a motion for reconsideration to be filed within 14 days; Mr. Levasseur makes this request nearly five months after dismissal. *Local Rule 7.1(i)* cannot provide relief here.

Mr. Levasseur's request for relief under *Rule 60(b)* is also unavailing. Nothing in Mr. Levasseur's submissions demonstrates mistake, inadvertence, surprise, or excusable neglect. Allowing Lighthouse Point to reopen the case would create a significant possibility of prejudice to the Defendant: two-and-a-half years have passed since the property was allegedly damaged, making investigation more difficult. Mr. Levasseur's request, unaccompanied by any citation to case [*24] law, comes almost five months after dismissal and more than ten weeks after sanctions were imposed, a delay that has no explanation apart from counsel's inattention. The pattern of neglect that made the Court doubt the Voss Firm's good faith is no less attributable to Mr. Levasseur, who signed the complaint and was at all relevant times counsel of record in this matter.

Mr. Levasseur's argument that his client's action "should not be permanently barred on account of the sins of its retained attorneys" is contrary to Supreme Court precedent. On several occasions, the Supreme Court has "held that clients must be held accountable for the acts and omissions of their attorneys." *See Pioneer, 507 U.S. at 396*. It reasoned that a party

voluntarily chose this attorney as [its] representative in the action, and . . . cannot now avoid the consequences of the acts or omissions of this freely selected agent.

Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

*Id. at 397*. Following this reasoning, the Court held that a client could [*25] be penalized for counsel's late filing of a tax return, *U.S. v. Boyle, 469 U.S. 241, 105 S. Ct. 687, 83 L. Ed. 2d 622 (1985)*, and that a client would have to suffer the consequences of dismissal of its lawsuit because of its attorney's failure to attend a pretrial conference. *Link v. Wabash R. Co., 370 U.S. 626, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962)*. An order of dismissal is an appropriate consequence of Plaintiff's attorneys' lack of diligence. *See id.; Poulis v. State Farm Fire & Casualty Co., 747 F.2d 863, 868 (3d Cir. 1984)*. Lighthouse Point must suffer this consequence.

## IV. Judgment against Lighthouse Point Is Vacated

A court may reconsider its prior decisions *sua sponte* so long as it explains the reasoning behind its decision and takes the appropriate steps to ensure that the parties are not prejudiced by reliance on its prior ruling. *See DeFranco v. Wolfe, 387 F. App'x 147, 155-56 (3d Cir. 2010)* (applying *Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997)*).

The consequences to a party from attorney negligence that the Supreme Court addressed in *Pioneer*, *Boyle* and *Link* did not include sanctions. The Court is aware of no authority that requires a client to bear the brunt of a sanctions award when the sanctionable conduct is the attorney's alone. Presented now with a more detailed record than when it made its initial sanctions ruling, the Court is aware of no evidence suggesting that the Voss Firm ever gave Lighthouse Point an opportunity to review the pleading, informed it that the case had been dismissed, [*26] or warned that an order threatening sanctions was pending. The appraisal reports suggest that Lighthouse Point had a colorable basis for contesting its insurance payment. Given the lack of information communicated to Lighthouse Point by its attorneys, the colorable factual basis for the complaint, and the ability of the attorneys to timely submit the appraisal reports on their own, Lighthouse Point is so distant from the sanctionable conduct that holding it responsible would be manifestly unjust. The judgment against Lighthouse Point is vacated.

## V. Defendant's Request for Additional Attorneys' Fees Is Granted

Defendant requests additional attorneys' fees, in accordance with the Court's Amended Opinion of January 20, 2015.

Ct.'s Op. at 10, ECF No. 21 ("[w]ithin 30 days, Defendant shall make application to the Court for any fees associated with this motion, and any other litigation expenses not already submitted"); *see* Decl. of Mark Antin, ECF No. 25. Defendant's counsel has provided satisfactory proof of an additional $676.08 in fees; Defendant's request is granted. The judgment against the Voss Firm and Mr. Levasseur now totals $6,901.70.

## CONCLUSION

The Voss Firm's motion is denied. Mr. Levasseur's [*27] motion is denied. Judgment against Lighthouse Point is vacated. Defendant's request for additional attorneys' fees is granted. An appropriate order follows.

DATE: 30 April 2015

/s/ William H. Walls

William H. Walls

Senior United States District Court Judge

## ORDER

### Walls, Senior District Judge

This matter having come before the Court on the motion for reconsideration, ECF No. 23, of the Court's sanctions order, ECF No. 21, filed on behalf of Bill L. Voss, Scott G. Hunziker and the Voss Law Firm P.C.; as well as on the declaration of Audwin Levasseur, ECF No. 34, requesting reconsideration of the Court's order of dismissal, ECF No. 16; and in accordance with the Order to Show Cause issued on March 11, 2015, ECF No. 28, it is hereby ORDERED that:

1. The judgment originally entered at ECF No. 20 is vacated;

2. The Amended Order entered at ECF No. 22 is vacated;

3. Judgment is entered against Audwin Levasseur, Bill L. Voss and Scott G. Hunziker, jointly and severally, in the amount of $6,901.70, a sum which represents Defendant's court costs and attorneys' fees to this date;

4. Bill L. Voss and Scott G. Hunziker are prohibited from seeking *pro hac vice* admission before this judge for a period of one [*28] year from the date of this Order;

5. Mr. Voss and Mr. Hunziker shall attach a copy of this Order and the accompanying Opinion with any future applications for *pro hac vice* admission in this district;

6. Audwin Levasseur is prohibited from appearing before this judge on any matters filed within a period of one year from the date of this Order;

7. The parties' requests for additional relief at ECF Nos. 23 and 34 are DENIED.

DATE: 30 August 2015

/s/ William H. Walls

William H. Walls

Senior United States District Court Judge

# EXHIBIT 7

 LexisNexis·

Ⓐ Neutral
As of: August 20, 2015 3:52 PM EDT

### *Lighthouse Point Marina & Yacht Club, LLC v. Int'l Marine Underwriters*

United States District Court for the District of New Jersey

April 30, 2015, Decided; May 1, 2015, Filed

Civ. No. 14-2974 (WHW)(CLW)

**Reporter**
2015 U.S. Dist. LEXIS 57556

LIGHTHOUSE POINT MARINA & YACHT CLUB, LLC, Plaintiff, v. INTERNATIONAL MARINE UNDERWRITERS, Defendant.

**Notice:** NOT FOR PUBLICATION

**Prior History:** *Lighthouse Point Marina & Yacht Club, LLC v. Int'l Marine Underwriters, 2015 U.S. Dist. LEXIS 6430 (D.N.J., Jan. 20, 2015)*

**Counsel:** [*1] For LIGHTHOUSE POINT MARINA & YACHT CLUB, LLC, Plaintiff: AUDWIN F. LEVASSEUR, LEAD ATTORNEY, The Law Offices of Harbatkin & Levasseur, P.A., Englewood Cliffs, NJ.

For INTERNATIONAL MARINE UNDERWRITERS, Defendant: MARK LEIGH ANTIN, LEAD ATTORNEY, GENNET, KALLMANN, ANTIN & ROBINSON, ESQS., PARSIPPANY, NJ.

**Judges:** William H. Walls, Senior United States District Judge.

**Opinion by:** William H. Walls

## Opinion

### Walls, Senior District Judge

In this dispute over insurance coverage for property damage caused by Superstorm Sandy, the Court imposed sanctions under *Fed. R. Civ. P. 11* on Plaintiff Lighthouse Point Marina & Yacht Club, LLC ("Lighthouse Point"), and its local and out-of-state counsel, for presenting a claim that lacked evidentiary basis. The Voss Law Firm P.C., Bill L. Voss and Scott G. Hunziker (the out-of-state attorneys for Plaintiff, collectively "the Voss Firm"), having retained independent counsel, now move under *Local Rule 7.1 (i)* for

reconsideration of the order imposing sanctions against them. As the Voss Firm contends that the judgment would have been different were it not for its excusable neglect, the Court also construes the motion as one for relief from a judgment under *Federal Rule of Civil Procedure 60(b)*.

Audwin Levasseur, local counsel for Plaintiff, separately requests [*2] reconsideration of the Court's dismissal of the underlying action in November of 2014. ECF Nos. 15-16.

Defendant Atlantic Specialty Insurance Company ("Atlantic Specialty," improperly pled as International Marine Underwriters) requests an award of additional attorneys' fees, in accordance with the Court's Amended Opinion of January 20, 2015.

Decided without oral argument under *Fed. R. Civ. P. 78*, the Voss Firm's motion is denied, Mr. Levasseur's motion is denied, and Defendant's request for additional attorneys' fees is granted.

### FACTUAL AND PROCEDURAL BACKGROUND

Set forth more fully in the Court's earlier opinion, ECF No. 21, the facts are summarized briefly here. The amended complaint, filed in New Jersey Superior Court on April 11, 2013 and removed to this Court on May 9, 2013, alleges that Atlantic Specialty underpaid Lighthouse Point's insurance claim after Superstorm Sandy. ECF No. 1-1. The action was filed by Scott G. Hunziker, Esq. of the Voss Law Firm, P.C. of The Woodlands, Texas, Hunziker Aff. ¶¶ 2, 4, 6, ECF No. 23-2; Compl., ECF No. 1-1 at 7. Lighthouse Point had retained the firm in February of 2013. Ex. A to Hunziker Aff., ECF No. 33-1. The Voss Firm engaged Audwin Levasseur, Esq., of the [*3] firm Harbatkin & Levasseur, P.A., to serve as local counsel. Hunziker Aff. ¶ 6. Both Mr. Hunziker and Mr. Levasseur signed the complaint. ECF No. 1-1 at 7. The name of Bill L. Voss was also listed at the top of the complaint and below Mr. Hunziker's signature. *Id.*

Case: 15-4045     Document: 003112366698     Page: 238     Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD     Document 135-8     Filed 09/08/15     Page 3 of 9 PageID: 3302

2015 U.S. Dist. LEXIS 57556, *4

Page 2 of 8

The Voss Firm then sent Atlantic Specialty a settlement demand, alleging property damage of $540,000, and attorneys' fees totaling $135,000. ECF No. 1-1 at 22.

After filing the complaint, the Voss Firm and Mr. Levasseur ignored their responsibilities in the litigation. They did not respond to Defendant's discovery requests, in violation of the Court-ordered case management schedule, the standing discovery order governing Superstorm Sandy cases in this district, *see* ECF No. 8, and the terms of the insurance policy. *See* ECF No. 13-2. Defendant moved to dismiss the complaint. ECF No. 13. Mr. Levasseur and the Voss Firm did not respond to the motion. The Court granted the motion and dismissed the complaint. ECF Nos. 15-16.

