

No. 15-4045

RECEIVED
AUG 2 6 2016
U.S.C.A. 3rd. CIR

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

STEVEN DURST, ET AL.,

*Plaintiffs-Appellants,*

v.

MATTHEW DURST, ET AL.,

*Defendants-Appelles.*

### On Appeal From The United States District Court
### For The District of New Jersey

### REPLY BRIEF OF PRO SE PLAINTIFFS/APPELLANTS STEVEN DURST AND REUBEN DURST

Steven Durst
23 Oakwood Drive
Medford, NJ  08055

## I. DID DEFENDANT TRUSTEE MATTHEW DURST HAVE THE AUTHORITY TO SETTLE THE REFERENCED LITIGATION ON OCTOBER 4, 2011

It has been Mr. Yacovelle's oft stated opinion that what he did was based on the following letter drafted by Kelley Peck, Esq. on December 29, 2006.

> *This letter will serve as authorization for you to perform all <u>ministerial tasks</u> associated with the investment and management of the Jake Ball Trust, as well as all distribution decisions that are within my power to delegate. If at any time you require my input or assistance, please let me know. Also, if there are <u>matters outside the scope of this delegation</u> that require my attention or approval, please advise me accordingly. By this letter I am expressly approving all acts and omission by you <u>within the scope of this delegation of authority.</u>* Emphasis Added. (Exhibit A)

The Court should note the specific mention of Matt's authority being agreed to by Steven Durst grantor and Dr. Mike Durst (co-Trustee) for "ministerial duties" that specifically suggests Matt reach out for assistance if any Trust matters are beyond the scope of his expertise.

When Matt Durst was deposed on April 28, 2015 he answered as to his expertise on real estate finance and valuation and development – that he had no knowledge of these subjects at all – zero. (Exhibit B)

*Q. And do you have any training, formal training in financial matters?*
*A. No.*
*Q. Do you have any training in real estate matters?*
*A. He's the expert. [Pointing to Plaintiff Steven Durst] I'm not the expert. The answer is no.*
*Q. I asked you did you have any training?*
*A. The answer is no.*
*Q. Do you have any training or any training with regard to doing appraisals of property?*
*A. No.*
*Q. Okay. Do you have any experience with appraisals?*
*A. No.*
*Q. I saw the list of stock you invested in. Are there other real estate that you have invested in?*
*A. That I've invested in personally? Clarify the question.*
*Q. That you personally.*
*A. No.*
*Q. You indicated you had no training in real estate appraisals. Do you know the criteria that's used by an appraiser to value real estate?*
*A. No.*
*Q. Do you know how to evaluate the value of a commercial property?*
*A. No*

Defendant Matt in fact, volunteered that Plaintiff Steven Durst was the real estate expert in our Trust – not he. Does this not suggest a failure by Peck to exercise a duty of care as to Matt's

authority. On (October 4, 2011) Yacovelle insists Matt Durst had the authority to negotiate and resolve a multimillion dollar multi faceted and complex real estate matter – and yet 3 years later in his deposition Matt asserts he knows nothing about the subject of the settlement.

Further undermining the duty of care not exercised by attorneys Peck and Yacovelle is an email from Matt Durst to former adversary Bruce Goodman stating (Exhibit C)

*Since I am the person who will be making whatever decision is made, I am emphasizing the importance of your directing all further correspondence in this case with my attorney, Mr. Yacovelle, through your attorney, Mr. Hladik. This is much too important to the Trust for me to be discussing it with an expert such as yourself, which leaves me at a clear disadvantage in a complicated situation.*

The delegation of authority for ministerial tasks was authored when the Trust was revocable and Plaintiff Steven could have countered any decision made by either Trustee. This authority - nominal as it was – was never extended to accompany the Trust agreement after it was amended to be irrevocable on December 21, 2007. Quite simply, it doesn't exist – and all of the Defendants know it. Nor does it appear anywhere in the body of the irrevocable Trust agreement.

Clearly, Matt did not have the authority to make a major decision such as the conveyance of the Trust Major Asset. Defendant Matt relied upon the Exhibit A letter giving him limited authority. That limited authority clearly expired when the Trust was converted from revocable to irrevocable.

In addition, the State Court relied upon Trust language that allowed a third party (Goodman) to rely upon a representation of a Trustee. The State Court upheld Defendant Matt's action as to Goodman. The State Court did not, however, rule on Matt's authority with respect to the other Trustee or the beneficiaries. That issue has never been litigated. The trial court in this matter deprived the Trust, the Trustees and the beneficiaries of their day in Court.

Yacovelle has conveniently failed to mention to this Court that after being retained by the Trust to set aside the loss of the Trust's key asset (its 10% interest in the Union Lake Crossing Shopping Center) he filed a complaint for Declaratory Judgment (Exhibit D) in August of 2010 and when Bruce Goodman and I reached an accord on May 19, 2011 it was on basically the terms: (Exhibit E)

1.    Yacovelle sought in his motion

2.    Both Trustee Mike Durst and Plaintiff Steven Durst found to be favorable.

*I will agree to amend our Operating Agreement to delay the buy-out opportunity for ten years. This should allow the property to further mature and to pay down additional debt, and over the next ten years the net value as defined in the Operating Agreement should be much greater than it is today. (Exhibit E)*

2

Yacovelle and his client killed the deal – proudly admitting so (Exhibit F) only to agree on a deal 5 months later vastly inferior in October 2011 the difference readily ascertainable in dollars in the range of 3.5 million, a deal not only 5 months later but about 1/10 the value of the deal they killed in May 2011 to avoid exposing Peck, Robinson and Cole and the appraiser.

> *I have rejected the Hladik proposal that we simply modify the termination buyout*
> *and kick it down the road for up to 10 years.* (Exhibit F)

Yacovelle would have this Court believe that the Plaintiffs may not object to the "fairness" of the settlement he and Matt Durst crafted. His argument is seriously flawed. If for example, Plaintiff bought a piece of land for $100,000 and 30 days later received two offers – one for $200,000 the other for $500,000 – it would be argued by Yacovelle that doubling your money in 30 days was a more than fair accomplishment. But if he as an attorney – or a broker (with a duty to present all offers as this court knows) did not carry out his fiduciary duty to his client – the Trust – then he is clearly liable for the difference between the 2 offers. Worse yet, the Goodman settlement offer I negotiated came months before the October 11 settlement which was one tenth the value of the May 19, 2011 offer Plaintiff and Bruce Goodman negotiated.

The reasons why are spelled out in my motion for reconsideration which I attach largely intact as (Exhibit G ). It is common knowledge that major corporations engage in M&A activities where the various initial offers may be fair – but the clear duty to the stockholder is to get the best deal for them. Not only was the deal Goodman and I crafted superior, it preceded the deal Yacovelle took after he unilaterally killed the better deal (by 5 months).

## II. THE COURT ER RED IN DENYING THE MOTION FOR RECONSIDERTION.

It is interesting to note that Defendants cannot and do not deny that they lied to their own client. Kelly Peck, Robinson & Cole and John Yacovelle all advanced the falsehood concerning the Parker Benjamin appraisal. Specifically, Peck, Yacovelle and Robinson & Cole prior to this litigation took the following position:

1.    That the Trust conversion from revocable to irrevocable took place in December, 2007.

2.    At the time of the conversion aforesaid, Peck and Robinson and Cole had no knowledge of the appraisal valuation by Parker Benjamin.

3.    That they first became aware of the Parker Benjamin appraisal in May of the next year; and

4.    They could not have relied upon the appraisal to convert the Trust from revocable to irrevocable, since they alleged that they did not have said appraisal.

3

Clearly, as articulated by John Yacovelle, Parker Benjamin was negligent in the preparation of his appraisal. He was negligent because he failed to understand the devastating impact of Paragraph 7.04 of the operating agreement for the Millville property. If the Trust had relied upon his appraisal to do the conversion, then Parker Benjamin would have been liable for damages.

The same holds true for Kelly Peck and Robinson and Cole. If they knew about the provisions of the operating agreement, they further knew that Parker Benjamin failed to account for it, they too are negligent.

As such, Robinson & Cole was granted summary judgment based upon the fact that they could not be liable because they did not rely upon the Parker Benjamin appraisal.

At the Robinson & Cole summary judgment motion, Plaintiffs argued that they needed to complete discovery in order to flush out the truth. The District Court erroneously failed to allow discovery to be completed.

When the discovery was completed, however, Kelly Peck confirmed that she, in fact, knew the appraisal at the time of the conversion. As such, both she, Parker Benjamin, and Robinson & Cole were negligent in their failure to take into account the impact of the operating agreement, specifically Paragraph 7.04 of the Operating Agreement.

Clearly, therefore, the summary judgment motion should never have been granted.

Defendants do not deny their lies. They do not deny that they mislead their own client. Instead, they rely on procedural niceties of the time constraints from making motions for reconsideration (according to the defendants, we should have made the motion for reconsideration well before the deposition of Kelly Peck, wherein she confirmed her lie).

The motion for reconsideration, therefore, has to be viewed under the spotlight of the facts related above.

A motion for reconsideration should only be granted if the moving party shows:

      1.     An intervening change in the controlling law.

      2.     The existence of the evidence previously unavailable, or

      3.     The need to correct the clear error or to prevent manifest injustice.

North River Ins. Co. v. CIGNA re: Insurance Co. 52 F3d. 1194, 1218(3rd Cir.1995).

In Alvarez v. QPI Multipress, Inc. 2007 U.S. Dist. LEXIS 48588 (N.D.N.Y.July 5, 2007) the plaintiff sought reconsideration of a summary judgement motion granted to defendant manufacturer. In furtherance of the motion for reconsideration, the plaintiff cited that there had

been a clerical oversight (one page of the expert's affidavit had been inadvertently omitted from the plaintiff's opposition papers).

On this basis, the court granted the motion for reconsideration.

Compare the simple clerical error of a missing page being the basis for reconsideration as opposed to the case at bar wherein defendants lied to their own client, in order to protect a malpractice claim against themselves. They continued the lie in their motion for summary judgment. They do not deny the lie, however, they seek to reap the benefits of the misrepresentation because of procedural niceties.

A clear manifest injustice has occurred and these lawyer/defendants should not be allowed to go scott-free.

Federal Rule 54(b) is the closest thing to a federal rule on a motion for reconsideration. Said rule provides:

> Any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is *subject to revision **at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties. (Emphasis added).***

The defendants, however, cite a local third circuit rule that contradicts the federal rule. Specifically, the local rule requires that the motion be made 14 days after entry of the order.