In its Answer and motion papers, Defendant alleged that the lawsuit was fraudulent. Answer ¶¶ 27-29, ECF No. 3; Def.'s Mot. to Dismiss, Def.'s Br. at 4, ECF No. 13. Atlantic Specialty's initial inspection after [*4] the storm found wind damage to two fences, and "[n]o damage to any of the 4 buildings." Antin Decl. MTD ¶ 7, Ex. C. It valued the claim at $1,612, and recommended a payment of $612, after applying a $1,000 deductible. *Id.* Defendant also pointed out that the Voss Firm and Mr. Levasseur had filed 250 lawsuits in New Jersey courts, almost identically worded, within a short period of time. *See* Ct.'s Op. at 1-2, ECF No. 21. Several of these cases were dismissed for lack of prosecution. *Id.* at 8.

Having received no information from the Voss Firm or Mr. Levasseur to contradict Defendant's allegation of fraud, the Court issued an Order to Show Cause on November 13, 2014, instructing Plaintiff to provide some evidentiary basis for its claim. ECF No. 14. The order warned that failure to satisfactorily respond could subject Plaintiff and its counsel to sanctions under *Fed. R. Civ. P. 11*. *Id.* The deadline for Plaintiff's response was December 15, 2014. *Id.* The order was entered on the district's CM/ECF system, and both Mr. Levasseur and the Voss Firm received a copy by certified mail. ECF No. 17-1. They did not respond.

The Court imposed sanctions on January 13, 2015, ECF Nos. 19-20, and amended its opinion and order on January [*5] 20, 2015. ECF Nos. 21-22. The Amended Order entered judgment against Lighthouse Point Marina & Yacht Club LLC, Audwin Levasseur, Bill L. Voss, and Scott G. Hunziker, jointly and severally, in the amount of $6,224.90, a sum which represents Defendants' court costs and attorneys' fees to that date. ECF No. 22. It also prohibited Bill L. Voss from seeking *pro hac vice* admission before this judge for one year. *Id.*

The central rationale for sanctions was that Plaintiff had presented no factual basis for the complaint's allegation that the insurance payment was inadequate. Ct.'s Op. at 9, ECF No. 21. Although the Court considered lesser sanctions, it chose to award attorneys' fees to Defendant and prohibit the *pro hac vice* admission of Bill L. Voss because of:

> "Plaintiff's counsel's apathy when faced with a motion to dismiss, indifference to the Court's Order to Show Cause, noncompliance with earlier orders of this Court, disregard for this district's Hurricane Sandy Case Management Order, negligence in pursuing their client's claim, apparent lack of investigation before and after filing, issuance of a settlement demand with no factual relation to the case, stonewalling of their adversary's [*6] attempts to investigate . . . and the continuing pattern of neglect before other judges in this district."

*Id.* at 10.

On February 3, 2015, the Voss Firm moved for reconsideration of the sanctions against it alone, ECF No. 23, through its newly retained independent counsel. *See* Notice of Appearance by Michael M. DiCicco, Esq., ECF No. 24; Pl.'s Br. in Supp. of Mot. for Recons. 1, ECF No. 23-1 ("the Movants [the Voss Law Firm, P.C., Bill L. Voss and Scott G. Hunziker] submit that the *Rule 11* sanctions entered against them should be withdrawn."). The Voss Firm argues that "the Amended Order if not reconsidered and amended in part will result in manifest injustice because the underlying conduct on which the sanctions are based constitutes excusable neglect." Pl.'s Br. 6. In support, the Voss Firm submits two reports from a private claims adjuster, dated April 18, 2013, detailing wind and flood damage to the Lighthouse Point Marina. Exs. A-B to Hunziker Aff. ECF No. 23-2. The reports state that the adjuster conducted an inspection of the loss, reviewed photos of damages and obtained verbal representations from the insured. *Id.*, Ex. B at 2. The adjuster estimated the actual cash value of the wind damage at [*7] $131,805.75, *id.*, Ex. A at 22; and the actual cash value of the flood damage at $70,388.92. *Id.*, Ex. B at 15.

Mr. Hunziker asserts in an affidavit that he "believed that the Harbatkin Firm was acting responsively to this Court and other Courts," *id.* ¶ 9, and, after the dismissal of this action, "believed wholeheartedly that Levasseur would respond to the Order to Show Cause." *Id.* ¶ 11. To demonstrate Mr. Levasseur's responsiveness and engagement with their joint cases, Mr. Hunziker submits a series of emails he exchanged with Mr. Levasseur. Mr. Hunziker's messages to Mr. Levasseur included the following: "I NEED TO HEAR FROM YOU" (October 15, 2014); "By the way, can you call [a client]. I have spoken to her a

Case: 15-4045 Document: 003112366698 Page: 239 Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD Document 135-8 Filed 09/08/15 Page 4 of 9 PageID: 3303

Page 3 of 8

2015 U.S. Dist. LEXIS 57556, *7

couple of times recently, and she is not happy about not hearing from you" (October 24, 2014); "When can we finally discuss the upcoming trials on these matters?" (October 28, 2014). *Id.*, Ex. C. Mr. Levasseur's responses to many of the messages, but not all, are included. *Id.* Mr. Hunziker also includes an email to Mr. Levasseur from December 22, 2014, attaching Defendant's counsel's letter of the same date, ECF No. 18, stressing that Plaintiff's counsel had not met its deadline [*8] to respond to the Order to Show Cause. Mr. Hunziker wrote, "Please call me on this one ASAP!!" *Id.*, Ex. D.

Mr. Levasseur filed a declaration with the Court on April 3, 2015, detailing his relationship with the Voss Firm. Decl. of Audwin Levasseur, ECF No. 34. In the penultimate paragraph, he "requests that the Court Amend its Order to dismiss Plaintiff's Complaint without prejudice. The extraordinary circumstances underlying the Plaintiff's case warrant that Plaintiff's access to the Court should not be permanently barred on account of the sins of its retained attorneys." *Id.* ¶ 62.

## STANDARD FOR RECONSIDERATION

*Local Civil Rule 7.1(i)* allows a party to move for reconsideration within 14 days after entry of judgment, and directs the moving party to submit "a brief setting forth the matter or controlling decisions which the party believes the Judge . . . has overlooked." *L. Civ. R. 7.1(i).* The Third Circuit has held that the "purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe ex rel. Lou-Ann v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)* (citation omitted).

Reconsideration motions may not be used to relitigate old matters, nor to raise arguments or present evidence that could have been raised before the entry of judgment. [*9] *See* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2810.1. Such motions will only be granted where (1) an intervening change in the law has occurred, (2) new evidence *not previously available* has emerged, or (3) the need to correct a clear error of law or prevent a manifest injustice arises. *North River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1218 (3d Cir. 1995)* (emphasis added).

## STANDARD FOR RELIEF FROM A JUDGMENT UNDER RULE 60(B)

The Court also considers the Voss Firm's request for relief as arising under *Rule 60(b).* The rule states, in relevant part,

"[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for mistake, inadvertence, surprise, or excusable neglect." *Fed. R. Civ. P. 60(b)(1).* "Due to the overriding interest in the finality and repose of judgments, a *Rule 60(b)* motion is considered extraordinary relief which should be granted only where extraordinary justifying circumstances are present." *Kutz v. Top, et Westfall, 287 Fed. App'x 985, 988 (3d Cir. 2008)* (internal quotations and citations omitted).

Although other circumstances may be relevant, the Third Circuit has instructed courts to examine four factors when determining whether neglect was excusable: "(1) the danger of prejudice to the non-movant; (2) the length of the delay and the impact [*10] on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith." *See Ragguette v. Premier Wines & Spirits, 691 F.3d 315, 319, 57 V.I. 886 (3d Cir. 2012)* (citing *Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993)).* "These factors, however, do not establish a mathematical formula; the determination is at bottom an equitable one." *Kanoff v. Better Life Renting Corp., 350 F. App'x 655, 657 (3d Cir. 2009)* (citations omitted). The court continued:

> Though no one factor is dispositive, inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute "excusable" neglect. To summarize, "excusable neglect" describes situations where the court, after weighing the relevant considerations is satisfied that counsel has exhibited substantial diligence, professional competence and has acted in good faith to conform his or her conduct in accordance with the rule, but as the result of some minor neglect, compliance was not achieved.

*Id.* (citations omitted).

## STANDARD FOR RULE 11 SANCTIONS

An attorney who submits a complaint certifies that there is a reasonable basis in fact and law for the claims made, to the best of the attorney's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances. *Fed. R. Civ. P. 11; see also Napier v. Thirty or More Unidentified Federal Agents, etc., 855 F.2d 1080, 1090 (3d Cir. 1988).* The Third Circuit has instructed that [*11] "[t]he legal standard to be applied when evaluating conduct allegedly violative of *Rule 11* is reasonableness under the circumstances." *Ford Motor Co. v. Summit Motor Products,*

Case: 15-4045   Document: 003112366698   Page: 240   Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD   Document 135-8   Filed 09/08/15   Page 5 of 9 PageID: 3304

Page 4 of 8

2015 U.S. Dist. LEXIS 57556, *11

*Inc.*, 930 F.2d 277, 289 (3d Cir. 1991) (citations omitted), *cert. denied*, 502 U.S. 939, 112 S. Ct. 373, 116 L. Ed. 2d 324 (1991). Reasonableness in the context of a *Rule 11* inquiry has been defined as "an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well grounded in law and fact." *Ford Motor Co.*, 930 F.2d at 289.

"On its own initiative, the court may enter an order describing the specific conduct that appears to violate *subdivision (b)* [of *Rule 11*] and directing an attorney, law firm, or party to show cause as to why it has not violated *subdivision (b)* with respect thereto." *Fed. R. Civ. P. 11(c)(1)(B)*. In the case of sanctions imposed *sua sponte* under *Rule 11(c)(3)*, "[t]he party sought to be sanctioned is entitled to particularized notice including, at a minimum, 1) the fact that *Rule 11* sanctions are under consideration, 2) the reasons why sanctions are under consideration, and 3) the form of sanctions under consideration." *Simmerman v. Corino*, 27 F.3d 58, 64 (3d Cir. 1994). "A District Court has the authority and, indeed, the duty to examine allegations that an attorney appearing before the court has violated his moral and ethical responsibility and to fashion an appropriate remedy, if warranted." *Thomason v. Lehrer*, 183 F.R.D. 161, 170 (D.N.J. 1998), *aff'd*, 189 F.3d 465 (3d Cir. 1999) (citations omitted). Courts have broad discretion "to control the [*12] conduct of those who appear before them" with "an arsenal of sanctions they can impose for unethical behavior." *Id.* (citations omitted). "The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorneys' fees and other expenses directly resulting from the violation." *Fed. R. Civ. P. 11(c)(4)*.

## DISCUSSION

### I. The Voss Firm's Neglect Was Not Excusable

To evaluate the Voss Firm's claim that its failure to timely submit evidence constitutes "excusable neglect" under *Rule 60(b)*, the Court applies the factors set out in *Pioneer*.