What defendants cannot do, however, is use the 14 day rule to eradicate a clear manifest injustice. What defendants should not be allowed to do is to hide behind a local rule to benefit from their lies and misrepresentations to their own client.

Reliance upon the 14 day local Third Circuit Rule was also misplaced because the Court had already entered a scheduling order dated April 10, 2015 (Exhibit N). Paragraph 4 of said Order required dispositive motions by August 14, 2015. Plaintiff's Motion for Reconsideration was filed several days before that on August 10, 2015.

Defendants also cannot and do not cite any prejudice attributed to the alleged delay in the filing of the Reconsideration Motion.

The only prejudice in this case is to Plaintiffs who were lied to by officers of the Court who now seek ratification from the Federal courts to condone their unethical behavior.

The Motion for Reconsideration clearly establishes the reasons why Yacovelle and Trustee Matt Durst acted as they did and in so doing clearly betrayed the fiduciary duty each had to provide the Trust with its best opportunity – not merely one that they hand crafted to buttress their illicit efforts to protect Peck, Robinson and Cole and Ed Heath. The 3 attorneys and the firm all knew

the appraisal was done and in Peck's (Exhibit I) control prior to the settlement converting the Trust to an irrevocable Trust. While we had circumstantial evidence (Exhibit I 1-8) it was the admission under oath by Peck during her deposition that she had the appraisal 6 months prior to the May 2008 date Yacovelle and Matt Durst have sworn it was received.

> *In any event, the appraisal speaks of value as of 12/31/2007 and assigns the sum of $841,000.* (Exhibit J)

> *Q. Okay, to make it clear, you had the information from Parker Benjamin at or about the tie that 8(A) was executed that the valuation was $841,000. Is that fair to say?*
> *A. I believe – your question is whether I had the information that the value was 841 at around the time when it was executed, and the answer to that question is yes.*

> *Q. Did there come a time when you had a conversation with Matt, Steve or Mr. Yacovelle concerning a potential claim against Parker Benjamin?*
> *A. Yes, there was Matt – Matt did tell me that Steve wanted to sue Parker Benjamin.*

> *Q. Do you recall having a conversation with Mr. Heath and Mr. Yacovelle concerning the potential claim against Parker Benjamin?*
> *A. I don't specifically recall a conversation with Ed and John Yacovelle. I only recall a conversation with Matt. But that doesn't mean it didn't happen. I just don't recall it.*

Not only did Yacovelle put this lie in writing but he accused attorney Vincent D'Elia and Plaintiff Steven Durst of altering the appraisal value and suggest we be sanctioned – knowing all the while that he was not only lying but orchestrating the entire bogus stories to insulate Peck and Robinson and Cole from a certain counter claim by the appraiser. (Exhibit K)

> *Defendant objects to receipt or consideration by the Court of Exhibit P attached to Plaintiff's brief on the ground that the first page of this exhibit has been altered and its submission amounts to fraud upon the defense and upon the court.*
> (Exhibit K)

It is freely admitted (for the first time) by Peck in her deposition that I wanted the Trust to sue the appraiser. That is when she elicited the help of attorney Heath of her firm to give his (Exhibit K) preordained view that there would be no sense suing the appraiser since the appraisal wasn't done until after the conversion of the Trust to irrevocable and as a consequence there could be no proximate cause of damages.

Yacovelle in his letter of (Exhibit M) stated, "I agree with that conclusion completely." Of course he did – he authored the fairy tale.

*Regardless of where it came from, the agreement was finalized in December*
*2007, several months before the draft appraisal let alone the final appraisal.*
*Therefore, you could not have relied on the appraisal valuation of $841K in the*
*agreement with Steve. In other words, the damages on this theory were clearly*
*not proximately caused by the appraiser's assumed negligence. I agree with that*
*conclusion completely.* (Exhibit M)

As Yacovelle point out in (Exhibit M) the appraiser is clearly negligent, "He [appraiser] had clearly been negligent – he simply missed it or ignored it" [clause 7:04] (but neglecting to note that so is attorney Peck and her firm Robinson and Cole). And then in a show of herculean arrogance – leads Peck, Robinson & Cole, Matt Durst, Ed Heath and both state and Federal court judges through a well articulated and artfully concealed litany of moves that belie his considerable legal acumen.

1. The cover up above
2. Protective order to prevent he deposition of Matt Durst
3. Change of venue (state to federal) to further delay the depositions of Matt and Peck
4. A series of motions for summary judgment to divert my efforts to get to the truth.
If it is the position of Yacovelle, Heath, Robinson and Cole and Matt Durst that what neutered any claim for damages was the concocted story by all of the above that the appraisal came after the December 21, 2007 settlement – then on April 2015 – Peck under oath stated "she had it." (Exhibit K)  It must be true by their collective reasoning that damages do flow since the appraisal was clearly in their hands prior to the closing – and utilized.

## III. THE DEFENDANTS CANNOT PREVAIL ON THEIR PROCEDURAL ARGUMENTS

This Court should note that all of the staggering array of briefs and citations and exhibits – attack the Plaintiff's case.
"Procedurally" – not Factually.

   So after all of the moves, motions, rulings and attacks on my counsel – on our integrity – on our ability – this very experienced (55 years) and intelligent attorney (Yacovelle) levels one assault after another on his view of what we should have done and when we should have done it – despite his neverending efforts to prevent the testimony under oath of Matt Durst and Peck on April 28, 29 2015. Less than 4 months later we filed our motion for reconsideration of the 4 orders that were based on a foundation of a colossal lie and subsequent cover up as described above and within the Court's deadline of August 2015. (Exhibit N)

   In a matter that has seen the Trust and me expend $580,000 to the litany of attorneys who have had a field day attacking my attorney, me and one another, we are hopefully down to a single issue.
Somebody is telling the truth.
Somebody ain't.

We will hopefully be before this court in a matter of weeks or months. I challenge Yacovelle or any of the attorneys representing the various Defendants to deny the facts as presented here.

And since I doubt they can or will – while under oath – Plaintiffs ask this Court to sweep aside their well articulated and overstated reliance on our procedural infirmities – and act to prevent this group of Defendants from bartering away years of work and hundreds of thousands of hard earned money – and my kids security to declare their actions a miscarriage of justice and resurrect my case.

## CONCLUSION

For all of the above reasons, it is respectfully submitted that this Court should remand this matter to the trial court for a full plenary trial. More specifically, the Court should reverse the summary judgments in favor of all defendants, allow Plaintiffs to amend their complaint to include claims against John Yacovelle and Parker Benjamin and such other relief as the Court deems necessary.

Respectively submitted,

By: _____

Steven Durst (Pro Se)

August 26, 2016

By: _____

Reuben Durst (Pro Se)

8

## EXHIBITS

A. December 29, 2006 letter delegating "ministerial duties" to Matthew Durst

B. Deposition of Matt Durst, Page 146, Lines 20-25, Page 147 Lines 1-20

C. Email from Matthew Durst to Bruce Goodman

D. Motion for Declaratory Judgment and filed by John Yacovelle

E. May 19, 2011 letter Bruce Goodman to Plaintiff regarding settlement.

F. January 2, 2012 wherein John Yacovelle admits killing settlement offer.

G. Plaintiff's Motion for Reconsideration

H. Attorney Peck's Deposition, Page 42, Lines 17-20

I. Various Emails Regarding the Conversion of Trust from Revocable to Irrevocable

J. Yacovelle letter to Matthew Durst regarding when they had appraisal.

K. Yacovelle letter to Superior Court accusing Attorney D'Elia and Plaintiff of fraud (altering the appraised value)

L. Peck Deposition, Page 43, Lines 22, 23 admitting Plaintiff had suggested suing appraiser

M. Yacovelle letter to Matthew Durst agrees with Attorney Heath they did not have appraisal at 2007 closing, therefore no proximate damages.

N. Amended Scheduling Order dated April 10, 2015

We will hopefully be before this court in a matter of weeks or months. I challenge Yacovelle or any of the attorneys representing the various Defendants to deny the facts as presented here.

And since I doubt they can or will – while under oath – Plaintiffs ask this Court to sweep aside their well articulated and overstated reliance on our procedural infirmities – and act to prevent this group of Defendants from bartering away years of work and hundreds of thousands of hard earned money – and my kids security to declare their actions a miscarriage of justice and resurrect my case.

## CONCLUSION

For all of the above reasons, it is respectfully submitted that this Court should remand this matter to the trial court for a full plenary trial. More specifically, the Court should reverse the summary judgments in favor of all defendants, allow Plaintiffs to amend their complaint to include claims against John Yacovelle and Parker Benjamin and such other relief as the Court deems necessary.

Respectively submitted,

By: _____
Steven Durst (Pro Se)

August 26, 2016                    By: _____
Reuben Durst (Pro Se)

8

## EXHIBITS

A. December 29, 2006 letter delegating "ministerial duties" to Matthew Durst

B. Deposition of Matt Durst, Page 146, Lines 20-25, Page 147 Lines 1-20

C. Email from Matthew Durst to Bruce Goodman

D. Motion for Declaratory Judgment and filed by John Yacovelle

E. May 19, 2011 letter Bruce Goodman to Plaintiff regarding settlement.

F. January 2, 2012 wherein John Yacovelle admits killing settlement offer.

G. Plaintiff's Motion for Reconsideration

H. Attorney Peck's Deposition, Page 42, Lines 17-20

I. 1-8  Various E mails RE: DEC.2007 CONVERSION
      of Trust To Irrevocable

J. Yacovelle letter to Matthew Durst regarding when they had appraisal.

K. Yacovelle letter to Superior Court accusing Attorney D'Elia and Plaintiff of fraud (altering
   the appraised value)

L. Peck Deposition, Page 43, Lines 22,23 admitting Plaintiff had suggested suing appraiser

M. Yacovelle letter to Matthew Durst agrees with Attorney Heath they did not have appraisal at
   2007 closing, therefore no proximate damages.

N. Scheduling Order Dated April 10, 2015

A

December 29, 2006

Mr. Matthew Durst
Co-Trustee
Jake Ball Trust
20 Woodcliff Drive
Simsbury, CT 06070

     Re:   Jake Ball Trust Administration

Dear Matt:

This letter will serve as authorization for you to perform all ministerial tasks associated with the investment and management of the Jake Ball Trust, as well as all distribution decisions, that are within my power to delegate. If at any time you require my input or assistance, please let me know. Also, if there are matters outside the scope of this delegations that require my attention or approval, please advise me accordingly. By this letter I am expressly approving all acts and omission by you within the scope of this delegation of authority.