### (1) The Delay Did Not Significantly Prejudice the Defendant

The Court dismissed the underlying case on the same day it issued the Order to Show Cause. ECF Nos. 14-16. Because the action against Atlantic Specialty had already been dismissed at the time the Voss Firm missed the deadline to respond to the Order to Show Cause, and the purpose of the

order was to determine the Voss Firm's compliance with *Rule 11*, Atlantic Specialty faced no prejudice from the Voss Firm's delay. If the Court were to vacate sanctions, the detriment to Atlantic Specialty [*13] would consist only in the elimination of its opportunity to collect its attorneys' fees from the Voss Firm. This factor weighs in favor of a finding of excusable neglect.

### (2) The Voss Firm Has Delayed Responding to the Court's Orders Until Now

The Order to Show Cause mandated that the Voss Firm provide a factual basis for the complaint's allegations within one month. The deadline passed without response. The firm was silent for an additional two months after that, despite knowing that the time to respond to the order had expired. Ex. D to Hunziker Decl. It took two more weeks after the Court had filed an amended order imposing sanctions, and three weeks after the original sanctions opinion, for the Voss Firm to submit this motion. Between filing the amended complaint and taking any action in the litigation (moving for reconsideration), the Voss Firm waited ten months. The Court dismissed the underlying action because the Voss Firm ignored repeated requests from their adversary to inspect the property, in violation of the Court-ordered discovery schedule. The pattern of delay here was extensive, weighing against a finding of excusable neglect.

### (3) The Voss Firm Could Have Responded Timely [*14] to the Order to Show Cause

The Voss Firm's stated reason for the delay in responding to the Order to Show Cause is that it "wholeheartedly believed" its local counsel would respond on its behalf. This explanation lacks credibility.

First, the Voss Firm attempts to minimize its role in the litigation, stating that Mr. Levasseur was acting as lead counsel for all jointly filed Superstorm Sandy-related actions in New Jersey. Pl.'s Br. 3. The record shows that the Voss Firm was not simply a silent partner to Mr. Levasseur. The firm commissioned the appraiser's reports and had these documents in its possession throughout the litigation, removing any reliance on Mr. Levasseur to send them to the Court. There is no indication that the reports were ever shared with Mr. Levasseur, leaving uncertainty as to whether he would have been able to submit them. The Voss Firm also held itself out as the point of contact for settlement, sending Defendant a $675,000 settlement demand on its own letterhead.

To the extent that the Voss Firm had turned over day-to-day responsibility for the case to Mr. Levasseur, the Voss Firm

had strong reason to doubt Mr. Levasseur would respond to the Order to Show Cause. [*15] To begin with, he failed to respond to the motion to dismiss in this case. By that point, he had established a pattern of disregarding cases. As early as June of 2014, judges in this district began to grant unopposed motions to dismiss actions filed by the Voss Firm and Mr. Levasseur. *Brusco v. Harleysville Ins. Co., No. CIVA. 14-914 JEI/JS, 2014 U.S. Dist. LEXIS 86794, 2014 WL 2916716 (D.N.J. June 26, 2014)*. By the time this Court issued an Order to Show Cause on November 13, 2014, ECF No. 14, at least five other cases had been dismissed after a lack of prosecution or other neglect. *See Truglia v. Selective Ins. Co., No. CIVA. 13-7531 JAP, 2014 U.S. Dist. LEXIS 155072, 2014 WL 5587978 (D.N.J. Oct. 31, 2014); Castellucci v. Beers, No. CIVA. 13-6691 JAP, 2014 U.S. Dist. LEXIS 152377, 2014 WL 5449803 (D.N.J. Oct. 27, 2014); Vacaro v. Narragansett Bay Ins. Co., No. CIVA. 14-371 FLW, 2014 U.S. Dist. LEXIS 139755, 2014 WL 4976691 (D.N.J. Oct. 3, 2014); Bruno v. Narragansett Bay Ins. Co., No. CIVA. 14-382 JAP, 2014 U.S. Dist. LEXIS 137712, 2014 WL 4854607 (D.N.J. Sept. 30, 2014)*. Mr. Levasseur flouted another judge's Order to Show Cause a mere four days after this Court threatened sanctions. *See* ECF No. 12, *Dringus v. NJM Ins. Grp.*, 13-cv-6693 (JAP/TJB) (D.N.J. 2014) ("Order to Show Cause Hearing held on 11/17/2014 why this matter should not be dismissed with prejudice. Plaintiff's attorney failed to appear. Report recommending dismissal to be entered."). The frustrated tone of Mr. Hunziker's emails to Mr. Levasseur ("I NEED TO HEAR FROM YOU") does not produce an [*16] impression of confidence. Most devastating for the Voss Firm's avowal that it trusted Mr. Levasseur to respond to the Order to Show Cause, Mr. Hunziker was aware on December 22, 2014 that Mr. Levasseur had failed to act by the Court's December 13th deadline. Ex. D to Hunziker Decl. Knowing this, the firm remained silent for the next six weeks, during which time the Court imposed sanctions.

At no point did it appear that Mr. Levasseur was deceiving the Voss Firm. Even if Mr. Levasseur failed to keep the Voss Firm informed about this case himself, the Voss Firm cannot blame him for its neglect of the communications it received directly from its adversary and the Court. Defendant's counsel attempted to contact the Voss Firm to arrange for an inspection of the property on no fewer than ten occasions, by both telephone and letter, and received no response. Antin Decl. ¶ 14, ECF No. 13-1. The Voss Firm received the Order to Show Cause of November 13, 2014 by certified mail. ECF No. 17-1. The order named them personally. *Id.* They had been in possession of their appraiser's reports since April of 2013. Hunziker Aff. ¶ 8. Their failure to respond to court orders was manifestly unreasonable, [*17] weighing heavily against finding their neglect excusable.

## (4) It Is Unclear Whether the Voss Firm Acted in Good Faith

Black's Law Dictionary defines "good faith" as "[b]ehaving honestly and frankly, without any intent to defraud or to seek an unconscionable advantage." *Black's Law Dictionary* (10th ed. 2014). Whether the Voss Firm acted in good faith here is uncertain. The failure of the Voss Firm and Mr. Levasseur to prosecute this action is not a one-time instance of administrative error or casual oversight; their neglect has been ongoing and pervasive in this district. In the months following this Court's Order to Show Cause, the Voss Firm and Mr. Levasseur failed to respond to dispositive motions in multiple other cases. *See Melillo v. Selective Ins. Co., No. CIVA. 13-7542 FLW, 2015 U.S. Dist. LEXIS 19724, 2015 WL 716046 (D.N.J. Feb. 19, 2015); Hobson v. Am. Bankers Ins. of Florida, No. CIVA. 14-948 MLC, 2015 U.S. Dist. LEXIS 18541, 2015 WL 668700 (D.N.J. Feb. 17, 2015); Golden v. Beers, No. CIV. 14-1368 NLH/KMW, 2015 U.S. Dist. LEXIS 7648, 2015 WL 273649, at *1 n.2 (D.N.J. Jan. 21, 2015)* (collecting cases where the Voss Firm and Mr. Levasseur failed to comply with court orders or otherwise prosecute actions); *Eun In Song v. Bank of Am., N.A., No. CIV. 2:14-5204 WJM, 2015 U.S. Dist. LEXIS 6204, 2015 WL 248436 (D.N.J. Jan. 20, 2015)*. The weakness of Mr. Hunziker's excuse that he trusted Mr. Levasseur to respond, even after repeated and obvious instances of disregard, raises doubts as to the Voss Firm's [*18] good faith. This factor does not support the Voss Firm's motion.

## The Pioneer Factors Weigh Against Finding that the Voss Firm's Neglect was Excusable

The Voss Firm's counsel concedes that "[t]he Movants seek to explain their conduct, not excuse it." Pl.'s Br. 8. The Court agrees: the explanation for the neglect does not excuse it. Although prejudice to the Defendant is modest, the Voss Firm's history of delay, its indifference to court orders throughout the district, and above all, the meritless nature of its excuse for the prolonged inattention, make relief under *Rule 60(b)* unavailable.

## II. Sanctions Against the Voss Firm Are Not Manifestly Unjust

The Voss Firm also argues that if the Court does not reverse its sanctions decision based on newly presented evidence, a manifest injustice arises.

"Manifest injustice" is not well-defined in case law. *See Oneida Indian Nation of New York v. Cnty. of Oneida, 214 F.R.D. 83, 99 (N.D.N.Y. 2003)*. More definite is the rule that,

"[w]here evidence is not newly discovered, a party may not submit that evidence in support of a motion for reconsideration." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985); *see also Gibson v. Mueller, No. CIV 09-6486-NLH-JS*, 2012 U.S. Dist. LEXIS 44853, 2012 WL 1079128, at *12 (D.N.J. Mar. 29, 2012) ("[t]here is a strong policy against entertaining reconsideration motions based on evidence that was readily available at the time that the original motion was heard.") [*19] (internal citations omitted). "The court will not, at a late date, consider evidence, which could and should have been submitted earlier. The court is bound not to consider such new materials, lest the strictures of the reconsideration rule erode entirely." *Damiano v. Sony Music Entertainment*, 975 F. Supp. 623, 635 (D.N.J. 1997); *see also Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251-52 (3d Cir. 2010) (affirming the denial of a motion for reconsideration when "[t]he stated aim of the Plaintiffs' motion was to submit the very evidence the District Court had found they had failed to present in their [original] motion.").

The rule against considering previously available evidence has limited flexibility. Although "courts often take a dim view of issues raised for the first time in post-judgment motions," the Third Circuit has held that when evidence is "so fundamental" to the disposition of the issue, then it is "not consistent with the wise exercise of discretion for the District Court to [decline] even to consider it" as proof of manifest injustice. *Max's Seafood Cafe, 176 F.3d at 678*. The *Max's Seafood Cafe* court found manifest injustice in a district court's refusal to consider newly introduced evidence when, in light of a party's reasonable belief that the opposition's argument lacked merit, the party did not introduce contrary evidence at the time of [*20] the original motion. *Id.* In other words, the moving party demonstrated that (1) the newly presented evidence was dispositive, and (2) the party's failure to timely present available evidence was reasonable under the circumstances. *See id.* ("[i]n the circumstances of this case, it is not surprising that [the movant] did not produce [the additional evidence] at the [original] hearing.").

*Max's Seafood Cafe* differs from another Third Circuit case, *DeLong Corp. v. Raymond Int'l, Inc.*, where the movant failed to timely present facts contradictory to the court's decision, and this failure was unreasonable:

"[The moving party] does not assert that the evidentiary material which it later sought to introduce on the motion for reargument was unavailable or unknown to it at the time of the original hearing. Nor does such

reason appear in the record. . . . If these affidavits and exhibits were to be advanced to meet the motion they should have been advanced then. If time were needed to gather and present them, an adjournment should have been requested. It is important to observe that these affidavits and exhibits were in the possession of [plaintiff] or available to it without seeking discovery from [*21] [defendant]."

*622 F.2d 1135, 1140 (3d Cir. 1980)* (internal citation omitted), *overruled on other grounds by Croker v. Boeing Co., 662 F.2d 975 (3d Cir. 1981)* (en banc).