Sincerely,

Mike Durst, co-Trustee

cc:    Steve Durst

930539v 1

E

Page 145

1  which I guess is your words the thread sent from Steve
2  to John Yacovelle, Saturday, May 14th, 2011 at 9:24
3  p.m. Subject, I got Bruce Leff SREA SRA, same as the
4  immortal Wes, working on a proper cap rate for
5  2005-2006. I anticipate a 6.5 percent to 7 percent
6  rate worst case. The center is 90 percent national
7  credit tenants on long term leases and therefore is
8  according to Leff investment grade. Will you e-mail
9  the cover letter from Hoffman to Matt advising him to
10 sign five blank pages on Monday from Fred's office.
11 SD.
12          MR. YACOVELLE: You added a you which
13 there wasn't.
14          THE WITNESS: Will e-mail, I'm sorry.
15 Let me clarify. Will e-mail you the cover letter from
16 Hoffman to Matt advising him to sign five blank
17 signature pages on Monday from Fred's office. SD.
18     Q.    Now, you understand that Mr. Yacovelle's
19 e-mail to you and Steve is talking about the effect of
20 the 7.04 provision of the operating agreement, correct?
21     A.    I just understood that he sent me an e-mail.
22 In terms of -- I'm looking. I don't understand cap
23 rate. Can you clarify the question for me?
24     Q.    My question is did you understand that he
25 was referring to the effect of 7.04 in the operating

Page 146

1  agreement?
2     A.    He was talking about a cap rate in here. If
3  it had to do with the 7.04 then that's what it had to
4  do with.
5     Q.    But you don't have any recollection?
6     A.    In terms of recollection of what, the
7  e-mail?
8     Q.    That it had something to do with 7.04.
9     A.    It's an e-mail that says cap rates. It's
10 got a few curse words in it. Valuation formula someone
11 by the name of Bruce Leff is working on the property
12 cap rate for 2005 and 6. And this is an e-mail from
13 2011. It mentions the center 90 percent national
14 credit tenants on long term leases and something of an
15 e-mail from Hoffman to me advising him to sign five
16 blank pages on Monday.
17     Q.    Okay. You had testified when you were
18 examined by one of the other attorneys about the amount
19 of research and the time you spent researching the
20 stock. Do you recall that testimony?
21     A.    I do.
22     Q.    And do you have any training, formal
23 training in financial matters?
24     A.    No.
25     Q.    Do you have any training in real estate

Page 147

1  matters?
2     A.    He's the expert. I'm not the expert. The
3  answer is no.
4     Q.    I asked you did you have any training?
5     A.    The answer is no.
6     Q.    Okay.
7     A.    The second time.
8     Q.    Do you have any training or any training
9  with regard to doing appraisals of property?
10    A.    No.
11    Q.    Okay. Do you have any experience with
12 appraisals?
13    A.    No.
14    Q.    I saw the list of stock you invested in.
15 Are there other real estate that you have invested in?
16    A.    That I've invested in personally? Clarify
17 the question.
18    Q.    That you personally.
19    A.    No.
20    Q.    And other than the real estate we talked
21 about as part of the Jake Ball Trust did you invest in
22 any other real estate items for the Jake Ball Trust?
23    A.    There was a house that Steve wanted
24 purchased for his daughter Erica down in Florida. And
25 I think we initially had put out $100,000. The market

Page 148

1  I believe tanked. The group of homes devalued
2  significantly and we ended up losing $50,000.
3     Q.    You indicated you had no training in real
4  estate appraisals. Do you know the criteria that's
5  used by an appraiser to value real estate?
6     A.    No.
7     Q.    Do you know how to evaluate the value of a
8  commercial property?
9     A.    No.
10         MR. D'ELIA: I'm done.
11    (The witness is excused and the deposition is
12 concluded at 3:55 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

C

**verizon**

Print

Subject **FW:**
From: **gmmbt <gmmbt@comcast.net>**
Sent: **Nov 26, 2010 05:09:48 AM**
To: **stevedurst@verizon.net**

This is what I sent to Bruce Goodman regarding 1600 Hunting Park.

I forwarded a copy to Mr. Yacovelle.

**From:** gmmbt [mailto:gmmbt@comcast.net]
**Sent:** Sunday, October 31, 2010 8:32 PM
**To:** 'John Yacovelle'
**Subject:**

Dear Bruce,

In your letter of October 29, you may have misinterpreted my non-response to your October 21 proposal outline as agreement with that proposal.

Your proposal is not acceptable.

**Whatever inference you have made or conveyed to other parties at this time are without merit.**

As it turns out, you must have come to the same conclusion and now propose another $400,000 in loans to make the deal possible.

Your new proposal is much too complicated for me to deal with as a Trustee would have to deal with it.

**Any further/correspondence must occur through your attorney Mr. Hladik who will need to convey information/proposals to the Trust's attorney, Mr. Yacovelle.**

I will seek advice on any proposed transaction from attorneys and accountants for the Trust so that I can make a decision as required by my fiduciary responsibilities.
Since I am the person who will be making whatever decision is made, **I am emphasizing the importance of your directing all further correspondence** in this case with my attorney, Mr. Yacovelle, through your attorney, Mr. Hladik.

This is much too important to the Trust for me to be discussing it with an expert such as yourself, which leaves me at a clear disadvantage in a complicated situation.

this case with my attorney, Mr. Yacovelle, through your attorney, Mr. Hladik. This is much too important to the trust for me to be discussing it with an expert such as yourself, which leaves me at a clear disadvantage in a complicated situation. Thank you.
Matt Durst


NOTE MATT: I have been working through the latest proposal and trying to see how it might end up in the event of a default. I'm not an expert in these deals, and these notes (attached) are very preliminary thoughts on my part, but you will see I have concerns which, as I said, require discussion with some knowledgeable people AFTER we know how he proposes to structure the loans, etc. Otherwise, my discussion would be largely a waste of time because of variables that would exist.
J.A.Y.

D

CUMBERLAND FINANCE
Batch # _900_
CA # _1108_
AMT $ _200.00_
Initials _ew_

Law Office, John A. Yacovelle
8438 Mackall Rd.
St. Leonard, MD 20685
888-819-3736
410-586-3344

SUPERIOR COURT
CUMBERLAND COUNTY
LAW DIVISION
AUG 12 2010
AUG 12 2010
REC'D & FILED
CIVIL CASE
MANAGEMENT OFFICE

---

**MATTHEW DURST, Trustee of the JAKE BALL TRUST,**

**Plaintiff,**

vs.

**GOODMILL, LLC, and BRUCE A. GOODMAN,**

**Defendants**

---

**Superior Court of New Jersey**
**Chancery Division, General**
**Equity,**
**Cumberland County**

**Civil Action** C 27 - 10

**Docket No.:**

**COMPLAINT FOR**
**DECLARATORY JUDGMENT**
**and EQUITABLE RELIEF**

---

Plaintiff, MATTHEW DURST, Trustee of the JAKE BALL Trust, residing at 20 Woodcliff Drive, Simsbury, Connecticut, by way of Complaint against the defendants, says:

1. Plaintiff is, and has been since November 29, 2004, Trustee of a certain Trust, the Jake Ball Trust, originally funded by Steven Durst, which became an irrevocable trust on or about December 24, 2007.

2. On or about November 15, 2005, plaintiff and others, including defendant Bruce A. Goodman, formed the defendant Goodmill, LLC, for the ultimate purpose of constructing, leasing and operating a shopping center in the City of Millville, County of Cumberland and State of New Jersey.

3. Upon execution of the Operating Agreement for Goodmill, LLC, the Jake Ball Trust became a Member of the LLC, and the owner of a 10% interest therein.

4. Defendant Goodmill, LLC proceeded to construct, lease and operate a shopping center known as Union Lake Crossing on lands located at N. 2nd St. in Millville, N.J.

5. On or about June 27, 2007, defendant Bruce Goodman, through his attorney, Peter Friedman, Esq., caused formation of an entity called 1600 GP LLC, which subsequently became the General Partner in a limited partnership entity called Zack &



1

Jack Realty; defendant Goodman owned a 99% interest in 1600 GP LLC and the plaintiff Jake Ball Trust owned a 1% interest.

6.  The limited partnership, Zack & Jack Realty, in turn, was owned 1% by the general partner, 1600 GP LLC, and 99% by the limited partner, the Jake Ball Trust.

7.  Within days of the formation of these entities, defendant Bruce Goodman loaned the sum of $1.2 million dollars to enable Zack & Jack Realty to purchase a certain property in North Philadelphia and the plaintiff Jake Ball Trust, the limited partner in Zack & Jack Realty, proceeded to guaranty repayment of the loan which, according to the documents, was finally due and payable on July 1, 2010, and is now allegedly in default.

8.  As part of the loan guaranty documentation, plaintiff executed, on behalf of the Jake Ball Trust, a series of documents drafted for his signature by Peter Friedman, Esq., attorney for the General Partner, including a "Surety Agreement" and a "Pledge of Membership Interest and Security Agreement", each of which is attached hereto and marked as "Exhibit A" and "Exhibit B", respectively.

9.  The "Surety Agreement", which included a Pennsylvania Confession of Judgment provision, purported to guaranty payment of the loan in the original amount of $1.2 million dollars, while the "Pledge of Membership Interests and Security Agreement" purported to secure the obligations undertaken in the Surety Agreement, and, as security therefore, pledged the entire 10% interest of the Jake Ball Trust in Goodmill, LLC.

10.  On or about August 14, 2007, Jeffrey Hoffmann, Esq., an associate of Peter Friedman, Esq., sent to the plaintiff email, via Kelley Peck, Esq., the Jake Ball Trust's Connecticut attorney, a document called "Assignment of Rights to Receive Distributions from Goodmill, LLC", along with a letter purporting to be from his client, defendant Bruce A Goodman, in which Goodman terminated the "Pledge Agreement dated June 29th, 2007" in consideration of the execution by plaintiff of the accompanying "Assignment of Rights to Receive Distributions", which the plaintiff did, in fact, execute. (Copies of the emails with the Goodman letter attachment and the Assignment attachment are attached to this Complaint as "Exhibit C").

11.  The effect of the aforesaid August 14 transaction was to replace plaintiff's pledge of the 10% Trust interest in Goodmill LLC with an assignment, not of plaintiff's interest, but of plaintiff's right to <u>distributions</u> from Goodmill in the event of a default on the loan to Zack & Jack Realty.