Here the Voss Firm does not argue that the Court erred in imposing sanctions under *Rule 11* based on the record at the time. It does not contest that there had been no evidentiary support for the factual contentions of the complaint, despite the Court's order to produce such evidence by a certain date under penalty of specific sanctions. *See* ECF No. 21. Instead, the Voss Firm now submits documents to provide the factual basis the Court had requested. The appraiser's reports suggest that Lighthouse Point suffered more damage during Superstorm Sandy than the $1,612 its insurer adjusted for damage to a fence. *Compare* Exs. A–B to Hunziker Aff. *with* Antin Decl. in Supp. of Mot. to Dismiss ¶ 8. Defendant has not challenged the reports' authenticity. *See* Def.'s Mem. in Opp. to Mot. for Recons., ECF No. 27.

The exhibits provide some support for the complaint's factual allegations. But the question remains: why did the Voss Firm withhold the documents until now? Considering the general rule against untimely submissions, and the rarity of granting a motion for reconsideration, the Court cannot find manifest injustice [*22] when the failure to timely submit evidence that the Voss Firm possessed throughout the litigation was inexcusable. The lack of a reasonable basis for failing to produce the evidence in a timely fashion, especially in spite of an Order to Show Cause, distinguishes this case from *Max's Seafood Cafe*, and makes it more akin to *DeLong*. Finding "manifest injustice" in *Max's Seafood Cafe*, the Third Circuit opined that the prior omission of dispositive evidence was "not surprising" under the circumstances. *176 F.3d at 678*. No such circumstances are present here.

"The court must keep in mind that the primary objective of any sanction is to preserve the integrity of the process, rather than to punish the offender." *Ming v. Caring, Inc., 166 F. Supp. 2d 61, 68 (D.N.J. 2001)*. Under these circumstances, with a meritless excuse from the Voss Firm as to why it ignored the litigation for so long, combined with its inattention to multiple other cases in the district, the

sanctions on the Voss Firm continue to serve a valid objective: encouraging the diligence which attorneys owe to the courts, their adversaries and their clients.

In its earlier opinion, the Court explained the rationale for barring Bill L. Voss from applying for *pro hac vice* status before this judge. ECF [*23] No. 21. After learning that Scott G. Hunziker is not admitted to practice before this Court, *see* Hunziker Aff. ¶ 2, the Court will amend its previous order to prohibit Mr. Hunziker from applying for *pro hac vice* admission before this judge for one year from the date of this opinion. Mr. Levasseur is likewise prohibited from appearing before this judge on matters filed within one year of the date of this opinion.

### III. Mr. Levasseur's Motion for Reconsideration Is Denied

The Court considers Mr. Levasseur's request to reconsider its dismissal of the complaint under both *Local Rule 7.1 (i)* and *Rule 60(b)*. *Local Rule 7.1 (i)* requires a motion for reconsideration to be filed within 14 days: Mr. Levasseur makes this request nearly five months after dismissal. *Local Rule 7.1(i)* cannot provide relief here.

Mr. Levasseur's request for relief under *Rule 60(b)* is also unavailing. Nothing in Mr. Levasseur's submissions demonstrates mistake, inadvertence, surprise, or excusable neglect. Allowing Lighthouse Point to reopen the case would create a significant possibility of prejudice to the Defendant: two-and-a-half years have passed since the property was allegedly damaged, making investigation more difficult. Mr. Levasseur's request, unaccompanied by any citation to case [*24] law, comes almost five months after dismissal and more than ten weeks after sanctions were imposed, a delay that has no explanation apart from counsel's inattention. The pattern of neglect that made the Court doubt the Voss Firm's good faith is no less attributable to Mr. Levasseur, who signed the complaint and was at all relevant times counsel of record in this matter.

Mr. Levasseur's argument that his client's action "should not be permanently barred on account of the sins of its retained attorneys" is contrary to Supreme Court precedent. On several occasions, the Supreme Court has "held that clients must be held accountable for the acts and omissions of their attorneys." *See Pioneer, 507 U.S. at 396*. It reasoned that a party

voluntarily chose this attorney as [its] representative in the action, and . . . cannot now avoid the consequences of the acts or omissions of this freely selected agent.

Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

*Id. at 397*. Following this reasoning, the Court held that a client could [*25] be penalized for counsel's late filing of a tax return, *U.S. v. Boyle, 469 U.S. 241, 105 S. Ct. 687, 83 L. Ed. 2d 622 (1985)*, and that a client would have to suffer the consequences of dismissal of its lawsuit because of its attorney's failure to attend a pretrial conference. *Link v. Wabash R. Co., 370 U.S. 626, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962)*. An order of dismissal is an appropriate consequence of Plaintiff's attorneys' lack of diligence. *See id.; Pentis v. State Farm Fire & Casualty Co., 747 F.2d 863, 868 (3d Cir. 1984)*. Lighthouse Point must suffer this consequence.

### IV. Judgment against Lighthouse Point Is Vacated

A court may reconsider its prior decisions *sua sponte* so long as it explains the reasoning behind its decision and takes the appropriate steps to ensure that the parties are not prejudiced by reliance on its prior ruling. *See DeFranco v. Wolfe, 387 F. App'x 147, 155-56 (3d Cir. 2010)* (applying *Williams v. Runyon, 130 F.3d 568, 573 (3d Cir. 1997)*).

The consequences to a party from attorney negligence that the Supreme Court addressed in *Pioneer, Boyle* and *Link* did not include sanctions. The Court is aware of no authority that requires a client to bear the brunt of a sanctions award when the sanctionable conduct is the attorney's alone. Presented now with a more detailed record than when it made its initial sanctions ruling, the Court is aware of no evidence suggesting that the Voss Firm ever gave Lighthouse Point an opportunity to review the pleading, informed it that the case had been dismissed, [*26] or warned that an order threatening sanctions was pending. The appraisal reports suggest that Lighthouse Point had a colorable basis for contesting its insurance payment. Given the lack of information communicated to Lighthouse Point by its attorneys, the colorable factual basis for the complaint, and the ability of the attorneys to timely submit the appraisal reports on their own, Lighthouse Point is so distant from the sanctionable conduct that holding it responsible would be manifestly unjust. The judgment against Lighthouse Point is vacated.

### V. Defendant's Request for Additional Attorneys' Fees Is Granted

Defendant requests additional attorneys' fees, in accordance with the Court's Amended Opinion of January 20, 2015.

Ct.'s Op. at 10, ECF No. 21 ("[w]ithin 30 days, Defendant shall make application to the Court for any fees associated with this motion, and any other litigation expenses not already submitted"); *see* Decl. of Mark Antin, ECF No. 25. Defendant's counsel has provided satisfactory proof of an additional $676.08 in fees; Defendant's request is granted. The judgment against the Voss Firm and Mr. Levasseur now totals $6,901.70.

## CONCLUSION

The Voss Firm's motion is denied. Mr. Levasseur's [*27] motion is denied. Judgment against Lighthouse Point is vacated. Defendant's request for additional attorneys' fees is granted. An appropriate order follows.

DATE: 30 April 2015

/s/ William H. Walls

William H. Walls

Senior United States District Court Judge

## ORDER

### Walls, Senior District Judge

This matter having come before the Court on the motion for reconsideration, ECF No. 23, of the Court's sanctions order, ECF No. 21, filed on behalf of Bill L. Voss, Scott G. Hunziker and the Voss Law Firm P.C.; as well as on the declaration of Audwin Levasseur, ECF No. 34, requesting reconsideration of the Court's order of dismissal, ECF No. 16; and in accordance with the Order to Show Cause issued

on March 11, 2015, ECF No. 28, it is hereby ORDERED that:

1. The judgment originally entered at ECF No. 20 is vacated;

2. The Amended Order entered at ECF No. 22 is vacated;

3. Judgment is entered against Audwin Levasseur, Bill L. Voss and Scott G. Hunziker, jointly and severally, in the amount of $6,901.70, a sum which represents Defendant's court costs and attorneys' fees to this date;

4. Bill L. Voss and Scott G. Hunziker are prohibited from seeking *pro hac vice* admission before this judge for a period of one [*28] year from the date of this Order;

5. Mr. Voss and Mr. Hunziker shall attach a copy of this Order and the accompanying Opinion with any future applications for *pro hac vice* admission in this district;

6. Audwin Levasseur is prohibited from appearing before this judge on any matters filed within a period of one year from the date of this Order;

7. The parties' requests for additional relief at ECF Nos. 23 and 34 are DENIED.

DATE: 30 August 2015

/s/ William H. Walls

William H. Walls

Senior United States District Court Judge

# EXHIBIT 8



Neutral
As of: August 20, 2015 3:52 PM EDT

### *Rios v. City of Bayonne*

United States District Court for the District of New Jersey

May 19, 2015, Decided; May 19, 2015, Filed

Civ. No. 2:12-4716

**Reporter**
2015 U.S. Dist. LEXIS 65137

Jason RIOS, Plaintiff, v. CITY OF BAYONNE et al., Defendants.

**Prior History:** *Rios v. City of Bayonne, 2015 U.S. Dist. LEXIS 45861 (D.N.J., Apr. 8, 2015)*

**Counsel:** [*1] For JASON RIOS, Plaintiff: JOEL SIDNEY SILBERMAN, LEAD ATTORNEY, Joel Silberman, Esq., Jersey City, NJ; AYMEN A. ABOUSHI, NEW YORK, NY.

For CITY OF BAYONNE, Defendant: KENNETH P. DAVIE, LEAD ATTORNEY, CIFELLI & DAVIE, ESQS., HARRISON, NJ.

For LT. ROBERT DECZYNSKI, Individually and in his official capacity as Lieutenant for the Bayonne Police Department; Defendant: MICHELE ANN ADUBATO, LEAD ATTORNEY, ADUBATO & JAFFE, ESQS., BAYONNE, NJ.

For SGT. FRANCO AMATO, Individually and in his official capacity as Sergeant for the Bayonne Police Department, Defendant: JOHN F. X. MCKEON, III, LEAD ATTORNEY, HARDIN, KUNDLA, MCKEON, POLETTO & POLIFRONI, PC, SPRINGFIELD, NJ.

For OFFICER JAMES MAHONEY, Individually and in his official capacity as a Police Officer for the Bayonne Police Department, Defendant: MICHELE ANN ADUBATO, LEAD ATTORNEY, ADUBATO & JAFFE, ESQS., BAYONNE, NJ; PETER WILLIAM TILL, LEAD ATTORNEY, LAW OFFICES OF PETER W. TILL, SPRINGFIELD, NJ.

For OFFICER JOSEPH SAROSHINSKY, Individually and in his official capacity as a Police Officer for the Bayonne

Police Department, OFFICER ROMAN POPOWSKI, Individually and in his official capacity as a Police Officer for the Bayonne Police Department, [*2] Defendants: GREGORY J. CASTANO, JR., LEAD ATTORNEY, CASTANO QUIGLEY, WEST CALDWELL, NJ.