12.  On or about July 7, 2010, defendant Goodman, acting through yet another attorney, one Gregory Fox, Esq., issued two Notices to plaintiff; the first was a "Default Notice", ("Exhibit D" attached) alleging that the original note had an unpaid balance and that plaintiff was in default of its obligations under the Surety Agreement; and the second was a **<u>NOTICE OF ASSUMPTION OF MEMBERSHIP INTERESTS</u>** ("Exhibit E" attached). In which it is announced that defendant Goodman has "assumed all rights to the [10% Goodmill] membership interests" and that he "may elect to sell the interests".

2

13. Although dated July 7, plaintiff received these notices on or about July 18, 2010, and sent them to counsel who promptly, on July 20, (letter attached as "Exhibit F") called to Mr. Fox's attention the fact that he was proceeding on the basis of a Pledge Agreement that had been terminated by his client back on August 14, 2007 and requested that Mr. Fox, without delay, rescind the Notice of Assumption of Membership Interests.

14. The Notice of Assumption of Membership Interests has not been rescinded, and plaintiff is concerned Goodman will take additional steps based upon his mistaken notion that he now owns the 10% Goodmill interest actually owned by the Jake Ball Trust.

**WHEREFORE,** plaintiff demands judgment:

(a) Declaring and adjudging that the Jake Ball Trust is still a Member of Goodmill, LLC, and the owner of a 10% interest therein, entitled to all of the rights relating to that ownership; and

(b) Declaring and adjudging that the purported "Notice of Assumption of Membership Interests" dated July 7, 2010, is of no force and effect; and

(c) Permanently enjoining defendants from taking any steps based upon the aforesaid purported "Assumption"; and

(d) For such further relief as may be appropriate in the circumstances; and

(e) For costs of suit.

Dated: August 9, 2010

Law Office, John A. Yacovelle

By: _____
John A. Yacovelle
Attorney for Plaintiff

## CERTIFICATIONS

As required by Rule 4:5-(b)(3) and Rule 1:38-7(c), I Certify that the documents attached contain no confidential personal identifiers and that should any subsequently submitted documents contain such confidential personal identifiers, they will be redacted.

NOTICE OF OTHER ACTIONS: As required by Rule 4:5-1(b)(2), I Certify that there is a related action pending in the Commonwealth of Pennsylvania, captioned Bruce A. Goodman vs. Matthew Durst, Trustee of the Jake Ball Trust, in the Court of Common Pleas of Montgomery County, docket No. 2010-21864, in which the plaintiff Goodman, defendant herein, is attempting to obtain a judgment by confession on the loan referred to in paragraph 7 of this Complaint, based in part upon documents referred to in paragraphs 8 and 9 of the Complaint. If and when that judgment is entered, it will be the subject of a motion to strike or vacate, according to Pennsylvania procedure, upon, *inter alia,* jurisdictional grounds, irregularities in the documents and certain signatures, and an

3

alleged breach of fiduciary responsibilities by the General Partner (controlled by defendant Goodman herein) of the borrower, Zack & Jack Realty, and the attorney for the General Partner and for the limited partnership. This Pennsylvania action does <u>not</u> involve any issue concerning whether or not the Jake Ball Trust is a Member with a 10% interest in Goodmill, LLC.

John A. Yacovelle

E

**Goodman**Properties

636 OLD YORK ROAD, JENKINTOWN, PA 19046

VIA: E-MAIL: stevedurst@verizon.net

May 19, 2011

Re:     **Response to May 18, 2011 offer**

Steve:

The following terms are elements of settlement negotiations – are confidential and as such are inadmissible as evidence in a court of law or legal proceedings.

In response to your latest offer May 18, 2011, I offer the following:

1) Hunting Park: Agreed. However, it must be clear that any and all deficiencies from a sale must be made up by the Trust. Millville can be the source of the repayment of the deficiency out of either cash flow, a sale or a refinance. The deficiency shall bear interest at a rate of 5%.

2) Union Lake Crossing: It is anticipated that over the next five years we will be refinancing the property and hopefully be out of harm's way with our lenders for another ten years. The phantom income will not kick in for many years. The buy-out that you are referring too cannot be an obligation on my part; rather, I will agree to amend our Operating Agreement to delay the buy-out opportunity for ten years. This should allow the property to further mature and to pay down additional debt, and over the next ten years the net value as defined in the Operating Agreement should be much greater than it is today. However, I am not obligated to buy it at that time. It is my option.

3) The Reserve: Notwithstanding the fact that your facts are off, we can figure out collectively the best course of action in order to modify the Master Plan improvements.

4) Agreed as too Bottino. However, as I have expressed to you earlier, we do not want to get involved with solar for Common Area Electric. However, we will consider granting you an easement for the Common Area Electric provided that none of our rooftops are used and we are not obligated to contribute any of our tenants' Common Area Electric reimbursements (i.e. your deal must work based purely on SRECS and tax benefits alone).

5) Agreed.

6) Agreed.

7) N/A: If we are finalizing this agreement it gets finalized by Friday, May 27, 2011. We both have legal teams who can do that.

Sincerely,

GOODMAN PROPERTIES

Bruce A. Goodman

BAG/bt





F

LAW OFFICE

## JOHN A. YACOVELLE

8438 MACKALL ROAD
ST. LEONARD, MD 20685
PHONE OR FAX 1-888-819-3736
EMAIL: yacovelle@hughes.net

MEMBER MARYLAND, NEW JERSEY
& DISTRICT OF COLUMBIA BARS

January 2, 2012

The Honorable Anne McDonnell, J.S.C.
1 North Broad Street
Woodbury, NJ 08096

### Re: Durst v. Goodman, Docket No. C-27-10

### <u>LETTER BRIEF</u>

Dear Judge McDonnell:

Please accept this Letter Brief in response to the various Motions set down before Your Honor on January 6, 2012.

I represent the plaintiff, Matthew Durst, Trustee of the Jake Ball Trust. The defendants are represented by Stephen Hladik, Esq. and David Onorato, Esq. (*pro hac vice*). Vincent D'Elia, Esq., represents Steven Durst, grantor of the irrevocable Trust and Reuben "Mike" Durst a Trustee of the Trust who after several years of doing nothing for the Trust has risen to object to the settlement of the above-captioned matter. The motions before the court are these: a motion to enforce the settlement entered on the record on October 4, 2011 and a motion to disqualify Mr. D'Elia as counsel (both by Mr. Hladik); and motions by Mr. D'Elia to set aside the settlement; reopen the case and allow it to proceed to trial; and to allow the intervention of both Steve and "Mike" Durst in the matter.

It would seem that the threshold issue is the disqualification motion, since if it is granted, the proposed interveners would need to obtain other counsel to represent their interests. On the **<u>disqualification</u>** motion, I have no position, either factual

1

provision, he claimed he had never read the Agreement and, basically, that the buy-out had been slipped past him. On the other hand, 3 ostensibly reputable witnesses were prepared to testify that Steve knew of the provision and had actually negotiated changes in the formula. That is the case which we came to Woodbury on October 3 prepared to try. We were also prepared to settle that case. Many discussions with defense counsel over the previous months involved a modification to Sec. 7.04 which would, for instance, make the option non-exercisable for an extended period such as 10 years, during which time the formula would presumably lead to a positive buyout number were the option to be exercised. We were well-motivated to settle, because the clause was written in plain English, Steve was known to be a sophisticated real estate person, and the 3 adverse witnesses were not easily dismissed. All in all, we were confronted with an uphill battle.

What was the **value** of the Trust interest in Goodmill as of October, 2011? On December 21, 2007, in an Agreement leading to the Trust becoming irrevocable, Steve Durst declared that the 10% interest was worth $600,000 "as per the attached appraisal", though there was none attached. (JAYCert par.9)

Later on, as we are told over and over in the moving papers, Paul Ruby of Parker Benjamin, Inc. of Farmington, CT, issued an appraisal dated May 19, 2008, valuing the 10% Goodmill interest at $841,000. Here is what we have not been told in the moving papers about that appraisal. At the repeated insistence and demand of Steve Durst, Matt (and I) explored the feasibility of a malpractice suit against the appraiser. He had obviously been negligent, since the appraisal indicated that he had seen the Operating Agreement, but nowhere did he flag Section 7.04 and either attempt to explain it away, or discount his appraisal because of it. He simply missed it or ignored it. Connecticut trial counsel, however, pointed out that no damages had been proximately caused by the negligence, because the appraisal was issued after the Operating Agreement had been signed (Nov. 2005) and after the Trust had issued a $500,000 note to Steve on December 24, 2007, (based on Steve's $600,000 valuation) and the appraisal influenced neither action because it did not yet exist. (JAYCert par .10) The suit, therefore, was not filed, but those most closely involved with the case knew better than to put stock in the $841,000 number, and that definitely includes Steve Durst, notwithstanding paragraph 7 of his Certification. And while we are looking at that paragraph, my reading of the report and the website of Paul Ruby have turned up no indication that he is an "MAI" or that his work product is an "MAI Appraisal" as claimed by Steve. Typically, Members of the American Institute of Real Estate Appraisers to not hide that fact; rather, they trumpet it. In

G

I make this certification in support of my motion for reconsideration to include John Yacovelle as a defendant in terms of malpractice for a multitude of breaches of fiduciary duty and then ultimately repeatedly lying throughout this case and endeavoring to cover up the lies by doubling down on them with repeated false statements on various documents permeating this case from the fall of 2011 – to this day. The proofs that follow will not be of the "he said, she said" variety but a litany of lies and misstatements that have now been dragged out into the light of day by the recently concluded depositions of Matthew Durst and trust attorney Kelley Peck.

Like anyone with a modicum of sanity it was my goal to settle the trust dispute with Bruce Goodman. Goodman was well represented, is exceptionally bright and extremely wealthy, a formidable array.

Accordingly in 2011, I was able to

I.     Settle my own litigation with Goodman  Ex A
II.    Elicit from him a significant reversal in his position on clause 7:04 in the Goodmill Operating Agreement that would have allowed the trust to maintain its 10% ownership in the Union Lake Crossing shopping center – and pay off any deficiency emanating from the sale of the 1600 building in Philadelphia that Goodman held a mortgage on by applying our share of distributions from the center's cash flow.


Furthermore, the trust would have been accruing 10% of the 3.0 million in principal debt being amortized each year – enough to pay off the deficiency in 1-2 years. By now our equity would conservatively by 3,541,000 (the 841,000 at inception and 9 years added at $300,000 per year. This deal was negotiated by BG and me simultaneously with our settlement and memorialized on May 19, 2011.  Exhibit B

Additional documents memorializing this understanding were prepared by BG's attorneys and transmitted to my brother, trustee Matthew Durst.    Exhibit C,D,E.