**Judges:** Kevin McNulty, United States District Judge.

**Opinion by:** Kevin McNulty

## Opinion

**OPINION & ORDER**

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes before the Court upon Defendant Officer James Mahoney's motion for reconsideration (ECF No. 150) of this Court's April 8, 2015 Opinion and Order (ECF Nos. 144, 145). That April 8 Order denied Mahoney's appeal of Judge Hammer's refusal to stay discovery.

For the reasons set forth below, Mahoney's motion for reconsideration is DENIED.

**I. BACKGROUND[1]**

This action arose out of an August 29, 2010 incident between Rios and defendant members of the City of Bayonne's Police and Fire Departments.

On October 25, 2013, all of the defendants moved to stay discovery because there was an ongoing criminal investigation of them regarding the same incident. (See Defs. Mot. to Stay, ECF No. 67 (brief at 68-4)). The defendants argued that discovery could not continue because

---

[1]  A more detailed description of the facts is included in my April 8, 2015 Opinion (ECF No. 144), as well as a companion opinion filed today.

the defendants would either have to invoke the _Fifth Amendment_ or risk incriminating themselves, either in depositions [*3] or by the act of producing documents in discovery.

On August 14, 2013, the fire and police departments were served with grand jury subpoenas from the U.S. Attorney's Office for the District of New Jersey ("USAO") related to the August 29, 2010 incident. The subpoenas mentioned the officers at the scene by name. (See Transcript of Nov. 18, 2013 Hearing ("Nov. 18, 2013 Tr."), ECF No. 134-2, Ex. B, 10:4-7, 19:9-20:21; see also Davie Cert.[2] ¶4, ECF No. 64). The government also subpoenaed the Internal Affairs Unit's files. (Id. 24:4-8). The individual defendants, however, were not subpoenaed. (Id. 32:24-33:1). In addition, Mahoney's attorney, Mr. Till, stated at oral argument before Judge Hammer "that there were statements made to, not to [Till], but to other counsel that indictment [of the officers] was imminent." (Id. 36:9-11; see also 45:5-8). Rios was also "summoned to speak with federal law enforcement" regarding the federal criminal investigation of the defendants. (Id. 63:4-7 (quoting Pl. Opp. to Defs. Mot. to Stay at 2, ECF No. 69)).

On November [*4] 18, 2013, Judge Hammer held a hearing and ruled on the defendants' first motion to stay discovery. (See id.). In his ruling, he balanced the _Walsh_ factors and concluded that they weighed in favor of granting a stay for a period of 90 days (except as to document discovery). (Id. 71:9-20); see _Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd., 7 F. Supp. 2d 523, 527 (D.N.J. 1998)_.

On May 27, 2014, Judge Hammer held oral argument as to whether the stay should be treated as having expired. (See Transcript of May 27, 2014 Hearing ("May 27, 2014 Tr."), ECF No. 134-2, Ex. C). The stay remained in place.

On September 22, 2014, Judge Hammer heard the parties' arguments as to whether to extend the stay. (See Transcript of September 22, 2014 Hearing ("Sept. 22, 2014 Tr."), ECF No. 134-2, Ex. D). At the hearing, Rios's counsel, Mr. Aboushi, informed Judge Hammer that FBI Agent Laura Rugler[3] had told his co-counsel, Mr. Silberman, "that the FBI completed their investigation and were not moving forward with any charges against the defendants." (Id. 11:11-18). Mr. Till confirmed that the defendants had no reason to disbelieve this representation. (Id. 12:3-12). Mr. Till nevertheless sought a _Fed. R. Evid. 104_ hearing on the

issue of whether a criminal investigation was pending. (Id. 12:3-6; 13:16-20). [*5] Because it was unclear at that point whether the government had concluded its investigation of the officers, Judge Hammer continued the stay. He scheduled an additional hearing for December 10, 2014. (Id. 28:8-16). Judge Hammer also instructed Mr. Aboushi to send notice to the United States Attorney's Office regarding the December 10, 2014 hearing so that they could appear if they wished. (Id. 30:1-4).

On December 10, 2014, Judge Hammer conducted a hearing regarding the stay and received updates as to the status of any government investigations. (See Transcript of December 10, 2014 Hearing ("Dec. 10, 2014 Tr."), ECF No. 134-2, Ex. E). Defendants Saroshinsky and Mahoney received letters informing them that (1) they were no longer targets of a criminal investigation by the DOJ Civil Rights Division and (2) the USAO took no position with respect to whether the current civil proceedings should be stayed. (Id. 4:6-6:21). Counsel for Mahoney, Mr. Till, said that AUSA Eicher had represented to him that the USAO would not take a position as to whether it was investigating Mahoney. (Id. 7:24-8:10). Mr. Till nevertheless expressed [*6] his ongoing concern about a potential USAO investigation for two reasons: (1) The letters to Saroshinsky and Mahoney included the following disclaimer: "Please be advised that [the DOJ Civil Rights Division's] conclusion in this matter does not preclude other components of the U.S. Department of Justice from taking action where appropriate under their separate enforcement authority," (Id. 12:8-17) (2) The USAO took no position with respect to a stay in the current matter, which led Mr. Till to an "inference" that USAO has "left all their options open." (Id. 12:18-25). Counsel for defendants Saroshinsky and Popowski, Ms. Garcia, also remained concerned about the USAO subpoenas that were part of the basis for Judge Hammer's first imposition of a stay. (Id. 16:8-18:13). Till and Garcia acknowledged, however, that neither of them had asked the USAO for an update in the year preceding the December 10, 2014 hearing. (Id. 18:9-25). Judge Hammer noted that Amato and Popowski had not received letters informing them that they were no longer targets of a DOJ investigation. (Id. 20:10-21:17). At that point, plaintiff Rios's counsel, Mr. Silberman, added that he had received a letter from the DOJ [*7] Civil Rights Division (ECF No. 116-1) stating that their investigation was closed. (Id. 24:15-22). That letter reads in pertinent part as follows:

---

[2]    The Certification of Kenneth P. Davie, dated October 7, 2013, submitted in support of the defendants' motion to seal; ECF No. 62 = Davie Cert.

[3]    The spelling of the FBI Agent's name is phonetic in the transcript.

Case: 15-4045    Document: 003112366698    Page: 248    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-9    Filed 09/08/15    Page 4 of 5 PageID: 3312

Page 3 of 4

We recently completed our review of the results of the investigation to determine whether a federal criminal prosecution could be brought concerning allegations that the civil rights of Mr. Jason Rios were violated by officials of the Bayonne Police Department. After careful consideration, we concluded that the evidence does not establish a prosecutable violation of the federal criminal civil rights statutes. Accordingly, we have closed our investigation and, based on current information, do not plan to take any further action.

(DOJ Letter Oct. 3, 2015, ECF No. 116-1).

After receiving all of this information, Judge Hammer adjourned the proceedings and continued the stay, with instructions for the parties to return with the following information: (1) whether Popowski and Amato had received a similar letter informing them that they are not targets of a DOJ investigation; and (2) whether the USAO was willing to say any more about a potential investigation of Mahoney. (Dec. 10, 2014 Tr. 30:9-31:21).

On February 9, 2015, Judge Hammer held a final [*8] hearing regarding the stay issue. (*See* Transcript of Feb. 9, 2015 Ruling ("Feb. 9, 2015 Tr."), ECF No. 134-2, Ex. F). Before that hearing, the parties submitted letters in response to Judge Hammer's requests for information. (*See* Landis Jan. 26, 2015 Letter, ECF No. 127; Till Jan. 26, 2015 Letter, ECF No. 128). The parties' responses stated that the DOJ Civil Rights Division had closed its investigation and that the USAO had "invoked its policy of not indicating one way or the other whether there was an open or closed investigation." (Feb. 9, 2015 Tr. 4:25-5:11; *see* Landis Jan. 26, 2015 Letter; Till Jan. 26, 2015 Letter). At the hearing, Mr. Till confirmed that he had no knowledge of any open or ongoing criminal investigation of Mahoney. (Feb. 9, 2015 Tr. 5:16-21). Mr. Till also expressed concern over Mahoney's potential involvement in other civil rights cases involving the City of Bayonne and an indictment against an officer of the Bayonne PD for civil rights violations.[4] (*Id.* 6:2-7:21). Specifically, Mr. Till spoke of "broad-based allegations of an environment of civil rights violations in the City of Bayonne and its police department," as evidenced by these cases. (*Id.* 7:19-21). [*9] Mr. Silberman replied that he was actually counsel to the plaintiff in one of these cases and could represent to the Court that Mahoney was in no way involved. (*Id.* 8:1-10). To this, Mr. Till replied that he was

still concerned that Mahoney might be involved in a future case based on the "culture of behavior in the Bayonne police department." (*Id.* 10:2-14).

Having heard the parties' arguments, Judge Hammer denied Mr. Till's request to stay discovery. (*See id.* 11:2-12:15; Order, ECF No. 131). Judge Hammer noted that "the only criminal investigation that anybody was actually aware of has since now been verified by the Civil Rights Division to have been closed," and that the parties had no knowledge [*10] of any active investigation by the USAO. (*Id.*). As to Mr. Till's more general concerns about other civil cases and the culture of behavior by the Bayonne PD, Judge Hammer reasoned that "if [he] stayed the litigation because of the mere threat" of a lawsuit involving Mahoney, then he would essentially have to stay the current case until the statute of limitations had run on any potential criminal offenses. (*Id.*). Judge Hammer concluded that there was no basis to believe any agency of the federal government was conducting an investigation into Mahoney or the incident giving rise to this litigation.

On February 24, 2015, Mahoney appealed Judge Hammer's denial of his request to stay discovery. (ECF No. 134.) On April 8, 2015, I denied Mahoney's appeal. (April 8, 2015 Opinion, ECF No. 144; Order, ECF No. 145.)

Mahoney now moves for reconsideration of my April 8, 2015 Opinion and Order. (ECF No. 150.) He focuses on Judge Hammer's denial of a *Rule 104* hearing.

## II. MOTION FOR RECONSIDERATION

### a. Standard for motion for reconsideration

Reconsideration is an "extraordinary remedy," to be granted "sparingly." *NL Indus. Inc. v. Commercial Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996)*. Generally, reconsideration is granted in three scenarios: (1) when there has been an intervening [*11] change in the law; (2) when new evidence has become available; or (3) when necessary to correct a clear error of law or to prevent manifest injustice. *See North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995)*; *Carmichael v. Everson, 2004 U.S. Dist. LEXIS 11742, 2004 WL 1587894, at *1 (D.N.J. May 21, 2004)*. *Local Rule 7.1(i)* requires such a motion to specifically identify "the matter or controlling

---

[4] Mr. Till was referring to the current civil rights lawsuit by Brandon and Kathy Walsh against the City of Bayonne, officers of the Bayonne Police Department, and John Does 1-25, pending before Judge Katharine S. Hayden of this district (Civ. No. 14-7186 (KSH-CLW)), as well as the criminal civil rights case against Officer Domenico Lillo that is pending before this Court (Crim. No. 15-0043 (KM)). Mr. Till also referred to a case pending against a defendant named "Johnson." (Feb. 9, 2015 Tr. 9:13-21).