Here's what happened to that offer by BG that would have ended this case not only preserving our ownership – but avoiding what has become over 500,000 in legal fees to half a dozen eager law firms. Yacovelle without any authority or dialogue with me or co trustee Mike Durst – killed the deal.   Exhibit F
See Exhibit F  Page 2 Paragraph 2
"I have rejected the Hladik proposal that we simply modify the termination buyout and kick it down the road for up to 10 years."

Yacovelle's decision cost this trust approximately 4.0 million dollars – and he had no authority to do so. What's more, in Exhibits G and J both (Ex G) Matt Durst and Yacovelle vocalize their (Ex J) lack of expertise in the issues affecting the values being discussed by the parties (BG & me).

But the real reason became evident during the recent depositions as follows. It is freely acknowledged by Yacovelle, Peck and Matt Durst that in summer of 2011 – once I had the first 2

1

legs of the case resolved- that I sought the third and final leg. I directed Matt and Yacovelle to pursue litigation against the appraiser (Paul Ruby of Parker Benjamin Appraisers) for missing the existence of clause 7:04 in the Goodmill Operating Agreement which gave Goodman the right to buy the trust's interest in the shopping center at a cap rate – that rendered our interest valueless. In a letter brief to Judge McDonnell, Yacovelle states Page 2 Par 3 Lines 5-10 "At the repeated insistence and demand of Steve Durst, Matt (and I) explored the feasibility of a malpractice suit against the appraiser. He had obviously been negligent since the appraisal indicated that he had seen the Operating Agreement, but nowhere did he flag Section 7:04 and either attempt to explain it away, or discount his appraisal because of it. He simply missed it or ignored it. Exhibit H

Yacovelle goes on to say in Exhibit H Page 2 Par 2 Lines 11-17
"Connecticut trial counsel however pointed out that no damages had been proximately caused by the negligence because the appraisal was issued after the Operating Agreement had been signed (November 2005) and after the trust had issued a 500,000 note to Steve on December 24, 2007 (based on Steve's 600,000 valuation) and the appraisal influenced neither action because it did not yet exist. The suit therefore was not filed.

   Unfortunately for Yacovelle, Peck testified repeatedly in her recent deposition that she had the appraisal (the 841,000 value) at the time (or prior to) the conversion of the revocable trust to irrevocable on December 24, 2007.

"I believe your question (Peck to Mr. D'Elia) is whether I had the information in that the value was 841 at around the time when it was executed – and the answer to that question is yes" Exhibit I

In an email from Kelley Peck to Matt Durst dated October 25, 2007, Peck stated:
"Matt, I have witnesses if we need them for Saturday morning. However, I want to explore the possibility of delaying the signing until we receive the appraisal. I spoke to Paul Ruby (the appraiser) and he is willing to do the appraisal and will have it for us in about 2 weeks." Ex J

In an email from Matt Durst to Peck sent December 19, 2007
" I want to review the reassessment that Paul Ruby has completed for the Goodmill Shopping Center and sign the documents converting the JB revocable trust to an irrevocable status as we had discussed." Ex K

In an email from Peck to Matt Durst dated October 25, 2007, Peck said
"This is the last document that will need to be reviewed. It makes the LLC interest the collateral for the promissory note in case the trust defaults on a loan payment." Ex L

Exhibit M is page 13 of the Trust accounting filed with Connecticut Probate Court in November 28, 2011 showing the appraiser paid in full on 10/31/2011    Ex M

   So, we have all sorts of exhibits and statements proving the appraisal was done and in Peck's hands in October or November 2007 in time for the December 24, 2007 closing. And we have no less a figure than Yacovelle himself declaring that the appraiser had missed 7:04 and it's possible

H

42

```
1        MR. LEISE:  Objection to form.
2        ANSWER:  -- the information.")
3        MR. LEISE:  I just didn't know what
4   information you meant.  That was my objection.
5   BY MR. D'ELIA:
6        Q.    Okay, to make it clear, you had the
7   information from Parker Benjamin at or about the
8   time that 8(A) was executed that the valuation was
9   $841,000.  Is that fair to say?
10       MR. O'CONNOR:  Objection to form.  I
11  think we are getting completely bolloxed up here.
12       MR. LEISE:  Objection.
13       MR. O'CONNOR:  She is talking about 8
14  in one minute and the next minute you are asking
15  about 8(A) in reference to what she said about 8, so
16  I think we are completely confused here.
17       A.    I believe -- your question is whether
18  I had the information that the value was 841 at
19  around the time when it was executed, and the answer
20  to that question is yes.
21       Q.    When Exhibit 8(A) was executed?
22       A.    I -- the only difference I can see
23  between these two documents is page 1.
24       Q.    Correct.
25       A.    So I don't know when -- I don't think
                CRUZ & COMPANY, LLC
```

43

```
1   there were two different instruments signed.  To the
2   best of my knowledge, they look like the signatures
3   are the same on the two documents.  It doesn't look
4   to me like they are two different documents.
5        Q.    Okay.
6        A.    So I am having a little trouble
7   understanding.  You are saying two different
8   documents were signed.  I don't think this was
9   signed on one day and this was signed on a different
10  day.
11       Q.    Okay.
12       A.    So I am not really understanding your
13  question.
14       MR. D'ELIA:  I would like to take a
15  ten-minute break.
16       (Whereupon, there is a break taken from
17  11:50 a.m. to 12:01 p.m.)
18       Q.    Did there come a time when you had a
19  conversation with Matt, Steve or Mr. Yacovelle
20  concerning a potential claim against Parker
21  Benjamin?
22       A.    Yes, there was Matt -- Matt did tell
23  me that Steve wanted to sue Parker Benjamin.
24       Q.    And did you give any advice with regard
25  to the merits of the claim against Parker Benjamin?
                CRUZ & COMPANY, LLC
```

44

```
1        A.    I am not a litigator, so I really
2   didn't.  I referred him to another attorney in my
3   office who does litigation.
4        MR. LEISE:  Can I make a statement for
5   the record, Vince?  I believe this line of
6   questioning would concern the witness' time at
7   Robinson & Cole.  We are not waiving -- I am going
8   to allow the witness to answer the questions in the
9   spirit of cooperation, but I am not waiving any and
10  all arguments arising from the previous decisions in
11  this case.
12       MR. D'ELIA:  I understand that.
13       MR. LEISE:  Okay.
14       Q.    The attorney at your office that
15  reviewed the potential claim against Parker
16  Benjamin, was that Ed Heath?
17       A.    Yes.
18       Q.    Do you recall having a conversation
19  with Mr. Heath and Mr. Yacovelle concerning the
20  potential claim against Parker Benjamin?
21       A.    I don't specifically recall a
22  conversation with Ed and John Yacovelle.  I only
23  recall a conversation with Matt.  But that doesn't
24  mean it didn't happen.  I just don't recall it.
25       (Exhibit Peck-2, Forward of an e-mail
                CRUZ & COMPANY, LLC
```

45

```
1   from Matthew Durst to Steven Durst of an e-mail from
2   John Yacovelle to Matt Durst dated June 18, 2011, is
3   marked for identification by the court reporter.)
4        Q.    I have marked as Peck-2 a document that
5   appears to be a forward of an e-mail from Matthew
6   Durst to Steven Durst of an e-mail from John
7   Yacovelle to Matt Durst dated June 18, 2011.
8        I don't know if you have ever seen this
9   before.  Do you recognize that e-mail?
10       (Witness reviews document.)
11       A.    I don't.
12       Q.    You don't?
13       A.    But it doesn't mean I haven't seen it.
14  I don't recognize it.
15       Q.    You don't recognize it as you are
16  sitting here now?
17       A.    Correct.
18       Q.    Why don't you read into the record this
19  paragraph where I have my finger, which appears to
20  be the second paragraph of that e-mail?  If you
21  could read that into the record, I have some
22  questions about it.
23       A.    Can I just take a minute?
24       Q.    Sure, read it first.
25       (Witness reviews document.)
                CRUZ & COMPANY, LLC
```

E

## AGREEMENT

THIS AGREEMENT is dated as of December 21, 2007, by and among **STEVEN DURST** ("Steven"), as Grantor, and **MATTHEW DURST** and **REUBEN H. DURST** (the "Trustees"), as Trustees of the Jake Ball Trust dated November 29, 2004 (hereafter the "Jake Ball Trust" or the "Trust").

WHEREAS, the Jake Ball Trust holds the following assets (collectively referred to as the "Trust Property"):

(1) a ten percent (10%) interest in **GOODMILL, LLC,** a limited liability company operating and existing under the laws of the State of New Jersey, having a principal place of business at 636 Old New York Road, 2nd Floor, Jenkinstown, Pennsylvania, 19046, having a net value of Eight Hundred Forty One Thousand Dollars ($841,000), as per the attached appraisal;

(2) a money market account at Pershing, LLC, account number 2110-5728, with a balance as of December 1, 2007 of $50,000.00; and

(3) a savings account at Northwest Community Bank, account number 55000371422, with a balance as of December 1, 2007 of $575.14; and

(4) a checking account at Northwest Community Bank, account number 55000459393, with a balance as of December 1, 2007 of $1,000.00; and

(5) a stock and cash account at Schwab and Company, holding 1,000 shares of Apple and 10,000 shares of Geron, as well as cash, valued as of December 3, 2007, at $254,520; and

(6) 75,000 shares of common stock in Useful Technology, a non-publicly-traded stock of a corporation having a principal place of business at 600 North Pine Island Road, Suite 450, in Plantation, Florida, having a present value of $75,000, as per a letter of appraisal.

WHEREAS, Steven, the Grantor and current beneficiary of the Trust has certain rights under the Jake Ball Trust, including, but not necessarily limited to, the right to alter, amend or revoke the Trust, make withdrawals of all or any part of the income and principal of the Trust, and to change the Trustees of the Trust, including specifically the right to vest title to the Trust Property in his own name (the "Rights"); and

WHEREAS, Steven is willing to relinquish substantially all of his Rights in the Trust by executing the Irrevocable Amendment and Restatement of the Trust Agreement attached hereto as Exhibit A; and

WHEREAS, Steven and the Trustees agree that all of the Trust Property will continue to be held by the Trust following conversion to an irrevocable Trust and, the act of converting the trust to an irrevocable trust constitutes a gift of the Trust Property to the beneficiaries of the Trust; and

## Carol Kulik

| | |
|---|---|
| **From:** | Durst, Matt [MDurst@stfranciscare.org] |
| **Sent:** | Thursday, October 25, 2007 12:37 PM |
| **To:** | Carol Kulik |
| **Subject:** | FW: Signing on Saturday |

~~Can you print this out for Steve so we can go over it tonight~~

Thanks

Matt

**From:** Peck, Kelley [mailto:peck@halloran-sage.com]
**Sent:** Thursday, October 25, 2007 10:47 AM
**To:** Durst, Matt
**Subject:** Signing on Saturday

Matt

I have witnesses if we need them for Saturday morning. However, I want to explore the possibility of delaying the signing until we receive the appraisal. I spoke to Paul Ruby and he is willing to do the appraisal and will have it for us in about 2 weeks. To do so, he needs the Operating Agreement and the appraisal, both of which he does and can give him. He also will need a copy of the 2 mortgage notes and a statement of the relatively exact amount still due (as of the September payment is fine). The whole purpose of this appraisal is to have a professional statement regarding the available discount. If Paul does not have the exact mortgage information as well as a copy of the mortgage paperwork, it calls into question the validity of his entire appraisal, so it is worthwhile to give him the exact info.