Case: 15-4045    Document: 003112366698    Page: 249    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-9    Filed 09/08/15    Page 5 of 5 PageID: 3313

Page 4 of 4

2015 U.S. Dist. LEXIS 65137, *11

decisions which the party believes the Judge or Magistrate Judge has overlooked." *Id.; see also Egloff v. New Jersey Air Nat'l Guard, 684 F. Supp. 1275, 1279 (D.N.J. 1988).* Evidence or arguments that were available at the time of the original decision will not support a motion for reconsideration. *Damiano v. Sony Music Entertainment, Inc., 975 F. Supp. 623, 636 (D.N.J. 1997); see also North River Ins. Co., 52 F.3d at 1218; Bapu Corp. v. Choice Hotels Int'l, Inc., 2010 U.S. Dist. LEXIS 135844, 2010 WL 5418972, at *4 (D.N.J. Dec. 23, 2010)* (citing *P. Schoenfeld Asset Mgmt., LLC v. Cendant Corp., 161 F. Supp. 2d 349, 352 (D.N.J. 2001)).* Mere disagreement with a holding is properly expressed via an appeal, not a motion for reconsideration. *See Morris v. Siemens Components, Inc., 938 F. Supp. 277, 278 (D.N.J. 1996).*

### b. Discussion of motion for reconsideration

Mahoney has not presented any new evidence, change in law, or clear error that would warrant reconsideration of his request to hold a *Rule 104(a)* hearing. Rather, he maintains that it is "absolute[ly] necessary" to "conduct[] a *Rule 104* hearing to once and for all conclusively establish whether a criminal investigation of the collective Defendant police officers is ongoing." (Mahoney Recons. Mot. 1-2, ECF No. 150.)

Mahoney disputes this Court's conclusion that a *Rule 104* hearing would be fruitless, but he does not offer any evidence to suggest otherwise. Indeed, based on the entire record, including [*12] responses from the FBI and the U.S. Attorney's Office, there is no indication that any investigation of the officers is ongoing. More importantly, there is no indication that any more information is available from either agency, whether in the context of a *Rule 104* hearing or not.

As Judge Hammer noted, "the only criminal investigation that anybody was actually aware of has since now been verified by the Civil Rights Division [of the Department of Justice] to have been closed." (Feb. 9, 2015 Tr., ECF No. 134-2, Ex. F, 11:2-12:15; *see also* Till Jan. 26, 2015 Letter,

ECF No. 128). The USAO has "invoked its policy of not indicating one way or the other whether there was an open or closed investigation." (Feb. 9, 2015 Tr. 4:25-5:11; *see* Landis Jan. 26, 2015 Letter, ECF No. 127; Till Jan. 26, 2015 Letter). As Judge Hammer and I have previously noted, the DOJ Civil Rights Division's conclusion that a prosecution is not warranted undercuts any general inference that the USAO is going ahead with an investigation. (Dec. 10, 2015 Tr. 8:21-9:9; April 8, 2015 Opinion at 11-12, ECF No. 144.)

As for the FBI, Rios's counsel, Mr. Aboushi, confirmed that FBI Agent Laura Rugler told his co-counsel, Mr. Silberman, [*13] "that the FBI completed their investigation and were not moving forward with any charges against the defendants." (Sept. 22, 2014 Tr. 11:11-18, ECF No. 134-2, Ex. D).

As observed before, the most that any agency could *ever* say (in or out of a *Rule 104* hearing) is that its investigation is closed for now. Mahoney will always face the choice of either testifying, or else (validly or not) asserting his *Fifth Amendment* rights based on the fear of a renewed investigation. Conducting a *Rule 104* hearing would not dispel those concerns or furnish the kind of insurance that he seems to seek. And, as stated above, there is no indication that more information is available from any government agency apart from that already provided.[5]

### III. CONCLUSION

Accordingly, based on this Opinion and for good cause shown;

IT IS this 19th day of May, 2015,

ORDERED that [*14] Defendant Mahoney's motion for reconsideration (ECF No. 150) is DENIED.

/s/ Kevin McNulty

**Kevin McNulty**

**United States District Judge**

---

[5]  I note that my decision is not based on Rios's letter suggesting that Mahoney and other officers waived their privilege by offering to testify in municipal proceedings regarding this case. (Rios Supp. Letter, ECF No. 155.) Mahoney denies that he was or is willing to testify in municipal court. (Mahoney Resp. to Rios Supp. Letter, ECF No. 156; Mahoney Recons. Reply, ECT No. 160.)

# EXHIBIT 9



Ⓐ Neutral
As of: August 20, 2015 3:53 PM EDT

## *United States v. Pechiney Plastics Packaging, Inc.*

United States District Court for the District of New Jersey

August 14, 2012, Decided; August 14, 2012, Filed

Civil Action No. 09-5692 (PGS)

**Reporter**

2012 U.S. Dist. LEXIS 114255; 2012 WL 3527721

UNITED STATES OF AMERICA, Plaintiff, v. PECHINEY PLASTICS PACKAGING, INC., Defendant.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part *United States v. Pechiney Plastics Packaging, Inc., 2013 U.S. Dist. LEXIS 37640 (D.N.J., Mar. 19, 2013)*

Stay denied by *United States v. Pechiney Plastic Packaging, Inc., 2013 U.S. Dist. LEXIS 92664 (D.N.J., July 2, 2013)*

Motion granted by, in part, Motion denied by, in part *United States v. Pechiney Plastic Packaging, Inc., 2013 U.S. Dist. LEXIS 139141 (D.N.J., Sept. 27, 2013)*

**Counsel:** [*1] For UNITED STATES OF AMERICA, Plaintiff: BETHANY LYNN ENGEL, LEAD ATTORNEY, US DEPARTMENT OF JUSTICE, ENVIRONMENTAL ENFORCEMENT SECTION, WASHINGTON, DC; DEANNA CHANG, KEITH TAKETO TASHIMA, LEAD ATTORNEYS, MYRIAH VALENTINA JAWORSKI, UNITED STATES DEPARTMENT OF JUSTICE, WASHINGTON, DC; CLAIRE HELEN WOODS, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENT AND NATURAL RESOURCES DIVISION, WASHINGTON, DC.

For PECHINEY PLASTICS PACKAGING, INC., Defendant: NICOLE R. MOSHANG, LEAD ATTORNEY, MANKO GOLD KATCHER & FOX LLP, BALA CYNWYD, PA.

**Judges:** TONIANNE J. BONGIOVANNI, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** TONIANNE J. BONGIOVANNI

## Opinion

**MEMORANDUM OPINION**

**BONGIOVANNI, Magistrate Judge,**

Presently before the Court is Defendant Pechiney Plastics Packaging, Inc.'s ("PPPI") motion for reconsideration of the Court's Letter Order of March 12, 2012 [Docket Entry No. 42], which granted in part and denied in part PPPI's request for certain discovery. Plaintiff United States of America (the "United States") opposes PPPI's motion for reconsideration. Also, to the extent the Court grants PPPI's motion and reconsiders its earlier decision, the United States opposes PPPI's request for additional discovery. The Court has reviewed all arguments [*2] raised in support of and in opposition to PPPI's motion for reconsideration, including all arguments made with respect to the discovery sought by PPPI. The Court considers PPPI's motion without oral argument pursuant to *FED.R.CIV.P. 78*. For the reasons stated more fully below, PPPI's motion for reconsideration is DENIED.

**I. Background**

On November 6, 2009, the United States brought this civil action against PPPI pursuant to Sections 107 and 113(b) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), *42 U.S.C. §§ 9607* and *9613(b)*. Through this lawsuit, the United States seeks to recover certain costs incurred or to be incurred by the United States Environmental Protection Agency (the "EPA") in connection with the release or threatened release of hazardous substances into the environment at or from the Pohatcong Valley Groundwater Contamination Superfund Site (the "Pohatcong Site"). The Pohatcong Site is comprised of approximately ten square miles and is located in Warren County, New Jersey. The United States seeks to recoup approximately $22 million in

costs for work done in relation to the Pohatcong Site and its cost claims extend [*3] for a time span of approximately 26 years.

During the course of this litigation, a discovery dispute arose over PPPI's request for discovery from CH2M Hill, the EPA's primary contractor. While the parties had reached an interim agreement concerning the production of CH2M Hill discovery in early 2011 under which the United States agreed to produce the files from certain CH2M Hill offices and servers, as well as certain hard copy files for PPPI to copy at other CH2M Hill offices along with the files of six priority CH2M Hill employees, the agreement did not foreclose PPPI's right to seek additional CH2M Hill discovery from the United States or directly from CH2M Hill. The agreement also did not foreclose the United States' right to object to any additional discovery requested by PPPI. After receiving the United States' interim production of discovery from CH2M Hill, PPPI exercised its right to seek additional information from CH2M Hill and the United States exercised its right to object to same.

The parties raised their inability to agree on the appropriate scope of CH2M Hill discovery to the Court in their status letters submitted on January 13, 2012 in advance of the telephone conference [*4] scheduled for January 20, 2012. (See Letter from Barbara Magel to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 1/13/2012; Letter from Keith Tashima to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 1/13/2012). On January 19, 2012, the day before the parties' scheduled status conference, the Court received an additional letter from PPPI, narrowing the scope of the additional CH2M Hill discovery it was currently seeking to nine employees' files and explaining why this discovery was relevant to its affirmative defenses: inconsistency with the National Contingency Plan (the "NCP"), statute of limitations and divisibility/apportionment. (See Letter from Barbara Magel to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 1/19/2012).

On January 20, 2012, the Court conducted a status telephone conference with the parties. During the conference, the Court discussed PPPI's request for additional CH2M Hill discovery and took that request under advisement. While the Court did not foreclose the possibility that It would require formal motion practice on this issue, the Court also left open the possibility that It would rely on the parties' informal letter applications to determine whether additional CH2M Hill discovery [*5] was warranted. Subsequent to the January 20, 2012 telephone conference, the Court permitted the parties to submit additional letter briefs on the CH2M Hill discovery issue. The parties submitted same on January 27, 2012. (See Letter from Barbara Magel to Hon. Tonainne J. Bongiovanni, U.S.M.J. of 1/27/2012; Letter from Myriah Jaworski to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 1/27/2012).

After reviewing all of the parties' letters on the issue, [1] the Court entered a Letter Order on March 12, 2012 [Docket Entry No. 42], granting in part and denying in part PPPI's request for additional CH2M Hill discovery. Specifically, the Court required the United States to produce the files of D. Zmudzin, but denied PPPI's request for any additional CH2M Hill discovery. In reaching this conclusion, the Court determined that PPPI had failed to establish that the requested discovery was relevant to either its defense that some of the United States' claimed costs are inconsistent with the NCP or its statute of limitations defense. (See 3/12/2012 Letter Order at 4-6). The Court further determined that while it was reasonable to presume that eight of the nine employee files requested by PPPI likely contained [*6] information at least somewhat relevant to the issue of apportionment, with one exception, the burden and expense associated with the production of those files was significantly outweighed by the likely benefit of same. (Id. at 10-11); the exception being D. Zmudzin's files, which as already noted above, the Court required the United States to produce.