I under-estimated the cost a little bit. His fees went up, so it will be $2500. However, with Steve having just come off an audit, I do not want to put him in the position of having another problem with his gift tax returns, so I think it is worth doing. So much so that I am willing to discount my fee by $1000, to make up for the additional cost of the appraisal.

Now to the reason for delay. As you can see from the documents that I sent to you, we will be selling less than the whole 10% interest in the LLC. After our meeting on Tuesday, I agree that using more of the lifetime exemption is a good idea. To accomplish this, however, we need to know the exact appraisal amount before we can decide on the exact % that we are selling and the exact amount of the promissory note - for example it may turn out to be a 5.5% interest and the note may be $492K. I do not want to sign these documents now and then have the numbers inserted later. Since this transaction might be subject to IRS scrutiny, I prefer that it be done "by the book." I also think that using exact numbers in the transaction rather than rounding off numbers is better because it give the transaction greater legitimacy. The whole purpose is to ensure that the transaction looks commercially reasonable. No bank would round off to $500K, so we should not do that either.

know you are anxious to get this done, but we have until the end of the year to do it and it is better to e cautious in these types of transactions. If we get the mortgage information to Paul next week, by fax, -mail or regular mail, he will have the appraisal done in 2 weeks. I know it is convenient that Steve ill be here this weekend, but that should not be the driving factor. We can still meet to discuss the

10/25/2007

## Carol Kulik

| | |
|---|---|
| **From:** | Durst, Matt [MDurst@stfranciscare.org] |
| **Sent:** | Wednesday, December 19, 2007 1:10 PM |
| **To:** | Peck, Kelley |
| **Cc:** | Steve Durst |
| **Subject:** | RE: Signing Meeting |

Hi Kelley,

I want to review the purpose of the meeting on Friday, 12.21/2007.
1. To review the re-assessment that Paul Ruby has completed for the Goodmill Shopping Center and sign the documents converting the JB Revocable Trust to an Irrevocable status as we had discussed.
2. Fund the existing Steve Durst Irrevocable Life Insurance Trust with the current $1, 500,000.00 10 year term policy as we had discussed.
3. Discuss the involvement of Halloran & Sage in preparing the 2007 tax returns for all facets of the JB Trust as well as Steve's personal income tax retern for 2007.

Is there anything else that we will need to review, discuss or ammend?

Matt

**From:** Peck, Kelley [mailto:peck@halloran-sage.com]
**Sent:** Monday, December 17, 2007 11:22 AM
**To:** Durst, Matt
**Subject:** RE: Signing Meeting

OK
see you then

Kelley


elley Galica Peck, JD, LLM
alloran & Sage LLP
elephone: 860-297-4632
ailto:peck@halloran-sage.com

                                        •

S Circular 230 Disclosure: In compliance with Treasury Department Regulations, we inform you that any U.S.
  advice contained in this communication (including any attachments) is not intended or written to be used by
  taxpayer, and cannot be used, for the purpose of: (i) avoiding penalties under the Internal Revenue Code that
  y be imposed on the taxpayer; or (ii) promoting, marketing or recommending to another party any transaction
  natter addressed herein.


n: Durst, Matt [mailto:MDurst@stfranciscare.org]
: Monday, December 17, 2007 10:20 AM
'eck, Kelley

/2007



## Carol Kulik

**From:** Peck, Kelley [peck@halloran-sage.com]

**Sent:** Thursday, October 25, 2007 10:21 AM

**To:** Durst, Matt; Steve Durst

**Subject:** Collateral Agreement

<<1067187_1.DOC>>
This is the last document that will need to be reviewed. It makes the LLC interest the collateral for the promissory note in case the trust defaults on a loan payment

Kelley


### Schedule B-1 (Continued)

| Date Paid | | Amount Paid | Total Paid |
|---|---|---|---|
| | **Northwestern Community Bank (Continued)** | | |
| 11/05/2009 | Service charge | $      2.00 | |
| 12/04/2009 | Service charge | 2.00 | |
| 01/05/2010 | Service charge | 2.00 | |
| 02/05/2010 | Service charge | 2.00 | |
| 03/05/2010 | Service charge | 2.00 | |
| 04/05/2010 | Service charge | 2.00 | |
| 05/05/2010 | Service charge | 2.00 | |
| 06/04/2010 | Service charge | 2.00 | |
| 07/02/2010 | Service charge | 2.00 | |
| 08/05/2010 | Service charge | 2.00 | |
| 09/03/2010 | Service charge | 2.00 | |
| 10/05/2010 | Service charge | 2.00 | |
| 11/24/2010 | Stop payment charge | 25.00 | |
| 03/16/2011 | Overdraft charge | 28.00 | |
| 03/25/2011 | Stop payment charge | 25.00 | |
| 06/03/2011 | Service charge | 2.00 | |
| 07/05/2011 | Service charge | 2.00 | |
| 08/22/2011 | Check order fee | 26.25 | |
| 08/05/2011 | Service charge | 2.00 | |
| 08/19/2011 | Bank charge | 25.00 | |
| | **Total  Northwestern Community Bank** | | $      956.62 |
| | **Note to Goodman Properties for Zack & Jack** | | |
| 01/05/2008 | | $   6,000.00 | |
| | **Total  Note to Goodman Properties for Zack & Jack** | | $   6,000.00 |
| | **P. Benjamin** | | |
| 07/31/2008 | Appraisal (Goodmill, LLC interest) | $   2,500.00 | |
| | **Total  P. Benjamin** | | $   2,500.00 |
| | **Pershing** | | |
| 08/29/2008 | Asset management fee | $      75.00 | |
| 08/31/2009 | Asset management fee | 75.00 | |
| | **Total  Pershing** | | $      150.00 |
| | **Robinson & Cole LLP** | | |
| 03/22/2011 | Legal fees | $   1,890.00 | |
| 06/13/2011 | Tax preparation | 1,090.00 | |
| 09/13/2011 | Legal fees | 4,772.75 | |
| 10/07/2011 | Legal fees | 2,140.00 | |
| 10/13/2011 | Legal fees | 13,000.00 | |
| | **Total  Robinson & Cole LLP** | | $   22,892.75 |

Kelley

Kelley Galica Peck, JD, LLM
Halloran & Sage LLP
Telephone: 860-297-4632
mailto:peck@halloran-sage.com

IRS Circular 230 Disclosure: In compliance with Treasury Department Regulations, we inform you that any U.S.
tax advice contained in this communication (including any attachments) is not intended or written to be used by
any taxpayer, and cannot be used, for the purpose of: (i) avoiding penalties under the Internal Revenue Code that
may be imposed on the taxpayer; or (ii) promoting, marketing or recommending to another party any transaction
or matter addressed herein.

**From:** Durst, Matt [mailto:MDurst@stfranciscare.org]
**Sent:** Sunday, December 16, 2007 5:40 PM
**To:** Peck, Kelley
**Cc:** steve@goodmanproperties.org
**Subject:** RE: Signing Meeting

I spoke to Steve this morning and he has a closing on Tuesday or Wednesday (the exact date is yet to be
determined) of next week and requested that we meet on Friday, 12/21/2007 in the early am.
Please let me know if you are available so I can re-schedule my patient's.

Thanks

Matt

**om:** Peck, Kelley [mailto:peck@halloran-sage.com]
**Sent:** Friday, December 14, 2007 3:50 PM
**To:** gmmbt; Durst, Matt
**Subject:** Signing Meeting

Matt
I understand you need to sign on Tuesday or Wednesday. I am available on the afternoon of
Wednesday, December 19 at 3:30. I could do it a little earlier or a little later, but I have a meeting that
will go until 2:30 and I have to leave by 5:30 for a 6:00 pm meeting. Signing should take no more than
1 hour.

Will that work with your schedules?
Kelley

Kelley Galica Peck, JD, LLM
Halloran & Sage LLP
One Goodwin Square

2/19/2007

**Subject:** RE: Signing Meeting

8:00 am is fine.
I'll re-schedule my patient's.

Matt

**From:** Peck, Kelley [mailto:peck@halloran-sage.com]
**Sent:** Monday, December 17, 2007 9:47 AM
**To:** Durst, Matt
**Subject:** RE: Signing Meeting

We can meet at 8:00. The witnesses wont be here before then. If you prefer, I can meet with Steve and then you can stop by later to sign when you have some free time so that you do not have to cancel patients.

Kelley


Kelley Galica Peck, JD, LLM
Halloran & Sage LLP
Telephone: 860-297-4632
mailto:peck@halloran-sage.com


IRS Circular 230 Disclosure: In compliance with Treasury Department Regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used by any taxpayer, and cannot be used, for the purpose of: (i) avoiding penalties under the Internal Revenue Code that may be imposed on the taxpayer; or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.


**From:** Durst, Matt [mailto:MDurst@stfranciscare.org]
**Sent:** Monday, December 17, 2007 9:44 AM
**To:** Peck, Kelley
**Subject:** RE: Signing Meeting

Let's get together as early as possible, prior to your 9:00 AM appointment.

Thanks

Matt

**From:** Peck, Kelley [mailto:peck@halloran-sage.com]
**Sent:** Monday, December 17, 2007 8:33 AM
**To:** Durst, Matt
**Subject:** RE: Signing Meeting

I have a 9:00 AM and a 10:00 AM appointment on Friday morning. I can do before that or between 11:00 to 12:30. I have a 1:00 out of the office, returning around 2:30 and will be in until 5:00.

terms of the transaction and address any questions Steve or you still have.  We can then target Nov 15 as the settlement date (or any other date before 12/31 that is convenient!!)  This also will give me the time to make any changes to the transaction based on our conversation on Saturday.