On March 19, 2012, PPPI submitted a letter to the Court, purportedly in accordance with L.Civ.R. 7.1, through which it sought reconsideration of the Court's March 12, 2012 Letter Order. PPPI's basis for seeking reconsideration was

---

[1] The Court notes that after the January 27, 2012 letters were submitted, the parties submitted several other letters tangentially related to the parties dispute concerning the appropriate scope of CH2M Hill discovery. (See Letter from Bethany Engel to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 2/3/2012; Email from Bruce White to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 2/3/2012; Letter from Barbara Magel to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 2/7/2012 (discussing production of cost documents); Letter from Barbara Magel to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 2/7/2012 (discussing PPPI's production of documents from Albea America, Inc.'s facility in Washington, New Jersey as well as CH2M Hill discovery); Letter from Bethany Engel to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 2/8/2012; Letter from Barbara Magel to Hon. Tonianne [*7] J. Bongiovanni, U.S.M.J. of 2/9/2012). These subsequent letters do not substantively address in any detail the relevancy of the CH2M Hill discovery to PPPI's affirmative defenses. As such, while the Court obviously reviewed these letters, the Court's decision on PPPI's request for additional CH2M Hill discovery was largely based on the five letters submitted by the parties on or before January 27, 2012, namely PPPI and the United States' January 13, 2012 letters, PPPI's January 19, 2012 letter and PPPI and the United States' January 27, 2012 letters.

Case: 15-4045    Document: 003112366698    Page: 253    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-10    Filed 09/08/15    Page 4 of 8 PageID: 3317

2012 U.S. Dist. LEXIS 114255, *6

Page 3 of 7

that PPPI did not believe that the Court would treat its letters of January 13, 2012 and January 19, 2012 "as if they were a complete briefing or presentation of PPPI's needs for the remaining production[,]" rather it was PPPI's understanding that it was "awaiting further instruction as to whether the Court wanted more formal filings as requested by the United States through its protective order approach) or [**8] an in person conference." (Letter from Barbara Magel to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 3/19/2012 at 1). In short, PPPI argued that reconsideration is appropriate because it "did not anticipate a ruling based on our letters which simply provided examples to demonstrate the relevancy of the documents sought, rather than a fully briefed position statement." (*Id.*)

After receiving PPPI's March 19, 2012 letter, the Court immediately entered a Letter Order, which in its entirety read:

> The Court has received Defendant Pechiney Plastics Packaging, Inc.'s ("PPPI's") letter dated today, March 19, 2012, regarding the Court's March 12, 2012 Letter Order. To the extent any party seeks reconsideration of all or part of the March 12, 2012 Letter Order, that party has until **March 26, 2012** to file a formal motion pursuant to *L.Civ.R. 7.1(i)* seeking same.

(March 19, 2012 Letter Order; Docket Entry No. 43). PPPI's instant motion for reconsideration followed.

## II. Analysis

In this district, motions for reconsideration are governed by *L.Civ.R. 7.1(i)* and are considered "extremely limited procedural vehicle(s)." *Resorts Int'l v. Greate Bay Hotel & Casino, 830 F.Supp. 826, 831 (D.N.J. 1992)*. As a result, [*9] "reconsideration is an extraordinary remedy, that is granted 'very sparingly[.]'" *Brackett v. Ashcroft, No. Civ 03-3988 (WJM), 2003 U.S. Dist. LEXIS 21312, 2003 WL 22303078, *2 (D.N.J. Oct. 7, 2003)* (quoting *Interfaith Community Org. v. Honeywell Int'l, Inc., 215 F.Supp.2d 482, 507 (D.N.J. 2002)*). As such, a party seeking reconsideration bears a high burden and must demonstrate one of the following three grounds to establish that reconsideration is appropriate: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [issued its order]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)*.

*L.Civ.R. 7.1(i)* provides that:

Unless otherwise provided by statute or rule . . ., a motion for reconsideration shall be served and filed within 14 days after the entry of the order or judgment on the original motion by the Judge or Magistrate Judge. A brief setting forth concisely the matter or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked shall be filed with the Notice of Motion.

As is clear from the text of the [*10] Rule, the term "overlook" is the dominant term in *L.Civ.R. 7.1(i)*. Indeed, generally, the Rule "does not contemplate a Court looking to matters which were not originally presented." *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F.Supp. 159, 162 (D.N.J. 1988)*. Consequently, "except in cases where there is a need to correct a clear error or manifest injustice, '[o]nly dispositive factual matters and controlling decisions of law which were presented to the court but not considered on the original motion my be the subject of a motion for reconsideration.'" *Guinta v. Accenture, LLP, Civ. No. 08-3776 (DRD), 2009 U.S. Dist. LEXIS 4674, 2009 WL 301920, *5 (D.N.J. Jan. 23, 2009)* (quoting *Resorts Int'l, 830 F.Supp. at 831*).

Here, Plaintiff seeks reconsideration because it was allegedly surprised by the Court's March 12, 2012 Letter Order deciding the appropriate scope of additional CH2M Hill discovery as "[i]t was PPPI's understanding that we were awaiting either scheduling of an in-person conference with the Court or further instructions allowing the parties to file a formal discovery motion on the issue." (PPPI Br. at 5). As a result, PPPI argues that as of March 12, 2012, PPPI had not fully presented its explanation [*11] of needs for the remaining documents to the Court." (*Id.*) Instead, PPPI had only submitted "two letters providing only examples of how the requested documents were needed to establish affirmative defenses and reviewing how PPPI had proposed to streamline its production approach" at the time the Court entered its Letter Order. (*Id.*) As such, PPPI argues that reconsideration is warranted here.

Surprisingly, in its opening brief, PPPI makes no mention of the stringent standards governing motions for reconsideration. Instead, PPPI states that it is seeking reconsideration pursuant to *L.Civ.R. 7.1(i)* and that "[r]econsideration is appropriate when, *inter alia*, 'evidence not previously available has become available or if necessary to correct a clear error of law or fact or prevent a manifest injustice." (PPPI Br. at 5 (quoting *Bouder v. Prudential Fin., Inc., Civil Action No. 06-4359 (DMC), 2010 U.S. Dist. LEXIS 51599, 2010 WL 2925938 (D.N.J. 2010)*). PPPI further argues that reconsideration is appropriate here

Case: 15-4045    Document: 003112366698    Page: 254    Date Filed: 07/28/2016
Case 1:12-cv-05255-JBS-AMD    Document 135-10    Filed 09/08/15    Page 5 of 8 PageID: 3318

2012 U.S. Dist. LEXIS 114255, *11

Page 4 of 7

because it "had not fully presented its explanation of needs for the remaining documents" and was surprised by the Court's Order limiting the scope of the CH2M Hill production because it believed that the Court [*12] was either going to permit the parties to file a formal motion on said issue or hold an in-person conference regarding same. (*Id.*)

While PPPI is correct that reconsideration is appropriate where evidence not previously available has become available or if necessary to correct a clear error of law or fact or prevent manifest injustice, the Court still would have expected a more extensive discussion in Plaintiff's opening brief regarding the propriety of granting reconsideration here, especially in light of the fact that parties moving for reconsideration are not generally permitted to file reply papers. *See L.Civ.R. 7.1(d)(3)* (stating that "[n]o reply papers shall be filed on a motion for reconsideration pursuant to *L.Civ.R. 7.1(i)* . . . unless the Court orders otherwise.") Nevertheless, here, Plaintiff was permitted to submit a reply.

In that reply, Plaintiff initially seems to suggest that the stringent standards that typically govern motions for reconsideration do not apply to the instant motion. In this regard, PPPI attempts to distinguish its motion for reconsideration, which seeks reconsideration of an order entered on a discovery dispute submitted informally through letter correspondence, [*13] from motions for reconsideration of decisions rendered after formal motion practice. PPPI also suggests that the typical standards for reconsideration do not apply because "the Court here has already granted PPPI's request to seek reconsideration through its March 19, 2012 Order." (PPPI Reply at 2). However, PPPI also reiterates the argument it made in its opening brief, claiming that reconsideration is appropriate in order to prevent a manifest injustice: namely the injustice that would result if the Court failed to reconsider its decision when PPPI had not fully presented all of its arguments concerning the discovery sought because it believed that the Court would either request additional, formal briefing on the CH2M Hill discovery issue or hold an in-person conference regarding same.

As an initial matter, the Court finds no reason why PPPI's motion for reconsideration should be excused from the normal standards governing motions for reconsideration. The Court finds that the fact that the decision over which PPPI seeks reconsideration was based on correspondence submitted informally to Chambers rather than as a formally filed motion is a distinction that makes no difference and, [*14] indeed, PPPI provides no legal support for its proposition that this distinction matters. Discovery issues like that involving the parties' current dispute over the appropriate scope of CH2M Hill Discovery are often times handled informally rather than by formal motion practice and the Court finds no support for the contention that disputes decided by way of informal letter applications are some how exempt from the typical standards governing motions for reconsideration; nor does PPPI provide any.

Further, there is nothing in the Court's March 19, 2012 Letter Order permitting PPPI to file the instant motion for reconsideration to suggest that PPPI's motion would be governed by any standard other than the same stringent standard under which all motions for reconsideration are governed. As previously noted, the Court's March 19, 2012 Letter Order reads in its entirety:

> The Court has received Defendant Pechiney Plastics Packaging, Inc.'s ("PPPI's") letter dated today, March 19, 2012, regarding the Court's March 12, 2012 Letter Order. To the extent any party seeks reconsideration of all or part of the March 12, 2012 Letter Order, that party has until **March 26, 2012** to file a formal motion [*15] pursuant to *L.Civ.R. 7.1(i)* seeking same.

Clearly, the Court's Letter Order does not exempt PPPI's motion for reconsideration from the normal standards governing such motions. Instead, quite the opposite is true: the Court explicitly directs any party seeking reconsideration to "file a formal motion **pursuant to** *L.Civ.R. 7.1(i)*." (*Id.* (emphasis added)). Thus, while the Court did permit PPPI to seek reconsideration of It's March 12, 2012 Letter Order by filing a formal motion for reconsideration, the Court never insinuated that the motion for reconsideration would be granted or that the party seeking reconsideration would not have to meet the typical standards governing such motions. [2]

Nevertheless, PPPI also argues that reconsideration is appropriate under *L.Civ.R. 7.1(i)* in order to prevent a

---

[2] In fact, the only reason the Court entered the March 19, 2012 Letter Order permitting the parties to formally move for reconsideration, is that earlier that day, PPPI sent in an informal letter application seeking reconsideration of the Court's March 12, 2012 Letter Order. Given the fact that one of PPPI's main bases for seeking reconsideration of the Court's March 12, 2012 Letter Order regarding the appropriate scope of additional CH2M Hill discovery is that PPPI believed the Court would request formal [*16] motion practice on said issue before rendering a decision on same, the Court certainly wasn't going to rule on PPPI's request for reconsideration without a formal motion. Indeed, in light of PPPI's reason for seeking reconsideration of the March 12, 2012 Letter Order, the Court finds it ironic

2012 U.S. Dist. LEXIS 114255, *15

manifest injustice. The prevention of manifest injustice is a well accepted basis for granting a motion for reconsideration. *See Max's Seafood Cafe, 176 F.3d at 677.* Here, PPPI argues that reconsideration is warranted to prevent the manifest injustice that would result if PPPI wasn't able to expand the record on which the Court entered Its decision in light of the fact that PPPI believed that it would have the opportunity to further supplement [*17] the record through either formal motion practice or an in-person conference before a ruling was made. Indeed, given PPPI's understanding that the Court would require a formal motion or hold an in-person conference before ruling on its request for additional CH2M Hill discovery, PPPI contends that it was surprised by the Court's March 12, 2012 Letter Order.