Let me know your thoughts and call me to discuss if you prefer.  If I am not in the office, I will call you back from my cell phone

Kelley

Kelley Galica Peck, JD, LLM
Halloran & Sage  LLP
One Goodwin Square
Hartford, CT 06103-4303
Telephone:  860-297-4632
Fax:  860-548-0006
mailto:peck@halloran-sage.com
www.halloran-sage.com

IRS Circular 230 Disclosure:  In compliance with Treasury Department Regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used by any taxpayer, and cannot be used, for the purpose of: (i) avoiding penalties under the Internal Revenue Code that may be imposed on the taxpayer; or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Confidentiality:  The information contained in this e-mail message is intended only for the use of the individual or entity named above and is privileged and confidential. Any dissemination, distribution, or copy of this communication other than to the individual or entity named above is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone.

<<Galica-Peck, Kelley.vcf>>

NOTICE: This email and/or attachments may contain confidential or proprietary information which may be legally privileged. It is intended only for the named recipient(s). If an addressing or transmission error has misdirected this email, please notify the author by replying to this message. If you are not the named recipient, you are not authorized to use, disclose, distribute, make copies or print this email, and should immediately delete it from your computer system.
Saint Francis Care has scanned this email and its attachments for malicious content. However, the recipient should check this email and any attachments for the presence of viruses. Saint Francis Care accepts no liability for any damage caused by any virus transmitted by this email.

J

http://netmail.verizon.net/webmail/driver/nimlet=deggetemail&fn=0

**verizon**                                                                                                    Print

Subject **Fwd: CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**

From: **Matthew Durst <gmmbt@comcast.net>**

Sent:   **Jun 18, 2011 09:52:23 AM**

To:     stevedurst@verizon.net

---

Begin forwarded message:

> **From:** John Yacovelle <yacovelle@yahoo.com>
> **Date:** June 18, 2011 10:18:05 AM EDT
> **To:** gmmbt@comcast.net
> **Subject: CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**
>
> Matt:
> In view of the several calls that have taken place this week (from Peck/Heath, Steve and you), I find it
> necessary to write this so as to clarify the situation regarding Parker Benjamin, Inc. and Paul Ruby.
> Ruby delivered a DRAFT appraisal of the Trust interest in Goodmill dated May 19, 2008, at which time
> he faxed the DRAFT to Kelley Peck. That is what I have--you faxed it to me on July 10 2010. I do not
> know if or when the draft became a final product, but that could be an important date in terms of the
> running of the 3-year Connecticut statute of limitations on negligence claims.
> In any event, the appraisal speaks of value as of 12/31/2007 and assigns the sum of $841,000. As we
> already know, Ruby had before him the Operating Agreement, from which he quoted on page 4 of the
> appraisal. He did not, however, note the existence of paragraph 7.04 which could have rendered the
> interest worthless for some years into the future. Let us assume for purposes of discussion that this
> omission amounted to negligence. Now, in order to be actionable, the negligence has to result in
> damages to the plaintiff--presumably the Trust.
>
> There are two potential areas of damages: the first is that the Trust, when it issued a $500K Note to
> Steve, could have been wasting money on a property of little value (the portion of the valuation
> attributable to Goodmill). Kelley Peck and Ed Heath called me on Thursday the 16th and he pretty
> much demolished that potential claim. He said that the agreement with Steve used the figure $900K as
> the estimated value of the Goodmill interest, a figure he said came from Steve. Regardless of where it
> came from, the agreement was finalized in December 2007, several months before the draft appraisal
> let alone the final appraisal. Therefore, you could not have relied on the appraisal valuation of $841K
> in the agreement with Steve. In other words, the damages on this theory were clearly not proximately
> caused by the appraiser's assumed negligence. I agree with that conclusion completely.
>
> The second potential area of damages only comes clearly into focus if we try our case and lose it. In
> that case, Goodman will pick up the 10% interest free of charge rather than at the value the appraiser
> assigned. There are still some problems to be confronted: one, when was the report finalized? Was it
> more than three years ago, and if so, is the claim then barred by the statute of limitations? Or, would it
> be true under Connecticut law that the claim would not accrue (that is the statute would not begin to

run) until damages were actually suffered--that is if and when we lose the case? I do not know the answers to these questions because a) I don't know when the appraisal was finalized and b) I don't know Connecticut law. These are questions you have to ask the proposed attorney very early on. It may be that the only way you can protect against a statute of limitations problem if we lose the case is to file suit immediately; but if the claim does not accrue until we lose it, then the statute of limitations is not a problem. There is, however, another potential problem: the Goodmill agreement was signed by Steve (in your name) on November 15, 2005 (or 2006, depending upon which version of the agreement you believe). It is pretty clear that a) he didn't read it; and b) that a lot of time passed before you even saw it. Now, along comes Ruby in 2008 and says the interest is worth $841K; suppose, instead, he said it was worthless or, speculating on the likelihood of termination, discounted it by 80% and said it was worth $168K. What would the Trust have done differently as of May or June of 2008 than what it actually did? The Operating Agreement was signed, a done deal. The Trust could have started suit to have the provision declared invalid (before any termination) or Steve could have negotiated some kind of a buyout of the interest with Goodman, etc., etc. But these are pretty speculative moves and the question for the attorney is whether, assuming we lose our case, the issuance of the appraisal in 2008 without calling attention to the precarious position the Trust was in proximately caused the Trust to wind up with a goose egg.

I do not want to express an opinion on a Connecticut case, but the more I think about this the more problems I see. There is no harm in you running it by a lawyer at a very early date, but my instinct is that it will probably not turn out well. By the way, I do not plan on losing our case. At the present time, I have rejected the Hladik proposal that we simply modify the termination buyout (maybe a little tweaking of the cap rate, etc., and kick it down the road for up to ten years. I am insisting on the provision being inapplicable to the Trust. Whether it remains applicable to Andersen is of no interest to us. I will keep the heat on and let you know when I hear anything.
J.A.Y.
P.S. Feel free to share this with Steve if you wish.

K

# TABLE OF CONTENTS

**INTRODUCTION**                                                                        1

**I. DEFENDANT OBJECTS TO RECEIPT OR CONSIDERATION BY THE COURT OF EXHIBIT "P" ATTACHED TO PLAINTIFFS' BRIEF ON THE GROUND THAT THE FIRST PAGE OF THIS EXHIBIT HAS BEEN ALTERED AND ITS SUBMISSION AMOUNTS TO A FRAUD UPON THE DEFENSE AND UPON THE COURT.** 2

**II. THE CLAIM THAT A DUTY WAS OWED BY COUNSEL FOR MATTHEW DURST, TRUSTEE OF THE JAKE BALL TRUST, TO SOME OF THE BENEFICIARIES OF THE TRUST HAS APPARENTLY BEEN ABANDONED.**                                           4

**III. REUBEN DURST IS NOT A "SUCCESSOR TRUSTEE" AND IS NOT OWED A DUTY BY THE ATTORNEY FOR MATTHEW DURST, TRUSTEE.**                                                          5

**IV. THE MOTION TO DISQUALIFY YACOVELLE AS ATTORNEY FOR MATTHEW DURST SHOULD BE DENIED.**                  14

**A.   THE MOTION TO DISQUALIFY MATTHEW DURST'S ATTORNEY ON "CONFLICT" GROUNDS SHOULD BE DENIED.**
                                                                          16

**B. THE MOTION TO DISQUALIFY COUNSEL ON THE GROUND THAT HE IS A NECESSARY WITNESS SHOULD ALSO BE DENIED.**                                                        19

**CONCLUSION**                                                            24

A reading of the actual brief filed by plaintiffs shows that plaintiffs have apparently abandoned their argument that a duty was owed to the beneficiaries, have raised a hitherto-unmentioned argument regarding the standing of Reuben Durst to maintain a malpractice action, and have re-briefed their motion to disqualify counsel.

## ARGUMENT

## I.  DEFENDANT OBJECTS TO RECEIPT OR CONSIDERATION BY THE COURT OF EXHIBIT "P" ATTACHED TO PLAINTIFFS' BRIEF ON THE GROUND THAT THE FIRST PAGE OF THIS EXHIBIT HAS BEEN ALTERED AND ITS SUBMISSION AMOUNTS TO A FRAUD UPON THE DEFENSE AND UPON THE COURT.

Before getting to the substantive matters to be addressed, it is unfortunately necessary to address another matter.    Throughout prior phases of this litigation there has been frequent reference to a certain Agreement dated December 21, 2007 between Steven Durst (Grantor) and Matthew Durst and Reuben Durst (Trustees), a copy of which is attached hereto as Exhibit 2.  The Agreement was signed and notarized as to all signatories on the "date first written above".   It referenced, as number (1) in the first Whereas clause, the ownership by the Trust of a 10% interest in Goodmill, LLC, and valued that interest at $600,000 "as per the attached appraisal".  No appraisal was attached and no appraisal in that amount has ever surfaced in the overall litigation. (MDurst Aff. (attached) par. 2) That valuation figure is believed to have been furnished entirely by Steve Durst.

2



L

# ROBINSON & COLE LLP

Page:               2
Date:        August 30, 2011
Invoice #:        50037431

For Services through July 31, 2011

File # 31762.0001
Trust Administration

| Date | Timekeeper | Description | Hours | |
|------|-----------|-------------|-------|---|
| 05/09/11 | K. Galica Peck | Review file re copies of communications, forward information to J. Yacovelle and M. Durst. | 2.00 | |
| 05/10/11 | C. Welch | Review incoming documents from M. Durst; update the 2010 U.S. Income Tax Return for Estates and Trusts. | 0.50 | |
| 05/18/11 | K. Galica Peck | Review K-1's for Reserve; telephone conference with M. Durst re same. | 0.50 | |
| 05/20/11 | C. Welch | Review incoming K-1 from The Reserve at Union Lake LLC; revise U.S. Income Tax Return for Estates and Trusts. | 0.70 | |
| 05/24/11 | K. Galica Peck | Review facts and analysis of cause of action options with E. Heath; follow-up with M. Durst. | 0.40 | ✓ |
| 05/24/11 | E. Heath | Office conference Atty Peck re analysis of potential claim. | 0.60 | ✓ |
| 05/26/11 | C. Welch | Prepare 2010 U.S. Income Tax Return for Estates and Trusts and New Jersey Income Tax Return for Trusts and Estates; preparation of file memo re Pennsylvania Schedules NRK-1s. | 2.00 | |
| 05/31/11 | K. Galica Peck | Conference call re possible suit against appraiser. | 0.50 | ✓ |
| 05/31/11 | E. Heath | Telephone conference re scope of project. | 0.50 | |
| 6/07/11 | K. Galica Peck | Meet with E. Heath re potential appraiser suit; review file information for facts. | 1.20 | ✓ |
| 6/07/11 | E. Heath | Review client documents; analysis of potential claims; office conference Atty Peck re same. | 1.20 | ✓ |
| 6/14/11 | K. Galica Peck | Telephone conference with M. Durst re appraiser suit. | 0.10 | ✓ |
| 6/15/11 | E. Heath | Analysis of claim against appraiser. | 0.70 | ✓ |
| 16/11 | K. Galica Peck | Telephone conference with J. Yacovelle re potential suit; telephone conference R. Knotek re fiduciary income tax return (CPA). | 0.80 | ✓ |
| 16/11 | E. Heath | Prepare telephone conference client re analysis of claim against appraiser; telephone conference counsel re same; office conference Atty Peck re same. | 0.60 | ✓ |
| 2/11 | K. Galica Peck | Telephone conference with M. Durst re suit. | 0.30 | |
| 3/11 | K. Galica Peck | Telephone conference with Matt re new acquisition of power station. | 0.30 | |
| 7/11 | K. Galica Peck | Follow-up regarding fiduciary income tax return. | 0.20 | |
| 7/11 | C Welch | Review and revise 2010 U.S. Fiduciary Income Tax Return. | 2.00 | |
| 7/11 | P. Kingsley-Bryda | Review draft of federal income tax return re: reporting of information for passthrough entities; office conference re. same | 1.30 | |