The Court is admittedly perplexed by PPPI's surprise that a decision was rendered without formal motion practice or an in-person conference. While the Court did leave open the possibility that It would request a formal motion or a conference, the Court also indicated that the parties' informal letter briefs might be sufficient. It appeared to the Court that PPPI understood as much when it submitted its third letter brief addressing the CH2M Hill discovery issue. In that letter, PPPI explicitly states that it "is cognizant of the Court's desire to resolve this production question without the need for lengthy briefing and/or argument and has limited this submission accordingly." (Letter from Barbara Magel to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 1/27/2012 at 1). Given PPPI's acknowledgment in this regard, the Court does not understand [*18] why PPPI was surprised when the Court rendered Its decision on the CH2M Hill discovery issue without formal motion practice or an in-person conference.

In its motion for reconsideration, PPPI makes no attempt to square its earlier statement with its current argument that it was surprised by the Court's March 12, 2012 Letter Order. Indeed, as noted by the United States, in its opening brief and attached exhibits, PPPI does not even acknowledge that it submitted the January 27, 2012 letter, focusing only on its letters dated January 13 and 19, 2012. (*See* PPPI Br. at 5 (stating that PPPI had submitted "two letters providing only examples of how the requested documents were needed to establish affirmative defenses and reviewing how PPPI had proposed to streamline its production approach" at the time the Court entered the March 12, 2012 Letter Order) (emphasis added)). Moreover, in its reply, while PPPI does acknowledge the fact that it submitted a letter to the Court

dated January 27, 2012 (PPPI Reply Br. at 3 (referring to "the January 27, 2012 submissions"), PPPI does not address its statement that it was "cognizant of the Court's desire to resolve this production question without the [*19] need for lengthy briefing and/or argument and has limited this submission accordingly." (Letter from Barbara Magel to Hon. Tonianne J. Bongiovanni, U.S.M.J. of 1/27/2012 at 1). Instead, PPPI focuses on the United States' January 27, 2012 submission and argues that it was unclear even to the United States whether the Court would require a formal motion or hear argument on the CH2M Hill discovery issue:

> While the United States takes great issue throughout its Opposition with PPPI's statements regarding PPPI's understanding, the United States' own January 27, 2012 letter unequivocally confirms that the United States was uncertain if the Court intended to "hear" argument and/or request the parties to submit a "formal motion" presenting the issue. (*See* United States' January 27, 2012 Letter at p. 1, "... in further support of the United States' request for the Court *to hear* or grant..., and at p. 14, "The United States *is prepared to file a formal motion at this time, ... or should* the [C]ourt decide the United States' motion on the papers already before it, the United States *is prepared to submit* a proposed protective order ...). Indeed, if, as the United States argues, it was so abundantly [*20] clear to the parties that the January 27, 2012 submission would be treated as the dispositive briefings on the matter without any opportunity for either party to reply, then one must wonder why the United States offered to file a formal motion and did not provide the Court with a proposed protective order in the first instance.

(PPPI Reply Br. at 2-3).

In the first instance, the Court, in determining whether to grant PPPI's motion for reconsideration, is more concerned with what PPPI reasonably believed, not the United States. Secondly, however, the Court finds that the statements contained in the United States' letter of January 27, 2012 unequivocally establish that the Court had left open the possibility that It might rule on the CH2M Hill discovery issue based on the informal letter briefs submitted to the Court without formal motion practice or an in-person conference:

> [The United States] submit[s] this supplemental letter, with leave of the Court, in further support of the United

---

that PPPI submitted an informal letter application for reconsideration, especially since, unlike discovery issues which are often addressed informally, "[t]he language of [L.Civ.R. 7.1(i)] strongly suggests that a motion for reconsideration should be by formal notice of motion[.]" *See* Comment to L.Civ.R. 7.1 at ¶6c "Motions for Reconsideration, Form."

2012 U.S. Dist. LEXIS 114255, *20

States' request for the Court to hear or grant the government's motion for entry of a protective order limiting the scope of discovery of CH2M Hill documents in this litigation to those documents already [*21] produced.

***

The United States seeks resolution from the Court on the scope of CH2M Hill discovery. The phased, conditional discovery that PPPI proposes is simply unworkable and comes at an unjustified expense and undue burden to the United States. Accordingly, the United States requests that the Court grant leave for the United States to move for a protective order at this time **or, alternatively, that the Court decide the United States' motion for a protective order on the record already before the Court.**

***

The United States seeks resolution from the Court on the scope of CH2M Hill discovery. Accordingly, the United States requests that the Court enter a protective order limiting the production of any additional CH2M Hill documents at this time. The United States is prepared to file a formal motion at this time, **or, should the Court decide the United States' motion on the papers already before it,** the United States is prepared to submit a proposed protective order should the Court so require.

(United States' Opp. at 1, 2, 14 (emphasis added)). Indeed, PPPI seems to ignore the United States' use of the conjunction "or" as well as the multiple instances in which the United States acknowledged [*22] that the Court might choose to decide the CH2M Hill discovery issue on the record already before It.

Thus, while the Court did not specifically advise the parties that It would consider their informal letter briefs as the dispositive briefing on the CH2M Hill discovery issue, the Court clearly indicated that this was an option. The United States clearly understood that this was the case and the PPPI's submissions suggest that it did as well. Why else would PPPI definitively state that it was "cognizant of the Court's desire to resolve this production question without the need for lengthy briefing and/or argument and has limited this submission accordingly." (Letter from Barbara Magel to Hon. Tonianne J. Bongiovanni, U.S.M.J. of

1/27/2012 at 1). Under these circumstances, the Court finds that no manifest injustice will result if the March 12, 2012 Letter Order stands as entered. Consequently, PPPI's motion for reconsideration is denied.

In light of the fact that the Court has denied PPPI's motion for reconsideration, the Court does not reach the question of whether the additional information provided in said motion would have persuaded the Court that further CH2M Hill discovery is warranted. [*23] The Court does, however, note that it appears unlikely, based on the Court's initial review of PPPI's supplementation, that PPPI would have succeeded in establishing that the United States should be compelled to produce all of the CH2M Hill employee files PPPI currently seeks. At first blush, it appears that PPPI has still failed to provide sufficient evidence that all of the files are relevant to its three affirmative defenses: inconsistency with NCP, statute of limitations and divisibility/apportionment.

In this regard, the Court notes the paucity of legal support cited by PPPI in the sections of its briefs addressing the relevancy of the files sought to its affirmative defenses. Indeed, the only legal citations contained in Section B of PPPI's opening brief, which is entitled "The CH2M Hill Documents Sought By PPPI Are Clearly Relevant," concern the general legal standard of relevancy. PPPI does not cite to a single case, statute, rule or other law to support its arguments that the files belonging to the nine CH2M Hill employees are, in fact, relevant to its affirmative defenses. To be clear, PPPI's entire analysis in its opening brief regarding how the CH2M Hill employee files are [*24] relevant to its inconsistency with NCP, statute of limitations and divisibility/apportionment defenses is devoid of any legal support. PPPI does not attempt to analogize its current requests for information to other cases in which courts have found similar information to be relevant; nor does PPPI support its conclusions, such as the following with any legal citation (*see generally* PPPI Br. at 6-11): "[u]nderstanding these aspects [i.e. the nature of the remedial work selected and the bases therefore] of the EPA approach to the Site are clearly part of a showing of inconsistency with NCP to preclude cost recovery under CERCL" (*Id.* at 7) or "[i]n any case, reliance on the administrative record does not translate into a limitation of discovery to just that collection of documents." (PPPI Reply Br. at 7). [3]

The lack of legal support provided by PPPI raises serious questions [*26] regarding whether PPPI would have been

---

[3]  While the Court is generally troubled by the dearth of legal support provided by PPPI, the Court is particularly concerned with the second unsupported conclusion identified above. PPPI's conclusory statement that "reliance on the administrative record does not translate into a limitation of discovery to just that collection of documents" (PPPI Reply Br. at 7) is especially troubling [*25] in light

2012 U.S. Dist. LEXIS 114255, *26

successful in obtaining the requested discovery if the Court had granted its request for reconsideration. Again, the Court does not ultimately decide that question in light of its decision denying PPPI's motion for reconsideration. Nevertheless, the Court simply notes that it is not abundantly clear that PPPI would have succeeded even if its motion for reconsideration had been granted.

On a different note, the Court points out that in the March 12, 2012 Letter Order, It determined that D. Zmudzin's files were relevant to PPPI's apportionment/divisibility defense and that it would not be unduly burdensome for the United States to produce same. The Court finds no reason to alter this determination. As a result, the United States is again directed to produce all of D. Zmudzin's files related to the development of depictions of plumes of hazardous material released at the Pohatcong Site and potential source areas other than the Washington plant. Further, as previously directed, to the extent the United States has already produced

said files, then it is instructed to specify the Bates Numbers of the documents corresponding to same. The United States [*27] shall make this production no later than **September 28, 2012.**

### III. Conclusion

For the reasons stated above, PPPI's motion for reconsideration is DENIED. An appropriate Order follows.

Dated: August 14, 2012

/s/ Tonianne J. Bongiovanni

**TONIANNE J. BONGIOVANNI**

**UNITED STATES MAGISTRATE JUDGE**

---

of the legislative history surrounding the Superfund Amendment and Reauthorization Action of 1986 (the "SARA Amendments"), which added Section 113(j) to CERCLA, 42 U.S.C. §9613(j). As the House Report on the SARA Amendments indicates:

> Reliance on an administrative record helps assure that the basis for the response decision is clearly articulated and open to scrutiny by the public and responsible parties. It also encourages full responsible party and public participation in development of the record before the remedy is selected. Moreover, limiting judicial review of response actions to the administrative record expedites the process of review, **avoids the need for time-consuming and burdensome discovery**, reduces litigation costs, and ensures that the reviewing court's attention is focused on the . . . criteria used in selecting the response.

H.R. Rep. No. 99-253, 99th Cong., 2d Sess. 81, *reprinted in* 1986 U.S. Code Cong. & Ad. News 2835, 2863. Given this legislative history, the Court would have expected PPPI to have provided some support for the notion that discovery is not limited to the administrative record.