EXHIBIT

PECK- 5

JSekella          04/29/15

M

Print

**veri**z**on**

Subject **Fwd: CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**

From: **Matthew Durst <gmmbt@comcast.net>**

Sent:  **Jun 18, 2011 09:52:23 AM**

To:    stevedurst@verizon.net

---

Begin forwarded message:

**From:** John Yacovelle <yacovelle@yahoo.com>
**Date:** June 18, 2011 10:18:05 AM EDT
**To:** gmmbt@comcast.net
**Subject: CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION**

Matt:
In view of the several calls that have taken place this week (from Peck/Heath, Steve and you), I find it
necessary to write this so as to clarify the situation regarding Parker Benjamin, Inc. and Paul Ruby.
Ruby delivered a DRAFT appraisal of the Trust interest in Goodmill dated May 19, 2008, at which time
he faxed the DRAFT to Kelley Peck.  That is what I have--you faxed it to me on July 10 2010.  I do not
know if or when the draft became a final product, but that could be an important date in terms of the
running of the 3-year Connecticut statute of limitations on negligence claims.
In any event, the appraisal speaks of value as of 12/31/2007 and assigns the sum of $841,000.  As we
already know, Ruby had before him the Operating Agreement, from which he quoted on page 4 of the
appraisal.  He did not, however, note the existence of paragraph 7.04 which could have rendered the
interest worthless for some years into the future.  Let us assume for purposes of discussion that this
omission amounted to negligence.  Now, in order to be actionable, the negligence has to result in
damages to the plaintiff--presumably the Trust.

There are two potential areas of damages: the first is that the Trust, when it issued a $500K Note to
Steve, could have been wasting money on a property of little value (the portion of the valuation
attributable to Goodmill).  Kelley Peck and Ed Heath called me on Thursday the 16th and he pretty
much demolished that potential claim.  He said that the agreement with Steve used the figure $900K as
the estimated value of the Goodmill interest, a figure he said came from Steve.  Regardless of where it
came from, the agreement was finalized in December 2007, several months before the draft appraisal
let alone the final appraisal.  Therefore, you could not have relied on the appraisal valuation of $841K
in the agreement with Steve.  In other words, the damages on this theory were clearly not proximately
caused by the appraiser's assumed negligence.  I agree with that conclusion completely.

The second potential area of damages only comes clearly into focus if we try our case and lose it.  In
that case, Goodman will pick up the 10% interest free of charge rather than at the value the appraiser
assigned.  There are still some problems to be confronted: one, when was the report finalized?  Was it
more than three years ago, and if so, is the claim then barred by the statute of limitations?  Or, would it
be true under Connecticut law that the claim would not accrue (that is the statute would not begin to

run) until damages were actually suffered--that is if and when we lose the case? I do not know the answers to these questions because a) I don't know when the appraisal was finalized and b) I don't know Connecticut law. These are questions you have to ask the proposed attorney very early on. It may be that the only way you can protect against a statute of limitations problem if we lose the case is to file suit immediately; but if the claim does not accrue until we lose it, then the statute of limitations is not a problem. There is, however, another potential problem: the Goodmill agreement was signed by Steve (in your name) on November 15, 2005 (or 2006, depending upon which version of the agreement you believe). It is pretty clear that a) he didn't read it; and b) that a lot of time passed before you even saw it. Now, along comes Ruby in 2008 and says the interest is worth $841K; suppose, instead, he said it was worthless or, speculating on the likelihood of termination, discounted it by 80% and said it was worth $168K. What would the Trust have done differently as of May or June of 2008 than what it actually did? The Operating Agreement was signed, a done deal. The Trust could have started suit to have the provision declared invalid (before any termination) or Steve could have negotiated some kind of a buyout of the interest with Goodman, etc., etc. But these are pretty speculative moves and the question for the attorney is whether, assuming we lose our case, the issuance of the appraisal in 2008 without calling attention to the precarious position the Trust was in proximately caused the Trust to wind up with a goose egg.

I do not want to express an opinion on a Connecticut case, but the more I think about this the more problems I see. There is no harm in you running it by a lawyer at a very early date, but my instinct is that it will probably not turn out well. By the way, I do not plan on losing our case. At the present time, I have rejected the Hladik proposal that we simply modify the termination buyout (maybe a little tweaking of the cap rate, etc., and kick it down the road for up to ten years. I am insisting on the provision being inapplicable to the Trust. Whether it remains applicable to Andersen is of no interest to us. I will keep the heat on and let you know when I hear anything.
J.A.Y.
P.S. Feel free to share this with Steve if you wish.

N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

REUBEN DURST, Trustee, and          Civil No. 12-5255 (JBS/AMD)
STEVEN DURST, Individually and
as Trustee,

                Plaintiffs,

        v.

MATTHEW DURST, et al.,

                Defendants.

### AMENDED SCHEDULING ORDER

        The Court having conducted a telephone status
conference on the record on April 9, 2015; and for good cause
shown:

        IT IS on this **10th** day of **April 2015**, hereby **ORDERED**:

        1. As set forth on the record, pretrial factual
discovery is hereby extended to **May 11, 2015**, for the limited
purpose of completing the depositions of Matthew Durst, Kelley
Galica-Peck and Reuben Durst.

        2. **Depositions**. All depositions are to be conducted
in accordance with the procedures set forth in the order of
Judge Gawthrop, in *Hall v. Clifton Precision*, 150 F.R.D. 525
(E.D. Pa. 1993).

        3. All expert reports and expert disclosures pursuant
to FED. R. CIV. P. 26(a)(2) on behalf of Plaintiffs shall be
served upon counsel for Defendants not later than **June 11, 2015**.
All expert reports and expert disclosures pursuant to FED. R. CIV.
P. 26(a)(2) on behalf of Defendants shall be served upon counsel
for Plaintiffs not later than **July 10, 2015**. Each such report
should be accompanied by the *curriculum vitae* of the proposed
expert witness. No expert opinion testimony shall be admitted at
trial with respect to any witness for whom this procedure has

not been timely followed. Depositions of proposed expert
witnesses shall be concluded by **July 31, 2015.**

The parties shall also exchange, in accordance with
the foregoing schedule, written statements identifying all
opinion testimony counsel and the parties anticipate will be
presented at trial pursuant to FED. R. EVID. 701 and *Teen-Ed v.
Kimball International, Inc.*, 620 F.2d 399 (3d Cir. 1980).

4. **Dispositive Motions.** Dispositive motions shall be
filed with the Clerk of the Court no later than **August 14, 2015.**
Opposition to the motion should be served in a timely fashion.
Counsel are to follow L. CIV. R. 7.1, 7.2, 56.1 and 78.1 (Motion
Practice - Generally).

5. Any application for an extension of time beyond the
deadlines set herein shall be made in writing to the undersigned
and served upon all counsel prior to expiration of the period
sought to be extended, and shall disclose in the application all
such extensions previously obtained, the precise reasons
necessitating the application showing good cause under FED. R.
CIV. P. 16(b), and whether adversary counsel agree with the
application. The schedule set herein will not be extended unless
good cause is shown.

**THE FAILURE OF A PARTY OR ATTORNEY TO OBEY THIS ORDER
MAY RESULT IN THE IMPOSITION OF SANCTIONS UNDER FED. R. CIV. P.
16(f).**

s/ Ann Marie Donio
ANN MARIE DONIO
UNITED STATES MAGISTRATE JUDGE

cc: Hon. Jerome B. Simandle

2

**Kim Yoos**

| | |
|---|---|
| **From:** | Vincent D'Elia <delia@delialawfirm.com> |
| **Sent:** | Friday, April 10, 2015 2:35 PM |
| **To:** | 'KIM YOOS' |
| **Cc:** | 'TERESA LENTINI' |
| **Subject:** | FW: Activity in Case 1:12-cv-05255-JBS-AMD JAKE BALL TRUST et al v. DURST Scheduling Order |

Copies please

**From:** njdefiling@njd.uscourts.gov [mailto:njdefiling@njd.uscourts.gov]
**Sent:** Friday, April 10, 2015 1:10 PM
**To:** njdefiling@njd.uscourts.gov
**Subject:** Activity in Case 1:12-cv-05255-JBS-AMD JAKE BALL TRUST et al v. DURST Scheduling Order

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of New Jersey [LIVE]

### Notice of Electronic Filing

The following transaction was entered on 4/10/2015 at 1:10 PM EDT and filed on 4/10/2015
**Case Name:**    JAKE BALL TRUST et al v. DURST
**Case Number:**    1:12-cv-05255-JBS-AMD
**Filer:**
**Document Number:** 116

**Docket Text:**
**AMENDED SCHEDULING ORDER: Discovery due by 5/11/2015. Disp. Motions due by 8/14/2015, etc. Signed by Magistrate Judge Ann Marie Donio on 4/10/15. (js)**

**1:12-cv-05255-JBS-AMD Notice has been electronically mailed to:**

CHRISTOPHER PHILIP LEISE    leisec@whiteandwilliams.com, clostab@whiteandwilliams.com, mcfaddend@whiteandwilliams.com, siegeln@whiteandwilliams.com

JASON AARON LANDRO    landroj@whiteandwilliams.com, suarezp@whiteandwilliams.com

1